SIDLEY AUSTIN LLP
Samuel A. Newman (SBN 217042)
(sam.newman@sidley.com)
Julia Philips Roth (SBN 324987)
(julia.roth@sidley.com)
555 West Fifth Street
Los Angeles, CA 90013
Telephone: 213.896.6000
Facsimile: 213.896.6600

SIDLEY AUSTIN LLP
Charles M. Persons (*pro hac vice* pending)
(cpersons@sidley.com)
Juliana Hoffman (*pro hac vice* pending)
(jhoffman@sidley.com)
Jeri Leigh Miller (*pro hac vice* pending)
(jeri.miller@sidley.com)
2021 McKinney Avenue
Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Facsimile: 214.981.3400

*Proposed Attorneys for Debtors and
Debtors in Possession*

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>WAVE COMPUTING, INC., *et al.*,<br><br>　　　　Debtors.[1] | Case No. 20-50682 (MEH)<br><br>Chapter 11 (Joint Administration Requested)<br><br>Assigned to the Hon. M. Elaine Hammond<br><br>**DECLARATION OF LAWRENCE R. PERKINS IN SUPPORT OF THE DIP FINANCING MOTION**<br><br>Hearing Scheduled:<br>Date:　April 28, 2020<br>Time:　2:00 p.m. (Pacific Time)<br>Place:　280 South 1st St.<br>　　　　San Jose, CA 95113-3099 |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Wave Computing, Inc. (4264), MIPS Tech, Inc. (8247), Hellosoft, Inc. (8640), Wave Computing (UK) Limited (None), Imagination Technologies, Inc. (6967), Caustic Graphics, Inc. (7272), and MIPS Tech, LLC (2161). The Debtors' mailing address is 3201 Scott Blvd, Santa Clara, CA 95054.

1

I, Lawrence R. Perkins, being duly sworn, state the following under penalty of perjury:

1. I am the Chief Executive Officer at SierraConstellation Partners ("SCP") and the Chief Restructuring Officer to Wave Computing, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). I have over 18 years of management consulting and advisory experience with distressed companies or companies undergoing transition and have served as a financial advisor to the Debtors since April 2020. Through this role, I have become generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am authorized to make this declaration (the "Declaration") on behalf of the Debtors and SCP. Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.[2]

2. I submit this declaration in support of the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, and 364 for Orders Authorizing (I) Postpetition Financing; (II) Cash Collateral Use; (III) Adequate Protection to Existing Secured Parties; (IV) Liens and Superpriority Claims; and (V) Modifying the Automatic Stay* (the "DIP Financing Motion"),[3] which among other things seeks authority to (i) obtain approximately $27.9 million of secured, superpriority postpetition financing (the "DIP Facility"), consisting of $14.5 million in a new money revolving loan facility (the "New Money DIP Loan Facility") and approximately $13.4 million in a refinancing term loan facility (the "Refinancing DIP Loan Facility") that will refinance the Debtors' prepetition first lien secured debt upon entry of a final order; and (ii) approve the terms and conditions governing the Debtors' use of cash collateral.[4]

3. In particular, I submit this Declaration in support of my view that the DIP Facility: (i) is the product of arm's-length, good-faith negotiation processes; (ii) is, in light of the marketing process

---

[2] Certain disclosures herein relate to matters within the personal knowledge of other professionals at SCP and are based on information provided by them.

[3] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Financing Motion.

[4] The material terms of the proposed DIP Facility are described in detail in the DIP Financing Motion. For the avoidance of doubt, in the event of conflict among any description of the proposed terms of the DIP Facility herein, in the DIP Financing Motion, or in the DIP Note, the terms of the DIP Note will control.

and negotiations described below, the best presently available postpetition financing option for the Debtors; and (iii) contains reasonable and appropriate financial terms and conditions under the circumstances.

4. The statements in this Declaration are, except as otherwise indicated, based on my personal knowledge or views, on information that I have obtained from the Debtors and their other advisors or from the Debtors' books and records, and from information obtained from SCP personnel working directly with me and under my supervision. I am not being specifically compensated for this testimony other than through payments to be received by SCP for my role as the Debtors' Chief Restructuring Officer. I am over the age of 18 years and am authorized to submit this Declaration. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

**I.    BACKGROUND AND QUALIFICATIONS**

5. I am the Chief Executive Officer and Founder of SCP, with eighteen years of management consulting and advisory experience in restructuring matters. I have extensive experience representing debtors in bankruptcy and out-of-court restructurings, providing due diligence on behalf of parties in interest, implementing operational changes, managing businesses, negotiating new and existing financing agreements, and performing estate wind-down and trustee-related services. In connection with this experience, I have held such positions as Chief Restructuring Officer, Principal Investor, Turnaround Advisor, Strategic Consultant, Investment Banker, Financial Executive, and Crisis Manager to numerous middle market companies and am particularly skilled in assisting companies by providing crisis management services. Prior to founding SCP in January 2013, I was a Senior Managing Director and Regional Leader of a national turnaround consulting firm where I was responsible for business development, marketing, staffing, and general management of the firm's presence in the region west of the Mississippi River. As Chief Restructuring Officer, I am principally responsible for the marketing and negotiation of debtor in possession ("DIP") financing facility for these Chapter 11 Cases.

6. I started my career in the strategic consulting group of Arthur Andersen after graduating from the University of Southern California Marshall School of Business with a Bachelor of Science

degree in Business Administration – Finance. Thereafter, I transitioned into restructuring and management consulting.

7. In addition to working with the Debtors in the above-captioned cases, I have served as Chief Restructuring Officer in numerous out-of-court restructurings as well as various chapter 11 cases, including but not limited to the following: *In re CFO Mgmt. Holdings, LLC*, Case No. 19-40426 (Bankr. E.D. Tex. 2019); *In re Woodbridge Grp. of Cos. LLC*, Case No. 17-12560 (Bankr. D. Del. 2017); *In re Katy Indus., Inc.*, Case No. 17-11101 (Bankr. D. Del. 2017); *In re Liberty Asset Mgmt. Corp.*, Case No. 16-13575 (Bankr. C.D. Cal. 2016); *In re Bethel Healthcare, Inc. & Corinthian Sub-Acute & Rehab. Ctr., Inc.*, Case No. 13-12220 (Bankr. C.D. Cal. 2013); and *In re The Fuller Brush Co., Inc.*, Case No. 12-10714 (Bankr. S.D.N.Y. 2012). In addition, I have been involved in dozens of in-court and out-of-court restructurings in other roles, including serving as a Deputy Chief Restructuring Officer, Interim Chief Executive Officer, Interim Chief Financial Officer, and financial advisor.

8. I was engaged by the company prepetition as Chief Restructuring Officer in April 2020. SCP was engaged simultaneously to provide CRO support services in conjunction with my role. Since our engagement, I have worked in conjunction with the Debtors' management and other restructuring professionals to familiarize myself with the Debtors' capital structure, liquidity needs, and business operations. Additionally, I have been actively engaged in the both the marketing and negotiation of a DIP financing facility to finance the Debtors' restructuring through these Chapter 11 Cases.

## II. DEBTORS' NEED FOR DIP FINANCING AND ACCESS TO CASH COLLATERAL

9. As described in the First Day Declaration, the Debtors are privately-traded, independent technology companies engaged in the development and sale of intellectual property technology. The Debtors have limited liquidity, with the only consistent cash flow coming from the collection of royalty payments. In addition, the Debtors expect to obtain limited additional liquidity postpetition from the second of two lump sum payments pursuant to an executed settlement agreement. In the ordinary course, the Debtors have obligations relating to vendors, utility providers, payroll, professional fees, taxes, insurance obligations, and their prepetition first lien debt, all of which must be paid on a weekly, biweekly, monthly, or quarterly basis.

10. I have worked with the Debtors in connection with the evaluation of their financing and funding alternatives. In connection with this work, I have come to understand that the Debtors will be unable to maintain business operations absent the infusion of additional liquidity and access to cash collateral. Accordingly, I have assisted in the marketing and negotiation of a DIP financing facility to fund these Chapter 11 Cases.

### III. MARKETING PROCESS AND PROPOSALS RECEIVED

11. The debt markets have experienced a high level of uncertainty in the past several weeks due to concerns surrounding the global pandemic. Specifically, the back half of March and early April have reflected conditions largely closed to new financings as portfolio managers turned inward to review their current outstanding debt, looking to quantify risk, and determine areas of future interest. Credit markets began to open back up after the United States Federal Government rolled out multiple stimulus initiatives, but to date, pricing terms are still difficult to quantify.

12. It was in the midst of this crisis that the Debtors were forced to begin marketing for a DIP loan. Prior to SCP's engagement, the Debtors approached eight (8) firms for financing. Six (6) of those firms declined to engage on the basis of the Debtors' credit. The other two firms—Tallwood Technology Partners LLC (the "DIP Lender") and a third-party investment group—each submitted financing proposals for consideration.

13. The investment group proposed a $12 million priming DIP facility with maturity set at the earlier of sixty (60) days after commencement of the Chapter 11 Cases or one hundred eighty (180) days following closing. Interest was proposed at LIBOR plus thirty percent (30%) paid monthly cash in arrears and a ten percent (10% origination fee). Finally, the Debtors would be subject to a ten percent (10%) make-whole prepayment premium in the event certain of their assets were sold to anyone other than the investment group.

14. By comparison, the DIP Lender proposed a $26 million DIP facility with a six-month term, ten percent (10%) interest rate, no origination fee, and no prepayment premium. Following extended negotiations, the DIP Lender agreed to reduce its proposed interest by half and to increase the overall size of the DIP to ensure the Debtors' liquidity needs were met.

15. Upon my retention, I was asked by the Debtors' independent director to market test the pricing and terms of the DIP Lender's proposal against other potential DIP providers. Accordingly, SCP personnel contacted an additional twenty-two (22) potential DIP providers. Of those providers contacted, five (5) declined to submit a proposal, fourteen (14) requested a teaser but failed to engage otherwise, and two (2) executed non-disclosure agreements but failed to submit a proposal. I was informed that, in addition to the uncertainty from the global pandemic, interest was reduced by the small sizing of the DIP facility and the lack of collateral available to fit an ABL structure, which is typical of most DIP financings.

## IV. PROPOSED DIP FACILITY REPRESENTS THE BEST CURRENTLY AVAILABLE FINANCING OPTION FOR THE DEBTORS AND SHOULD BE APPROVED

16. Of the two proposals received, the DIP Lender's proposal makes better economic sense for these Chapter 11 Cases. Under the DIP Lender's proposal, the Debtors will save a significant amount in interest and origination fees over the course of the DIP Facility, as they will be paying only five percent (5%) interest on the DIP Facility as opposed to the proposed thirty percent (30%) interest and ten percent (10%) origination fee. In addition, the Debtors will avoid a costly priming fight with the DIP Lender, who is also their prepetition lender under that certain Secured Promissory Note, as originally dated July 5, 2019 and as amended and restated February 12, 2020, between Tallwood Technology Partners LLC, as lender, and Wave Computing, Inc., as borrower (the "<u>Prepetition Note</u>") and who holds a perfected first priority lien in substantially all of the Debtors' assets (the "<u>Collateral</u>")[5] as a result of the liens and security interests granted thereunder (the "<u>Prepetition First Liens</u>").[6] Finally, the Debtors will save significant cash on account of the Prepetition Note, as the DIP Lender has agreed to accept the administrative and superpriority protections granted in the DIP Facility in lieu of adequate protection payments.

---

[5] Although not borrowers under the Prepetition Note, each of Wave Computing Inc.'s subsidiaries signed on as note parties thereto. As note parties, each of the subsidiaries pledged substantially all of their assets as collateral to secure Prepetition Note and provided guaranties in favor of the lender with respect to the Prepetition Note.

[6] A UCC-1 with respect to the Prepetition Note was filed with the Delaware Secretary of State on January 3, 2020.

17. In light of these concessions, the Debtors determined in their sound business judgment and in consultation with myself and their other restructuring professionals, that the DIP Facility offered by the DIP Lenders was the best and only actionable option available.

18. The DIP Facility does contain certain terms that have been identified by the Court in its *Guidelines for Cash Collateral and Financing Motions and Stipulations* as provisions that are not ordinarily approved. Specifically, the DIP Facility provides for the repayment in full of the Prepetition Note through the Refinancing DIP Loan Facility, stipulates as to the validity, perfection, priority, and enforceability of the Prepetition Note and Prepetition First Liens (subject to the rights of all parties to challenge such debt and/or liens during the Committee Review Period), releases the DIP Lender from all causes of action relating to the Prepetition Note, Prepetition First Liens, and DIP Facility (subject to the rights of all parties during the Committee Review Period), contains certain Events of Default that limit the Debtors ability to file a plan of reorganization or liquidation or seek the use of any Collateral without the DIP Lender's consent, and, subject to the Carve-Our, waives the Debtors right to surcharge the Collateral for administrative costs or expenses.

19. It is my belief that the DIP Lender would not have been willing to provide the DIP Facility or any of the New Money DIP Loan Facility without the inclusion of the terms referenced above. The DIP Facility went through several rounds of arms'-length negotiations, whereby the Debtors were able to obtain significant concessions from the DIP Lender. At no point during these negotiations did the DIP Lender waiver on its general unwillingness to make the loan if these disfavored terms were not included. Absent the DIP Facility, the Debtors would lack the liquidity to restructure successfully, which would detrimentally affect the Debtors' estates, their creditors, and other parties in interest.

20. Based on the prepetition marketing and negotiation processes, along with my understanding of the Debtors' lack of unencumbered assets, I believe the DIP Facility contains the most favorable terms currently available to the Debtors and are in the best interests of the Debtors, their creditors, and their estates. I believe the DIP Facility is the product of arms'-length, good faith negotiations with the DIP Lender and are reasonable and appropriate under the circumstances.

21. I base my opinion not only on the marketing process we conducted, but also on comparing the terms of the DIP Facility with other debtor in possession loans in recent chapter 11 cases. *See In re Air Force Village West, Inc.*, Case No. 16-11920 (Bankr. C.D. Cal. 2019) (approving DIP financing that contained several disfavored provisions, including the rollup of approximately $3.9 million of prepetition debt into an $8.15 million DIP facility and tight sale milestones); *In re Channel Techs. Grps., LLC*, Case No. 16-11912 (Bankr. C.D. Cal. 2016) (approving DIP financing that rolled up approximately $2.86 million of prepetition debt into a $5 million DIP facility and that contained stipulations as to the prepetition debt's validity, priority, and enforceability); *In re Freedom Commc'ns*, 15-15311 (Bankr. C.D. Cal. 2015) (approving DIP financing that rolled up approximately $17.2 million of prepetition debt into a $21.7 million DIP facility and that included stipulation as to prepetition debt's validity, priority, and enforceability and section 506(c) waiver); *In re Anna's Linens, Inc.*, Case No. 15-13008 (Bankr. C.D. Cal. 2015) (approving DIP financing that rolled up approximately $64.6 million of prepetition debt into a $80 million DIP facility and that included stipulation as to prepetition debt's validity, priority, and enforceability).

## V. DEBTORS ARE UNABLE TO OBTAIN UNSECURED OR JUNIOR SECURED DEBT

22. No party presented the Debtors or their advisors with a feasible proposal for unsecured or junior secured credit. The only proposals received were on a superpriority or priming basis with respect to some portion, or all, of the Debtors' assets. The DIP Lender was unwilling to provide the DIP Facility on any other terms, and no existing stakeholder offered better terms. I believe the Debtors' efforts to seek the necessary postpetition financing from sources within the Debtors' existing capital structure and from third-parties were reasonable and sufficient. Thus, I believe the Debtors made appropriate and sufficient efforts to confirm that postpetition financing is not available on an unsecured or junior secured basis.

## VI. ENTRY INTO THE DIP FACILITY IS A SOUND EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT

23. I believe that the Debtors and their board of directors, with the assistance of myself, SCP, and the Debtors' other restructuring professionals, after significant discussion reasonably determined that a postpetition credit facility was appropriate and necessary. After appropriate

examination and analysis by the Debtors' management and their professionals, including myself, the Debtors have concluded that the DIP Facility provides the necessary liquidity to allow the Debtors to achieve a successful restructuring in these Chapter 11 Cases.  In light of this, I believe the Debtors' decision to enter into the DIP Facility was a sound exercise of their business judgment.

## VII. CONCLUSION

24. In sum, based on my experience and my involvement in assisting the Debtors with the marketing and negotiation of the DIP Facility in this matter, it is my view that the DIP Facility represents the best presently-available postpetition financing option for the Debtors and contains terms that are reasonable under the circumstances.  Further, I believe that the negotiation process was conducted at arm's length and in good faith.

//

//

//

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 27th day of April, 2020

Lawrence R. Perkins, Chief Executive Officer
SierraConstellation Partners LLC

*Proposed Chief Restructuring Officer for Debtors and Debtors in Possession*