SIDLEY AUSTIN LLP
Samuel A. Newman (SBN 217042)
(sam.newman@sidley.com)
Julia Philips Roth (SBN 324987)
(julia.roth@sidley.com)
555 West Fifth Street
Los Angeles, CA 90013
Telephone: 213.896.6000
Facsimile: 213.896.6600

SIDLEY AUSTIN LLP
Charles M. Persons (*pro hac vice* pending)
(cpersons@sidley.com)
Juliana Hoffman (*pro hac vice* pending)
(jhoffman@sidley.com)
Jeri Leigh Miller (*pro hac vice* pending)
(jeri.miller@sidley.com)
2021 McKinney Avenue
Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Facsimile: 214.981.3400

*Proposed Attorneys for Debtors and
Debtors in Possession*

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>WAVE COMPUTING, INC., *et al.*,<br><br>Debtors.[1] | Case No. 20-50682 (MEH)<br><br>Chapter 11 (Joint Administration Requested)<br><br>Assigned to the Hon. M. Elaine Hammond<br><br>**DECLARATION OF LAWRENCE R. PERKINS IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**<br><br><u>Hearing Scheduled</u>:<br>Date: April 28, 2020<br>Time: 2:00 p.m. (Pacific)<br>Place: 280 South 1st St.<br>      San Jose, CA 95113-3099 |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Wave Computing, Inc. (4264), MIPS Tech, Inc. (8247), Hellosoft, Inc. (8640), Wave Computing (UK) Limited (None), Imagination Technologies, Inc. (6967), Caustic Graphics, Inc. (7272), and MIPS Tech, LLC (2161). The Debtors' mailing address is 3201 Scott Blvd, Santa Clara, CA 95054.

1

I, Lawrence R. Perkins, being duly sworn, state the following under penalty of perjury:

1.     I am the Chief Executive Officer at SierraConstellation Partners, and the Chief Restructuring Officer ("CRO") to Wave Computing, Inc. ("Wave") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). I have over 18 years of management consulting and advisory experience with distressed companies or companies undergoing transition. My experience includes, but is not limited to, the following: *In re CFO Mgmt. Holdings, LLC*, Case No. 19-40426 (Bankr. E.D. Tex. 2019); *In re Woodbridge Grp. of Cos. LLC*, Case No. 17-12560 (Bankr. D. Del. 2017); *In re Katy Indus., Inc.*, Case No. 17-11101 (Bankr. D. Del. 2017); *In re Liberty Asset Mgmt. Corp.*, Case No. 16-13575 (Bankr. C.D. Cal. 2016); *In re Bethel Healthcare, Inc. & Corinthian Sub-Acute & Rehab. Ctr., Inc.*, Case No. 13-12220 (Bankr. C.D. Cal. 2013); and *In re The Fuller Brush Co., Inc.*, Case No. 12-10714 (Bankr. S.D.N.Y. 2012). I have served as Chief Restructuring Officer and financial advisor to Wave since April 3, 2020. Through this role, I have become generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.     Except as otherwise indicated herein, all statements set forth in this declaration (the "Declaration") are based on (i) my personal knowledge of and familiarity with the Debtors' operations, finances, and restructuring efforts; (ii) my review of relevant documents and information provided to me by employees of or advisors to the Debtors; (iii) my opinion based on my experience and knowledge of the Debtors' operations and financial and business affairs, including my general knowledge of the industry in which the Debtors operate; and (iv) information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management, the independent manager, and the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I have obtained this information in the course of my short tenure working with the Debtors and their advisors, and my investigation of the Debtors' operations and circumstances is ongoing. To the extent that I learn that any information provided herein is materially inaccurate, the Debtors will act promptly to notify the Court and other parties; however, I believe all information herein to be true and correct to the best of my knowledge. I am over the age of 18 and authorized to submit this First Day

Declaration on behalf of the Debtors. If called upon to testify, I would testify competently to the facts set forth herein.

3. Furthermore, as a result of my personal knowledge, information supplied to me by other members of the Debtors' management, the Debtors' counsel, and from my colleagues that perform services for the Debtors; from my review of relevant documents; or upon my opinion based upon my experience, discussions with the Debtors' advisors and outside counsel, and knowledge of the Debtors' operations and financial condition, I believe the relief sought in the First Day Pleadings (as defined below) is necessary for the Debtors to effectuate a smooth transition into chapter 11, to avoid immediate and irreparable harm to their businesses and estates, and is in the best interests of the Debtors' creditors, estates, and other stakeholders.

4. On the date hereof (the "Petition Date"), the Debtors filed these cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California, San Jose Division (the "Court"), to effectuate a complete restructuring of their capital structure and operations. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed. The Debtors' current organizational chart is attached hereto as **Exhibit A**.

5. In order to effectuate their restructuring, the Debtors are requesting various forms of relief pursuant to certain "first day" motions and applications (collectively, the "First Day Pleadings") filed concurrently with this Declaration. The relief requested in the First Day Pleadings is intended to minimize the potential adverse effects of the commencement of these chapter 11 cases on the Debtors' employees and their business operations. The First Day Pleadings request, among other things, that the Court: (i) approve the Debtors' entry into a debtor-in-possession financing facility and use of cash collateral, which will provide the liquidity necessary for the Debtors to fund these chapter 11 cases; (ii) authorize the Debtors to pay certain prepetition claims in the ordinary course of business, including employee wage, benefit, and expense reimbursement claims and the claims of critical vendors; (iii) authorize the Debtors to provide adequate assurance payments to utility companies in accordance with

Case: 20-50682    Doc# 16    Filed: 04/28/20    Entered: 04/27/20 20:21:41    Page 3 of 25
FIRST DAY DECLARATION

section 366 of the Bankruptcy Code; (iv) authorize the Debtors to continue using their existing cash management system, including their existing bank accounts; and (v) authorize the implementation of certain administrative procedures to minimize any disruption to the Debtors' business as a result of the commencement of these chapter 11 cases. It is my belief that the relief requested in each First Day Pleading: (i) is necessary to preserve and maximize the value of the Debtors' estates; (ii) is essential to the successful reorganization of the Debtors; and (iii) serves the best interests of the Debtors, their estates, creditors, and all other parties in interest.

6. I submit this Declaration in accordance with the Court's First Day Motion Guidelines for chapter 11 cases and Rule 9013-1(d) of the Bankruptcy Local Rules for the Bankruptcy Court for the Northern District of California (the "<u>Bankruptcy Local Rules</u>") to provide the Court and all parties in interest with an overview of the Debtors, their business, and the circumstances surrounding the commencement of these chapter 11 cases and in support of Debtors' petitions and First Day Pleadings. I am authorized to submit this Declaration on behalf of Wave.

## I.    PRELIMINARY STATEMENT

7. The Debtors are privately held, independent technology companies that have historically been engaged in two main business lines: the development of a cutting edge artificial intelligence ("<u>AI</u>") solution and the licensing of intellectual property cores for embedded microprocessors used in a variety of technology applications. The Debtors are headquartered in Santa Clara, California. As of the Petition Date, the Debtors have twenty-eight (28) employees in the United States and three (3) employees outside of the United States. None of these thirty-one (31) total employees are subject to collective bargaining agreements.

8. The AI portion of the business was focused in the Wave entity. This business concentrated on the development and sale of technology that focuses the use of "coarse grain reconfigurable architecture" ("<u>CGRA</u>") towards artificial intelligence workloads. This includes such applications as deep-learning and natural language processing. This technology has a wide variety of uses, including voice recognition software for cellphones, computers, or other devices, document analysis, chat bots, and vehicle safety and navigation.

4

9.      In June 2018, Wave, the parent company of the Debtors, acquired MIPS Tech, Inc. ("MIPS"), a provider of reduced instruction set computer processor architectures and intellectual property ("IP") cores, which are blocks of logic essential to making a field programmable array or application-specific integrated circuit ("ASIC"). Wave hoped that, by combining its AI technologies with MIPS embedded microprocessor technologies, the Debtors would be able to address a broader market for AI-enabled hardware that processed data throughout a network, from the edge to the data center. Unfortunately, this effort has taken longer and been more costly to implement than expected, and given rise to a series of unexpected disputes, all of which resulted in the need to exit the AI business and restructure the Debtors' business and operations.

10.      The Debtors planned to launch their first commercial dataflow microprocessing unit, named Cayenne, at the end of 2018. Unexpectedly, shortly before launch, issues were found with the performance of the Cayenne chipset architecture. Corrective action failed to improve the issue, requiring the Debtors to look at alternative solutions to re-engineer the project, costing them both time and money and resulting in liquidity challenges.

11.      At about the same time, the Debtors became embroiled in a dispute relating to a Series E preferred equity offering. This dispute, combined with continued setbacks with Cayenne, quickly drained the Debtors' liquidity. To maintain operations during these challenging times, the Debtors borrowed additional funds from equity sponsor Tallwood Technology Partners LLC ("Tallwood") under their preexisting loan facility and sought to sell non-core assets where possible.

12.      As 2020 progressed, tightening markets and the economic slowdown caused by COVID-19 limited access to new liquidity from traditional sources, while additionally limiting the funds that could be generated through asset sales. Meanwhile, the Debtors were hit with an increasing number of lawsuits from creditors and a Series E investor, leading the Debtors to conclude that filing for chapter 11 and availing themselves of the automatic stay was the best option to maximize return to all constituents. To allow the process to proceed with independent oversight of the Debtors' decision-making process, on March 27, 2020, the Debtors retained Tom FitzGerald, an experienced restructuring professional with no pre-existing relationship to the Debtors. Mr. FitzGerald formally accepted appointment to the Board of Directors on April 7, 2020. Prior to filing for Chapter 11, Mr.

FitzGerald was made the sole member of the Debtors' Board of Directors. The Debtors also appointed me to serve as the CRO.

13. Over the course of the last two months, the Debtors' management team and professionals have also worked diligently to secure the Debtors' access to much-needed capital while cleaning up and reducing contingent liabilities. Following a lengthy and extensive marketing process and hard-fought negotiations, the Debtors have secured debtor-in-possession financing from their existing prepetition secured lender, Tallwood. Tallwood has provided funding on competitive terms, allowing the Debtors to enjoy an immediate infusion of cash necessary to avoid defaulting on upcoming contract obligations and to avoid a costly and time-consuming priming and cash collateral fight.[2]

14. The Debtors expect to expeditiously address their legal liabilities in a centralized forum, restructure their debt obligations, and maximize recovery for creditors and other parties in interest, all while continuing to operate their business without interruption. The decision to file follows extensive consultations and discussions with the Debtors' Board of Directors, creditors, and external advisors, and represents the best available option to generate the most recovery for the estates.

15. This Declaration is comprised of five parts, including this preliminary statement. Part II summarizes the Debtors' history and operations. Part III describes the Debtors' current capital structure. Part IV discusses the events and circumstances leading to the commencement of these chapter 11 cases. Part V sets forth the relevant facts in support of each of the First Day Pleadings.

## II. COMPANY HISTORY AND OPERATIONS

### A. Corporate History

16. Wave began in 2010 as a startup technology company with venture funding from Southern Cross Venture Capital and Tallwood Venture Capital. Although initially focused on the development of CGRA and its corresponding technologies, Wave later engaged with Micron

---

[2] The Tallwood financing provides necessary liquidity and a meaningful cost reduction; however, it does require the Debtors to settle certain potential claims against Tallwood. While the Debtors business judgement is that these settlements are necessary to maximize value, the Debtors have ensured a claim period will be available to permit creditors to make their own assessment.

Corporation in a large, non-reoccurring engineering project concerning the potential commercialization of the Debtors' technology for general computing applications.

17. The company sought to capitalize on its early success, and in 2018, acquired MIPS. MIPS, which was established in 1984, had a long history of licensing its IP core architecture to many different applications, proving itself adaptable to new technology trends and customer demands as they arose over the course of decades. The Debtors had hoped that with the acquisition of MIPS and its related IP, they could address a broader market for AI-enabled hardware.

18. The Debtors subsequently narrowed their focus from general computing applications to AI workloads, seeking to harness the inherent reconfigurability of the technology to better mimic machine learning algorithms. At this time, hyper-scale data driven businesses such as Facebook and Google were becoming increasingly focused on developing and deploying a deep-learning ASIC in their data centers, and Wave hoped to become a leader in the market. Accordingly, Wave adapted its existing CGRA technology towards the dataflow type software these large customers were using and pivoted its product offerings from AI accelerator microchips to entire systems that could be installed in both data center and on premise within a company's information technology environment.

19. The Debtors began exploring commercialization of their AI systems, with potential applications arising in the financial services, automotive, retail, healthcare, and manufacturing sectors, to name a few. The Debtors hoped that, through ongoing development, they could build the future generation of data processing units.

**B. Operations**

20. The Debtors' United States operations are based in Santa Clara, California, where they engage in the licensing and marketing of the considerable portfolio of IP cores held by MIPS Tech, LLC. Additional offices were located across the globe in Shanghai, Manila, Sri Lanka, Taiwan, Tokyo, and Israel. As of the Petition Date, following significant reductions in force over the previous year, Wave employed twenty-eight (28) employees in the United States and three (3) employees outside of the United States.

Case: 20-50682    Doc# 16    Filed: 04/28/20    Entered: 04/27/20 20:21:41    Page 7 of 25
FIRST DAY DECLARATION

### III. CAPITAL STRUCTURE

21.     The following is an approximate overview of Wave's capital structure as of the Petition Date.

| Description | Amount ($mm) | Interest Rate |
|---|---|---|
| Prepetition Tallwood Secured Note | $13.4 | 7.5% |
| **Total Secured Debt** | **$13.4** | |
| Unsecured Convertible Notes[3] | $2.1 | - |
| **Total Funded Unsecured Debt** | **$2.1** | |
| **Total Debt** | **$15.5** | |

In addition, the Debtors are obligated on significant tax, and other priority and general unsecured claims.

#### A.     Tallwood Secured Claims

22.     Wave is party to that certain First Amended and Restated Secured Promissory Note, dated as of February 12, 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Secured Note") with Tallwood, as lender, along with certain subsidiaries of Wave party thereto (collectively the "Prepetition Guarantors"), pursuant to which Tallwood provided an aggregate commitment of $19.4 million to Wave (the "Aggregate Prepetition Commitment"), consisting of a term loan facility and a delayed draw term loan facility, and for which Wave and the Prepetition Guarantors granted security interests and entered into the guaranties in favor of Tallwood in connection with, and as consideration for, the advancement of the loans thereunder.

23.     Wave's obligations under the Prepetition Secured Note are secured by a first-priority lien upon all right, title, and interest in all property owned by Wave or any of its subsidiaries party to the Prepetition Secured Note, including but not limited to all:  (i) inventory; (ii) general intangibles; (iii) accounts; (iv) chattel paper; (v) instruments and documents or any other intangible representing payment for goods or services; (vi) equipment; (vii) investment property; (viii) commercial tort claims;

---

[3] The Debtors reserve the right to contest the validity and amount of the unsecured convertible notes. Such notes have been referenced in certain of the Debtors' documents and are being listed herein for disclosure purposes only.  Neither I nor the Debtors make any representation as to the existence or accuracy of the total unsecured convertible notes.

(ix) letter of credit rights; (x) deposit accounts and funds on deposit therein; (xi) fixtures located at or affixed to the real estate; (xii) patents, trademarks, copyrights, and other intellectual property; and (xiii) parts, replacements, substitutions, profits, products, accessions, and cash and non-cash proceeds and supporting obligations of any of the foregoing in any form and wherever located and whether now owned or hereafter acquired. In addition, each of Wave's subsidiary entities (including MIPS) signed on as note parties and guarantors to the Prepetition Secured Note, pledging their assets as collateral and guarantying repaying in the event of a default by Wave. A UCC-1 financing statement was with respect to the Prepetition Secured Note was filed with the Delaware Secretary of State on January 3, 2020.

24.     As of the Petition Date, $13,409,440 of Aggregate Prepetition Commitment is outstanding. The Debtors will seek relief, subject to entry of a final order, to roll-up the outstanding portion of the Aggregate Prepetition Commitment into the debtor-in-possession loan facility requested by the Debtors, which facility includes an additional $14,500,000 of new money delayed draw term loans, for a total commitment under the DIP Facility (as defined below) of $27,909,440.

**B.      Common and Preferred Stock**

25.     Wave has issued both common and preferred stock prepetition. Of the 178,000,000 shares of common stock authorized, 5,410,218 have been issued and remain outstanding.

26.     Wave has also raised capital through the issuance of six series of preferred stock—Series A-1, Series A-2, Series B, Series C, Series D, and Series E. All shares authorized for Series A-1 (7,390,144), Series A-2 (968,724), Series B (11,571,228), and Series D (54,068,553) have been issued and remain outstanding. Of the 46,807,004 shares authorized in Series C, 43,086,742 remain outstanding. Of the 24,571,428 shares authorized in Series E, only 12,970,421 remain outstanding. The preferred stock has liquidation priority in reverse alphabetical (and numeric) order (*i.e.*, the Series E preferred stock has priority over all other preferred stock, followed by the Series D preferred stock, etc.).

27.     A large portion of the Series E shares were redeemed in 2019 from various investors (the "Series E Redemption"). The remaining Series E shares are split among four shareholders, including Tallwood, that chose not to participate in the Series E Redemption. As of the Petition Date,

one such non-redeeming Series E shareholder is exploring potential legal action and one has filed a complaint against the Debtors related to the Series E Redemption.

## IV.    EVENTS LEADING TO THE CHAPTER 11 CASES

### A.    Setbacks with Cayenne Processing Unit

28.    The Debtors planned to launch their first commercial dataflow processing unit—named Cayenne—in the last quarter of 2018.  To support the development of the Cayenne unit, Wave issued its sixth series of preferred stock (Series E), which raised approximately $60 million in new capital for the company between June and November of 2018.  There were several investors in this new series of preferred stock.

29.    Systems based on the Cayenne unit were to be subsequently launched in the first quarter of 2019.  In late 2018, however, issues with the performance of the Cayenne architecture were found limiting its performance to levels that were substandard to current market offerings.  This performance issue was made worse by additional limitations in cooling at the systems level, which hindered the Debtors' ability to cluster multiple dataflow processing units in a single system for data center applications, a process commonly achieved by several competitors in the industry.

30.    The Debtors attempted to take corrective actions with the Cayenne design in early 2019.  Unfortunately, the corrective attempts failed to successfully address the issues, forcing the company to re-engineer the system to include co-processors to compensate for the Cayenne dataflow processing units' underperformance.

### B.    Series E Redemption

31.    As issues arose with Cayenne, certain investors became dissatisfied with its investment in the Series E Preferred Stock.  According to a complaint recently filed by another Series E investor, the Debtors were approached and it was alleged that certain misleading statements had been made during the due diligence process.  As stated in the third-party litigation, an investor allegedly then threatened to sue if its shares were not redeemed.

32.    Ultimately, the Debtors determined that the most economical option was to avoid a prolonged legal battle and redeem the disputed shares in July 2019.  Shortly after the initial Series E redemption, the other Series E investors were given two options: (1) sell their Series E stock to

Tallwood pursuant to a Stock Transfer Agreement; or (2) redeem the value of their stock by way of a convertible promissory note. I have been informed that two investors chose to redeem their stock by way of a convertible promissory note in the amounts of $1,999,998 and $99,998.50 respectively. I can make no representations as to the validity, enforceability, or amounts of these notes.

33. Following the Series E Redemption, delays in development and legal issues continued to mount, causing capital to quickly erode, leading the Debtors to begin seeking strategic alternatives to continue their business.

### C. Seeking Strategic Alternatives

34. Immediately following the Series E Redemption, facing a shortfall of capital to continue the development of their re-engineered processing units, the Debtors set out to raise funds for the ongoing development of their second-generation dataflow processing unit architecture, known as Reaper. Several strategies were investigated, ranging from raising capital from new venture capital investors and strategic investors; selling portions of the business; or financing capital against royalty revenues from existing MIPS IP cores or the intellectual property and patent portfolio of Wave. The Debtors struggled in the marketplace, however, finding that while there was interest in their business and assets, the liabilities accrued by the company during the commercialization efforts of previous years were too great to attract the needed liquidity infusion.

35. Ultimately, while the Debtors made substantial progress with their corrective, second-generation technology, the failure of the Cayenne chips and subsequent developmental delays put significant strain on the company's capital reserves and ground development to a halt. As a consequence, the Debtors are filing for bankruptcy under chapter 11 to avail themselves of the protections of the automatic stay, address legacy legal and tax liabilities, restructure the Company's debt obligations, and maximize recovery for creditors and our other constituents—all while continuing to operate the business without interruption. The Debtors remain a fundamentally strong business with a promising strategy and valuable intellectual property assets. Given the market demand for the Debtors' solutions, they expect to emerge from the bankruptcy process with greater financial flexibility to pursue their long-term goals.

11

FIRST DAY DECLARATION

## V. RELEVANT FACTS IN SUPPORT OF FIRST DAY PLEADINGS

36. The Debtors have filed several First Day Pleadings, consisting of administrative motions and motions relating to the Debtors transition into chapter 11. The Debtors' advisors believe, and I agree, that the approval of each First Day Pleading is an important element of the Debtors' reorganization efforts. I have reviewed each of the First Day Pleadings set forth below, and I believe that the Debtors would suffer immediate and irreparable harm absent the ability to obtain the relief requested in the First Day Pleadings. Capitalized terms, to the extent not defined in this Part V, shall have the meanings ascribed to such terms in the respective First Day Pleading.

### A. Administrative Motions

*1. Motion of Debtors Pursuant to B.L.R. 9006-1 Requesting Order Shortening Time for Hearing on First Day Motions (the "Motion to Shorten Time")*

37. Through the Motion to Shorten Time, the Debtors seek entry of an order shortening the time for the Court to hold a hearing on the First Day Pleadings to April 28, 2020 at 2:00 p.m. (PT), or as soon thereafter as convenient to the Court. The Debtors are likely to face numerous operational and payment issues without expedited consideration of the First Day Pleadings, all of which would work to decrease the value of the estates and the potential return for creditors. Accordingly, I respectfully ask the Court to grant the relief requested in the Motion to Shorten Time.

*2. Motion of Debtors Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion")*

38. Through the Joint Administration Motion, the Debtors seek entry of an order directing joint administration of these chapter 11 cases for procedural purposes. Because the Debtors' financial affairs and business operations are closely related, many of the motions, hearings, and orders in the bankruptcy proceedings will affect all of the Debtors. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections without harming the substantive rights of any party in interest.

39. Joint administration will significantly reduce the volume of paper that otherwise would be filed with the Clerk of the Court, because it will avoid the preparation, replication, service, and

filing, as applicable, of duplicative notices, applications, and orders. Accordingly, I respectfully ask the Court to grant the relief requested in the Joint Administration Motion.

        *3.      Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 342, and 521 for Order (I) Waiving Creditor List Requirement and (II) Approving Certain Procedures for Providing Notice to Creditors (the "<u>Consolidated Creditor List Motion</u>")*

40.    Through the Consolidated Creditor List Motion, the Debtors seek entry of an order (i) authorizing the Debtors to file the Consolidated Creditor Matrix and the Consolidated Top 30 Creditors List; (ii) approving the form and manner of the Notice of Commencement and the scheduling of the Section 341 Meeting; and (iii) authorizing the Debtors to redact individual employee addresses on the Consolidated Creditor Matrix. Because segregating and converting their computerized records into a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings, I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, will help alleviate administrative burdens, costs, and the possibility of duplicative service.

41.    Accordingly, I respectfully ask the Court to grant the relief requested in the Consolidated Creditor List Motion.

        *4.      Motion of Debtors Pursuant to L.B.R. 9013-1(c) for Entry of an Order Authorizing Oversize Briefing for Certain First Day Motions (the "<u>Oversize Briefing Motion</u>")*

42.    Through the Oversize Briefing Motion, the Debtors seek entry of an order authorizing the Debtors to file oversize briefs for certain of the First Day Pleadings. The First Day Pleadings seek emergency relief on various matters meant to sustain the Debtors' operations, prevent disruptions in employee wages, and maintain cash management systems. The Debtors' operations are large and necessarily complex so, while the Debtors have tried to limit the lengths of their briefs as much as possible, certain First Day Pleadings may exceed the 25-page limit set by Bankruptcy Local Rules. Accordingly, I respectfully ask the Court to grant the relief requested in the Oversize Briefing Motion.

5. *Motion of Debtors Pursuant to 11 U.S.C. §§ 521(a) and 105(a) and Fed. R. Bankr. P. 1007(c) for Entry of Order (I) Extending Time to File Schedules of Assets and Liabilities, (II) Statements of Financial Affairs, and (III) Schedules of Executory Contracts and Unexpired Leases (the "Schedules and Statements Extension Motion")*

43. Through the Schedules and Statements Extension Motion, the Debtors seek entry of an order extending the deadline by which the debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statement of financial affairs (the "Schedules and Statements") by twenty-three (23) days (making the Schedules and Statements due within thirty-seven (37) days of the Petition Date).

44. I submit that good and sufficient cause for granting an extension of time to file the Schedules and Statements exists. The Debtors maintain a sizeable patent portfolio, with over one hundred thirty (130) patents held by different debtor-entities that require a comprehensive and individual examination of each license. The scope and complexity of the Debtors' businesses, coupled with the limited time available to the Debtors to assemble the required information, increases the difficulty of accurately compiling the necessary information.

45. To prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents relating to creditor claims, as well as the Debtors' assets, executory contracts, and unexpired leases. This information is voluminous and collecting the necessary information requires a significant expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term, when these resources would be best used to address the immediate needs of the Debtors' business operations.

46. Although the Debtors have commenced the process that will enable them to prepare and finalize the Schedules and Statements, the Debtors may not be able to properly and accurately complete the Schedules and Statements within the required time period. The Debtors therefore request that the Court extend the 14-day period provided in the Bankruptcy Code by an additional twenty-three (23) days for cause shown (making the Schedules and Statements due thirty-seven (37) days after the Petition Date). Accordingly, I respectfully ask the Court to approve the Schedules and Statements Extension Motion.

6. *Application of Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. §§ 105(a), 327, and 503(b) for an Order Appointing Donlin Recano & Company, Inc. as Claims, Noticing, and Solicitation Agent (the "Claims Agent Application")*

47. Through the Claims Agent Application, the Debtors seek entry of an order appointing Donlin, Recano & Company, Inc. ("Donlin Recano") as claims, noticing, and solicitation agent ("Claims Agent") in the Debtors' chapter 11 cases. The Debtors anticipate there will be hundreds of persons and entities to be noticed and that many of these parties will file claims. In view of the number of anticipated claimants and the complexity of the Debtors' business, they respectfully submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk of Court of the administrative burden of, noticing and soliciting and tabulating votes, and is in the best interests of both the Debtors' estates and creditors.

48. I believe that the Debtors' selection of Donlin Recano to act as Claims Agent is appropriate under the circumstances and in the best interest of the estates. The terms of Donlin Recano's retention were negotiated at arm's length, and Donlin Recano was chosen after several engagement protocols were considered by the Debtors and their advisors. Donlin Recano's rates are competitive and comparable to the rates charged by others in the industry for similar services. Accordingly, I respectfully ask the Court to approve the Claims Agent Application.

**B. Motions Relating to Business Operations for First Day Relief**

1. *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507 and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Continuation of Debtors' Existing Cash Management System, (II) Authorizing Continued Intercompany Transactions, and (III) Granting Related Relief (the "Cash Management Motion")*

49. Through the Cash Management Motion, the Debtors seek entry of interim and final orders: (i) authorizing the Debtors to (a) continue to use their existing cash management system (the "Cash Management System"), including existing bank accounts; (b) honor certain prepetition obligations related thereto; (c) continue, in the ordinary course of business, transactions between and among the Debtors (the "Intercompany Transactions"); and (d) maintain their existing check form; and (ii) granting related relief.

50.     The Debtors maintain a centralized Cash Management System, that they use in the ordinary course of business to collect funds generated by their operations and disburse those funds to satisfy obligations required to operate their business. The Cash Management System is similar to the systems commonly employed by businesses comparable to that of the Debtors. The Cash Management System facilitates the Debtors' cash monitoring, forecasting, and reporting and enables the Debtors to control the administration of the Debtors' bank accounts.

51.     Continued use of the Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative expenses and inefficiencies associated with disrupting this system and minimizing delays in the payment of postpetition obligations. On behalf of the Debtors, I respectfully submit that, because they utilize appropriate mechanisms to ensure that unauthorized payments will not be made on account of prepetition obligations, maintaining the Cash Management System, including the Bank Accounts, will not harm parties in interest.

52.     I believe that requiring the Debtors to implement changes to the Cash Management System at this critical stage of these cases would be expensive, impose needless administrative burdens on the Debtors, disrupt the Debtors' operations, and affect the Debtors' ability to maximize value. Moreover, I believe that such a disruption would be wholly unnecessary because the Debtors have the capacity to track—and historically have tracked—payments and transfers of funds related to or on account royalties, licensing agreements, and Intercompany Transactions. Accordingly, I respectfully ask the Court to grant the relief requested in the Cash Management Motion.

> 2.     *Motion of the Debtors Pursuant to U.S.C. §§ 105(a), 361, 362, 363, and 364 for Orders Authorizing (I) Postpetition Financing; (II) Cash Collateral Use; (III) Adequate Protection to Existing Secured Parties; (IV) Liens and Superpriority Claims; and (V) Modifying the Automatic Stay (the "DIP Financing Motion")*

53.     Through the DIP Financing Motion, the Debtors request (i) approval of and authority to enter into a $14.5 million new money revolving loan facility and an approximately $13.4 million refinancing term loan facility (collectively, the "DIP Facility") with Tallwood, its existing prepetition lender; (ii) authority to use its Cash Collateral to fund their operations; (iii) approval of the adequate protection to be provided by the Debtors to Tallwood; (iv) the grant of superpriority claims with

respect to the DIP Facility; (v) modification of the automatic stay to effectuate the terms and conditions set forth in the DIP Financing Motion; and (vi) scheduling a final hearing to consider approval of the DIP Facility on a final basis.

54. As a result of extensive negotiation, the Debtors secured commitments for both a new-money debtor-in-possession revolving facility and a refinancing debtor-in-possession term facility from Tallwood (the "DIP Facility"). If approved, the DIP Facility would allow the Debtors to access up to $3,000,000 of new capital on an interim basis, up to $14,500,000 of new capital on a final basis, and would provide for a cashless exchange of loans under the Prepetition Secured Note for every $1.00 of new money loans under the DIP Facilities (for a total "roll-up" of up to $13,409,440) only on a final basis. The Debtors and their advisors believe the DIP Facilities are the best presently available postpetition financing options for the Debtors and are in the best interests of the Debtors and their estates.

55. The Debtors urgently require financing under the proposed DIP Facility to cover working capital needs and to fund these chapter 11 cases. Without the relief requested in the DIP Financing Motion, the Debtors will not have sufficient liquidity to continue their business operations, fund employee payroll and benefits obligations, pay trade creditors, and satisfy other working capital or operating expenses during these chapter 11 cases. I believe that all of the foregoing expenditures are necessary to preserve the value of the Debtors' estates as a going concern.

56. As further set forth in the Declaration of Lawrence R. Perkins filed in support of the DIP Financing Motion (the "DIP Declaration"), the DIP Facility is the best available financing options for the Debtors for several reasons: (i) it is the product of arm's-length, good-faith negotiations; (ii) it is collectively and individually the best postpetition financing options presently available to the Debtors; and (iii) it contains financial terms and conditions that are reasonable and appropriate under the circumstances. I believe that the DIP Facilities will provide the Debtors with sufficient liquidity to ensure uninterrupted operations throughout their chapter 11 cases. Accordingly, I respectfully ask the Court to grant the relief requested in the DIP Financing Motion.

Case: 20-50682    Doc# 16    Filed: 04/27/20    Entered: 04/27/20 20:21:41    Page 17 of 25

3. *Motions of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507 and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Authority to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation; (II) Maintain Employee Benefit Programs and Pay Related Administrative Obligations; and (III) Authorize Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers (the "Employee Wage Motion")*

57. Through the Employee Wage Motion, the Debtors seek entry of an interim and final order (i) authorizing the Debtors to (a) pay their outstanding Prepetition Employee Obligations; and (b) maintain their existing Employee Benefits Programs; (ii) authorizing applicable banks and other financial institutions to receive, process, honor, and pay any and all checks drawn on and transfers made from the Debtors' accounts to the extent such checks or transfers relate to any of the foregoing; and (iii) granting related relief.

58. As of the Petition Date, the Debtors have approximately thirty-one (31) employees globally (twenty-eight (28) of which sit in the United States), consisting of executives, clerical and accounting, engineers, managers and supervisors, sales and marketing personnel, officers, administrative support staff, and other personnel (collectively, the "Employees"). The Debtors additionally supplement their workforce by retaining independent contractors (the "Independent Contractors") to perform various tasks including, but not limited to, operational functions and services related to the Debtors' intellectual property portfolio and technology business. As of the Petition Date, approximately twenty (20) Independent Contractors were providing services to the Debtors. The Debtors' Employees and Independent Contractors are an indispensable part of the Debtors' business operations, and their continued services are critical to ensuring the success of these chapter 11 cases.

59. The Debtors are seeking authority to continue to administer the Employee Compensation and Benefits Programs in the ordinary course, as the Debtors may elect to modify, change, and/or discontinue any such programs in their discretion in the ordinary course of business. The Employee Compensation and Benefits Programs include, among other things, Employee Compensation Obligations, Health Insurance Plans, Health Savings Account Program, Flexible Spending Account Program, COBRA Benefits, Life and AD&D Insurance, Disability Insurance, Workers' Compensation, and 401(k) Plans, each as further described in the Employee Wage Motion.

60.     The vast majority of the Debtors' Employees and Independent Contractors rely exclusively or primarily on the compensation and benefits they receive from the Debtors under the Employee Compensation and Benefits Programs to pay their daily living expenses.  The Employees, Independent Contractors, and their families would be subject to significant financial hardship if the Debtors could not honor prepetition obligations that may be outstanding as of the Petition Date under the Employee Compensation and Benefits Programs or continue to administer the Employee Compensation and Benefits Programs without interruption during the pendency of the Debtors' chapter 11 cases.  Further, the Debtors' failure to honor their obligations in connection with the Employee Compensation and Benefits Programs could likely result in substantial attrition at a time when the Debtors need their Employees to perform at peak efficiency and would have extreme difficulty in replacing any such Employees given the technical nature of the Debtors' operations and the condition of the Debtors.  Consequently, I believe the relief requested is necessary and appropriate. Accordingly, I respectfully ask the Court to grant the relief requested in the Employee Wage Motion.

> 4.     *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503 for Entry of Orders (I) Authorizing the Payment of Critical Vendors; and (II) Granting Related Relief (the "Critical Vendor Motion")*

61.     Through the Critical Vendor Motion, the Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to pay up to $80,000 on an interim basis (the "Interim Critical Vendor Cap") and up to $160,000 on a final basis (the "Final Critical Vendor Cap," and together with the Interim Critical Vendor Cap, the "Critical Vendor Caps"); (ii) authorizing, but not directing, the Debtors to honor outstanding obligations to the Claimants on a postpetition basis in the ordinary course of business and consistent with past practice; and (iii) authorizing, but not directing, the Debtors to pay in advance if reasonably desirable to procure goods and services in the ordinary course of business and otherwise consistent with past practice; and (iv) granting related relief.

62.     The Debtors rely heavily on their relationship with various Critical Vendors who, among other things, provide information and technology, software, and colocation related services. The Debtors do not have long-term supply agreements with most of their Critical Vendors, and instead, source the service on an order-by-order basis.  Without these services, the Debtors would likely

experience significant disruptions in licensing their products to customers, which would cause revenue streams to dry up and negatively impact the Debtors' likelihood of success in these chapter 11 cases.

63.     Ultimately, the Debtors have limited leverage to compel performance from their Critical Vendors on commercially reasonable terms. Consequently, I believe the relief requested is necessary and appropriate and will benefit both the Debtors and their estates by ensuring operations remain uninterrupted. Accordingly, I respectfully ask the Court to grant the relief requested in the Critical Vendor Motion.

> 5.      *Motion of Debtors Pursuant to 11 U.S.C. §§ 366 and 105(a) for Entry of an Order (I) Prohibiting the Debtors' Utility Providers from Altering, Refusing, or Discontinuing Utility Service; (II) Determining Adequate Assurance of Payment for Postpetition Services; and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")*

64.     Through the Utilities Motion, the Debtors seek a final order (i) prohibiting the Debtors' utility providers (each, a "Utility Provider" and collectively, the "Utility Providers") from altering, refusing, or discontinuing service to the Debtors, except as set forth herein; (ii) determining adequate assurance of payment for postpetition utility services; and (iii) establishing procedures for determining adequate assurance of payment to the Utility Providers.

65.     In the ordinary course of business, the Debtors incur utility expenses, including electricity, natural gas, water, sewage, waste removal, and telecommunications (including internet and cable). Approximately seven (7) Utility Providers provide services to the Debtors. The Debtors make utility payments by direct payment to a Utility Provider providing such services.

66.     The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner and anticipate having sufficient funds to do so. the Debtors propose monthly prepayments, to be paid on or before the 1st of each in an amount equal to the cost of one (1) month of the Debtors' typical utility services, calculated based on the historical average of Debtors' monthly utility costs over the twelve-month period prior to the Petition Date (collectively, the "Adequate Assurance Prepayments" and each an "Adequate Assurance Prepayment"). Based on the list of Utility Providers, the Debtors estimate that the total amount of the Adequate Assurance Prepayments each month are expected not to exceed $45,000.

20

67.     Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures.  These procedures allow Utility Providers to request adequate assurance for unpaid Utility Services and additional adequate assurance when they believe the Adequate Assurance Prepayment provided is not sufficient.

68.     Furthermore, the Debtors request that Utility Providers be prohibited from refusing or disrupting Utility Services, for any duration.  Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations.  Any interruption in utility services—even for a brief period of time—would disrupt the Debtors' ability to continue their business operations, would irreparably impact the going concern value of the enterprise, and would adversely affect the Debtors' restructuring efforts.  I believe it is critical that the Debtors obtain the relief requested herein to ensure they are able to maintain and pay for utility services on an uninterrupted basis throughout these chapter 11 cases.  Accordingly, I respectfully ask the Court to grant the relief requested in the Utilities Motion.

> 6.     *Motion of the Debtors Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), 363(c), and 364 and Fed. R. Bankr. P. 4001, 6003, and 6004 for Interim and Final Orders (I) Authorizing the Debtors to Maintain Insurance Policies and Workers' Compensation Program, and Pay All Obligations with Respect Thereto; and (II) Granting Related Relief from the Automatic Stay with Respect to Workers' Compensation Claims (the "Insurance Motion")*

69.     Through the Insurance Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to continue their Insurance Policies; (ii) authorizing the payment of all prepetition obligations related thereto, including obligations arising under the Insurance Policies and Workers' Compensation Program; (iii) authorizing applicable banks and other financial institutions to honor and process related checks and transfers; and (iv) granting related relief.

70.     The Debtors maintain various liability, property, and other insurance policies (whether current or expired, and together with any agreements related thereto and any new policies that may be entered into, the "Insurance Policies") through several different insurance carriers (together with any third-party administrators, the "Insurance Carriers") including, but not limited to, the currently in-force Insurance Policies and Insurance Carriers identified in Exhibit B to the Insurance Motion.  The Insurance Policies provide the Debtors with insurance coverage for liabilities relating to, among other things, global general liability (includes employee benefits liability, medical expenses and fire

Case: 20-50682     Doc# 16     Filed: 04/27/20     Entered: 04/27/20 20:21:41     Page 21 of 25

damage), umbrella (includes excess liability), commercial (includes real and personal property), international commercial liability, (includes contingent auto liability and personal and advertising injury), business automobile (includes rental car coverage for business purposes), directors' and officers' liability (includes employment practices liability), and errors and omissions liability. The Debtors may also enter into replacement or new Insurance Policies after the date hereof due to the expiration or other termination of currently in-force Insurance Policies.

71.     The Debtors also maintain a Workers' Compensation program that covers, among other things, workers' compensation and employer liability for accidents, death, or disease sustained by employees. California Labor Code §§ 3700-3823 mandate that the Debtors provide for payment of all injury claims suffered by the Debtors' employees arising out of the course and scope of their employment, either by obtaining third-party insurance or obtaining a certificate to self-insure from the California Department of Industrial Relations. The Debtors have elected to obtain third-party insurance through Travelers, which is serviced through its broker, Automatic Data Processing Insurance Agency, Inc. ("ADPIA"). In the ordinary course of the Debtors' business, ADPIA's payroll automatically withdraws the premiums out of each payroll to pay the Workers' Compensation program.

72.     Continuation of the current Insurance Policies, entry into new insurance policies, and continuation of the Workers' Compensation program are essential to the operation of the Debtors' business and necessary to protect the Debtors from catastrophic, potential liability. Furthermore, in in many instances, insurance coverage and workers' compensation are required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the U.S. Trustee's requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case. Accordingly, I respectfully ask the Court to grant the relief requested in the Insurance Motion.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

22

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief

Executed this __27th__ day of April, 2020

_____
Larry Perkins
Chief Executive Officer, SierraConstellation Partners

*Proposed Chief Restructuring Officer for Debtors and Debtors in Possession*

**EXHIBIT A**

**ORGANIZATIONAL CHART**

FIRST DAY DECLARATION
EXHIBIT A

# Wave Corporate Entity Structure

