SIDLEY AUSTIN LLP
Samuel A. Newman (SBN 217042)
(sam.newman@sidley.com)
Julia Philips Roth (SBN 324987)
(julia.roth@sidley.com)
555 West Fifth Street
Los Angeles, CA 90013
Telephone: 213.896.6000
Facsimile: 213.896.6600

SIDLEY AUSTIN LLP
Charles M. Persons (*pro hac vice* pending)
(cpersons@sidley.com)
Juliana Hoffman (*pro hac vice* pending)
(jhoffman@sidley.com)
Jeri Leigh Miller (*pro hac vice* pending)
(jeri.miller@sidley.com)
2021 McKinney Avenue
Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Facsimile: 214.981.3400

*Proposed Attorneys for Debtors and
Debtors in Possession*

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>WAVE COMPUTING, INC., *et al.*,<br><br>Debtors.[1] | Case No. 20-50682 (MEH)<br><br>Chapter 11 (Joint Administration Requested)<br><br>**SUPPLEMENTAL DECLARATION OF LAWRENCE R. PERKINS IN SUPPORT OF THE DIP FINANCING MOTION**<br><br>Related to Docket Nos.: 14 & 15<br><br>**Hearing Scheduled For**:<br>Date: May 1, 2020<br>Time: 11:15 a.m. (Pacific Time)<br>Ctrm: 11<br>Judge: Honorable M. Elaine Hammond<br>       United States Bankruptcy Court<br>       280 South First St.<br>       San Jose, CA 95113-3099 |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Wave Computing, Inc. (4264), MIPS Tech, Inc. (8247), Hellosoft, Inc. (8640), Wave Computing (UK) Limited (None), Imagination Technologies, Inc. (6967), Caustic Graphics, Inc. (7272), and MIPS Tech, LLC (2161). The Debtors' mailing address is 3201 Scott Blvd, Santa Clara, CA 95054.

1

I, Lawrence R. Perkins, being duly sworn, state the following under penalty of perjury:

1. I am the Chief Executive Officer at SierraConstellation Partners ("SCP") and the Chief Restructuring Officer to Wave Computing, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). I am authorized to make this supplemental declaration (the "Supplemental Declaration") in support of the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, and 364 for Orders Authorizing (I) Postpetition Financing; (II) Cash Collateral Use; (III) Adequate Protection to Existing Secured Parties; (IV) Liens and Superpriority Claims; and (V) Modifying the Automatic Stay* (the "DIP Financing Motion"),[2] on behalf of the Debtors and SCP. Unless otherwise stated in this Supplemental Declaration, I have personal knowledge of the facts set forth herein.[3]

2. The statements in this Supplemental Declaration are, except as otherwise indicated, based on my personal knowledge or views, on information that I have obtained from the Debtors and their other advisors, or from the Debtors' books and records, and from information obtained from SCP personnel working directly with me and under my supervision. I am not being specifically compensated for this testimony other than through payments to be received by SCP for my role as the Debtors' Chief Restructuring Officer. I am over the age of 18 years and am authorized to submit this Declaration. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## I. DEBTORS' NEED FOR INTERIM FINANCING

3. It is my belief that without immediate access to capital—in the form of the $3 million interim financing contemplated in the DIP Note and Interim DIP Order (the "Interim Financing")—the Debtors will suffer immediate and irreparable harm. First, the Interim Financing is necessary to immediately demonstrate to both current and potential customers that the Debtors are adequately capitalized and remain capable of continuing business operations. Based upon both my analysis of

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Financing Motion.

[3] Certain disclosures herein relate to matters within the personal knowledge of other professionals at SCP and are based on information provided by them.

2

the Debtors and my years of experience as a restructuring officer, without this immediate assurance, in my opinion, customers will not be willing to contract with the Debtors for the licensing of products, due to fear that the Debtors would not be viable to provide ongoing services, including maintenance and technical support, over the upcoming months. Second, the Interim Financing is critical to minimize the impact of the COVID-19 pandemic and resulting economic downturn, including—what we have already seen to be—late or insufficient payments by customers impacted by the crisis. The full effects of the pandemic are currently unknown, but since I have been involved it is already impacting Debtors' receipts and collections.

### A. Absent Adequate Capital, the Debtors Cannot Provide Necessary Assurances to Current and Future Customers

4. The Interim Financing is necessary to show both current and future customers that the Debtors have adequate capital in the interim to continue operations as these Chapter 11 Cases commence. Although the 13-week cash flow attached to the Interim Order as Exhibit 1 (the "Budget") shows a positive ending cash balance through at least July 24, 2020, the Debtors are in a vulnerable position because they are reliant on irregular revenues from a small number of clients and a $2 million lump sum payment from the MediaTek Settlement. Indeed, absent the MediaTek Settlement, Debtors' operations would currently show a negative cash flow. Current and potential customers are cognizant of these liquidity constraints and eager to know what, if any, financing the Debtors have in place to ensure operational stability on a go-forward basis.

5. As a point of background, the Debtors' primary revenue stream comes from the licensing of technology to customers. As part of these licensing arrangements, the Debtors are expected to provide ongoing maintenance and support during the life of the contract for the products licensed. These contracts are often for multiple years, with high costs to remove the Debtor's technology from the customers' products. Through this model, the Debtors are able to lock customers into multi-year contracts, which ensures a steady revenue stream for extended periods of time, however the customers need some level of assurance that the Company has access to capital to ensure that the Debtors are a "safe bet" to still operate in the future.

3

6. With respect to the MediaTek Settlement, this in of itself is not sufficient capitalization required to address the concerns expressed by customers and potential contract counterparties, as described herein. The Debtors have obligations relating to vendors, utility providers, payroll, professional fees, taxes, insurance obligations, and a compensation obligation of $200,000 per month to our CEO. If the Debtors do not obtain access to the $3 million, it is very likely that they will be unable to provide assurances regarding adequate capitalization.

7. To date, two contract counterparties have reached out to Debtors to express concern regarding the Debtors' capitalization. These parties fear that if the Debtors run out of working capital, the maintenance and support services that they rely on will be interrupted, causing those customers significant disruption and harm. I anticipate that additional current or prospective customers will express the same or similar concerns in the upcoming months and could decide not to engage with the Debtors if there potential liquidity concerns are not adequately addressed. A key part of the comfort to the customers has been that there is access to capital through the bankruptcy process and that there will be a smooth transition to the new phase.

8. In addition, the Debtors have been actively developing new technology that they hope to monetize through licensing arrangements with new customers in the near future. If the Debtors are unable to offer these potential new customers assurances that Debtors will remain operational, it is unlikely Debtors will be able to execute the multi-year agreements on which their revenue streams currently rely.

9. To address these concerns, avoid termination of these licensing agreements, and ensure that new licensing agreements are possible, the Debtors need to be able to point to a source of adequate liquidity. Absent this ability, the Debtors are likely to experience immediate and irreparable harm in the form of terminated licensing agreements and disruptions to their revenue stream.

**B.   The Interim Financing Provides Adequate Capital to Protect Operations in an Uncertain Future**

10. The Interim Financing is also necessary to cushion the impact of these uncertain times on the Debtors' ability to operate. In creating the Budget, my team and I relied on certain assumptions, such as continued timely payments from customers under existing licensing and royalty arrangements

4

and the receipt of a second lump-sum payment from the MediaTek settlement. With these assumptions in place, the Budget shows a positive ending cash balance through at least July 24, 2020.

11. However, the impact of COVID-19 shutdowns and the related global economic downturn are just beginning to be seen. Debtors' most recent customer invoices have been coming in between 10% and 15% below the amounts expected, and it is likely that one or more customers may experience their own financial turmoil and/or inability to pay. Over the coming weeks and months, I would expect that our collection rates decline even further, which could deplete cash quickly and make it difficult or even impossible for Debtors to operate and pay its bills absent access to additional capital.

12. If collections decline as a result of the ongoing pandemic and related financial turmoil, the Debtors' liquidity situation could unravel very quickly. On such an occasion, it is unclear whether the Debtors will be able to negotiate interim financing and present it to the Court for approval before defaulting on key operating expenses, such as payroll, rent payments under our lease, and/or other restructuring-related costs.

13. In addition, while I believe the disbursement estimates reflected in the budget are correct, there is no guaranty that costs in these Chapter 11 Cases will not exceed current projections. If a party were to challenge the terms of the DIP Note, or otherwise seek to prohibit the Debtors' use of financing and/or cash collateral, the Debtors' restructuring-related costs would be expected to rise significantly as they responded to such challenge. Similarly, to the extent parties move for relief from the automatic stay to pursue ongoing litigation outside of this Court, the Debtors' counsel and other restructuring professionals may incur higher-than-expected costs. While the parties have built such variance expectations into the DIP Note in the form of Permitted Variances, the combination of increased expenses along with decreased revenue could have dire effects on the Debtors' ability to continue operating in the ordinary course.

14. In sum, the lack of access to Interim Financing is very likely to cause immediate and irreparable harm to the Debtors' estates. Absent available liquidity, the Debtors' business relationships and prospects for future business will be severely prejudiced, and the business could unravel very quickly at any moment due to financial constraints caused by the COVID-19 pandemic.

5

## II. AVAILABILITY OF INTERIM FINANCING

15. The DIP Lender has agreed to provide the Debtors with up to $3 million in Interim Financing on an "as needed" basis. It is my understanding that the DIP Lender has the ability to wire the funds into the Debtors' operating accounts upon request and notice (as provided in the DIP Note). This Interim Financing would be available to the Debtors upon entry of the Interim DIP Order, without further condition or requirement.

## III. CONCLUSION

16. In sum, based on my experience and my involvement in assisting the Debtors with their Budget and operations, the Interim Financing is necessary to avoid immediate and irreparable harm to the Debtors, their estates, creditors, and all parties in interest. Without access to this capital on an "as needed" basis, the Debtors will have no way of providing assurances to current and potential customers of adequate capitalization and liquidity and will have no cushion to protect operations in this uncertain financial climate.

//

//

//

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 30th day of April, 2020

*/s/ Lawrence R. Perkins*
Lawrence R. Perkins, Chief Executive Officer
SierraConstellation Partners LLC

*Proposed Chief Restructuring Officer for Debtors and Debtors in Possession*
