

1  SIDLEY AUSTIN LLP
   Samuel A. Newman (SBN 217042)

2  (sam.newman@sidley.com)
   Genevieve G. Weiner (SBN 254272)

3  (gweiner@sidley.com)
   Julia Philips Roth (SBN 324987)

4  (julia.roth@sidley.com)
   555 West Fifth Street

5  Los Angeles, CA 90013
   Telephone: 213.896.6000

6  Facsimile: 213.896.6600

7  SIDLEY AUSTIN LLP
   Charles M. Persons (admitted *pro hac vice*)

8  (cpersons@sidley.com)
   Juliana Hoffman (admitted *pro hac vice*)

9  (jhoffman@sidley.com)
   Jeri Leigh Miller (admitted *pro hac vice*)

10 (jeri.miller@sidley.com)
   2021 McKinney Avenue

11 Suite 2000
   Dallas, TX 75201

12 Telephone: 214.981.3300
   Facsimile: 214.981.3400

13

14 *Attorneys for Debtors and Debtors in Possession*

**The following constitutes the order of the Court.**
**Signed: December 3, 2020**

_M. Elaine Hammond_
_____
**M. Elaine Hammond**
**U.S. Bankruptcy Judge**

15              **UNITED STATES BANKRUPTCY COURT**

16              **NORTHERN DISTRICT OF CALIFORNIA**

17                      **SAN JOSE DIVISION**

18

19 In re:                                    ) Case No. 20-50682 (MEH)
                                             )
20 WAVE COMPUTING, INC., *et al.*,           ) Chapter 11 (Jointly Administered)
                                             )
21      Debtors.[1]                          ) **ORDER (I) APPROVING THE**
                                             ) **ADEQUACY OF THE FIFTH AMENDED**
22                                           ) **DISCLOSURE STATEMENT, AND**
                                             ) **(II) GRANTING RELATED RELIEF**
23                                           )
                                             ) **Related to Docket No.: 848**
24                                           ) Date:    November 20, 2020
                                             ) Time:    11:00 a.m. (Pacific Time)
25                                           ) Crtrm:   Videoconference
                                             ) Judge:   Honorable M. Elaine Hammond
26 _____

27 _____
   [1] The Debtors in these chapter 11 cases are Wave Computing, Inc., MIPS Tech, Inc., Hellosoft, Inc.,
28 Wave Computing (UK) Limited, Imagination Technologies, Inc., Caustic Graphics, Inc., and MIPS
   Tech, LLC. The Debtors' mailing address is 3201 Scott Blvd, Santa Clara, CA 95054.

                                          1

Upon the *Fifth Amended Disclosure Statement for the Joint Chapter 11 Plan of Reorganization for Wave Computing, Inc. and its Debtor Affiliates* [Docket No. 848] (as may be amended, supplemented, or modified from time to time, the "Disclosure Statement"),[2] of the above-captioned debtors and debtors-in-possession (the "Debtors") for entry of an order (this "Order"), pursuant to sections 105, 363, 1125, 1126, and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3016, 3017, 3018, and 3020, and Local Rules 2002-1 and 3017-1, (i) approving the Disclosure Statement with respect to the proposed *Fourth Amended Joint Chapter 11 Plan of Reorganization of Wave Computing, Inc. and its Debtor Affiliates* [Docket No. 846] (as may be amended, supplemented, or modified from time to time, the "Plan"), and (v) granting certain related relief; and this Court having found that the relief requested through the Disclosure Statement is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Disclosure Statement and opportunity for a hearing on the Disclosure Statement were appropriate under the circumstances, and no other notice need be provided; and this Court having reviewed the Disclosure Statement and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Disclosure Statement, and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.     The Disclosure Statement, attached hereto as **Exhibit 1**, is hereby approved as providing Holders of Claims or Interests entitled to vote on the Plan with adequate information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.

---

[2] Capitalized terms used but not defined herein shall have the meanings given to them in the Disclosure Statement.

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 2 of 276

2.    The Debtors have provided adequate notice of the time fixed for filing objections and the hearing to consider approval of the Disclosure Statement in accordance with Bankruptcy Rules 2002 and 3017. And Local Rules 2002-1 and 3017-1.

3.    The Disclosure Statement (including all applicable exhibits thereto) provides Holders of Claims, Holders of Interests, and other parties in interest with sufficient notice of the injunction, exculpation, and release provisions contained in Article IX of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

4.    Any objections to approval of the Disclosure Statement that were not withdrawn or resolved at or prior to the hearing to consider approval of the Disclosure Statement are overruled.

**A.    Approval of Cure Procedures.**

5.    The following procedures regarding the assumption of the Executory Contracts and Unexpired Leases are hereby approved to the extent set forth herein, and shall govern the assumption of all Executory Contracts or Unexpired Leases proposed to be assumed by the Debtors pursuant to Section 365(b) of the Bankruptcy Code (the "Assumed Contracts")

6.    No later than seven (7) calendar days before the Confirmation Hearing, the Debtors shall provide notices of proposed Cure amounts to the counterparties to Assumed Contracts, which shall include a description of the procedures for objecting to the proposed Cure amounts or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code). Unless otherwise agreed in writing by the parties in the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure amount must be Filed, served, and actually received by the counsel to the Debtor no later than the date and time specified in the notice.

7.  If the Asset Sale Distribution is elected, any unresolved objection shall be heard at the Sale Hearing, unless otherwise agreed by the parties.  If the Restructuring occurs, any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors' first scheduled omnibus hearing for which such objection is timely filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure amount will be deemed to have assented to such assumption or Cure amount.  Notwithstanding anything therein to the contrary, in the event that any Executory Contract or Unexpired Lease is removed from the Rejected Executory Contracts and Unexpired Leases Schedule and is proposed to be assumed pursuant to the Plan after such seven-day deadline, a notice of proposed Cure amounts with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof.

8.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court no later than the date and time specified in the notice.  Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing therein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure amount.

**B.  Availability of Plan, Disclosure Statement, and the Plan Supplement.**

The Debtors shall make copies of the Plan and Disclosure Statement and, prior to the Confirmation Hearing, the Plan Supplement publicly available at:

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 4 of 276

https://www.donlinrecano.com/Clients/wave/Index.  In addition, copies of the Plan, the Disclosure Statement, this Disclosure Statement Approval Order, and the Committee's solicitation letter may also be obtained, upon written request at least three (3) business days prior to the Voting Deadline from the Claims and Balloting Agent at wavecompinfo@donlinrecano.com or through the Debtors' chapter 11 case website at https://www.donlinrecano.com/Clients/wave/Index.

### C. Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.

If any Class of Claims entitled to vote on the Plan does not vote to accept the Plan, the Debtors may (i) seek confirmation of the Plan under Bankruptcy Code section 1129(b), or (ii) amend or modify the Plan in accordance with Article X of the Plan and the Bankruptcy Code.

### D. Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Reorganized Debtors or the Liquidation Trustee, or the Wind-Down Debtors, as applicable, to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### E. Plan Confirmation Objections Preserved

9.   Any objections to the Plan, including, without limitation, objections with respect to any release or exculpation provisions in the Plan, are hereby preserved in their entirety, notwithstanding approval of the Disclosure Statement or the solicitation and voting procedures relating to the Plan.

### F. Miscellaneous

10.  The Debtors are soliciting votes on the Plan in good faith, under section 1125(e) of the Bankruptcy Code and, as such, are entitled to all of the protections afforded thereby.

11.  Nothing in this Order shall be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

12. The Debtors are authorized to make non-substantive changes to the Plan, Disclosure Statement, Ballot, Non-Voting Status Notices, Confirmation Hearing Notice, and Plan Supplements, without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors and to make conforming changes among the Plan, Disclosure Statement, and any other materials contained in the Solicitation Materials prior to their distribution. The Debtors are also authorized to update any financial information in the Disclosure Statement with more current or accurate information to the extent available prior to the distribution of the Solicitation Materials.

13. All time periods referenced in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

14. Notice of the Disclosure Statement as provided therein shall be deemed good and sufficient notice of such Disclosure Statement under the circumstances and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

15. Notwithstanding the applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

16. The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Order.

17. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

/ / /

/ / /

/ / /

Agreed as to Form:


SIDLEY AUSTIN LLP                     SEVERSON & WERSON, P.C.
*/s/ Samuel A. Newman*                */s/ Benrad J. Kornberg*
Samuel A. Newman                      Bernard J. Kornberg
Charles M. Persons
                                      *Attorneys for Prestige Century*
*Attorneys for Debtors and*           *Investments Limited and CIP*
*Debtors in Possession*               *United Co. Ltd.*


James L. Snyder Acting                HOGAN LOVELLS US LLP
United States Trustee, Region 12
                                      *By: /s/ Edward J. McNieilly*
*By: /s/ Jason Blumberg*              Richard L. Wynne
JASON BLUMBERG                        Edward J. McNeilly
Trial Attorney for the United
States Trustee                        *Attorneys for the Official Committee of*
                                      *Unsecured Creditors of Wave*
                                      *Computing, Inc.*


BINDER & MALTER LLP

*By: /s/ Robert G. Harris*
Robert G. Harris
*Attorneys for secured claimant and DIP*
*Lender Tallwood Technology Partners, LLC*
*and DIP Agent, Tallwood*
*Management Company, LLC*

## EXHIBIT 1

**Disclosure Statement**

SIDLEY AUSTIN LLP
Samuel A. Newman (SBN 217042)
(sam.newman@sidley.com)
Genevieve G. Weiner (SBN 254272)
(gweiner@sidley.com)
Julia Philips Roth (SBN 324987)
(julia.roth@sidley.com)
555 West Fifth Street
Los Angeles, CA 90013
Telephone: 213.896.6000
Facsimile: 213.896.6600

SIDLEY AUSTIN LLP
Charles M. Persons (admitted *pro hac vice*)
(cpersons@sidley.com)
Juliana Hoffman (admitted *pro hac vice*)
(jhoffman@sidley.com)
Jeri Leigh Miller (admitted *pro hac vice*)
(jeri.miller@sidley.com)
2021 McKinney Avenue
Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Facsimile: 214.981.3400
*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| In re:<br>WAVE COMPUTING, INC., *et al.*,<br><br>    Debtors.[1] | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 20-50682 (MEH)<br>Chapter 11 (Jointly Administered)<br><br>**FIFTH AMENDED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR WAVE COMPUTING, INC. AND ITS DEBTOR AFFILIATES**<br><br>Dated:     December 1, 2020 |

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT APPROVES A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1] The Debtors in these Chapter 11 Cases are Wave Computing, Inc., MIPS Tech, Inc., Hellosoft, Inc., Wave Computing (UK) Limited, Imagination Technologies, Inc., Caustic Graphics, Inc., and MIPS Tech, LLC. The Debtors' mailing address is 3201 Scott Blvd, Santa Clara, CA 95054.

# **TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................................1

    A. Notice to Creditors ...................................................................................................2

    B. Important Information about This Disclosure Statement ...........................................3

II. EXECUTIVE SUMMARY .....................................................................................................7

    A. Preliminary Statement ...............................................................................................7

    B. Overview of the Plan .................................................................................................8

        1. Debt-for-Equity Exchange ...........................................................................9

        2. The DIP Claims...........................................................................................9

        3. Recovery to Holders of General Unsecured Claims ...................................10

        4. Payment in Full of Allowed Administrative Expenses, Other Secured, Claims, Other Priority Claims, and *De Minimis* Unsecured Claims...............10

        5. Subordination of (Non Rolled-Up) Prepetition Tallwood Debt .....................10

        6. Existing Stock .............................................................................................11

        7. Exit Facility ................................................................................................11

        8. The Plan Support Agreement......................................................................11

        9. The Marketing Process ...............................................................................12

        10. Liquidating Trust ........................................................................................13

        11. General Settlement of Claims and Interests................................................15

        12. Releases and Injunctions............................................................................15

    C. Entitlement to Vote .................................................................................................15

    D. Plan Distributions ...................................................................................................16

III. Voting instructions and procedures ......................................................................................24

    A. Voting Agent............................................................................................................24

    B. Solicitation Package.................................................................................................24

    C. Distribution of the Solicitation Package ..................................................................25

    D. Voting Instructions ..................................................................................................26

    E. Voting Tabulation ...................................................................................................27

| | | | | |
|---|---|---|---|---|
| | F. | Confirmation Hearing | | 27 |
| | G. | Amendments to the Plan and Solicitation and Voting Procedures | | 28 |
| IV. | | General Information About the Debtors | | 28 |
| | A. | Overview | | 28 |
| | B. | Corporate History | | 28 |
| | C. | Operations | | 29 |
| | D. | Prepetition Capital Structure | | 29 |
| | | 1. | Tallwood Claims | 30 |
| | | 2. | Common and Preferred Stock | 31 |
| | | 3. | Series E Redemption | 31 |
| | E. | Executive Officers and Board of Directors | | 32 |
| V. | | Events Leading to these Chapter 11 Cases | | 32 |
| | A. | Impediments with the Debtors' Business Operations | | 32 |
| | B. | Strategic Alternatives | | 33 |
| VI. | | Chapter 11 Cases | | 33 |
| | A. | Overview of Chapter 11 | | 33 |
| | B. | Administration of these Chapter 11 Cases | | 34 |
| | | 1. | First Day Motions | 34 |
| | | 2. | Debtor-in-Possession Financing | 35 |
| | | 3. | Filing of Retention Applications and Related Motions | 35 |
| | | 4. | Stock Transfer Motion | 36 |
| | | 5. | Appointment of the Official Committee of Unsecured Creditors | 37 |
| | | 6. | Filing of Schedules and Statements of Financial Affairs | 37 |
| | | 7. | Meeting of Creditors | 37 |
| | | 8. | Establishment of Bar Dates | 37 |
| | | 9. | KERP Motion | 38 |
| | | 10. | KEIP Motion | 38 |
| | | 11. | Subordination and/or Disallowance of Certain Claims | 40 |

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 11 of 276

| | | | | |
|---|---|---|---|---|
| | C. | SEC Investigation | ..................................................... | 40 |
| | D. | Other Litigation Matters | ..................................................... | 41 |
| | E. | Assumption and Rejection of Executory Contracts | ..................... | 42 |
| | F. | Exclusivity | ..................................................... | 42 |
| VII. | | Plan of Reorganization | ..................................................... | 43 |
| | A. | Administrative Expense Claims and Priority Claims | ............... | 43 |
| | | 1. | General Administrative Expense Claims | ......................... | 43 |
| | | 2. | DIP Claims | ..................................................... | 44 |
| | | 3. | Professional Claims | ..................................................... | 44 |
| | | 4. | Priority Tax Claims | ..................................................... | 46 |
| | B. | Classification and Treatment of Claims and Interests | ............... | 46 |
| | | 1. | Classification of Claims and Interests | ......................... | 46 |
| | | 2. | Treatment of Claims and Interests | .............................. | 47 |
| | | 3. | Treatment of Tallwood Claims if the Asset Sale Distribution is Elected | ........ | 58 |
| | | 4. | Special Provision Governing Unimpaired Claims | ............... | 58 |
| | | 5. | Elimination of Vacant Classes | .................................. | 59 |
| | | 6. | Acceptance or Rejection of the Plan | ......................... | 59 |
| | | 7. | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code | ........ | 59 |
| | | 8. | Controversy Concerning Impairment | ......................... | 60 |
| | | 9. | Subordinated Claims | ..................................................... | 60 |
| | C. | Means for Implementation of the Plan | ............................... | 60 |
| | | 1. | General Settlement of Claims and Interests | ................... | 60 |
| | | 2. | Plan Transactions | ..................................................... | 60 |
| | | 3. | Cancellation of Existing Securities and Agreements | ........ | 61 |
| | | 4. | Section 1146 Exemption | .......................................... | 61 |
| | | 5. | The Restructuring | ..................................................... | 62 |
| | | 6. | Asset Sale Distribution | .......................................... | 67 |

| | | | |
|---|---|---|---|
| | | 7. | Liquidating Trust ...................................................................72 |
| | D. | | Treatment of Executory Contracts and Insurance Policies ...........................77 |
| | | 1. | Assumption and Rejection of Executory Contracts .........................77 |
| | | 2. | Claims Based on Rejection of Executory Contracts .......................78 |
| | | 3. | Cure of Defaults for Assumed Executory Contracts........................79 |
| | | 4. | Preexisting Obligations to the Debtors under Executory Contracts ...............80 |
| | | 5. | Insurance Policies ............................................................80 |
| | E. | | Reservation of Rights............................................................81 |
| | | 1. | Nonoccurrence of Effective Date.........................................81 |
| | | 2. | Employee Compensation and Benefits ....................................81 |
| | | 3. | Contracts and Leases Entered Into After the Petition Date ..........................82 |
| | F. | | Provisions Governing Distributions................................................82 |
| | | 1. | Timing and Calculation of Amounts to Be Distributed ................................82 |
| | | 2. | Disbursing Agent .............................................................83 |
| | | 3. | Rights and Powers of Disbursing Agent...................................83 |
| | | 4. | Delivery of Distributions and Undeliverable or Unclaimed Distributions.............................................................83 |
| | | 5. | Delivery of Distributions on DIP Claims.................................84 |
| | | 6. | New Common Stock ..........................................................84 |
| | | 7. | Minimum Distributions .......................................................84 |
| | | 8. | Undeliverable Distributions and Unclaimed Property....................85 |
| | | 9. | Manner of Payment...........................................................85 |
| | | 10. | Exemption From Registration Requirements...............................85 |
| | | 11. | Compliance with Tax Requirements........................................86 |
| | | 12. | Allocations ....................................................................86 |
| | | 13. | No Postpetition Interest on Claims ........................................86 |
| | | 14. | Foreign Currency Exchange Rates.........................................86 |
| | | 15. | Setoffs and Recoupments....................................................87 |

iv

| | 16. | Claims Paid or Payable by Third Parties | 87 |
|---|---|---|---|
| G. | | The Plan Administrator | 88 |
| | 1. | The Plan Administrator | 88 |
| | 2. | Wind Down | 89 |
| | 3. | Tax Returns | 89 |
| | 4. | Dissolution of the Debtors | 90 |
| H. | | Procedures for Resolving Disputed, Contingent, and Unliquidated Claims | 90 |
| | 1. | Allowance of Claims | 90 |
| | 2. | Claims Administration Responsibilities | 90 |
| | 3. | Adjustment to Claims without Objection | 90 |
| | 4. | Time to File Objections to Claims | 90 |
| | 5. | Disallowance of Claims or Interests | 91 |
| | 6. | Amendments to Proofs of Claim | 91 |
| | 7. | No Distributions Pending Allowance | 91 |
| | 8. | Distributions after Allowance | 91 |
| I. | | Settlement, Release, Injunction and Related Provisions | 92 |
| | 1. | Discharge of Claims and Termination of Interests in the Event of a Restructuring | 92 |
| | 2. | Release of Liens | 92 |
| | 3. | Releases by the Debtors | 93 |
| | 4. | Consensual Releases by the Releasing Parties | 94 |
| | 5. | Exculpations | 95 |
| | 6. | Injunction | 95 |
| | 7. | Provision Regarding SEC | 96 |
| | 8. | Protections Against Discriminatory Treatment | 96 |
| J. | | Reimbursement or Contribution | 97 |
| K. | | Conditions Precedent to the Effective Date | 97 |
| L. | | Waiver of Conditions | 98 |

| | | | | |
|---|---|---|---|---|
| | M. | | Effect of Failure of Conditions | 98 |
| | N. | | Substantial Consummation | 99 |
| | O. | | Modification, Revocation, or Withdrawal of Plan | 99 |
| | | 1. | Modification and Amendments | 99 |
| | | 2. | Effect of Confirmation on Modifications | 99 |
| | | 3. | Revocation or Withdrawal of Plan | 99 |
| | P. | | Retention of Jurisdiction | 99 |
| | Q. | | Miscellaneous Provisions | 102 |
| | | 1. | Immediate Binding Effect | 102 |
| | | 2. | Additional Documents | 102 |
| | | 3. | Payment of Statutory Fees | 102 |
| | | 4. | Dissolution of Committee and Cessation of Fee and Expense Payment | 102 |
| | | 5. | Reservation of Rights | 103 |
| | | 6. | Successors and Assigns | 103 |
| | | 7. | Notices | 103 |
| | | 8. | Term of Injunctions or Stays | 104 |
| | | 9. | Entire Agreement | 104 |
| | | 10. | Exhibits and Annexes | 104 |
| | | 11. | Nonseverability of Plan Provisions | 104 |
| | | 12. | Votes Solicited in Good Faith | 105 |
| | | 13. | Governing Law | 105 |
| | | 14. | Waiver or Estoppel | 105 |
| | | 15. | Closing of these Chapter 11 Cases | 105 |
| VIII. | | | LIQUIDATION ANALYSIS, VALUATION, AND FINANCIAL PROJECTIONS | 106 |
| | A. | | Liquidation Analysis | 106 |
| | B. | | Financial Projections | 106 |
| IX. | | | FEASIBILITY AND BEST INTEREST OF THE CREDITORS | 106 |
| | A. | | Feasibility of the Plan | 106 |

vi

| | B. | Best Interests of Creditors Test | 107 |
| X. | | CONFIRMATION PROCEDURES | 107 |
| | A. | Confirmation Hearing | 107 |
| | B. | Statutory Requirements for Confirmation of the Plan | 107 |
| | | 1. Acceptance by Impaired Classes | 108 |
| | | 2. Confirmation Without Acceptance by All Impaired Classes | 108 |
| XI. | | RISK FACTORS | 109 |
| | A. | Bankruptcy-Specific Considerations | 109 |
| | | 1. General | 109 |
| | | 2. Objections to the Plan's Classification of Claims and Interests | 109 |
| | | 3. Challenges to the Financial Projections and Liquidation Analysis | 110 |
| | | 4. Termination of Plan Support Agreement | 110 |
| | | 5. Non-Confirmation or Delay of Confirmation of the Plan | 110 |
| | | 6. Non-Consensual Confirmation | 111 |
| | | 7. Non-Occurrence of the Effective Date | 111 |
| | | 8. Conversion to Chapter 7 | 112 |
| | | 9. Impact of Chapter 11 Cases on the Debtors | 112 |
| | | 10. Inability to Assume Executory Contracts | 112 |
| | | 11. Adverse Effect on Debtors' Tax Attributes | 113 |
| | | 12. Votes and Recoveries Subject to Contingencies | 113 |
| | | 13. Ability to Discharge or Satisfy Prepetition Claims | 113 |
| | | 14. Failure to Obtain Approval of Releases, Injunctions, and Exculpation | 114 |
| | | 15. Plan Based on Assumptions | 114 |
| XII. | | Certain securities law matters | 115 |
| | A. | Potential Plan Securities | 115 |
| | B. | Issuance and Resale of Plan Securities under the Plan | 115 |
| | | 1. Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws | 115 |

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 16 of 276

| | 2. | Resales of Plan Securities; Definition of Underwriter | 116 |

XIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ....................................................................118

A. Introduction ...............................................................................118

B. Certain U.S. Federal Income Tax Consequences to the Debtors ..............119

  1. Cancellation of Debt and Reduction of Tax Attributes ...............120

  2. Limitation on NOLs and Other Tax Attributes ...........................120

  3. Applicable High Yield Discount Obligations .............................122

C. Liquidating Trust .........................................................................123

D. Certain U.S. Federal Income Tax Consequences to Certain Holders of Claims .......123

  1. General .....................................................................................123

  2. Market Discount .......................................................................124

  3. Definition of "Security" ...........................................................124

  4. Consequences to U.S. Holders of Tallwood Claims (Class 3) ......125

  5. Consequences to U.S. Holders of *De Minimis* Unsecured Claims (Class 4) ........126

  6. Consequences to U.S. Holders of General Unsecured Claims (Class 5) .......126

  7. Non-U.S. Holders .....................................................................128

  8. FATCA .....................................................................................128

  9. Information Reporting and Backup Withholding .........................128

XIV. Reservation of Rights .............................................................................129

XV. Conclusion ...............................................................................................129

viii

## INDEX OF EXHIBITS

**Exhibit A** – Debtors' Chapter 11 Plan

**Exhibit B** – Proposed Amended and Restated Plan Support Agreement

**Exhibit C** – Liquidation Analysis

**Exhibit D** – Financial Projections

<div style="border: 1px solid black; padding: 10px; text-align: center;">

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS FIFTH AMENDED DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

</div>

## I. INTRODUCTION

On October 15, 2020, Wave Computing, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors" or the "Company") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") filed the original *Joint Plan of Reorganization for Wave Computing, Inc. and its Debtor Affiliates* [Docket No. 600] and the original *Disclosure Statement* [Docket No. 601]. The Debtors filed the *First Amended Disclosure Statement* [Docket No. 615] on October 20, 2020, and on November 13, 2020, filed the *First Amended Joint Plan of Reorganization for Wave Computing, Inc. and its Debtor Affiliates* [Docket No. 775] and the *Second Amended Disclosure Statement* [Docket No. 776]. On November 19, 2020, the Debtors filed the *Second Amended Joint Plan of Reorganization for Wave Computing, Inc. and its Debtor Affiliates* [Docket No. 806] and the Third Amended Disclosure Statement [Docket No. 808], which was further amended on November 20, 2020 by filing the *Third Amended Joint Plan of Reorganization for Wave Computing, Inc. and its Debtor Affiliates* [Docket No. 816], and the *Fourth Amended Disclosure Statement* [Docket No. 817]. On December 1, 2020, the Debtors filed the *Fourth Amended Joint Plan of Reorganization for Wave Computing, Inc. and its Debtor Affiliates* (the "Plan"), and the *Fifth Amended Disclosure Statement* (as it may be further amended, modified or supplemented, and together with any exhibits or schedules hereto, the "Disclosure Statement"), which, after notice and hearing, was approved by the Bankruptcy Court subject to the revisions contained herein.

This Disclosure Statement is being provided to you in connection with the solicitation of votes to accept or reject the Plan. A copy of the Plan is annexed to this Disclosure Statement as **Exhibit A**.[1]

The Debtors seek to consummate the restructuring on the proposed Effective Date of the Plan that will be effectuated through either a Restructuring (as defined below) or an Asset Sale (defined below). The Debtors, Tallwood (as defined below) and the Committee (as defined below) are co-proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code (collectively, the "Plan Co-Proponents"). Unless otherwise indicated in a particular Class, the classification of Claims and Interests set forth in **Article III** of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors.

The Plan is supported by the following parties (collectively, the "Supporting Parties"):

i.      Wave Computing, Inc., a Delaware corporation ("Wave"), and its direct and indirect subsidiaries (MIPS Tech LLC, a Delaware limited liability company ("MIPS"); MIPS Tech, Inc., a Delaware corporation; Hellosoft, Inc., a Delaware corporation; Wave Computing (UK) Limited, a United Kingdom limited corporation; Imagination Technologies, Inc., a Delaware corporation; and Caustic Graphics, Inc., a Delaware corporation) (collectively, the "Debtors");

ii.     The official statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code in the chapter 11 cases of the Debtors on May 18, 2020 (the "Committee");

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan.

iii.    Tallwood Technology Partners LLC, a California limited liability company ("<u>Tallwood</u>");

iv.    Tallwood, in its capacity as the lender (the "<u>DIP Lender</u>") under that certain Senior Secured Super-Priority Debtor-In-Possession Promissory Note, dated as of April 27, 2020 (the "<u>DIP Note</u>"), pursuant to which the Debtors obtained a debtor-in-possession financing facility (the "<u>DIP Facility</u>") from the DIP Lender;

v.    Tallwood, in its capacity as a prepetition lender (the "<u>Prepetition Lender</u>") pursuant to that certain Secured Promissory Note, dated as of July 5, 2019 (as further amended, restated, or otherwise modified from time to time) (the "<u>Prepetition Note</u>");[2]

vi.    those certain holders of preferred stock of Wave that are signatories to the PSA (defined below) (the "<u>Prepetition Ad Hoc Preferred Equityholder Group</u>" and, collectively with the Plan Sponsor, the DIP Lender, and the Prepetition Lender, the "<u>Specified Supporting Creditors</u>"); and

vii.    those other creditors, if any, that are or become signatories to the PSA (the "<u>Other Supporting Creditors</u>" and, together with the Specified Supporting Creditors, the "<u>Supporting Creditors</u>" and, collectively, with (i) the Debtors and (ii) any transferee that becomes a Supporting Creditor pursuant to section 4.03 of the PSA, the "<u>Parties</u>").

**A.    Notice to Creditors**

The purpose of this Disclosure Statement is to set forth information that (i) summarizes the treatment of Claims and Interests under the Plan, (ii) advises holders of Claims and Interests of their rights under the Plan, (iii) assists parties entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

---

[2] If the Asset Sale Distribution is elected, the provisions of Section VII.B.3 shall apply to the portion of the Prepetition Tallwood Debt that was not rolled-up, which constitute Class 3 (Tallwood Claims), as described more fully in the Plan. In the event of an Asset Sale, if such matters have not been resolved prior to the Effective Date, the Plan provides for the following Causes of Action, among other things, to be transferred to and to vest in the Liquidating Trust on the Effective Date: (1) the right to Dispute the Tallwood Claims; (2) the right to challenge the amount, validity, perfection, enforceability, priority or extent of the Prepetition Tallwood Debt; and (3) the right to assert Causes of Action to avoid, subordinate, or disallow any of the Prepetition Tallwood Debt, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise. If the Committee has obtained standing to assert such Causes of Action, and such Causes of Action have not been resolved prior to the Effective Date, the Committee's rights to assert such Causes of Action shall be transferred to and shall vest in the Liquidating Trust on the Effective Date.

2

**IT IS THE OPINION OF THE PLAN CO-PROPONENTS THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND CREDITORS.**

**ACCORDINGLY, THE DEBTORS AND ALL OF THE OTHER SUPPORTING PARTIES MENTIONED ABOVE RECOMMEND THAT ALL CLAIMANTS WHO ARE ENTITLED TO VOTE, VOTE TO ACCEPT THE PLAN AND RETURN THEIR BALLOTS ON TIME FOLLOWING THE METHODS SET FORTH BELOW.**

**BALLOTS FOR VOTING TO ACCEPT OR REJECT THE PLAN MUST BE RECEIVED BY JANUARY 11, 2021 AT 4:00 P.M. (PREVAILING PACIFIC TIME) (THE "VOTING DEADLINE"). THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS AND INTERESTS MAY VOTE ON THE PLAN IS NOVEMBER 18, 2020 (THE "RECORD DATE").**

**A HEARING TO CONSIDER CONFIRMATION OF THE PLAN (THE "CONFIRMATION HEARING") WILL BE HELD BEFORE THE HONORABLE M. ELAINE HAMMOND, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA (THE "BANKRUPTCY COURT"), BY ZOOM VIDEOCONFERENCING ON JANUARY 27, 2021 AT 10:15 A.M. (PREVAILING PACIFIC TIME), OR AS SOON THEREAFTER AS COUNSEL MAY BE HEARD. ONCE MADE AVAILABLE BY THE BANKRUPTCY COURT, THE ZOOM LINK FOR THE CONFIRMATION HEARING CAN BE ACCESSED AT https://www.canb.uscourts.gov/judge/hammond/calendar.**

**THE BANKRUPTCY COURT HAS DIRECTED THAT ANY OBJECTIONS TO CONFIRMATION OF THE PLAN BE SERVED AND FILED ON OR BEFORE JANUARY 11, 2021 AT 4:00 P.M. (PREVAILING PACIFIC TIME) (THE "PLAN OBJECTION DEADLINE").**

**PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY. THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUCH SUMMARIES. IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.**

**B.      Important Information about This Disclosure Statement**

This Disclosure Statement describes the assumptions that underlie the Plan and how the Plan will be executed. The Disclosure Statement includes information (i) regarding the history of the Debtors, their business, assets and liabilities, and these Chapter 11 Cases, (ii) concerning the Plan and alternatives to the Plan, (iii) advising the Holders of Claims and Wave Interests of their rights under the Plan, (iv) assisting the Holders of General Unsecured Claims in making an informed judgment regarding whether they should vote to accept or reject the Plan, and (v) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of the Bankruptcy Code and therefore, should be confirmed.

Unless the context requires otherwise, references to "*we*," "*our*" and "*us*" are to the Debtors.

3

Confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein and in the Plan. The Debtors give no assurance that the Plan will be confirmed, or if confirmed, that the conditions precedent to the occurrence of the Effective Date will be satisfied (or waived).

**THE DEBTORS ENCOURAGE YOU TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING WITHOUT LIMITATION THE PLAN AND SECTION XI OF THIS DISCLOSURE STATEMENT, ENTITLED "RISK FACTORS," (AND ALL EXHIBITS) BEFORE SUBMITTING A BALLOT TO VOTE ON THE PLAN.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan and the Plan Supplement, as applicable, and the summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entireties by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and the Debtors give no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe that the summaries of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement are fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan, or otherwise incorporated herein by reference, are qualified in their entireties by reference to those documents.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly stated herein. The financial projections, attached hereto as **Exhibit D** and described in this Disclosure Statement (the "Financial Projections"), have been prepared by the Debtors' management in consultation with their advisors. The Financial Projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors or Debtors' management. Important factors that may affect actual results and cause the management forecasts to not be achieved include, but are not limited to, risks and uncertainties relating to the Debtors (including their ability to achieve strategic and operational goals, objectives and targets over applicable periods), industry environment, the regulatory environment, general business and economic conditions and other factors. The Debtors caution that no representations can be made as to the accuracy of these projections or to the ultimate performance of the Reorganized Debtors and any subsidiaries of the foregoing compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance that these projected results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigations or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party,

4

but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence. As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial, or other effects of the Plan to Holders of Claims or Interests or any other party in interest.

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or Interest should consult with his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to Accept or Reject the Plan.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties, and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements. In addition to statements that explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be uncertain and forward-looking. There can be no assurance that the Restructuring described herein be consummated. Creditors and other interested parties should see **Article XI** of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Bankruptcy Court's approval of this Disclosure Statement does not mean that the Bankruptcy Court recommends either acceptance or rejection of the Plan. The Bankruptcy Court has not yet confirmed the Plan, which means that the terms of the Plan are not yet binding upon anyone.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

**Any securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities laws ("Blue Sky Laws").**

**The Debtors are relying on Section 3(a)(9) and Section 18(b)(4)(E) of the Securities Act and similar Blue Sky Laws, and/or Section 1145(a) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Laws the issuance of the New Common Stock and (to the extent they are deemed to be securities) the GUC Note, the Senior Secured Note and/or the Secured Subordinated Note (as applicable) as provided for in the Plan.**

**The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. This Disclosure Statement does not constitute an offer to sell or the**

5

solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

See the Risk Factors in **<u>Article XI</u>** of this Disclosure Statement for certain risks that you should carefully consider.

## II. EXECUTIVE SUMMARY

On April 27, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On October 15, 2020, the Debtors filed their proposed Plan, which was amended on November 13, 2020. The Plan sets forth the manner in which Claims against and Interests in the Debtors will be treated following confirmation of the Plan. This Disclosure Statement, submitted pursuant to section 1125 of the Bankruptcy Code for the purpose of soliciting votes to accept or reject the Plan, describes certain aspects of the Plan, the Debtors' business operations and financial projections, significant events occurring in the Debtors' Chapter 11 Cases, and related matters. This Executive Summary is intended solely as a summary. **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.**

### A. Preliminary Statement

In June 2018, Wave, the parent company of the Debtors, acquired MIPS Tech, Inc., a provider of reduced instruction set computer processor architectures and intellectual property ("IP") cores that are essential to making a field programmable array or application-specific integrated circuit ("ASIC"). As discussed in this Disclosure Statement, the Debtors' objectives of the merged businesses were disrupted and the liquidity drained, which was amplified in recent months based on the tightening markets and the economic slowdown due to the COVID-19 global pandemic. Meanwhile, the Debtors were hit with an increasing number of lawsuits from creditors and a Series E investor, leading the Debtors, in consultation with their professional advisors, to conclude that an open process to market their assets and refinance their maturing debt was the best path forward. Based in large part on the results of this process, the Company ultimately determined that pursuing a potential restructuring of its funded debt and creditor claims was necessary to optimize operations and reduce expenses. Through the Chapter 11 Cases and the Plan, the Company seeks to realign its debt and creditor claims with the Company's projected cash flows, enhance liquidity, and reduce the go-forward cost of capital for its otherwise healthy business. If the Debtors go forward with the Asset Sale, they will seek to sell substantially all of their assets and maximize returns for all Holders of Claims and Interests.

The Plan effectuates the terms of an agreement and settlement among the Plan Co-Proponents and the Supporting Creditors as set forth in the plan support agreement, as amended and restated on November 16, 2020 (the "PSA") regarding the means for restructuring the Debtors' prepetition debt and moving forward as a reorganized company. The Plan is supported by the Plan Co-Proponents and Supporting Creditors pursuant to the PSA which is attached hereto as **Exhibit B**. Under the Plan and in accordance with the priorities set forth in the Bankruptcy Code, and as part of a compromise contained in the Plan, the Plan provides for a comprehensive restructuring of the Debtors' capital structure. The Plan Co-Proponents and the Supporting Creditors believe that the Plan provides for fair and reasonable treatment of Holders of Claims and Interests, and is in the best interests of the Debtors, their Estates, and their creditors. Accordingly, the Supporting Parties recommend that Holders of Claims in the Voting Classes vote to accept the Plan.

7

## B. Overview of the Plan

The Plan contemplates the restructuring of approximately $56,908,138 in principal amount of funded and general unsecured debt and creditor claims, as well as a committed exit financing up to $5,110,000. This will be accomplished through (i) the equitization of a substantial portion of the Debtors' prepetition funded indebtedness, (ii) the reallocation of general unsecured claims into a secured GUC Note in the principal amount of $36,000,000; (iii) the implementation of the PSA; (v) the consummation of the Exit Facility in the amount of $5,110,000; and (vi) the establishment of the Liquidating Trust for the benefit of Holders of General Unsecured Claims (and, subject to sufficient recoveries by the Liquidating Trust, holders of Prepetition Notes and DIP Claims) (collectively with the Exit Facility described herein, the "Restructuring"). If the Plan is effectuated through the Restructuring, Tallwood, or its designee, either directly or through one of its subsidiaries, will control the Debtors. The restructured debt and creditor claims and new exit financing contemplated under the Restructuring will provide the Debtors with sufficient liquidity, not only to continue funding their operations, but also to make the necessary capital expenditures to implement the next generation of data processing units, maintain core IP portfolios and customer relationships, and secure liquidity as the Company continues to grow and market new products.

Alternatively, and to ensure the restructuring transactions maximize value for all stakeholders, the Plan includes a sale "toggle" feature, allowing for an asset sale. The Debtors and their advisors are conducting an extensive marketing process and are engaged in active dialogue with several potential bidders to achieve the most value-maximizing transaction for the Debtors' stakeholders. This dual-track process enables the Debtors to pursue a sale of all or substantially all their assets pursuant to sections 363 and 1123 of the Bankruptcy Code, the terms of which shall be reasonably acceptable to the Debtors and the Committee (the "Asset Sale"). The Debtors intend to continue the marketing process and will proceed with an auction if the Debtors receive one or more qualified bids in an amount in excess of $52,500,000. If an auction is held, the Debtors intend to seek approval of the highest or otherwise best bid made at such auction if the Board of Directors (the "Board"), in consultation with their advisors and investment bankers, Armory Securities, LLC ("Armory") determine that the aggregate total of the estimated Asset Sale Distribution from the highest or otherwise best bid(s) is greater than the value of the Restructuring as determined by the Debtors in conjunction with their advisors. If the Debtors elect to pursue an Asset Sale, they will file an Asset Sale Election Notice. The Sale Proceeds of the Asset Sale will be distributed pursuant to the Plan (the "Asset Sale Distribution").

Whether confirmed and consummated through the debt-for-equity transaction or through the sale transaction, the Plan will resolve these Chapter 11 Cases, will wind down the bankruptcy, and will permit the Debtors to distribute value to their stakeholders in a timely manner. The key components of the Plan are described below. The Debtors reserve the right to further amend, modify or supplement the First Amended Plan and this Second Amended Disclosure Statement, as necessary, to effectuate a plan that will maximize the value of the Debtors' estates, and provide the best available recovery to all creditors.

Additionally, the Debtors, Tallwood and the Committee have worked in good faith to reach agreement on the terms of the Restructuring contained in the Plan and this Disclosure Statement. The result of these negotiations is embodied in the amended Plan, filed contemporaneously herewith, and includes, without limitation, (i) an increase in the amount of the GUC Note from $23,000,000 to $36,000,000, (ii) an increase in the Senior Revolver from $4,000,000 to $5,110,000; (iii) a change in the precondition for cash payment of the Secured Subordinated Note from 75% payment of the face

value of the GUC Note to 75% payment of the Allowed General Unsecured Claims, meaning that the Secured Subordinated Note shall not be entitled to any cash payment of principal or interest until 75% of the Allowed General Unsecured Claims are paid; (iv) the DIP Lender will equitize a portion of its DIP Claim into New Common Shares, thereby reducing the amount of the Senior Secured Note; and (v) all interest and principal payments on the Exit Facility and Senior Secured Note will be deferred for one (1) year after the Effective Date. In connection with these negotiations, the Committee has become a signatory to the PSA and a Co-Proponent of the Plan.

If the Debtors (i) elect the Asset Sale Distribution, and the Committee reasonably determines in accordance with its fiduciary duties based on the advice of its counsel and financial advisors that the net proceeds to the Debtors of such Asset Sale Distribution are less than the implied value of the Plan or (ii) proceed with the Restructuring, and the Committee reasonably determines in accordance with its fiduciary duties based on the advice of its counsel and financial advisors that the implied value of the Plan is less than would be the net proceeds to the Debtors of an Asset Sale Distribution, the Committee will not be obligated to support the Restructuring or the Asset Sale, as the case may be.

### 1. Debt-for-Equity Exchange

As set forth in the Plan, the Restructuring contemplated therein provides for a conversion of a substantial portion of the Prepetition Tallwood Debt into common equity in the Reorganized Debtors. Specifically, if the Plan is confirmed, Tallwood will exchange $5,000,000 of the Prepetition Tallwood Debt for the New Common Stock. The remaining portion of the Prepetition Tallwood Debt will be subordinated to payments as General Unsecured Claims.

The Plan and restructuring transactions, therefore, implement a significant recapitalization that allows the Company to pay down creditors and continue to focus on its traditional business strengths while pursuing new markets and product.

### 2. The DIP Claims

In addition, if the Debtors pursue a Restructuring, Tallwood, in its capacity as lender under the DIP Note, shall receive, on account of and in full and final satisfaction of its Allowed DIP Claim (i) if the aggregate amount of all such Holders' Allowed DIP Claims is equal to or less than $4,000,000, its Pro Rata share of 37.66% of the New Common Stock and (ii) if the aggregate amount of all such Holders' Allowed DIP Claims exceeds $4,000,000, (a) their Pro Rata share of the New Common Stock and (b) solely with respect to the portion of such Holders' aggregate Allowed DIP Claims that exceeds $4,000,000, their Pro Rata Share of the Senior Secured Note. The Senior Secured Note will be issued by Reorganized Wave and guaranteed by each of the other Reorganized Debtors in an aggregate principal amount equal to the amount of DIP Claims outstanding as of the Effective Date (up to an aggregate total principal of $10,286,511) *less* $4,000,000. If the aggregate amount of the Allowed DIP Claims outstanding as of the Effective Date do not exceed $4,000,000, the Senior Secured Note shall not be issued.

If the Debtors pursue an Asset Sale, Tallwood, in its capacity as lender under the DIP Note, shall receive payment in full in Cash on account of and in final satisfaction of its Allowed DIP Claim.

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 27 of 276

### 3. Recovery to Holders of General Unsecured Claims

On the Effective Date, or as soon thereafter as is reasonably practicable, in full satisfaction of each Allowed General Unsecured Claim that is not a Holder of a *De Minimis* Unsecured Claim, and except to the extent that a Holder of an Allowed General Unsecured Claim has agreed to different treatment with the Debtors or Reorganized Debtors, as applicable, in consultation with Tallwood, each Holder of a General Unsecured Claim shall, (a) in the event of a Restructuring, receive (1) its Pro Rata share of the GUC Note and its right to recovery under the Liquidating Trust as set forth in **Section II.B.10** below; or (2) if such Holder has a *De Minimis* Unsecured Claim, payment in full in Cash; or (b) in the event of an Asset Sale, receive its Pro Rata share of the Sale Proceeds after satisfaction of the Administrative Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, DIP Claims, *De Minimis* Unsecured Claims, and (subject to **Section II.B.5**, below) Tallwood Claims.

### 4. Payment in Full of Allowed Administrative Expenses, Other Secured, Claims, Other Priority Claims, and *De Minimis* Unsecured Claims

As set forth in more detail below and in the Plan, the Plan provides for the full satisfaction or Reinstatement of Allowed Administrative Claims, Priority Tax Claims, Other Secured Claims, Other Priority Claims, and *De Minimis* Unsecured Claims.

### 5. Subordination of (Non Rolled-Up) Prepetition Tallwood Debt

The Plan contemplates partial equitization and partial subordination of the Prepetition Tallwood Debt that was not rolled-up through the treatment of Class 3, as set forth in this **Section III.B.3** of the Plan. Specifically, if the Restructuring occurs, Tallwood shall receive, in full and final satisfaction of its Tallwood Claim, (i) its Pro Rata share of 62.34% of the New Common Stock, (ii) its Pro Rata share of the Secured Subordinated Note, and (iii) its right to recovery under the Liquidating Trust, as set forth in **Section IV.G.7** of the Plan. If the Restructuring occurs, confirmation shall be deemed to give effect to the Liens securing the Secured Subordinated Note and such Liens shall be deemed automatically perfected on a second priority basis, to extent provided for in the Secured Subordinated Note, without any further filing or action by any party.

If the Asset Sale Distribution is elected, the Debtors shall establish an escrow account into which the Debtors shall deposit Sale Proceeds in an amount equal to the lesser of (i) the amount of the Prepetition Tallwood Debt that was not rolled up through treatment of Class 3, as set forth in **Section III.B.3** of the Plan and (ii) the amount of the Sale Proceeds less the aggregate amount of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims and the *De Minimis* Unsecured Claims (the "Escrowed Amount"). In such event, the Plan Co-Proponents shall negotiate in good faith the application of the Escrowed Amount as between the Tallwood Claims and the General Unsecured Claims.

If the Tallwood Claims have not been resolved or compromised before the Effective Date, upon the Effective Date, the Estates' right to (i) Dispute the Tallwood Claims, (ii) challenge the amount, validity, perfection, enforceability, priority or extent of the Prepetition Tallwood Debt; and (iii) assert Causes of Action to avoid, subordinate, or disallow any of the Prepetition Tallwood Debt, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise, shall

10

automatically transfer to the Liquidating Trust. If the Committee obtains standing from the Bankruptcy Court to assert such Causes of Action and such Causes of Action have not been finally resolved or compromised before the Effective Date, upon the Effective Date, the Committee's right to assert such Causes of Auction shall automatically transfer to and vest in the Liquidating Trust.

### 6. Existing Stock

As set forth in the Plan, the Restructuring contemplated therein provides for the cancellation and extinguishment of all of the Wave Preferred Interests and Wave Common Interests and such interests will be of no further force or effect. In the event of Restructuring, the Holders of Wave Preferred Interests and Wave Common Interests will not receive any Plan Distribution.

In the event of an Asset Sale, each Holder of a Wave Preferred Interest or Wave Common Interest shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Administrative Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, DIP Claims, *De Minimis* Unsecured Claims, Tallwood Claims, and General Unsecured Claims.

Each distribution and issuance referred to herein shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 7. Exit Facility

If the Restructuring is consummated, Tallwood shall provide maximum commitment amount of $5,110,000 pursuant to that certain senior secured revolving credit facility to be issued by Reorganized Wave and guaranteed by each of the other Reorganized Debtors. In exchange for such Exit Facility, Tallwood shall receive a first priority secured claim in the Collateral pursuant to the terms and conditions set forth in the Exit Facility Documents. The Exit Facility shall provide liquidity sufficient to provide liquidity to the Reorganized Debtors and fund their general operational needs.

Confirmation shall be deemed approval of the Exit Facility, including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith.

### 8. The Plan Support Agreement

On October 15, 2020, the Debtors, Tallwood, and any Supporting Creditors entered into the original PSA, which was amended and restated on November 16, 2020 to include the Committee as a Supporting Party. Since negotiating the PSA, the Debtors have documented the terms of the pre-arranged restructuring contemplated thereby, including the dual-track "toggle" feature that will allow for the Restructuring or the Asset Sale.

The Plan represents a significant step in the Debtors' months-long restructuring process. The PSA will allow the Debtors to proceed expeditiously through chapter 11 to a successful emergence. The Plan will significantly realign the Debtors' debt structure and provide the capital injection needed for the Debtors to conduct competitive operations going forward. A copy of the proposed PSA is attached hereto as **Exhibit B** but material terms of the PSA are set forth herein.

The Debtors negotiated terms to eliminate any non-solicitation provisions in the PSA to ensure their ability to entertain any competitive offers. The Debtors continue to actively market the Company and solicit offers that will provide the highest return for all stakeholders.

Tallwood and the Committee, subject to the terms and conditions of the PSA, agrees to support the Debtors in their efforts to confirm the Plan through the Restructuring, as well as to provide additional liquidity to the Debtors both during the Chapter 11 Cases and upon emergence (as described in greater detail in the PSA attached hereto as **Exhibit B**). As a result, the PSA provides a clear path forward for the Debtors to effectuate an efficient, consensual restructuring which will allow the Debtors to meaningfully realign their balance sheet with projected cash flows and, ultimately, return to profitability.

Both the PSA and the DIP Facility require that the Debtors proceed expeditiously through these Chapter 11 Cases. The commitments under the PSA and DIP Facility are conditioned upon, among other things, the Debtors administering the Chapter 11 Cases in accordance with certain "Milestones," specifically:

    (i)     approval of the Disclosure Statement within sixty (60) calendar days of the execution of the PSA;

    (ii)    entry of an order confirming the Plan (the "Confirmation Order") within ninety (90) calendar days of entry of the order approving the Disclosure Statement; and

    (iii)   occurrence of the Plan's effective date within thirty (30) calendar days of entry of the Confirmation Order.[3]

The PSA is a critical component to the Debtors' Restructuring and its implementation will significantly reduce the Debtors' funded-debt obligations and creditor claims and will result in a stronger balance sheet for the Debtors.

**9.    The Marketing Process**

On or around March 2020, with the assistance of SCP and the Debtors' professional advisors, the Debtors commenced a marketing process to solicit bids from potential purchasers of the Debtors' business or assets or potential plan investors. Subsequently thereafter, the Debtors engaged Armory as the Debtors' investment banker to continue soliciting potential bidders, representing both financial and strategic buyers/investors. In connection with this solicitation, the Debtors and their advisors prepared, among other things, a confidential information memorandum ("CIM") to provide potential investors with adequate information upon which to make a proposal. The Debtors executed confidentiality agreements with multiple parties, who were subsequently granted access to the CIM and a virtual data room containing additional diligence from the Debtors. To date, the Debtors have received indications of interest from several parties and are continuing to evaluate their options to maximize estate value. The Debtors' management team and advisors continue to facilitate further diligence and negotiate with the remaining bidders to obtain the highest bid for a sale through a plan.

---

[3] To the extent the Milestones in the PSA conflict with any other Milestone, the dates set forth in the PSA shall govern.

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 30 of 276

To further these negotiations and progress toward a potential sale that will optimize estate value, the Debtors intend to file a motion to approve bid procedures to begin formally soliciting bids and commence the auction process.

The Debtors continue to pursue both the plan and sale paths in tandem and continue discussions with their lenders and the Committee, which the Debtors believe will enable them to preserve and maximize value for the benefit of all stakeholders.

## 10. Liquidating Trust

Upon the Effective Date, the Liquidating Trust, which shall be a Delaware liquidating trust, shall be established pursuant to the Liquidating Trust Agreement. The initial Liquidating Trustee shall be appointed by the Committee, in consultation with the Debtors and Tallwood. The appointment of the Liquidating Trustee shall be approved in the Confirmation Order, and the Liquidating Trustee's duties shall commence as of the Effective Date. The Liquidating Trustee shall administer the Liquidating Trust and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of (i) enforcing Causes of Action transferred to the Liquidating Trust on the Effective Date, and (ii) if the Restructuring occurs, holding the GUC Note.

In accordance with the Liquidating Trust Agreement, the Liquidating Trustee shall serve in such capacity through the earlier of (i) the date that the Liquidating Trust is dissolved and (ii) the date such Liquidating Trustee resigns, is terminated, or is otherwise unable to serve; provided, however, that, if the Liquidating Trustee resigns, is terminated, or is otherwise unable to serve, the Liquidating Trust Advisory Board shall appoint a successor to serve as the Liquidating Trustee in accordance with the Liquidating Trust Agreement. If the Liquidating Trust Advisory Board does not appoint a successor within the time periods specified in the Liquidating Trust Agreement, then the Court, upon the motion of any party-in-interest, including counsel to the Liquidating Trust, shall approve a successor to serve as the Liquidating Trustee. Any such successor Liquidating Trustee shall serve in such capacity until the Liquidating Trust is dissolved.

Under the Liquidating Trust Agreement, the initial Liquidating Trustee shall be appointed by the Committee, in consultation with the Debtors and Tallwood. Until the GUC Note has been indefeasibly paid in full in cash, the Liquidating Trust shall receive input and advice from an advisory board of three (3) creditors selected by the Committee. After such time, to the extent assets remain, the Liquidating Trust shall receive input and advice from an advisory board consisting of (i) a representative appointed by the Committee; (ii) a representative appointed by Tallwood; and (iii) a representative appointed by a majority of the Holders of Interests in Reorganized Wave.

Upon the Effective Date, if the Restructuring occurs, (i) the GUC Note; and (ii) subject to the releases and exculpations set forth herein (including the Debtor Release and the Third Party Release), each of the Causes of Action (other than the right to object to or otherwise contest Claims or Interests as described below) and Avoidance Actions that are not released or waived pursuant to the Plan shall automatically vest in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries. On the Effective Date, standing to commence, prosecute and compromise all Causes of Actions (other than the right to object to or otherwise contest Claims or Interests as described below) and Avoidance Actions vesting in the Estates shall transfer to the Liquidating Trustee and/or the Liquidating Trust free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or the Confirmation Order. If the Restructuring occurs, the primary right to object to or otherwise

13

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 31 of 276

contest Claims or Interests shall be retained by the Reorganized Debtors, except as otherwise agreed between the Reorganized Debtors and the Liquidating Trustee in writing in accordance with **Section XIII.G** of the Plan. If the Reorganized Debtors do not object to or otherwise contest a Claim, the Liquidating Trust shall have standing and the right to file and prosecute such a Claim objection, and in all circumstances, the Liquidating Trust shall have the right to join in any claim objection filed by or pursued by the Reorganized Debtors.

Upon the Effective Date, if the Asset Sale Distribution is elected, each of the Causes of Action (including, if not previously compromised, the right to object to or contest the Tallwood Claims, but excluding the right to object to or otherwise contest Claims or Interests as described below) and Avoidance Actions that are not released or waived pursuant to the Plan shall automatically vest in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries. On the Effective Date, standing to commence, prosecute and compromise all Causes of Actions (including, if not previously compromised, the right to object to or contest the Tallwood Claims, but excluding the right to object to or otherwise contest Claims or Interests as described below) and Avoidance Actions vesting in the Estates shall transfer to the Liquidating Trustee and/or the Liquidating Trust free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or the Confirmation Order. If the Asset Sale Distribution is elected, all rights to object to or otherwise contest Claims or Interests (other than, if not previously compromised, the right to object to or contest the Tallwood Claims) shall be transferred to, and shall vest in, the Wind-Down Debtors, except as otherwise agreed between the Wind-Down Debtors and the Liquidating Trustee in writing in accordance with **Section XIII.G** of the Plan. If the Wind-Down Debtors do not object to or otherwise contest a Claim, the Liquidating Trust shall have standing and the right to file and prosecute such a Claim objection, and in all circumstances, the Liquidating Trust shall have the right to join in any claim objection filed by or pursued by the Wind-Down Debtors.

If the Restructuring occurs, the Liquidating Trustee shall, with the consent of the Liquidating Trust Advisory Board, be entitled to use the $1 million initial pre-payment on the GUC Note and up to $2 million of the quarterly GUC Note payments (i.e., a total of up to $3 million of GUC Note proceeds) as an advance against Liquidating Trust Expenses (the "Restructuring Liquidating Trust Expense Advance"). The proceeds of the Liquidating Trust Assets realized by the Liquidating Trust shall be used to repay the Restructuring Liquidating Trust Expense Advance to Holders of Allowed General Unsecured Claims on a Pro Rata basis until the Sale Proceeds Liquidating Trust Expense Advance has been repaid in full. Until the Restructuring Liquidating Trust Expense Advance has been repaid in full, no proceeds of the Liquidating Trust Assets realized by the Liquidating Trust shall be used to repay, or deemed to repay, any portion of the GUC Note (other than the Liquidating Trust Expense Advance) or the Excess General Unsecured Claim Amount.

If the Asset Sale Distribution is elected, after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, and the Allowed *De Minimis* Unsecured Claims from the Sale Proceeds, up to $3 million of the Sale Proceeds that would otherwise be paid to Holders of Allowed General Unsecured Claims may be transferred to the Liquidating Trust as an advance against Liquidating Trust Expenses (the "Sale Proceeds Liquidating Trust Expense Advance"). The Liquidating Trust Advisory Board shall determine the amount, not to exceed $3 million, of the Sale Proceeds Liquidating Trust Expense Advance. The Sale Proceeds Liquidating Trust Expense Advance shall be deemed to be a payment on account of the Claims of the Holders of Allowed General Unsecured Claims on a Pro Rata basis,

14

which such Holders of Allowed General Unsecured Claims are then advancing to the Liquidating Trust. The proceeds of the Liquidating Trust Assets realized by the Liquidating Trust shall be used to repay the Sale Proceeds Liquidating Trust Expense Advance to Holders of Allowed General Unsecured Claims on a Pro Rata basis until the Sale Proceeds Liquidating Trust Expense Advance has been repaid in full.

### 11. General Settlement of Claims and Interests

As described more fully in the Plan, pursuant to section 1123 of the Bankruptcy Code, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the PSA will be approved on the Effective Date, and will constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the Debtors.

### 12. Releases and Injunctions

The Plan contains certain releases and injunctions (as described more fully in **Article IX** of the Plan), including releases between the Debtors and Reorganized Debtors, on the one hand, and certain Released Parties on the other hand. The Released Parties shall include: (a) the Debtors; (b) the Reorganized Debtors or the Wind-Down Debtors, as applicable; (c) the Committee (d) the DIP Lender; (e) the DIP Agent; (f) the Exit Lender; (g) the Prepetition Lender; and (h) with respect to each of the foregoing Entities in clauses (a) through (g), such entity's current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, principals, members, employees, agents, advisors, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, and successors and assigns. This release will be effective upon entry of the Confirmation Order. **The Plan also provides that each Holder of a Claim or an Interest that (1) votes to accept the Plan or (2) makes the opt-in election on its Ballot or form included with the notice of non-voting status, as applicable, and returns such Ballot or form pursuant to the instructions set forth therein, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties. The applicable Ballot or election form included with a notice of non-voting status provide the instructions by which Holders of Claims or Interests as of the Voting Record Date may opt-in to granting the Third Party Release in the Plan.** The release, exculpation, and injunction provisions in **Article IX** of the Plan are integral to the Plan and the Debtors' restructuring efforts, and the Debtors' emergence from these Chapter 11 Cases.

### C. Entitlement to Vote

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (as defined below). Each category of Holders of Claims or Interests, as set forth in **Article III** of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

15

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 3 | Tallwood Claims | Impaired | Entitled to Vote |
| Class 4 | *De Minimis* Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5[4] | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 7 | Wave Series E Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Series E Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Wave Series D Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Series D Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Wave Series C Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 12 | Wave Series B Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 13 | Wave Series A-2 Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 14 | Wave Series A-1 Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 15 | Wave Common Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 16 | Intercompany Interests | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |

### D.    Plan Distributions

The following chart summarizes the projected distributions to Holders of Allowed Claims and Allowed Interests.  Although every reasonable effort was made to be accurate, the projections of estimated recoveries are only an estimate.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received.  In addition, the ability to receive Plan Distributions depends on the ability of the Debtors to obtain Confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. Reference should be made to the entire Disclosure Statement, including without limitation **Section VII.A–B.** of this Disclosure Statement, and the Plan for a complete description of the classification and treatment of Allowed Claims and Allowed Interests.

---

[4] To the extent that Class 5 includes General Unsecured Claims against multiple Debtors, the treatment of Class 5 described herein potentially constitutes a partial substantive consolidation of the applicable Debtors.

16

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan** |
| N/A | General Administrative Expense Claims | Unless otherwise agreed to by the Holder of an Allowed Administrative Expense Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Expense Claim (other than Holders of DIP Claims, Professional Claims, and Claims for fees and expenses pursuant to Section 1930 of Chapter 123 of Title 28 of the United States Code) that is unpaid as of the Effective Date shall receive from their respective Debtor, on account and in full satisfaction of such Allowed Administrative Expense Claim, (i) payment in full in cash, (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, or (iii) such other terms as agreed to among the Debtors and the holders thereof, and with the consent of Tallwood and the Committee (which consent shall not be unreasonably withheld, conditioned or delayed). | Undetermined | 100% |
| N/A | DIP Claims | On the Effective Date, (i) if a Restructuring occurs, each Holder of an Allowed DIP Claim shall receive, on account of and in full and final satisfaction of such Holder's Allowed DIP Claim, (a) if the aggregate amount of all such Holders' Allowed DIP Claims is equal to or less than $4,000,000, their Pro Rata share of 37.66% of the New Common Stock, and (b) if the aggregate amount of all such Holders' Allowed DIP Claims exceeds $4,000,000, (x) its Pro Rata share of the New Common Stock and (y) solely with respect to the portion of such Holders' aggregate Allowed DIP Claims that exceeds $4,000,000, their Pro Rata share of the Senior Secured Note; (ii) if an Asset Sale Distribution is elected, each Holder of an Allowed DIP Claim shall receive payment in full in Cash on account of and in full and final satisfaction of such Holder's Allowed DIP Claim. | $10,286,511 | [●]% |
| N/A | Professional Claims | All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Claim Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Claim Reserve Amount on the Effective Date. | $[●] | 100% |

17

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| N/A | Priority Tax Claims | Except as otherwise agreed by Holders of Priority Tax Claims and the Debtors or Reorganized Debtors, as applicable, and in consultation with Tallwood, Holders of Priority Tax Claims shall receive regular installment payments in Cash over a period ending not later than five (5) years after the Petition Date equal in total value, as of the Effective Date, to the Allowed amount of such Claim, plus interest as permitted under applicable law. Tax Claims not entitled to priority, and to the extent such Claims are Allowed Claims, shall be an obligation of the applicable Reorganized Debtor and paid *pari passu* with the Allowed General Unsecured Claims included under the GUC Note, but without receiving security for such Claims. For the avoidance of doubt, at no point shall the Holders of Priority Tax Claims be paid in a manner or on terms less favorable than Allowed Claims paid under the GUC Note, except that the Holders of Allowed Priority Tax Claims shall not receive any security interest for such Claims. If the aggregate amount of Allowed Priority Tax Claims is less than $12,949,150, then the difference between such aggregate amount and $12,949,150 shall be used to pay, in Cash, the Relevant Obligations as follows: (i) fifty percent (50%) shall be used to pay the Excess General Unsecured Claim Amount, and (ii) fifty percent (50%) shall be used to pay the GUC Note; provided, that, if the Excess General Unsecured Claim Amount has been paid in full in Cash, but the GUC Note has not been repaid in full in Cash (or vice versa), one hundred percent (100%) shall be used to pay the Excess General Unsecured Claim Amount or the GUC Note, as applicable. | Undetermined | 100% |
| Class 1 | Other Secured Claims | On the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor, in consultation with Tallwood and the Committee, (i) payment in full in cash,  (ii) the return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim; or (iii) such other treatment sufficient to render such Allowed Other Secured Claim as Unimpaired. | Undetermined | 100% |
| Class 2 | Other Priority Claims | On the Effective Date, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash. | Undetermined | 100% |
| Class 3 | Tallwood Claim | On the Effective Date, (i) if the Restructuring occurs, each Holder of an Allowed Tallwood Claim shall receive, in full and final satisfaction of its Claim, (1) its | $10,621,628 | [●]% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | Pro Rata share of 62.34% of the New Common Stock, (2) its Pro Rata share of the Secured Subordinated Note; and (3) its right to recovery under the Liquidating Trust; or (ii) if the Asset Sale Distribution is elected, each Holder of an Allowed Tallwood Claim shall (subject to **Section III.C** of the Plan, and as set forth in **Section II.B.5** hereof) and as outlined in Section II, receive, in full and final satisfaction of such Claim, its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, and the *De Minimis* Unsecured Claims, up to the Allowed amount of such Tallwood Claim. | | |
| Class 4 | *De Minimis* Unsecured Claims | Within thirty (30) days of the Effective Date, each Holder of an Allowed *De Minimis* Unsecured Claim shall receive payment in full in Cash. | Undetermined | 100% |
| Class 5 | General Unsecured Claims | On the Effective Date, or as soon thereafter as is reasonably practicable, (i) if the Restructuring occurs, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the GUC Note and their right to recovery under the Liquidating Trust as set forth in Section IV.E.2 of the Plan; or (ii) if the Asset Sale Distribution is elected, each Holder of an Allowed General Unsecured Claim shall (subject to **Section III.C** of the Plan, and as set forth in **Section II.B.5** hereof)  receive, in full and final satisfaction of such Claim, its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the *De Minimis* Unsecured Claims and the Allowed Tallwood Claims, up to the Allowed amount of such General Unsecured Claim.  For the avoidance of doubt, tax Claims not entitled to priority, and to the extent such Claims are Allowed Claims, shall be an obligation of the applicable Reorganized Debtor and paid *pari passu* with the Allowed General Unsecured Claims included under the GUC Note, but without receiving security for such Claims. | $[●] | 70.3%-83.8%[5] |

---

[5] This estimate contemplates recoveries in the event of a Restructuring and is subject to further revision.

19

| | SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| Class 6 | Intercompany Claims | On the Effective Date, or as soon thereafter as is reasonable practicable, (i) if the Restructuring occurs, at the option of the applicable Debtor and with the consent of Tallwood (which consent shall not be unreasonably withheld, conditioned or delayed), all Intercompany Claims shall be either Reinstated or canceled, released, and extinguished and shall be of no further force and effect without any Plan Distribution; if the Debtors elect to Reinstate the Intercompany Claims, no payments may be made with respect to the Intercompany Claims until all Allowed General Unsecured Claims have been repaid in full in Cash; or (ii) if the Asset Sale Distribution is elected, all Intercompany Claims shall be canceled, released, and extinguished and shall be of no further force and effect without any Plan Distribution. | Undetermined | [●]% |
| Class 7 | Wave Series E Preferred Interests | On the Effective Date, or as soon thereafter as is reasonable practicable, (i) if the Restructuring occurs, all Wave Series E Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or (ii) if the Asset Sale Distribution is elected, each Holder of Wave Series E Preferred Interests shall receive, in full and final satisfaction of such Interests, its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the *De Minimis* Unsecured Claims, the Allowed Tallwood Claims and the Allowed General Unsecured Claims, up to the Allowed amount of such Wave Series E Preferred Interests. | N/A | N/A |

20

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan** |
| Class 8 | Series E Section 510(b) Claims | On the Effective Date, or as soon thereafter as is reasonable practicable, (i) if the Restructuring occurs, all Series E Section 510(b) Claims shall be canceled, released, and extinguished, and will be of no further force, and Holders of such Claims shall not receive any Plan Distribution; or (ii) if the Asset Sale Distribution is elected, each Holder of a Series E Section 510(b) Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the *De Minimis* Unsecured Claims, the Allowed Tallwood Claims, the Allowed General Unsecured Claims, and the Allowed Wave Series E Preferred Interests, up to the Allowed amount of such Series E Section 510(b) Claim. | N/A | N/A |
| Class 9 | Wave Series D Preferred Interests | On the Effective Date, or as soon thereafter as is reasonable practicable, (i) if the Restructuring occurs, all Wave Series D Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or (ii) if the Asset Sale Distribution is elected, each Holder of Wave Series D Preferred Interests shall receive, in full and final satisfaction of such Interests, its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the *De Minimis* Unsecured Claims, the Allowed Tallwood Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, and the Allowed Series E Section 510(b) Claims, up to the Allowed amount of such Wave Series D Preferred Interests. | N/A | N/A |
| Class 10 | Series D Section 510(b) Claims | On the Effective Date, or as soon thereafter as is reasonable practicable, (i) if the Restructuring occurs, all Series D Section 510(b) Claims shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Claims shall not receive any Plan Distribution; or (ii) if the Asset Sale Distribution is elected, each Holder of a Series D Section 510(b) Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General | N/A | N/A |

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 39 of 276

| | SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan** |
| | | Administrative Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the *De Minimis* Unsecured Claims, the Allowed Tallwood Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims, and the Allowed Wave Series D Preferred Interests, up to the Allowed amount of such Series D Section 510(b) Claim. | | |
| Class 11 | Wave Series C Preferred Interests | On the Effective Date, or as soon thereafter as is reasonable practicable, (i) if the Restructuring occurs, all Wave Series C Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or (ii) if the Asset Sale Distribution is elected, each Holder of Wave Series C Preferred Interests shall receive, in full and final satisfaction of such Interests, its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the *De Minimis* Unsecured Claims, the Allowed Tallwood Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims,, and the Allowed Series D Section 510(b) Claims, up to the Allowed amount of such Wave Series C Preferred Interests. | N/A | N/A |
| Class 12 | Wave Series B Preferred Interests | On the Effective Date, or as soon thereafter as is reasonable practicable, (i) if the Restructuring occurs, all Wave Series B Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or (ii) if the Asset Sale Distribution is elected, each Holder of Wave Series B Preferred Interests shall receive, in full and final satisfaction of such Interests, its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the *De Minimis* Unsecured Claims, the Allowed Tallwood Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series | N/A | N/A |

22

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | E Section 510(b) Claims,, the Allowed Series D Section 510(b) Claims, and the Allowed Wave Series C Preferred Interests, up to the Allowed amount of such Wave Series B Preferred Interests. | | |
| Class 13 | Wave Series A-1 Preferred Interests | On the Effective Date, or as soon thereafter as is reasonable practicable, (i) if the Restructuring occurs, all Wave Series A-2 Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or (ii) if the Asset Sale Distribution is elected, each Holder of Wave Series A 2 Preferred Interests shall receive, in full and final satisfaction of such Interests, its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the *De Minimis* Unsecured Claims, the Allowed Tallwood Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims,, the Allowed Series D Section 510(b) Claims, the Allowed Wave Series C Preferred Interests, and the Wave Series B Preferred Interests, up to the Allowed amount of such Wave Series A-2 Preferred Interests. | N/A | N/A |
| Class 14 | Wave Series A-2 Preferred Interests | On the Effective Date, or as soon thereafter as is reasonable practicable, (i)if the Restructuring occurs, all Wave Series A-1 Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or (ii) if the Asset Sale Distribution is elected, each Holder of Wave Series A 1 Preferred Interests shall receive, in full and final satisfaction of such Interests, its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the *De Minimis* Unsecured Claims, the Allowed Tallwood Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims,, the Allowed Series D Section 510(b) Claims, the Allowed Wave Series C Preferred Interests, the Wave Series B Preferred Interests, and the Allowed Wave Series A-2 | N/A | N/A |

23

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan** |
| | | Preferred Interests, up to the Allowed amount of such Wave Series A-1 Preferred Interests. | | |
| Class 15 | Wave Common Interests | As of the Effective Date, or as soon thereafter as is reasonable practicable, (i) if the Restructuring occurs, all Holders of Wave Common Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or (ii) if the Asset Sale Distribution is elected, each Holder of Wave Common Interests shall receive, in full and final satisfaction of such Interests, its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the *De Minimis* Unsecured Claims, the Allowed Tallwood Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims,, the Allowed Series D Section 510(b) Claims, the Allowed Wave Series C Preferred Interests, the Wave Series B Preferred Interests, the Allowed Wave Series A-2 Preferred Interests, and the Allowed Wave Series A-1 Preferred Interests. | N/A | N/A |
| Class 16 | Intercompany Interests | As of the Effective Date, or as soon thereafter as is reasonable practicable, (i) if the Restructuring occurs, at the option of the applicable Debtor and in consultation with Tallwood and the Committee, all Intercompany Interests shall be either Reinstated or canceled, released, and extinguished and shall be of no further force and effect without any Plan Distribution; or (ii) if the Asset Sale Distribution is elected, all Intercompany Interest shall be canceled, released, and extinguished and shall be of no further force and effect without any Plan Distribution. | N/A | N/A |

## III. VOTING INSTRUCTIONS AND PROCEDURES

### A. Voting Agent

The Debtors have retained Donlin Recano & Company, Inc. ("Donlin") to act as, among other things, the Voting Agent in connection with the solicitation of votes to accept or reject the Plan.

### B. Solicitation Package.

The following materials shall constitute the solicitation package (the "Solicitation Package"):

24

1. a cover letter to the order approving the Disclosure Statement and Solicitation Procedures (the "Disclosure Statement Order"), describing the contents of the Solicitation Package and urging the holders of Claims in each of the Voting Classes to vote to accept the Plan;

2. the applicable form of Ballot, in substantially the form of Ballots attached as **Exhibits B-1 and B-2** to the Disclosure Statement Order, as applicable, including a pre-paid, pre-addressed return envelope;

3. a copy of the Solicitation and Voting Procedures;

4. the approved Disclosure Statement (and exhibits hereto, including the Plan);

5. the Disclosure Statement Order (without exhibits);

6. the *Notice of Hearing to Consider Confirmation of the Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines*, (the "Confirmation Hearing Notice"); and

7. any additional documents that the Court has ordered to be made available.

### C.    Distribution of the Solicitation Package

The Solicitation Package shall provide the Plan, the Disclosure Statement, and the Disclosure Statement Order (without exhibits) in electronic format (flash drive or CD-ROM), and all other contents of the Solicitation Package, including Ballots and these Solicitation and Voting Procedures, shall be provided in paper format. Any party that receives the materials in electronic format but would prefer paper format (to be provided at the Debtors' expense) may contact the Debtors' Solicitation Agent by: (i) calling the Debtors' restructuring hotline at (877) 476-4390; (ii) visiting the Debtors' restructuring website at: https://www.donlinrecano.com/Clients/wave/Index; (iii) writing to Donlin, Recano & Company, Inc., Re: Wave Computing, Inc. et al., P.O. Box 199043, Blythebourne Station, Brooklyn, NY 11219; and/or (iv) emailing wavecompinfo@donlinrecano.com and requesting paper copies of the corresponding materials previously received in electronic format.

The Debtors shall file the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court no later than fourteen (14) days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Voting Agent by: (i) calling the Voting Agent at the telephone numbers above; (ii) visiting the Debtors' restructuring website at: https://www.donlinrecano.com/Clients/wave/Index; (iii) writing to Donlin, Recano & Company, Inc., Re: Wave Computing, Inc. et al., P.O. Box 199043, Blythebourne Station, Brooklyn, NY 11219; and/or (iv) emailing wavecompinfo@donlinrecano.com and requesting paper copies of the corresponding materials previously received in electronic format.

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 43 of 276

### D. Voting Instructions

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote such Claims, you will receive separate Ballots, which must be used for each separate Class of Claims.

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

After carefully reviewing the Plan and this Disclosure Statement, and the Exhibits thereto, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan on the enclosed Ballot. After indicating your acceptance or rejection of the Plan, please complete any other applicable items on your Ballot, sign your Ballot and return your Ballot in accordance with the instructions accompanying your Ballot on or before the Voting Deadline. In order for your vote to be counted, you must complete and return your Ballot in accordance with the instructions accompanying your Ballot on or before the Voting Deadline.

Holders of Claims in the Voting Classes may return their Ballot(s) in hard copy or submit electronically on the Debtors' online balloting portal. If the holder wants to have its hard copy Ballot counted, such holder's Ballot must be properly completed, executed, and delivered timely via (i) the enclosed pre-paid, pre-addressed return envelope, or (ii) first class mail, overnight courier, or hand delivery to the Voting Agent at Donlin, Recano & Company, Inc., Re: Wave Computing, Inc. et al., 6201 15th Avenue, Brooklyn, NY 11219. **Delivery of a Ballot to the Solicitation Agent by facsimile or any other electronic means other than the online balloting portal will not be valid.**

If you have any questions about the procedure for voting your eligible Claim or with respect to the Solicitation Package that you have received, please contact the Voting Agent:

Donlin, Recano & Company, Inc.
Re: Wave Computing, Inc., et al.
P.O. Box 199043
Blythebourne Station
Brooklyn, NY 11219
Toll Free Tel: 1-877-476-4390
Fax: 1-212-481-1416
Email: wavecompinfo@donlinrecano.com

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE _ACTUALLY RECEIVED_ BY THE VOTING AGENT ON OR BEFORE 4:00 P.M. (PREVAILING PACIFIC TIME) ON JANUARY 11, 2021, AT THE ABOVE ADDRESS. EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT OR DETERMINED OTHERWISE BY THE DEBTORS, BALLOTS RECEIVED AFTER THE PLAN VOTING DEADLINE WILL NOT BE ACCEPTED OR USED IN CONNECTION WITH THE DEBTORS' REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF. THE RECORD DATE FOR DETERMINING WHICH CREDITORS MAY VOTE ON THE PLAN IS NOVEMBER 18, 2020.**

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 44 of 276

**ONLY BALLOTS WITH SIGNATURES WILL BE COUNTED. ONLY ORIGINAL BALLOTS RECEIVED BY THE VOTING AGENT BY THE PLAN VOTING DEADLINE WILL BE COUNTED. FOR THE AVOIDANCE OF DOUBT, HOLDERS OF CLAIMS IN THE VOTING CLASSES MAY SUBMIT BALLOTS CONTAINING AN ELECTRONIC SIGNATURE THROUGH AN ONLINE BALLOTING PORTAL MAINTAINED BY THE VOTING AGENT.**

If you are a Holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning this Disclosure Statement, the Plan or the procedures for voting on the Plan, please (i) call the Debtors' restructuring hotline at (877) 476-4390; or (ii) visit the Debtors' restructuring website at: https://www.donlinrecano.com/Clients/wave/Index.

> **RECOMMENDATION: THE DEBTORS RECOMMEND THAT CREDITORS IN THE VOTING CLASSES VOTE TO ACCEPT THE PLAN.**

### E. Voting Tabulation

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Holders who actually vote will be counted. The failure of a Holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such Holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots.

Unless the applicable Ballot is timely submitted to the Voting Agent before the Voting Deadline, together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid and decline to use it in connection with seeking Confirmation of the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to Bankruptcy Code section 1126(e), that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another Party acting in a fiduciary or representative capacity, such Person should indicate such capacity when signing and, upon request by the Debtors, must submit proper evidence satisfactory to the Debtors of authority to so act.

### F. Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on January 27, 2021, commencing at 10:15 a.m. (prevailing Pacific Time), before the Honorable M. Elaine Hammond, United States Bankruptcy Judge, at the United States Bankruptcy Court Northern District of California. The Confirmation Hearing will be conducted by Zoom videoconferencing. A link to the Confirmation Hearing will be posted on the Bankruptcy Court's website the Monday before

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 45 of 276

the Confirmation Hearing, and can be found at https://www.canb.uscourts.gov/judge/hammond/calendar. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before the Plan Objection Deadline of January 11, 2021 at 4:00 p.m. (prevailing Pacific Time). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

**G.    Amendments to the Plan and Solicitation and Voting Procedures**

The Debtors reserve the right to make non-substantive or immaterial changes to the Disclosure Statement, the Plan, these Solicitation and Voting Procedures, the Confirmation Hearing Notice, the Non-Voting Status Notices, the Ballots, the cover letter, and related documents without further order of the Court, including changes to correct typographical and grammatical errors, if any, and to make conforming changes to the Disclosure Statement, the Plan, and any other materials in the Solicitation Packages before distribution.

**IV. GENERAL INFORMATION ABOUT THE DEBTORS**

**A.    Overview**

Wave was founded in 2008 as a processor technology company that investigated the use of "coarse grain reconfigurable architecture" ("CGRA") to combat the growing cost of the ASIC development. In June 2018, Wave acquired MIPS, a provider of reduced instruction set computer processor architectures and intellectual property cores. The Company's current organizational chart is attached to the Plan as **Exhibit A.** A total of seven (7) Debtors, including Wave and each wholly-owned direct or indirect subsidiary of Wave, filed voluntary petitions on the Petition Date.

As detailed below, the Company began to face financial instability when their first commercial dataflow microprocessing unit proved unmarketable shortly before the product was expected to launch. This, in conjunction with the economic slowdown caused by COVID-19 and increased shareholder litigation, precipitated the filings of the Chapter 11 Cases. The Debtors commenced the Chapter 11 Cases in order to provide breathing room for the Company to restructure its capital, claims, and operations. The proposed restructuring transactions described herein, and the related chapter 11 process, are expected to allow the Company to right-size its balance sheet and go forward with the ability to compete successfully in the current economic environment.

**B.    Corporate History**

Wave began in 2010 as a startup technology company with venture funding from Southern Cross Venture Capital and Tallwood Venture Capital. Although initially focused on the development of CGRA and its corresponding technologies, Wave later engaged with Micron Corporation in a large, non-reoccurring engineering project concerning the potential commercialization of the Debtors' technology for general computing applications.

The Company sought to capitalize on its early success, and in 2018, acquired MIPS. MIPS, which was established in 1984, had a long history of licensing its IP core architecture to many different applications, proving itself adaptable to new technology trends and customer demands as they arose

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 46 of 276

over the course of decades.  The Debtors had hoped that with the acquisition of MIPS and its related IP, they could address a broader market for AI-enabled hardware.

The Debtors subsequently narrowed their focus from general computing applications to AI workloads, seeking to harness the inherent reconfigurability of the technology to better mimic machine learning algorithms.  At this time, hyper-scale data driven businesses such as Facebook and Google were becoming increasingly focused on developing and deploying a deep-learning ASIC in their data centers, and Wave hoped to become a leader in the market.  Accordingly, Wave adapted its existing CGRA technology towards the dataflow type software these large customers were using and pivoted its product offerings from AI accelerator microchips to entire systems that could be installed in both data center and on premise within a company's information technology environment.

The Debtors began exploring commercialization of their AI systems, with potential applications arising in the financial services, automotive, retail, healthcare, and manufacturing sectors, to name a few.  The Debtors hoped that, through ongoing development, they could build the future generation of data processing units.

### C.      Operations

The Debtors are privately held, independent technology companies that have historically been engaged in two main business lines: the development of a cutting edge artificial intelligence solution and the licensing of intellectual property cores for embedded microprocessors used in a variety of technology applications.  The Debtors are headquartered in Santa Clara, California.  As of the Petition Date, the Debtors had twenty-eight (28) employees in the United States and three (3) employees outside of the United States.

When Wave was originally founded, it concentrated its business on the development and sale of technology that focuses the use of CGRA towards artificial intelligence workloads.  This includes such applications as deep-learning and natural language processing but has a wide variety of uses.  Wave has since shifted its business platform and now focuses the use of the CGRA technology towards AI workloads versus general computing applications.  In 2018, Wave Computing, Inc. acquired MIPS Tech, Inc., a provider of reduced instruction set computer processor architectures and IP cores, which are blocks of logic essential to making a field programmable array or ASIC.  The acquisition was designed to combine Wave's AI technologies with MIPS' embedded microprocessor technologies to address a broader market for AI-enabled hardware from the edge to the data center.  The Debtors continue to maintain a sizeable patent portfolio, with over one hundred thirty (130) patents held by different debtor-entities and are currently working on the next generation technology.

### D.      Prepetition Capital Structure

The following is an approximate overview of Wave's capital structure as of the Petition Date.

| Description | Amount ($mm) | Interest Rate |
|---|---|---|
| **Total Prepetition Tallwood Debt** | **$13.4** | **7.5%** |
| **Total Debt** | **$13.4** | |

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 47 of 276

The following chart sets forth a summary of the Debtors' equity structure as of the Petition Date.

| Stock Classification | Issued and Outstanding | Percent Ownership |
|---|---|---|
| **Preferred Stock** | -- | -- |
| Series E | 12,970,421 | 7.9802% |
| Series D | 54,068,553 | 33.2663% |
| Series C | 43,086,742 | 26.5096% |
| Series B | 11,571,228 | 7.1193% |
| Series A–2 | 968,724 | 0.596% |
| Series A–1 | 7,390,144 | 4.5469% |
| **Common Stock** | 5,410,218 | 3.3287% |
| **Total Shares Outstanding** | 130,055,812 | |

In addition, the Debtors are obligated on significant tax, and other priority and general unsecured claims.

### 1. Tallwood Claims

Wave is party to that certain Prepetition Note, dated as of July 5, 2019 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Note") with Tallwood, as lender, along with certain subsidiaries of Wave party thereto (collectively the "Prepetition Guarantors"), pursuant to which Tallwood provided an aggregate commitment of $19.4 million to Wave (the "Aggregate Prepetition Commitment"), consisting of a term loan facility and a delayed draw term loan facility, and for which Wave and the Prepetition Guarantors granted security interests and entered into the guaranties in favor of Tallwood in connection with, and as consideration for, the advancement of the loans thereunder.

Tallwood asserts that Wave's obligations under the Prepetition Note are secured by a first-priority lien upon all right, title, and interest in substantially all property owned by Wave or any of its subsidiaries party to the Prepetition Note, including but not limited to substantially all: (i) inventory; (ii) general intangibles; (iii) accounts; (iv) chattel paper; (v) instruments and documents or any other intangible representing payment for goods or services; (vi) equipment; (vii) investment property; (viii) commercial tort claims; (ix) letter of credit rights; (x) deposit accounts and funds on deposit therein; (xi) fixtures located at or affixed to the real estate; (xii) patents, trademarks, copyrights, and other intellectual property; and (xiii) parts, replacements, substitutions, profits, products, accessions, and Cash and non-cash proceeds and supporting obligations of any of the foregoing in any form and wherever located and whether now owned or hereafter acquired, in each case subject to certain exceptions. In addition, each of Wave's subsidiary entities (including MIPS) signed on as note parties and guarantors to the Prepetition Note, pledging their assets as collateral and guarantying repaying in the event of a default by Wave. A UCC-1 financing statement with respect to Wave (but not any of the other subsidiaries party to the Prepetition Note) was filed with the Delaware Secretary of State on January 3, 2020. The Committee believes that no steps have been taken to perfect Tallwood's security

30

interests in any assets of Wave or any of the other subsidiaries party to the Prepetition Note that cannot be perfected by filing of a UCC-1 financing statement.

As of the Petition Date, $13,408,137.50 of Aggregate Prepetition Commitment is outstanding. The Debtors have obtained relief on a final basis to roll-up $2,786,511 of the outstanding amount of the Aggregate Prepetition Commitment into the debtor-in-possession loan facility requested by the Debtors, which facility includes an additional $7,500,000 of new money delayed draw term loans, for a total commitment under the DIP Facility of $10,286,511.

### 2.      Common and Preferred Stock

Wave has issued both common and preferred stock prepetition.  Of the 178,000,000 shares of common stock authorized, 5,410,218 have been issued and remain outstanding.

Wave has also raised capital through the issuance of six series of preferred stock—Series A-1, Series A-2, Series B, Series C, Series D, and Series E.  All shares authorized for Series A-1 (7,390,144), Series A-2 (968,724), Series B (11,571,228), and Series D (54,068,553) have been issued and remain outstanding.  Of the 46,807,004 shares authorized in Series C, 43,086,742 remain outstanding.  Of the 24,571,428 shares authorized in Series E, only 12,970,421 remain outstanding. The preferred stock has liquidation priority in reverse alphabetical (and numeric) order (*i.e.*, the Series E preferred stock has priority over all other preferred stock, followed by the Series D preferred stock, etc.).

A large portion of the Series E shares were redeemed in 2019 from various investors (the "Series E Redemption").  The remaining Series E shares are split among four groups of affiliated shareholders, including Tallwood, which chose not to participate in the Series E Redemption.  As of the Petition Date, one such group of affiliated non-redeeming Series E shareholders was exploring potential legal action and one had filed a complaint against the Debtors related to the Series E Redemption.

### 3.      Series E Redemption

On July 1, 2019, the Debtors entered into a settlement agreement with Windtree Drive, LLC ("Windtree"), pursuant to which the Debtors paid to Windtree $40 million in Cash to redeem Windtree's entire 2018 investment in the Wave Series E Preferred Interests (the "Windtree Redemption") plus $350,000 attorneys' fees.  Windtree alleged that Wave had made fraudulent or misleading representations  to Windtree to induce it to invest in the Wave Series E Preferred Interests, and threatened to sue Wave and its officers and directors if Wave did not agree to settle the dispute through the Windtree Redemption.  The Debtors and the Committee are exploring whether there exist Causes of Action to recover the funds paid to Windtree and its direct and indirect shareholders in connection with the Windtree Redemption.  Any such Causes of Action will be transferred to the Liquidating Trust upon the Effective Date.

A large portion of the remaining Wave Series E Preferred Interests (other than those redeemed pursuant to the Windtree Redemption) were redeemed in 2019 from various investors (together with the shares redeemed in the Windtree Redemption, the "Series E Redemption").  The remaining Series E shares are split among four groups of affiliated shareholders, including Tallwood, which chose not to participate in the Series E Redemption.  As of the Petition Date, one such group of affiliated non-redeeming Series E shareholders was exploring potential legal action and one, Canyon Bridge I LP

31

("Canyon Bridge"), had filed a complaint against Wave, Tallwood, and former officers and directors of Wave related to the Series E Redemption. The Canyon Bridge action, which was filed shortly before the Petition Date, is captioned *Canyon Bridge Fund I, LP v. Wave Computing, Inc., et al., 20-cv-366150, Superior Court of California Santa Clara County* (the "Canyon Bridge Action"). In the Canyon Bridge Action, Canyon Bridge asserts individual and derivative claims on behalf of Wave for, among other things, securities fraud.

### E. Executive Officers and Board of Directors

The Debtors' current executive officers and Board of Directors include:

| Name | Position |
|---|---|
| Sanjai Kohli | President and Chief Executive Officer |
| Lawrence R. Perkins | Chief Restructuring Officer |
| Tom Fitzgerald | Director |

The members of Wave Computing's Board of Directors will be deemed to have resigned as directors as of the Effective Date. The members of the New Board shall be appointed in accordance with the Plan and the terms provided in the Plan Supplement. From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall serve pursuant to the terms of their respective charters and by-laws or other formation and constituent documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation. For more information regarding the selection of the New Board, see **Section VII.C.5** of this Disclosure Statement and **Section IV.E.8** of the Plan.

## V. EVENTS LEADING TO THESE CHAPTER 11 CASES

### A. Impediments with the Debtors' Business Operations

Wave acquired MIPS in June, 2018, with the expectation that, by combining its AI technologies with MIPS embedded microprocessor technologies, the Debtors would be able to address a broader market for AI-enabled hardware that processed data throughout a network, from the edge to the data center. This effort took longer and proved more costly to implement than anticipated and ultimately resulted in the need to exit the AI business and restructure the Debtors' business and operations.

The Debtors planned to launch their first commercial dataflow microprocessing unit, but the Debtors found issues with the performance of the chipset architecture shortly before bringing it to market. Corrective action failed to improve the issue, requiring the Debtors to look at alternative solutions to re-engineer the project, costing them both time and money and resulting in liquidity challenges.

At the same time, the Debtors became embroiled in a dispute relating to the Series E preferred equity offering. This dispute, combined with continued setbacks with the microprocessing unit, quickly eroded the Debtors' liquidity. To maintain operations during these challenging times, the Debtors borrowed additional funds from Tallwood, as their equity sponsor, under the Prepetition Notes and sought to sell non-core assets where possible.

32

As 2020 progressed, tightening markets and the economic slowdown caused by COVID-19 limited access to new liquidity from traditional sources, while additionally limiting the funds that could be generated through asset sales. Meanwhile, the Debtors were hit with an increasing number of lawsuits from creditors and a Series E investor, leading the Debtors to conclude that filing for chapter 11 and availing themselves of the automatic stay was the best option to maximize return to all constituents. To allow the process to proceed with independent oversight of the Debtors' decision-making process, on March 27, 2020, the Debtors retained Tom FitzGerald, an experienced restructuring professional with no pre-existing relationship to the Debtors. Mr. FitzGerald formally accepted appointment to the Board of Directors on April 7, 2020. Prior to filing for Chapter 11, Mr. FitzGerald became the sole member of the Debtors' Board of Directors, and Lawrence R. Perkins of SierraConstellation Partners LLC ("SCP") was selected to be the Debtors' Chief Restructuring Officer.

### B. Strategic Alternatives

The Windtree Redemption severely and negatively impacted the Debtors' liquidity and prospects for survival. Immediately following the Series E Redemption, facing a shortfall of capital to continue the development of their re-engineered processing units, the Debtors set out to raise funds for the ongoing development of their second-generation dataflow processing unit architecture. Several strategies were investigated, ranging from raising capital from new venture capital investors and strategic investors; selling portions of the business; or financing capital against royalty revenues from existing MIPS IP cores or the intellectual property and patent portfolio of Wave. However, the Debtors realized that while there was interest in their business and assets, the liabilities accrued by the company during the commercialization efforts of previous years were too great to attract the needed liquidity infusion.

Despite the Debtors' progress with their corrective, second generation technology, the failure of the original chips and subsequent developmental delays put a significant strain on the company's capital reserves and ground development to a halt. As a consequence, the Debtors filed for bankruptcy under chapter 11 to avail themselves of the protections of the automatic stay, address legacy legal and tax liabilities, restructure the Company's debt obligations and claims, and maximize recoveries for creditors and other constituents—all while continuing to operate the business without interruption. The Debtors expect to emerge from the bankruptcy process with greater financial flexibility to pursue their long-term goals.

## VI. CHAPTER 11 CASES

### A. Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 authorizes a debtor to reorganize its business for the benefit of its creditors, equity interest holders, and other parties in interest. Commencing a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The principal objective of a chapter 11 case is to consummate a plan of reorganization. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court binds a debtor, any issuer of securities

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 51 of 276

thereunder, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity the bankruptcy court may find to be bound by such plan. Chapter 11 requires that a plan treat similarly situated creditors and similarly situated equity interest holders equally, subject to the priority provisions of the Bankruptcy Code.

Subject to certain limited exceptions, the bankruptcy court order confirming a plan of reorganization discharges a debtor from any debt that arose prior to the date of confirmation of the plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

Prior to soliciting acceptances of a proposed plan of reorganization, Bankruptcy Code section 1125 requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization. This Disclosure Statement is submitted in accordance with Bankruptcy Code section 1125.

**B.      Administration of these Chapter 11 Cases**

**1.      First Day Motions**

On the Petition Date, or soon thereafter, the Debtors filed numerous first-day motions (the "First Day Motions"), the object of which was to streamline the transition to operating under chapter 11, to stabilize operations, and to preserve their relationships with vendors, customers, royalty interest owners and employees. These first-day motions requested, among other things, authority to:

(i)      jointly administer the Chapter 11 Cases for procedural purposes only;

(ii)      continue to operate the Debtors' existing cash management system and continue the use of existing bank accounts and business forms;

(iii)      pay prepetition compensation, wages, salaries, and other reimbursable employee expenses;

(iv)      designate Lawrence R. Perkins as a responsible individual of these estates pursuant to B.L.R. 4002-1;

(v)      continue prepetition insurance coverage, workers' compensation programs and related practices;

(vi)      pay certain vendors the Debtors deemed critical to their business operations and the administration of these estates;

(vii)      obtain postpetition financing, use cash collateral, and provide adequate protection in connection therewith; and

(viii)      continue to pay for utility services.

The First Day Motions and all orders for relief granted in the Chapter 11 Cases can be viewed free of charge at https://www.donlinrecano.com/Clients/wave/Dockets.

34

## 2. Debtor-in-Possession Financing

As a result of an extensive pre- and postpetition negotiation process, the Company was able to secure commitments for to borrow up to $7,500,000 in new money (the "New Money DIP Facility") and up to $2,786,511 in a roll-up of prepetition debt (the "Rolled-Up Prepetition Debt") from Tallwood pursuant to the DIP Note. The Debtors and their advisors believe the DIP Facility is the best presently available postpetition financing option for the Debtors and is in the best interest of the Debtors and their estates.

On the Petition Date, the Debtors filed the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, and 364 For Orders Authorizing (i) Postpetition Financing; (ii) Cash Collateral Use; (iii) Adequate Protection To Existing Secured Parties; (iv) Liens And Superpriority Claims; And (v) Modifying The Automatic Stay* [Dkt. No. 14] requesting authority to enter into the DIP Facility. On September 16, 2020, after negotiations with objecting parties through which the Debtors were able to reach consensus with the Committee, the U.S. Trustee, Alibaba and Canyon Bridge, the Bankruptcy Court granted an order authorizing the Debtors to enter into the DIP Facility on a final basis [Dkt. No. 537].

Among other things, the DIP Order (i) authorizes the Debtors to obtain up to an total aggregate principal of $10,286,511 in secured, superpriority postpetition financing consisting of (a) a new money revolving loan facility in the aggregate principal amount of $7,500,000, and (b) a refinancing term loan facility in the aggregate principal amount of up to $2,786,511. The Order further permits the Committee to investigate the validity, priority, perfection, extent, avoidability, or enforceability of the Prepetition Tallwood Debt and requires the Debtors to segregate any new money DIP loans until used. As of the date of filing this Disclosure Statement, the Debtors have not drawn any DIP loans under the DIP Facility, but expect to draw the full amount of the new money portion of the loan ($7,500,000) prior to the Effective Date for general corporate needs and to cover the costs of these Chapter 11 Cases.

## 3. Filing of Retention Applications and Related Motions

On the Petition Date, the Debtors filed their application to retain Donlin as claims, noticing and solicitation agent [Dkt. No. 7]. Shortly thereafter, on May 11, 2020, the Debtors filed applications to retain certain professionals, specifically, Sidley Austin LLP ("Sidley") as Debtors' counsel [Dkt. No. 90] and Lawrence R. Perkins as Chief Restructuring Officer and SCP as Debtors' financial and restructuring advisor [Dkt. No. 92], as well as the *Debtors' Motion Pursuant to 11 U.S.C. §§ 331 and 105(a) and Fed. R. Bankr. P. 2016 for Authority to Establish Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (the "Interim Compensation Motion") [Dkt. No. 99].

The Debtors subsequently filed the following applications to retain certain other professionals, including:

(i)　May 13, 2020: Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 327, 328, and 330 for Authority to Employ and Compensate Professionals Used in the Ordinary Course of Business ("OCP Motion") [Dkt. 102];

(ii)　May 13, 2020: Kroll Associates, Inc. ("Kroll") as Data Retention and Litigation Support Agent [Dkt. No. 105];

(iii)    May 20, 2020: Affeld Grivakes LLP ("Grivakes") as conflicts counsel[6] [Dkt. No. 126]; and

(iv)    June 10, 2020: Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") as Special Counsel [Dkt. No. 235] (each a "Retention Application," and collectively, the "Retention Applications")

No objections were filed to the Donlin, Sidley, Kroll, or Grivakes Retention Applications; however, the United States Trustee for Region 17 (the "UST") filed objections and limited objections to the SCP and OCP Retention Applications and the Interim Compensation Motion [Dkt. Nos. 134, 136, 137]. The Bankruptcy Court ultimately approved the relief requested in the Donlin, Sidley, and Kroll Retention Applications [Dkt. Nos. 54, 193, 194], and after notice and hearing overruled the U.S. Trustee's objections and authorized the requested relief for the SCP Retention Application, the Interim Compensation Motion, and the OCP Motion [Dkt. Nos. 197, 252, 253].

The Committee, CIP United Co. Ltd., and Prestige Century Investments Limited filed an objection to Paul Weiss's Retention Application, asserting that the legal services to be rendered were duplicative to that of the Debtors' prior legal counsel, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"), Sidley, and the Committee's counsel, Hogan Lovells US LLP ("HL"). [Dkt. Nos. 275, 283]. In order to address the concerns raised by the Committee and CIP, a supplemental declaration was filed in support of the Paul Weiss' Retention Application [Dkt. No. 288] (the "Supplemental Fitzgerald Declaration") and filed a revised proposed order [Dkt. No. 289], which addressed the Committee's concerns. The Committee withdrew its objection [Dkt. No. 299] and the following day, the Bankruptcy Court overruled the CIP objection at the hearing on July 1, 2020. The order authorizing the Debtors to retain Paul Weiss was entered shortly thereafter [Dkt. No. 307].

### 4.    Stock Transfer Motion

On May 13, 2020, the Debtors filed the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 362 for Interim and Final Orders Establishing Notice and Objection Procedures and Approving Restrictions on Certain Transfers of Wave Stock* [Dkt. No. 101] (the "Stock Transfer Motion"), requesting streamlined notice and objection procedures related to certain transfers of and declarations of worthlessness for federal or state tax purposes with respect to Wave's existing common or preferred stock or any Beneficial Ownership, as determined in accordance with the applicable rules of section 382 of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1–9834 (as amended, the "IRC"), and the Treasury Regulations thereunder. Through the Stock Transfer Motion, the Debtors further requested that any purchase, sale, or other transfer of Wave Stock in violation of the Procedures be null and void ab initio. Two days later, the Debtors filed an amended motion [Dkt. No. 113] (the "Amended Stock Transfer Motion"), to reflect a more accurate calculation to determine a percentage of ownership of the Debtors. The Debtors subsequently filed a revised proposed order [Dkt. No. 183], which was granted and entered on June 8, 2020 [Dkt. No. 196], approving procedures for certain transfers of and declarations of worthlessness with respect to common and/or preferred stock of Wave or any beneficial ownership thereof on an interim basis. The following day, the Debtors filed the Notice of (I) Disclosure Procedures for Transfers of Wave Stock Applicable to Certain Holders of Wave Stock and (II) Final Hearing on the Motion Therefor [Dkt. No. 219], and shortly thereafter, on July 1, 2020, a

---

[6] Grivakes was retained as conflicts counsel to the Debtors with respect to all matters concerning the application and receipt of funds under the Paycheck Protection Program ("PPP"), as well as any other conflicts issues that may arise through the duration of these Chapter 11 Cases.

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 54 of 276

final hearing on the Stock Transfer Motion was held and the Bankruptcy Court approved the relief requested in the Stock Transfer Motion on a final basis [Dkt. No. 306] (the "Final Stock Transfer Order"). On July 6, 2020, the Debtors, in accordance with the terms of the Final Stock Transfer Order, submitted a copy of the notice of interim order (as modified for publication) for publication in Investor's Business Daily.

### 5. Appointment of the Official Committee of Unsecured Creditors

On May 18, 2020, the UST, pursuant to sections 1102(a) and 1102(b)(1) of the Bankruptcy Code, appointed certain creditors to the Committee [Dkt. No. 114]. The Committee filed applications to retain certain professionals, specifically, HL as Committee counsel [Dkt. No. 279] and Dundon Advisers, LLC ("Dundon") as financial advisor [Dkt. No. 356]. The Committee consists of the following five members: (i) Synopsys, Inc.; (ii) Avnet, Inc.; (iii) Ensilica India Pvt Ltd.; (iv) Sintegra, Inc.; and (v) PFIL North America Inc.

The HL and Dundon Retention Applications were unopposed, and the Bankruptcy Court entered orders approving their respective Retention Applications [Dkt. Nos. 355, 569, respectively].

### 6. Filing of Schedules and Statements of Financial Affairs

On June 3, 2020, the Debtors filed their Schedules of Assets and Liabilities (the "**Schedules**") and Statements of Financial Affairs (the "**Statements**") in compliance with section 521 of the Bankruptcy Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure. The Schedules and Statements set forth, among other things, the Debtors' assets and liabilities, current income and expenditures, and executory contracts and unexpired leases. The Debtors filed Amended Schedules for Wave, MIPS Tech, Inc., Wave Computing (UK) Limited, and MIPS Tech, LLC and Amended Statements for Wave and Imagination Technologies, Inc. on July 17, 2020. The Debtors filed Second Amended Schedules for Wave, MIPS Tech, Inc., and MIPS Tech, LLC and Second Amended Statements for Wave on August 3, 2020. The Debtors' Schedules and Statements can be downloaded free of charge at https://www.donlinrecano.com/Clients/wave/Static/SOALS.

### 7. Meeting of Creditors

On June 2, 2020, the UST held the meeting of creditors pursuant to section 341 of the Bankruptcy Code (the "341 Meeting"). The 341 Meeting was called but continued until June 25, 2020. Days before the continued 341 Meeting, the UST adjourned the meeting once again due to external factors resulting in inadequate notice to creditors. The 341 meeting was ultimately held and concluded on July 22, 2020.

### 8. Establishment of Bar Dates

Pursuant to the *Notice of 341(a) Meeting of Creditors via Telephone Conference and Notice of Bar Date* [Dkt. No. 86] filed on May 7, 2020, the deadline for creditors other than governmental units to file a proof of claim in these Chapter 11 Cases was August 31, 2020. Pursuant to Bankruptcy Rule 3002(c)(1), the deadline for governmental units to file a proof of claim is October 26, 2020.

37

### 9. KERP Motion

On June 8, 2020, the Debtors filed the *Motion of the Debtors Pursuant to 11 U.S.C. §§ 105(a), 363 and 503 for Entry of an Order Authorizing Implementation of Key Employee Retention Plan* [Dkt. No. 209] (the "KERP Motion"), the *Declaration of Lawrence R. Perkins in Support of the Debtors' Motion of the Debtors To 11 U.S.C. §§ 105(a), 363 and 503 for Entry of an Order Authorizing Implementation of Key Employee Retention* [Dkt. No. 210], and the *Declaration of John Dempsey in Support of the KERP Motion* [Dkt. No. 211], requesting authority to implement a retention plan (the "KERP"), which would allow the Debtors to adequately compensate and retain eighteen (18) key employees that are critical to the Debtors' business and ongoing operations. The KERP was approved by the Debtors' Board of Directors (the "Board") and supported by the Committee, and was filed under seal to prevent public disclosure of the employees' sensitive information. The Bankruptcy Court, the UST and the Committee were provided an unredacted version of the KERP on a strictly confidential basis. On June 24, 2020, the U.S. Trustee filed an objection to the KERP Motion [Dkt. No. 272], asserting that the evidence did not demonstrate the employee subject to the KERP were non-insiders, and that the terms of the KERP were inconsistent with industry standards and failed to establish a reasonable relation between the plan and the results obtained due to the large payout immediately upon approval of the KERP Motion.

In response, the Debtors filed their *Reply in Support of Motion Pursuant to 11 U.S.C. §§ 105(a), 363 and 503 for Entry of an Order Authorizing Implementation of Key Employee Retention Plan* [Dkt. No. 290], and the S*upplemental Declaration of Lawrence R. Perkins in Support of the KERP Motion* [Dkt. No. 291]. The reply included the KERP Participant Schedule, which listed the names of the employees subject to the KERP, their job title at the Debtors and a general description of their services to demonstrate they were not insiders and therefore eligible to participate in the KERP. The Debtors moved to seal the KERP Participant Schedule [Dkt. No. 295], which the Bankruptcy Court granted [Dkt. No. 305], but was provided to the Bankruptcy Court and the UST on a strictly confidential basis. After a hearing on July 1, 2020, the Bankruptcy Court overruled the UST's objection and entered an order authorizing the Debtors to implement the KERP for the eighteen employees [Dkt. No. 308]. The total cost of the KERP is $905,000 and awards participants a bonus in incremental payouts, determined from the duration the respective employee remains with the Debtors or Reorganized Debtors.

### 10. KEIP Motion[7]

As part of the Debtors' efforts to enhance value for the Debtors' estates and creditors, the Debtors, in consultation with their compensation consultant, decided in their business judgment to implement a key employee incentive plan for their most critical employee, Sanjai Kohli, the Debtors Chief Executive Officer. The Debtors determined, in their business judgment and after consultation with their professionals, that the incentive plan would appropriately incentivizes the Mr. Kohli as he continues to stabilize operating cash flow and increase the long-term attractiveness of the Debtors' assets. After the plan was approved by the Board, the Debtors filed the *Motion of the Debtors for the Entry of an Order (I) Authorizing the Debtors to Implement Key Employee Incentive Plan and (II) Granting Related Relief* [Dkt. No. 103], and the *Declaration of John Dempsey* in support thereof [Dkt. No. 104]. The motion was further supported by the *Declaration of Lawrence R. Perkins in Support of*

---

[7] Capitalized terms used but not otherwise defined in this Section VI.B.10 shall have the meanings ascribed to such terms in the Original KEIP Order.

*the Debtors' Second Day Pleadings* [Docket No. 108]. The motion was opposed by the UST [Dkt. No. 135], CIP United Co. Ltd., Prestige Century Investments Limited [Docket No. 140], and the Committee [Dkt. No. 486]. In response, the Debtors filed their Reply in support of the Motion [Dkt. No. 502], a Supplemental Dempsey Declaration [Dkt. No. 503] and the Kohli Declaration [Dkt. No. 104], which supported the reasonableness of the incentive plan and set forth revisions to the incentive plan that resolved the Committee and CIP objections.

After a hearing on September 16, 2020, the Bankruptcy Court overruled the UST's objections and authorized the Debtors to implement the modified incentive plan pursuant to an order entered September 23, 2020 [Dkt. No. 523] (the "Original KEIP Order"). On November 12, 2020, the Debtors filed a motion to amend the Original KEIP Order [Dkt. No. 743] (the "Motion to Amend"), requesting the terms of the KEIP be revised to allow the KEIP Participant to earn the incentive bonus if the Bankruptcy Court enters a final order, on or before February 28, 2021, as opposed to January 1, 2021. Further, the Debtors requested the KEIP be amended to allow (i) an "Acceptable Plan" to include a proposed distribution to Allowed Priority Claims in addition to Allowed Unsecured Claims, and (ii) the definition of an "Acceptable Sale" be expanded to include a sale through a plan pursuant to section 1123 of the Bankruptcy Code. The Motion to Amend was approved in part, and the KEIP will be amended to (i) allow the entry of a final order on or before February 28, 2021, and (ii) to expand the definition of an "Acceptable Sale" be expanded to include a sale through a plan pursuant to section 1123 of the Bankruptcy Code. The Debtors, in consultation with the Committee and Tallwood, may seek Bankruptcy Court approval to make additional amendments to the Original KEIP Order.

The incentive plan provides Mr. Kohli an incentive bonus equal to two percent (2.0%) of the Plan (or sale) value up to a maximum Plan (or sale) value of $100,000,000 if the Bankruptcy Court enters a final order, on or before February 28, 2021 that either (i) approves a sale of all or substantially all of the assets of the Debtors of the Bankruptcy Code, which the Transaction Value[8] equals or exceeds $40,000,000, or (ii) confirms a plan of reorganization that provides for a proposed distribution to Allowed Unsecured Claims in an aggregate amount not less than $40,000,000 (unless the total amount of Allowed Unsecured Claims is less than $40,000,000, in which case the plan of reorganization shall provide for a proposed distribution equal to one hundred percent (100%) of the amount of such Allowed Unsecured Claims and the plan of reorganization shall have a Transaction Value of $40,000,000); *provided*, *however*, that the value of any equity securities in the reorganized Debtors shall not count towards the $40,000,000 aggregate distribution to Allowed Unsecured Claims. An audio file with the Bankruptcy Court's oral ruling in connection with the Original KEIP Order can be found at Dkt. No. 528. Moreover, as part of the resolution with CIP and the Committee, the Debtors agreed to reduce Mr. Kohli's monthly compensation from $200,000 to $150,000.

---

[8] "Transaction Value" means, (i) in the case of a plan of reorganization, the implied valuation of the Debtors reflected in such plan of reorganization, which valuation must (x) be approved by the Committee, or (y) established by this Court after notice and a hearing; and (ii) in the case of a Sale, the total cash consideration actually paid by a purchaser to the Debtors (excluding contingent consideration and amounts in escrow) in such Sale. In no event shall approval of the Transaction Value for the purposes of the Incentive Plan have any res judicata or other preclusive effect in this case or on the parties to this bankruptcy. Original KEIP Order at ¶ 5.e.

39

**11. Subordination and/or Disallowance of Certain Claims**

As of the filing of this Disclosure Statement, the Debtors have objected to numerous proofs of claim as part of the claims reconciliation process. This includes, *inter alia*, the Debtors' *Amended Fourth Omnibus Objection to Certain Proofs of Claim (Equity Claims)* [Dkt. No. 628] (the "Fourth Omnibus Objection") and the *Amended Sixth Omnibus Objection to Certain Proofs of Claim (Equity Claims)* [Dkt. No. 633] (the "Sixth Omnibus Objection") filed on October 21, 2020. The Fourth and Sixth Omnibus Objections sought to disallow and expunge or subordinate under section 510(b) of the Bankruptcy Code certain equity claims after determining that each such claim was filed either on account of an equity interest in the Debtors or as a result of damages arising from the purchase or sale of a security of the Debtors. After notice and hearing, the Bankruptcy Court entered orders sustaining certain claim objections, including, notably, the Debtors' Fourth and Sixth Omnibus Objections. *See* Dkt. Nos. 831, 836 (orders sustaining the Fourth Omnibus Objection and the Sixth Omnibus Objection, respectively). The entry of these orders has resulted in a significant reduction of claims asserted against the Debtors, including the elimination and/or subordination of over $22,000,000. The Debtors will to continue to litigate, settle or seek to resolve additional claims as necessary throughout the pendency of these Chapter 11 Cases, and post-Confirmation, as applicable, in accordance with the terms set forth herein and in the Plan.

**C. SEC Investigation**

On March 3, 2020, Wave received a request for the voluntary production of documents from the Securities and Exchange Commission (the "SEC"). In response, Wave, through counsel, placed litigation holds to preserve documents, discussed and refined the scope of the request with the Staff of the Commission ("Staff"), and produced documents in response to the letter request.

On May 22, 2020, the SEC issued a subpoena for documents to Wave which incorporated and expanded the requests from the earlier letter request. In order to avoid the necessity for an extensive privilege review, Wave negotiated a clawback agreement with the Staff which would allow Wave to preserve the privilege by producing documents with the SEC's agreement that Wave could claw them back should they later be identified as privileged. A form of this agreement was filed with the Bankruptcy Court prior to execution. *See* Dkt. No. 360, Ex. A. Upon receiving permission from the Bankruptcy Court to enter into the clawback agreement, Wave executed the agreement and pursuant to its terms has produced documents responsive to the subpoena.

Based on discussions with the Staff, Wave understands the focus of the SEC's investigation to be statements made by former management and/or directors of Wave in the course of Wave's Series E financing. Wave understands that the SEC's investigation is ongoing and intends to continue to cooperate with that investigation.

The Debtors, the SEC and the Committee have entered into two stipulations (one on July 29, 2020 at [Dkt. No. 385] and one on October 29, 2020 [Dkt. No. 682]) to extend the time for the SEC to file a complaint to determine the non-dischargeability of any debt owed to the SEC. Both of those stipulations were approved by the Bankruptcy Court. *See* Dkt. Nos. 392 and 685. The current deadline for the SEC to file a non-dischargeability action is December 1, 2020.[9] On November 18, 2020 the

---

[9] The SEC has taken the position that the deadline to file a non-dischargeability complaint against the Debtors under section 523(c) of the Bankruptcy Code and Bankruptcy Rule 4007(c) does not apply to

40

SEC Staff informed Debtors' counsel that they intend to let the extended deadline pass without filing an action under Section 1141(d)(6).

## D. Other Litigation Matters

In the ordinary course of business, the Debtors are parties to a number of lawsuits, legal proceedings, and collection proceedings arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and collection proceedings.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of these Chapter 11 Cases. The following represents a list of known litigation matters that were pending at the time of the Petition Date:

- *Prestige Century Investments, Ltd. v. MIPS Tech., LLC*, 20-cv-02318, United States District Court of the Northern District of California – Breach of Contract

- *Truvantis, Inc. v. Wave Computing, Inc.*, 20CV364565, Superior Court of California Santa Clara County – Breach of Contract

- *Managed Facilities Solutions, LLC v. Wave Computing, Inc.*, 20CV364538, Superior Court of California Santa Clara County – Breach of Contract

- *Andes Tech. USA Corp. v. Wave Computing, Inc.*, 19CV360905, Superior Court of California Santa Clara County – Breach of Contract

- *Sintegra, Inc. v. Wave Computing Inc.*, 19CV360485, Superior Court of California Santa Clara County – Breach of Contract

- *David Doyle v. Wave Computing Inc., et al*, 19CV360689, Superior Court of California Santa Clara County – Breach of Contract

- *Gajendra Singh v. Wave Semiconductor, Inc.*, 18CV338804, Superior Court of California Santa Clara County – Breach of Contract

- *Canyon Bridge Fund I, LP v. Wave Computing, Inc., et al.*, 20-cv-366150, Superior Court of California Santa Clara County – Securities Fraud

- *Avnet, Inc. v. Wave Computing, Inc.*, CV2020-002927, Superior Court of Arizona Maricopa County – Breach of Contract

---

any claim asserted by the SEC or that any deadline exists to seek a determination of non-dischargeability under section 1141(d)(6) of the Bankruptcy Code. The SEC has asserted that it may assert a non-dischargeability action against the Debtors, including after the Effective Date. December 1, 2020 is the deadline that would apply *if* section 523(c) of the Bankruptcy Code and Bankruptcy Rule 4007(c) apply to the SEC. The Bankruptcy Court has not determined this issue. Each of the Debtors, the Committee and the SEC reserve their rights on this issue.

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 59 of 276

- *WMBE Payrolling Inc. dba TargetCW v. Wave Computing Inc.*, 01-20-0000-2215, American Arbitration Association – Breach of Contract

Upon the Effective Date, the Debtors will receive a discharge of liability with respect to each of these litigation matters. Insofar as these litigation matters assert derivative claims against third parties on behalf of the Debtors, such Causes of Action, to the extent not released in connection with the Plan, will be transferred to the Liquidating Trust.

### E.   Assumption and Rejection of Executory Contracts[10]

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into over 180 Executory Contracts. The Debtors, with the assistance of their advisors, are in the process of reviewing the Executory Contracts to identify the contracts and leases to either assume or reject pursuant to sections 365 and 1123 of the Bankruptcy Code. If any Executory Contracts are rejected, any resulting Allowed rejection damages Claims will be treated as Allowed General Unsecured Claims.

The Plan provides that any Executory Contracts that are not rejected during the Chapter 11 Cases or as part of the Plan will be assumed by the Reorganized Debtors; *provided, however*, that the Reorganized Debtors shall retain the right to supplement, modify or amend the Executory Contracts Rejection Schedule and/or Cure Notices, as applicable, without further order from the Bankruptcy Court; *provided further,* that Debtors may elect to file additional discrete motions seeking to assume or reject various of the Debtors' Executory Contracts.

The Debtors will provide a Schedule of the licenses and intellectual property that the Debtors intend to reject with estimates of potential rejection damages as part of the Plan Supplement or before Confirmation.

### F.   Exclusivity

Pursuant to sections 1121(b) and 1121(c)(3) of the Bankruptcy Code, the Debtors had the exclusive right to file a plan (the "Exclusive Filing Period") until August 25, 2020, and the exclusive right to solicit acceptances for its plan until October 26, 2020 (the "Exclusive Solicitation Period" and together with the Exclusive Filing Period, the "Exclusive Periods"). Pursuant to section 1121(d) of the Bankruptcy Code, the Debtors requested a three (3) month extension of the initial Exclusive Filing Period and Exclusive Solicitation Period up to an including November 30, 2020 and January 25, 2021, respectively by motion dated July 20, 2020 [Dkt. No. 344]. The Debtors, at the request of the Committee, agreed to shorten the requested extension to a period of approximately forty-five days up to and including October 9, 2020 and December 8, 2020, respectively. The Bankruptcy Court entered an order on August 18, 2020 [Dkt. No. 448], setting the Exclusive Filing Period to October 9, 2020 and Exclusive Solicitation Period to December 8, 2020.

---

[10] The Debtors were not counterparties to any Unexpired Leases as of the Petition Date, therefore provisions regarding the treatment of Executory Contracts contemplated herein and pursuant to the Plan does not account for treatment of any Unexpired Leases.

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 60 of 276

On October 7, 2020, the Debtors requested a second extension of the Exclusive Filing period and Exclusive Solicitation Period, again seeking to extend the deadlines pursuant to section 1121(d) of the Bankruptcy Code to November 30, 2020 and January 25, 2021, respectively. Pursuant to the stipulation filed between the Debtors and the Committee [Dkt. No. 679], which was approved by the Court on November 2, 2020 [Dkt. No. 686], the Debtors' Exclusive Filing Period is extended to November 20, 2020, and the Exclusive Solicitation Period is extended to January 15, 2021. As there is always a possibility that Confirmation of the Plan will not occur, the Debtors reserve their rights to seek further extension of the Exclusive Periods.

## VII. PLAN OF REORGANIZATION

### A. Administrative Expense Claims and Priority Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Claims, Professional Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in **Article III** of the Plan.

### 1. General Administrative Expense Claims

Unless otherwise agreed to by the Holder of an Allowed General Administrative Expense Claim and the Debtors, the Reorganized Debtors, or the Wind Down Debtors as applicable, and with the consent of the Committee and Tallwood (which consent shall not be unreasonably withheld, conditioned or delayed), each Holder of an Allowed General Administrative Expense Claim that is unpaid as of the Effective Date shall receive, on account and in full satisfaction of such Allowed General Administrative Expense Claim, Cash in an amount equal to the Allowed amount of such General Administrative Expense Claim, to be paid in accordance with the following: (i) if a General Administrative Expense Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed General Administrative Expense Claim is due or as soon as reasonably practicable thereafter); (ii) if such General Administrative Expense Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such General Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed General Administrative Expense Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Expense Claim without any further action by the Holders of such Allowed General Administrative Expense Claim; (iv) at such time and upon such terms as may be agreed upon by such Holder and the Debtors, the Reorganized Debtors, or the Wind Down Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Each Holder of a General Administrative Expense Claim that was not accrued in the ordinary course of business must File and serve a request for payment of such General Administrative Expense Claim on the Debtors, the Reorganized Debtors, or the Wind Down Debtors, as applicable, no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date. Holders of General Administrative Expense Claims that are required to File and serve a request for payment of such General Administrative Expense Claims by the Administrative Expense Claims Bar Date that do not File and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and

43

enjoined from asserting such General Administrative Expense Claims against the Debtors or Reorganized Debtors, as applicable, or their respective property, and such General Administrative Expense Claims shall be deemed forever discharged and released as of the Effective Date. Any requests for payment of General Administrative Expense Claims that are not properly Filed and served by the Administrative Expense Claims Bar Date shall not appear on the Claims Register and shall be Disallowed automatically without the need for further action by the Debtors or the Reorganized Debtors, as applicable, or further order of the Bankruptcy Court.

The Debtors or the Reorganized Debtors, with the consent of the Committee and Tallwood, which consent shall not be unreasonably withheld, conditioned or delayed, may settle General Administrative Expense Claims without further Bankruptcy Court approval. The Reorganized Debtors may also choose to object to any General Administrative Expense Claim no later than sixty (60) days from the Administrative Expense Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Reorganized Debtors, or the Wind Down Debtors (or other party with standing), as applicable, object to a timely Filed and properly served General Administrative Expense Claim, such General Administrative Expense Claim will be deemed Allowed in the amount requested. In the event that the Reorganized Debtors, or the Wind Down Debtors, as applicable, object to a General Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such General Administrative Expense Claim should be Allowed and, if so, in what amount.

### 2. DIP Claims

In the event of the Restructuring, on the Effective Date, except to the extent a Holder of an Allowed DIP Claim agrees to a less favorable treatment, each Holder of an Allowed DIP Claim shall receive, on account of and in full and final satisfaction of each such Holder's Allowed DIP Claim, (i) its Pro Rata share of 37.66% of the New Common Stock, and (ii) if the aggregate amount of all such Holders' Allowed DIP Claims exceeds $4,000,000, (a) their Pro Rata share of 37.66% of the New Common Stock, and (b) solely with respect to the portion of such Holders' aggregate Allowed DIP Claims that exceeds $4,000,000, their Pro Rata share of the Senior Secured Note.

If an Asset Sale Distribution is elected, on the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, each Holder of an Allowed DIP Claim shall receive payment in full in Cash on account of and in full and final satisfaction of such Holder's Allowed DIP Claim. Further, the DIP Lender shall have the right to credit bid, dollar-for-dollar, the full amount of the DIP Claim, plus all interest and fees accrued thereunder, pursuant to section 363(k) of the Bankruptcy Code.

The DIP Lender shall have the right to credit bid, dollar-for-dollar, the full amount of the Allowed DIP Claim, plus all interest and fees accrued thereunder, pursuant to section 363(k) of the Bankruptcy Code. In no event shall Tallwood have the right to credit bid any amount of the Tallwood Claims, whether pursuant to section 363(k) of the Bankruptcy Code or otherwise.

### 3. Professional Claims

#### a. Final Fee Applications and Payment of Professional Claims

44

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than the Administrative Expense Claims Bar Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Claim Escrow Account, which the Reorganized Debtors or the Wind-Down Debtors, as applicable, will establish in trust for the Professionals and fund with Cash equal to the Professional Claim Reserve Amount on the Effective Date.

### b. Professional Claim Escrow Account

On the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall fund the Professional Claim Escrow Account with Cash equal to the aggregate Professional Claim Reserve Amount for all Professionals. The Professional Claim Escrow Account shall be maintained in trust for the Professionals. Such funds in the Professional Claim Escrow Account shall not constitute property of the Debtors' Estates or property of the Reorganized Debtors or the Wind-Down Debtors, except as otherwise expressly set forth in the last sentence of this paragraph. The amount of Professional Claims owing to the Professionals on and after the Effective Date shall be paid in Cash to such Professionals from funds held in the Professional Claim Escrow Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order. When all Allowed Professional Claims have been paid in full, amounts remaining in the Professional Claim Escrow Account, if any, shall revert to the Reorganized Debtors or the Wind-Down Debtors, as applicable, without any further action or order of the Bankruptcy Court.

### c. Professional Claim Reserve Account

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five (5) days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in these Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors, Reorganized Debtors, or the Wind-Down Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional

### d. Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors, the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation of the Plan incurred by the Debtors, the Reorganized Debtors or the Wind-Down Debtors, as applicable. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

45

### 4. Priority Tax Claims[11]

Except as otherwise agreed by a Holder of an Allowed Priority Tax Claim and the Debtors or Reorganized Debtors, as applicable, with the consent of Tallwood (which consent shall not be unreasonably withheld, conditioned, or delayed), each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Claim, regular installment payments in Cash over a period ending not later than five (5) years after the Petition Date equal in total value, as of the Effective Date, to the Allowed amount of such Claim, plus interest as permitted under applicable law.  Tax Claims not entitled to priority, and to the extent such Claims are Allowed Claims, shall be an obligation of the applicable Reorganized Debtor and paid *pari passu* with the Allowed General Unsecured Claims included under the GUC Note, but without receiving security for such Claims.  For the avoidance of doubt, at no point shall the Holders of Allowed Priority Tax Claims be paid in a manner or on terms less favorable than Allowed Claims paid under the GUC Note, except that the Holders of Allowed Priority Tax Claims shall not receive any security interest for such Claims.  If the aggregate amount of Allowed Priority Tax Claims is less than $12,949,150, then the difference between such aggregate amount and $12,949,150 shall be used to pay, in Cash, outstanding amounts of the GUC Note and the Excess General Unsecured Claim Amount as follows: (i) fifty percent (50%) shall be used to pay the Excess General Unsecured Claim Amount, and (ii) fifty percent (50%) shall be used to pay the GUC Note; provided that, if the Excess General Unsecured Claim Amount has been paid in full in Cash, but the GUC Note has not been repaid in full in Cash (or vice versa), one hundred percent (100%) shall be used to pay the Excess General Unsecured Claim Amount or the GUC Note, as applicable.

## B. Classification and Treatment of Claims and Interests

### 1. Classification of Claims and Interests

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a) of the Bankruptcy Code.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and such Claim or Interest shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is classified in a particular Class for purposes of distribution only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code and as described in **Article II** of the Plan, the Debtors have not classified General Administrative Expense Claims, DIP Claims and Professional Claims, and Priority Tax Claims.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

---

[11] Notwithstanding anything herein, the Debtors and Reorganized Debtors, as applicable, reserve all rights to object to and prosecute Claims filed by any taxing authority, including the California Franchise Tax Board and the Internal Revenue Service.

46

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 3 | Tallwood Claims | Impaired | Entitled to Vote |
| Class 4 | *De Minimis* Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 7 | Wave Series E Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Series E Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Wave Series D Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Series D Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Wave Series C Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 12 | Wave Series B Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 13 | Wave Series A-2 Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 14 | Wave Series A-1 Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 15 | Wave Common Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 16 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |

## 2. Treatment of Claims and Interests

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors or the Wind-Down Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable, in consultation with Tallwood and the Committee, unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

### a. Class 1 – Other Secured Claims

(i) *Classification*. Class 1 consists of all Other Secured Claims.

(ii) *Treatment*. Each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors and in consultation with Tallwood and the Committee:

(a) payment in full in Cash;

(b) the return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim; or

47

(c) such other treatment sufficient to render such Allowed Other Secured Claim as Unimpaired

(iii) *Voting*. Class 1 is Unimpaired under the Plan. Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**b.** **Class 2 – Other Priority Claims**

(i) *Classification*. Class 2 consists of all Other Priority Claims.

(ii) *Treatment*. On the Effective Date, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash.

(iii) *Voting*. Class 2 is Unimpaired under the Plan. Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**c.** **Class 3 – Tallwood Claims**

(i) *Classification*. Class 3 consists of the Tallwood Claims.

(ii) *Allowance*. On the Effective Date, the Tallwood Claims shall (subject to **Section III.C** of the Plan and **Section VII.B.3** hereto, be Allowed in the amount of $10,621,628.

(iii) *Treatment*. On the Effective Date or as soon thereafter as is reasonably practicable**:**

(1) if the Restructuring occurs, each Holder of an Allowed Tallwood Claim shall receive, (1) its Pro Rata share of 62.34% of the New Common Stock, (2) its Pro Rata share of the Secured Subordinated Note, and (3) its right to recovery under the Liquidating Trust, as set forth in **Section IV.G.7** of the Plan; or

(2) if the Asset Sale Distribution is elected, each Holder of an Allowed Tallwood Claim shall, in full and final satisfaction of such Claim (subject to **Section III.C** of the Plan and **Section VII.B.3** hereto), receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the

48

Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, and the Allowed Other Secured Claims, and the *De Minimis* Unsecured Claims up to the Allowed amount of such Tallwood Claim.[12]

    (iv)    *Voting*. Class 3 is Impaired under the Plan. Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

d.    **Class 4 – *De Minimis* Unsecured Claims**

    (i)    *Classification*. Class 4 consists of all *De Minimis* Unsecured Claims.

    (ii)    *Treatment*. On the Effective Date, or within thirty (30) days thereafter, each Holder of an Allowed De Minimis Unsecured Claim shall receive payment in full in Cash.

    *Voting*. Class 4 is Unimpaired under the Plan. Holders of Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Class 4 are not entitled to vote to accept or reject the Plan.

e.    **Class 5 – General Unsecured Claims**

    (i)    *Classification*. Class 5 consists of all General Unsecured Claims.[13]

    (ii)    *Treatment*. On the Effective Date, or as soon thereafter as is reasonably practicable:

---

[12] If the Liens securing the Tallwood Claims are avoided, as set forth in Section III.C of the Plan and Section VII.B.3 herein, and the Tallwood Claims are not subordinated to the General Unsecured Claims, the Tallwood Claims will rank *pari passu* with the General Unsecured Claims with respect to the distribution of Sale Proceeds. If the Liens securing the Tallwood Claims are avoided and the Tallwood Claims are subordinated to the General Unsecured Claims, as set forth in Section III.C of the Plan and Section VII.B.3 hereto, the Tallwood Claims will rank below the General Unsecured Claims with respect to the distribution of Sale Proceeds.

[13] To the extent that Class 5 includes General Unsecured Claims against multiple Debtors, the treatment of Class 5 described herein potentially constitutes a partial substantive consolidation of the applicable Debtors.

49

(a)     if the Restructuring occurs, each Holder of an Allowed General Unsecured Claim shall (subject to **Section III.C** of the Plan and **Section VII.B.3** hereto) receive its Pro Rata share of the GUC Note and its right to recovery under the Liquidating Trust as set forth in **Section IV.G.7** of the Plan; or

(b)     if the Asset Sale Distribution is elected, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, and the Allowed *De Minimis* Unsecured Claims, up to the Allowed amount of such General Unsecured Claim. [14]

For the avoidance of doubt, Tax claims not entitled to priority, and to the extent such Claims are Allowed Claims, shall be an obligation of the applicable Reorganized Debtor and paid *pari passu* with the Allowed General Unsecured Claims in this Class 5 but without receiving security for such Claims.

(iii)     *Voting.* Class 5 is Impaired under the Plan. Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

**f.**     **Class 6 – Intercompany Claims**

(i)     *Classification*. Class 6 consists of all Intercompany Claims.

(ii)     *Treatment*. On the Effective Date, or as soon thereafter as is reasonably practicable:

(a)     if the Restructuring occurs, at the option of the applicable Debtor and with the consent of Tallwood (which consent shall not be unreasonably withheld, conditioned or delayed), all Intercompany Claims shall be either Reinstated or canceled, released, and extinguished and

---

[14] If the Liens securing the Tallwood Claims are avoided, as set forth in Section III.C and Section VII.B.3 hereto, and the Tallwood Claims are not subordinated to the General Unsecured Claims, the Allowed Tallwood Claims will rank *pari passu* with the Allowed General Unsecured Claims with respect to the distribution of Sale Proceeds. If the Liens securing the Tallwood Claims are avoided and the Tallwood Claims are subordinated to the General Unsecured Claims, as set forth in Section III.C and Section VII.B.3 hereto, the Allowed Tallwood Claims will rank below the Allowed General Unsecured Claims with respect to the distribution of Sale Proceeds.

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 68 of 276

shall be of no further force and effect without any Plan Distribution; if the Debtors elect to Reinstate the Intercompany Claims, no payments may be made with respect to the Intercompany Claims until all Allowed General Unsecured Claims have been repaid in full in Cash; or

(b) if the Asset Sale Distribution is elected, all Intercompany Claims shall be canceled, released, and extinguished and shall be of no further force and effect without any Plan Distribution.

(iii) *Voting*. Pursuant to sections 1126(f) and 1126(g) of the Bankruptcy Code, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

g. **Class 7 – Wave Series E Preferred Interests**

(i) *Classification*. Class 7 consists of all Wave Series E Preferred Interests.

(ii) *Treatment*. On the Effective Date, or as soon thereafter as is reasonably practicable:

(a) if the Restructuring occurs, all Wave Series E Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or

(b) if the Asset Sale Distribution is elected, each Holder of an Allowed Wave Series E Preferred Interest shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, and the Allowed General Unsecured Claims, up to the Allowed amount of such Wave Series E Preferred Interest.

(iii) *Voting*. Class 7 is Impaired under the Plan. Holders of Interests in Class 7 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

h. **Class 8 – Series E Section 510(b) Claims**

51

(i) *Classification*. Class 8 consists of all Series E Section 510(b) Claims.

(ii) *Treatment*. On the Effective Date, or as soon thereafter as is reasonably practicable, all Series E Section 510(b) Claims shall be canceled, released, and extinguished, and will be of no further force or effect; and:

    (a) if the Restructuring occurs, all Series E Section 510(b) Claims shall be canceled, released, and extinguished, and will be of no further force, and Holders of such Claims shall not receive any Plan Distribution; or

    (b) if the Asset Sale Distribution is elected, each Holder of a Series E Section 510(b) Claim shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, and the Allowed Wave Series E Preferred Interests, up to the Allowed amount of such Series E Section 510(b) Claim.

(iii) *Voting*. Class 8 is Impaired under the Plan. Holders of Claims in Class 8 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

### i. Class 9 – Wave Series D Preferred Interests

(i) *Classification*. Class 9 consists of all Wave Series D Preferred Interests**.**

(ii) *Treatment*. On the Effective Date, or as soon thereafter as is reasonably practicable:

    (a) if the Restructuring occurs, all Wave Series D Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or

    (b) if the Asset Sale Distribution is elected, each Holder of an Allowed Wave Series D Preferred Interest shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed

52

Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, and the Allowed Series E Section 510(b) Claims, up to the Allowed amount of such Wave Series D Preferred Interest.

(iii)    *Voting*. Class 9 is Impaired under the Plan. Holders of Interests in Class 9 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan

**j.**    **Class 10 – Series D Section 510(b) Claims**

(i)    *Classification*. Class 10 consists of all Series D Section 510(b) Claims.

(ii)    *Treatment*. On the Effective Date, or as soon thereafter as is reasonably practicable:

(a)    if the Restructuring occurs, all Series D Section 510(b) Claims shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Claims shall not receive any Plan Distribution; or

(b)    if the Asset Sale Distribution is elected, each Holder of a Series D Section 510(b) Claim shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims, and the Allowed Wave Series D Preferred Interests, up to the Allowed amount of such Series D Section 510(b) Claim.

(iii)    *Voting*. Class 10 is Impaired under the Plan. Holders of Claims in Class 10 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**k.**    **Class 11 – Wave Series C Preferred Interests**

53

(i)  *Classification*.  Class 11 consists of all Wave Series C Preferred Interests.

(ii)  *Treatment*.  On the Effective Date, or as soon thereafter as is reasonably practicable:

(a)  if the Restructuring occurs, all Wave Series C Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or

(b)  if the Asset Sale Distribution is elected, each Holder of an Allowed Wave Series C Preferred Interest shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims, the Allowed Wave Series D Preferred Interests, and the Allowed Series D Section 510(b) Claims, up to the Allowed amount of such Wave Series C Preferred Interest.

(iii)  *Voting*.  Class 11 is Impaired under the Plan.  Holders of Interests in Class 11 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this.

**l.  Class 12 – Wave Series B Preferred Interests**

(i)  *Classification*.  Class 12 consists of all Wave Series B Preferred Interests.

(ii)  *Treatment*.  On the Effective Date, or as soon thereafter as is reasonably practicable:

(a)  if the Restructuring occurs, all Wave Series B Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or

(b)  if the Asset Sale Distribution is elected, each Holder of an Allowed Wave Series B Preferred Interest shall receive its Pro Rata share of the Sale Proceeds after

54

satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims, the Allowed Wave Series D Preferred Interests, the Allowed Series D Section 510(b) Claims, and the Allowed Wave Series C Preferred Interests, up to the Allowed amount of such Wave Series B Preferred Interest.

(iii)    *Voting*.    Class 12 is Impaired under the Plan.    Holders of Interests in Class 12 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

m.    **Class 13 – Wave Series A-2 Preferred Interests**

(i)    *Classification*.    Class 13 consists of all Wave Series A-2 Preferred Interests.

(ii)    *Treatment*.    On the Effective Date, or as soon thereafter as is reasonably practicable:

(a)    if the Restructuring occurs, all Wave Series A-2 Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or

(b)    if the Asset Sale Distribution is elected, each Holder of an Allowed Wave Series A-2 Preferred Interest shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims, the Allowed Wave Series D Preferred Interests, the Allowed Series D Section 510(b) Claims, the Allowed Wave Series C Preferred Interests, and the

55

Allowed Wave Series B Preferred Interests, up to the Allowed amount of such Wave Series A-2 Preferred Interest.

(iii)    *Voting*.   Class 13 is Impaired under the Plan.   Holders of Interests in Class 13 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**n.**    **Class 14 – Wave Series A-1 Preferred Interests**

(i)    *Classification*.   Class 14 consists of all Wave Series A-1 Preferred Interests.

(ii)    *Treatment*.   On the Effective Date, or as soon thereafter as is reasonably practicable:

(a)    if the Restructuring occurs, all Wave Series A-1 Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or

(b)    if the Asset Sale Distribution is elected, each Holder of an Allowed Wave Series A-1 Preferred Interest shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims, the Allowed Wave Series D Preferred Interests, the Allowed Series D Section 510(b) Claims, the Allowed Wave Series C Preferred Interests, the Allowed Wave Series B Preferred Interests, and the Allowed Wave Series A-2 Preferred Interests, up to the Allowed amount of such Wave Series A-1 Preferred Interest.

(iii)    *Voting*.   Class 14 is Impaired under the Plan.   Holders of Interests in Class 14 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**o.**    **Class 15 – Wave Common Interests**

56

(i)     *Classification*.  Class 15 consists of all Wave Common Interests.

(ii)    *Treatment*.  On the Effective Date, or as soon thereafter as is reasonably practicable:

(a)     if the Restructuring occurs, all Holders of Wave Common Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or

(b)     if the Asset Sale Distribution is elected, each Holder of a Wave Common Interest shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims, the Allowed Wave Series D Preferred Interests, the Allowed Series D Section 510(b) Claims, the Allowed Wave Series C Preferred Interests, the Allowed Wave Series B Preferred Interests, the Allowed Wave Series A-2 Preferred Interests, and the Allowed Wave Series A-1 Preferred Interests.

(iii)   *Voting*.  Pursuant to sections 1126(f) and 1126(g) of the Bankruptcy Code, Holders of Interests in Class 15 are not entitled to vote to accept or reject the Plan.

p.      **Class 16 – Intercompany Interests**

(i)     *Classification*.  Class 16 consists of all Intercompany Interests.

(ii)    *Treatment*.  On the Effective Date, or as soon thereafter as is reasonably practicable:

(a)     if the Restructuring occurs, at the option of the applicable Debtor and in consultation with Tallwood and the Committee, all Intercompany Interests shall be either Reinstated or canceled, released, and extinguished and shall be of no further force and effect without any Plan Distribution; or

(b)     if the Asset Sale Distribution is elected, all Intercompany Interest shall be canceled, released, and extinguished and

57

shall be of no further force and effect without any Plan Distribution.

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests, but for the purposes of administrative convenience and maintaining the prepetition corporate structure,[15] and in exchange for the Debtors', the Reorganized Debtors', or the Wind-Down Debtors', as applicable, agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

(iii)    *Voting*.    Pursuant to sections 1126(f) and 1126(g) of the Bankruptcy Code, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

**3.    Treatment of Tallwood Claims if the Asset Sale Distribution is Elected**

If the Asset Sale Distribution is elected, the Debtors shall establish an escrow account into which the Debtors shall deposit Sale Proceeds in an amount equal to the lesser of (i) the amount of the Tallwood Claims and (ii) the amount of the Sale Proceeds less the aggregate amount of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims and the Allowed *De Minimis* Unsecured Claims (the "Escrowed Amount").  In such event, the Plan Co-Proponents shall negotiate in good faith the application of the Escrowed Amount as between the Tallwood Claims and the General Unsecured Claims.

If the application of the Escrowed Amount as between the Tallwood Claims and the General Unsecured Claims has not been resolved or compromised before the Effective Date, upon the Effective Date, the Estates' right to (i) Dispute the Tallwood Claims; (ii) challenge the amount, validity, perfection, enforceability, priority or extent of the Prepetition Tallwood Debt; and (iii) assert Causes of Action to avoid, subordinate, or disallow any of the Prepetition Tallwood Debt, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise, shall automatically transfer to the Liquidating Trust.  If the Committee obtains standing from the Bankruptcy Court to assert such Causes of Action and such Causes of Action have not been finally resolved or compromised before the Effective Date, upon the Effective Date, the Committee's right to assert such Causes of Action shall automatically transfer to and vest in the Liquidating Trust.

**4.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors', the Reorganized Debtors', or the Wind-Down Debtors' rights regarding any Unimpaired or Reinstated

---

[15] An organizational chart of the Debtors and certain non-debtor affiliates is attached to the Plan as Exhibit A.

58

Claim, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired or Reinstated Claim.

### 5. Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 6. Acceptance or Rejection of the Plan

#### a. Presumed Acceptance of the Plan

Claims in Classes 1, 2, 4 and 6 (to the extent Unimpaired) and Interests in Class 16 (to the extent Reinstated) are Unimpaired under the Plan. The Holders of such Claims and Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

#### a. Voting Classes

Claims in Classes 3 and 5 are Impaired under the Plan and the Holders of such Claims are entitled to vote to accept or reject the Plan. If such a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, such Class shall be deemed to have accepted the Plan.

#### b. Deemed Rejection of the Plan

Claims in Classes 6 (to the extent Impaired), 8, and 10 and Interests in Classes 7, 9, 11, 12, 13, 14, 15, and 16 (to the extent canceled, released, and extinguished) are Impaired under the Plan and are anticipated to receive no Plan Distribution on account of their Claims and Interests. The Holders of such Claims and Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

### 7. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by Class 5. The Debtors reserve the right to modify the Plan in accordance with **Section XI.A** of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules. If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before Confirmation.

59

### 8. Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 9. Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests (as applicable) and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest (as applicable) in accordance with any contractual, legal, or equitable subordination relating thereto.

### C. Means for Implementation of the Plan

#### 1. General Settlement of Claims and Interests

As discussed in detail in this Disclosure Statement and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies relating to the Plan, including (i) any challenge to the amount, validity, perfection, enforceability, priority or extent of the Prepetition Tallwood Debt (if the Restructuring occurs) or DIP Claims; and (ii) any claim to avoid, subordinate, or disallow any of the Prepetition Tallwood Debt (if the Restructuring occurs) or DIP Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to **Section VI.A** of the Plan, all Plan Distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

If the Asset Sale Distribution is elected, **Section IV.A** of the Plan shall not apply to the Tallwood Prepetition Debt. Instead, **Section III.C** of the Plan shall apply to (i) any challenge to the amount, validity, perfection, enforceability, priority or extent of the Prepetition Tallwood Debt; and (ii) any claim to avoid, subordinate, or disallow any of the Prepetition Tallwood Debt, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.

#### 2. Plan Transactions

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter

60

into and shall take any actions as may be necessary or appropriate to effect the restructuring contemplated herein, including: (i) the execution and delivery of appropriate agreements or other documents that are consistent with the terms of the Plan and that satisfy the applicable requirements of law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (iv) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

### 3. Cancellation of Existing Securities and Agreements

On the Effective Date, except to the extent otherwise provided in the Plan or the Confirmation Order, all notes, instruments, certificates, credit agreements, indentures, and other similar documents evidencing Claims or Interests, shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such canceled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan. Notwithstanding the occurrence of the Confirmation Date, Effective Date, or anything to the contrary herein, the Prepetition Note and DIP Note shall continue in effect solely to the extent necessary to: (i) permit Holders of Claims under the Prepetition Note and DIP Note to receive their respective Plan Distributions, as applicable; and (ii) permit the Reorganized Debtors or Wind-Down Debtors to make or assist in making, as applicable, Plan Distributions on account of the Prepetition Note and DIP Note. Except as provided in the Plan, on the Effective Date, the DIP Agent and its agents, successors, and assigns shall be automatically and fully discharged of all of its duties and obligations associated with the DIP Note. The commitments and obligations (if any) of the Prepetition Note Lender or DIP Lender to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the Prepetition Note or DIP Note, shall fully terminate and be of no further force or effect on the Effective Date.

### 4. Section 1146 Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor, a Wind-Down Debtor, the Liquidating Trust, the Liquidating Trustee, or to any other Person) of property under the Plan, including the Asset Sale, if applicable, or pursuant to: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (ii) the Plan Transactions; (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iv) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facility; or (v) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction

61

arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 5. The Restructuring

If the Restructuring occurs, the following provisions shall govern.

#### a. Reorganized Debtors

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan. Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in the Definitive Documentation, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors or members of the applicable Reorganized Debtors deem appropriate.

#### b. Sources for Plan Distributions

The Debtors and the Reorganized Debtors, as applicable, shall fund Plan Distribution under the Plan with: (i) Cash on hand, including Cash from operations and borrowed from the DIP Facility; (ii) proceeds from the Exit Facility; (iii) proceeds from the Liquidating Trust; and (iv) the newly-issued Senior Secured Note, Secured Subordinated Note, and GUC Note.

##### (i) Exit Facility

Upon the Effective Date, if the Restructuring is consummated, Tallwood shall provide the Exit Facility Commitment Amount of up to $5,110,000 pursuant to that certain senior secured revolving credit facility to be issued by Reorganized Wave and guaranteed by each of the other Reorganized

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 80 of
276

Debtors.  In exchange for such Exit Facility, Tallwood shall receive a first priority Lien and pledges on the Collateral pursuant to the terms and conditions set forth in the Exit Facility Documents.  The Exit Facility shall provide liquidity sufficient to provide liquidity to the Reorganized Debtors and fund their general operational needs.

Confirmation shall be deemed approval of the Exit Facility, including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees to be paid by the Debtors or the Reorganized Debtors in connection therewith. Confirmation also shall be deemed to give effect to the Liens securing the Exit Facility and such Liens shall be deemed automatically perfected on a first priority basis, to extent provided for in the Exit Facility Documents, without any further filing or action by any party.

(ii)     New Common Stock

The issuance of the New Common Stock shall be authorized without any further action by the Holders of Claims or Interests.  Reorganized Wave shall be authorized to issue shares of New Common Stock under the Plan and pursuant to their New Organizational Documents. On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

The Debtors do not have an estimate of the value of the Liquidating Trust at this time. However, the Debtors estimate the equity value of the Debtors to be approximately $88,000.00 as of the Effective Date.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to herein shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

(iii)     Liquidating Trust

Upon the Effective Date, the Liquidating Trust shall be established and administered in accordance with **Section IV.G** of the Plan and **Section VII.C.8** hereto.

(iv)     Senior Secured Note

The Senior Secured Note shall be issued by Reorganized Wave and guaranteed by each of the other Reorganized Debtors  in an aggregate principal amount equal to the amount of DIP Claims outstanding as of the Effective Date, up to an aggregate total principal of $6,286,511.  The Senior Secured Note will be on the terms set forth herein, as will be more fully set forth in the Plan Supplement.

Confirmation shall be deemed to give effect to the Liens securing the Senior Secured Note and such Liens shall be deemed automatically perfected on a second priority basis, to extent provided for in the Senior Secured Note, without any further filing or action by any party.

(v)     Secured Subordinated Note

63

The Secured Subordinated Note shall be issued by Reorganized Wave and guaranteed by each of the other Reorganized Debtors in an aggregate principal amount equal to $4,000,000. The Secured Subordinated Note will be on the terms set forth herein, as will be more fully set forth in the Plan Supplement.

Confirmation shall be deemed to give effect to the Liens securing the Secured Subordinated Note and such Liens shall be deemed automatically perfected on a second priority basis, to extent provided for in the Secured Subordinated Note, without any further filing or action by any party.

### (vi)  GUC Note

The GUC Note shall be issued by Reorganized Wave and guaranteed by each of the other Reorganized Debtors in an aggregate amount of up to $36,000,000.00. The GUC Note will be on the terms set forth more fully in the Plan and the Plan Supplement.

Confirmation shall be deemed to give effect to the Liens securing the GUC Note and such Liens shall be deemed automatically perfected on a second priority basis, to extent provided for in the GUC Note, without any further filing or action by any party.

### (vii)  Patent Asset Sale

If the Restructuring occurs, the Reorganized Debtors may, on and after the Effective Date and during the term of the Plan, enter into one or more Patent Asset Sales. Until seventy-five percent (75%) of the aggregate principal amount of the GUC Note outstanding as of the Effective Date has been indefeasibly paid in Cash, the net proceeds from any Patent Asset Sale shall, unless the Liquidating Trustee otherwise consents, be distributed as follows: (i) forty percent (40%) shall be retained by the Reorganized Debtors for general corporate purposes and (ii) sixty percent (60%) shall be used to pay the GUC Note. After seventy-five percent (75%) of the aggregate principal amount of the GUC Note outstanding as of the Effective Date has been indefeasibly paid in Cash, all net proceeds of any Patent Asset Sale may be retained by the Reorganized Debtors for general corporate purposes.

### c.  Corporate Existence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other New Organizational Documents) are amended under the Plan or otherwise. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). After the Effective Date, the respective certificate of incorporation and bylaws (or other New Organizational Documents) may be amended or modified without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the

64

Bankruptcy Code or Bankruptcy Rules.

### d. Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### e. Corporate Action

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (i) adoption or assumption, as applicable, of the Compensation and Benefit Programs; (ii) selection of the directors and officers for the New Board; (iii) implementation of the Plan; (iv) entry into the Exit Facility; (v) entry into the Senior Secured Note, the GUC Note and the Secured Subordinated Note, (vi) adoption of the New Organizational Documents; (vii) the issuance and distribution of the New Common Stock; (viii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts; and (ix) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the restructuring contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the holders of securities, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the Reorganized Debtors, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the Exit Facility, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by **Section IV.E.5** of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law, in each case in accordance with applicable law.

### f. New Organizational Documents

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required by the laws of the respective state or country of organization. The New Organizational Documents will prohibit the issuance of non-voting equity securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 83 of 276

Documents, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents, in each case in accordance with applicable law.

### g. Indemnification Provisions in New Organizational Documents

As of the Effective Date, the New Organizational Documents of each Reorganized Debtor shall, to the fullest extent permitted by applicable law, provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, current and former managers, directors, officers, employees, or agents at least to the same extent as the certificate of incorporation, bylaws, or similar organizational document of each of the respective Debtors on the Petition Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted.

### h. Directors and Officers of the Reorganized Debtors

As of the Effective Date, the term of the current members of the board of directors of Wave shall expire, and all of the directors for the initial term of the New Board shall be appointed in accordance with the terms herein and the terms to be provided in the Plan Supplement. The GUC Board Representative shall remain on the New Board until fifty-one percent (51%) of the principal amount outstanding under the GUC Note as of the Effective Date has been paid. For the avoidance of doubt, the New Board shall be appointed in compliance with section 1129(a)(5) of the Bankruptcy Code. The identity of the members of the New Board will be disclosed in the Plan Supplement or prior to Confirmation, consistent with section 1129(a)(5) of the Bankruptcy Code. If the GUC Board Representative is not the same person as the Liquidating Trustee, the GUC Board Representative may share with the Liquidating Trustee all documents and information received in his or her capacity as the GUC Board Representative.

### i. Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, File, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### j. Director and Officer Liability Insurance

The Reorganized Debtors shall obtain new director and officer liability insurance policies to cover the New Board effective as of the Effective Date.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any "tail" D&O Liability Insurance Policies covering the Debtors' current boards of directors in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and, subject to the terms of the applicable D&O Liability Insurance Policies,

66

all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

### k. Employee and Retiree Benefits

Unless otherwise provided herein, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### l. Closing the Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases, provided, as of the Effective Date, the Reorganized Debtors may submit separate orders to the Bankruptcy Court under certification of counsel previously provided to the U.S. Trustee closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly, provided further that matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed. Nothing in the Plan shall authorize the closing of any case effective as of a date that precedes the date any such order is entered. Any request for such relief shall be made on motion served on the U.S. Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing. Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

### 6. Asset Sale Distribution

If the Asset Sale Distribution is elected, the following provisions shall govern.

### a. Asset Sale

In the event of an Asset Sale, and upon entry of the Sale Order, the Debtors shall be authorized to consummate the applicable Asset Sale to the applicable Purchaser pursuant to the terms of the applicable Purchase and Sale Agreement, the Sale Order, the Plan, and the Confirmation Order. The Sale Proceeds and any reserves required pursuant to the Purchase and Sale Agreement (including any documents contemplated to be executed or delivered by the Debtors or the Purchaser under the Purchase and Sale Agreement), the Debtors' rights under the Purchase and Sale Agreement, payments made directly by the Purchaser on account of any Assumed Purchaser Obligations under the Purchase and Sale Agreement, and payments of Cures made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided herein. Unless otherwise agreed in writing by the Debtors and the Purchaser, distributions required by the

67

Plan on account of Allowed Claims that are Assumed Purchaser Obligations shall be paid by the Purchaser to the extent such Claim is Allowed against the Debtors.

### b. Vesting of Assets in the Wind-Down Debtors

Except as otherwise provided in the Plan, the Confirmation Order, the Purchase and Sale Agreement, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, the assets of the Debtors remaining after effectuating the Asset Sales shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided for in the Plan, the DIP Orders, the Purchase and Sale Agreement, or the Sale Order, the Debtors and the Wind-Down Debtors may operate their business and use, acquire, or dispose of property in accordance with the Wind-Down Budget, and compromise or settle any Claims, Interests, or Causes of Action (other than the Causes of Action transferred to the Liquidating Trust).

### c. Sources of Plan Distributions

The Wind-Down Debtors will fund distributions under the Plan with (i) Cash on hand on the Effective Date, (ii) the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not transferred to the Liquidating Trust and not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date, and (iii) proceeds, if any, distributed to the Wind-Down Debtors by the Liquidating Trustee.

The Debtors do not have an estimate of the value of the Liquidating Trust at this time. However, the Debtors estimate the equity value of the Debtors to be approximately $88,000.00 as of the Effective Date.

Notwithstanding anything to the contrary in the Plan or in the Purchase and Sale Agreement, on the Effective Date, any Cause of Action (i) not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date, or (ii) not transferred to the Liquidating Trust shall vest in the Wind-Down Debtors and shall be subject to administration by the Plan Administrator.

### d. Wind-Down Debtors

On and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of (i) winding down the Debtors' business and affairs as expeditiously as reasonably possible in accordance with the Wind-Down Budget and Wind-Down Milestones, (ii) resolving Disputed Claims (other than, if Disputed and not previously resolved, the Tallwood Claims) (iii) making distributions on account of Allowed Claims as provided in the Plan, (iv) funding distributions in accordance with the Wind-Down Budget, (v) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action (other than the Causes of Action transferred to the Liquidating Trust) on the Schedule of Retained Causes of Action in an efficacious manner, (vi) filing appropriate tax returns, (vii) complying with their continuing obligations under the Purchase and Sale Agreement, if any, and the DIP Orders (as applicable), and (viii) administering the Plan in an efficacious manner. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, (ii) DIP Orders (as applicable), and (iii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need

68

or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

### e. Plan Administrator

On and after the Effective Date, the Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, officers, or other such similar governing body, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers, officers, directors, sale director, or other such similar governing body of the Wind-Down Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors, and shall succeed to the powers of the Wind-Down Debtors' managers, directors, officers, and other Governing Bodies. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors. The foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchaser. The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget.

### f. Dissolution and Governing Bodies of the Debtors

As of the Effective Date, the current board shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, members, or Governing Bodies, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, managers, or other such similar governing body, as applicable, of the Debtors, or the members of any Debtor. Subject in all respects to the terms of the Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, and other such similar governing body, as applicable, of the Debtors with respect to their affairs. Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (i) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of its state of formation; and (ii) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule.

69

#### g. Release of Liens

Except as otherwise expressly provided herein or in the Confirmation Order, on the Effective Date, all Liens on any property of any Debtors or the Wind-Down Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors or the Wind-Down Debtors shall be automatically discharged and released; *provided* that notwithstanding anything to the contrary set forth in the Plan, subject to the funding of the Professional Fee Escrow Account, (i) all Liens of the DIP Agent, DIP Lenders, and (subject to **Section III.C** of the Plan) Tallwood on any property of any Debtors or the Wind-Down Debtors shall remain valid, binding, and in full effect on and after the Effective Date, (ii) all property of the Debtors and Wind-Down Debtors shall remain subject to the Liens and claims of the DIP Agent, DIP Lenders, and (subject to **Section III.C** of the Plan) Tallwood and shall continue to secure all Obligations (as defined in the DIP Note and Prepetition Note, as applicable) owing to the DIP Agent, DIP Lenders, and (subject to **Section III.C** of the Plan) Tallwood, (iii) all guarantees of any Debtors or the Wind-Down Debtors in favor of the DIP Agent, DIP Lenders, and (subject to the immediately following paragraph) Tallwood shall be reaffirmed and remain in full force and effect, and (iv) the proceeds of sales of any collateral of the Wind-Down Debtors securing the DIP Claims and (subject to **Section III.C** of the Plan) Tallwood Claims shall remain subject to the Liens and claims of the DIP Agent, DIP Lenders, and (subject to **Section III.C** of the Plan) Tallwood, as applicable, to the same extent as such Liens and claims were enforceable against the Debtors and the Debtors' assets, in each case of clauses (i)-(iv) of this Section IV.F.7 until the DIP Agent, DIP Lenders, and (subject to **Section III.C** of the Plan) Tallwood receive their distributions or other treatment in accordance with **Section II.B** and **Section III.B** of the Plan.

#### h. Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including: (i) consummation of the Asset Sale; and (ii) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with the Plan or the corporate structure of the Debtors or Wind-Down Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the equity holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors. The authorizations and approvals contemplated by **Section IV.F** of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

#### i. Effectuating Documents; Further Transactions

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Wind-Down Debtors, the Plan Administrator, and the officers and members thereof are, authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of the Plan

such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

### j. Preservation of Causes of Action

Unless any Cause of Action against a Person or Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall convey to the Plan Administrator all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action not transferred to the Liquidating Trust, whether arising before or after the Petition Date, which shall vest in the Plan Administrator pursuant to the terms of the Plan. The Plan Administrator may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action not transferred to the Liquidating Trust, whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Plan Administrator may, in its reasonable business judgment, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Plan Administrator deems appropriate, including on a contingency fee basis. **No Person or Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against it. The Debtors and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action not transferred to the Liquidating Trust against any Person or Entity, except as otherwise expressly provided in the Plan; _provided_ that the Wind-Down Debtors, in consultation with the Plan Administrator after the Effective Date, may prosecute any such Cause of Action against any party only in connection with their objection to and resolution of any Claim asserted by such party.** Unless any Cause of Action against a Person or Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Plan Administrator expressly reserves all Causes of Action not transferred to the Liquidating Trust for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court.

### k. Closing the Chapter 11 Cases

The Wind-Down Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases, _provided_ that, as of the Effective Date, the Wind-Down Debtors may submit separate orders to the Bankruptcy Court under certification of counsel previously provided to the U.S. Trustee closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly, _provided further_ that matters concerning Claims may be heard and adjudicated in one of the Debtors' chapter 11 cases that remains open

71

regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed. Nothing in the Plan shall authorize the closing of any case effective as of a date that precedes the date any such order is entered. Any request for such relief shall be made on motion served on the U.S. Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing. Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Wind-Down Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## 7. Liquidating Trust

### a. Appointment of Liquidating Trustee

Upon the Effective Date, the Liquidating Trust, which shall be a Delaware liquidating trust, shall be established pursuant to the Liquidating Trust Agreement. The initial Liquidating Trustee shall be appointed by the Committee, in consultation with the Debtors and Tallwood. The appointment of the Liquidating Trustee shall be approved in the Confirmation Order, and the Liquidating Trustee's duties shall commence as of the Effective Date. The Liquidating Trustee shall administer the Liquidating Trust and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of (i) enforcing Causes of Action belonging to the Estates and (ii) if the Restructuring occurs, holding the GUC Note.

In accordance with the Liquidating Trust Agreement, the Liquidating Trustee shall serve in such capacity through the earlier of (i) the date that the Liquidating Trust is dissolved in accordance with **Section IV** of the Plan; and (ii) the date such Liquidating Trustee resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, if the Liquidating Trustee resigns, is terminated, or is otherwise unable to serve, the Liquidating Trust Advisory Board shall appoint a successor to serve as the Liquidating Trustee in accordance with the Liquidating Trust Agreement. If the Liquidating Trust Advisory Board does not appoint a successor within the time periods specified in the Liquidating Trust Agreement, then the Court, upon the motion of any party-in-interest, including counsel to the Liquidating Trust, shall approve a successor to serve as the Liquidating Trustee. Any such successor Liquidating Trustee shall serve in such capacity until the Liquidating Trust is dissolved.

### b. Establishment of the Liquidating Trust

Upon the Effective Date, if the Restructuring occurs, (i) the GUC Note; and (ii) subject to the releases and exculpations set forth herein (including the Debtor Release and the Third Party Release), each of the Causes of Action (other than the right to object to or otherwise contest Claims or Interests as described below) and Avoidance Actions that are not released or waived pursuant to the Plan shall automatically vest in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries. On the Effective Date, standing to commence, prosecute and compromise all Causes of Actions (other than the right to object to or otherwise contest Claims or Interests as described below) and Avoidance Actions vesting in the Estates shall transfer to the Liquidating Trustee and/or the Liquidating Trust free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or the Confirmation Order. If the Restructuring occurs, the primary right to object to or otherwise

72

contest Claims or Interests shall be retained by the Reorganized Debtors, except as otherwise agreed between the Reorganized Debtors and the Liquidating Trustee in writing in accordance with **Section XIII.G** of the Plan. If the Reorganized Debtors do not object to or otherwise contest a Claim, the Liquidating Trust shall have standing and the right to file and prosecute such a Claim objection, and in all circumstances, the Liquidating Trust shall have the right to join in any claim objection filed by or pursued by the Reorganized Debtors.

Upon the Effective Date, if the Asset Sale Distribution is elected, each of the Causes of Action (including, if not previously compromised, the right to object to or contest the Tallwood Claims, but excluding the right to object to or otherwise contest Claims or Interests as described below) and Avoidance Actions that are not released or waived pursuant to the Plan shall automatically vest in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries. On the Effective Date, standing to commence, prosecute and compromise all Causes of Actions (including, if not previously compromised, the right to object to or contest the Tallwood Claims, but excluding the right to object to or otherwise contest Claims or Interests as described below) and Avoidance Actions vesting in the Estates shall transfer to the Liquidating Trustee and/or the Liquidating Trust free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or the Confirmation Order. If the Asset Sale Distribution is elected, all rights to object to or otherwise contest Claims or Interests (other than, if not previously compromised, the right to object to or contest the Tallwood Claims) shall be transferred to, and shall vest in, the Wind-Down Debtors, except as otherwise agreed between the Wind-Down Debtors and the Liquidating Trustee in writing in accordance with **Section XIII.G** of the Plan. If the Wind-Down Debtors do not object to or otherwise contest a Claim, the Liquidating Trust shall have standing and the right to file and prosecute such a Claim objection, and in all circumstances, the Liquidating Trust shall have the right to join in any claim objection filed by or pursued by the Wind-Down Debtors.

### c. Liquidating Trust Advisory Board

The Liquidating Trust Advisory Board shall consist of three (3) members.

If the Restructuring occurs, until the GUC Note has been indefeasibly paid in full in Cash, all members of the Liquidating Trust Advisory Board shall be Holders of Allowed General Unsecured Claims, with the initial members selected by the Committee. After the GUC Note has been indefeasibly paid in full in Cash, if the Liquidating Trust retains any assets, the Liquidating Trust Advisory Board shall consist of: (i) a representative appointed by a majority in value of Holders of Allowed General Unsecured Claims; (ii) a representative appointed by Tallwood; and (iii) a representative appointed by a majority of the Holders of Interests in Reorganized Wave. After all of the Allowed General Unsecured Claims have been indefeasibly paid in full in Cash, the representative appointed by the Holders of Allowed General Unsecured Claims shall resign and be replaced by a representative appointed by Tallwood.

If the Asset Sale Distribution is elected, until all Allowed General Unsecured Claims have been indefeasibly paid in full in Cash, all members of the Liquidating Trust Advisory Board shall be Holders of Allowed General Unsecured Claims, with the initial members selected by the Committee. After all Allowed General Unsecured Claims have been indefeasibly paid in full in Cash, the members of the Liquidating Trust Advisory Board shall be selected by the Plan Administrator.

### d. Preservation of Causes of Action

73

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 91 of 276

In accordance with section 1123(b) of the Bankruptcy Code, but subject to **Article IX** of the Plan, the Liquidating Trust shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, other than those (i) released pursuant to the Plan, (ii) if the Restructuring occurs, retained by the Reorganized Debtors and (iii) if the Asset Sale Distribution is elected, transferred to the Wind-Down Debtors, whether arising before or after the Petition Date, and the Liquidating Trust's right to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan.

The Liquidating Trust may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Liquidating Trust Beneficiaries. **No Person or Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Liquidating Trust will not pursue any and all available Causes of Action of the Debtors against it. The Liquidating Trust expressly reserves all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against the Liquidating Trust, without the need for any objection or responsive pleading by the Liquidating Trust or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Liquidating Trust may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Liquidating Trust and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against a Person or Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan (including in **Article IX** of the Plan) or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation.

The Liquidating Trust reserves and retains such Causes of Action of the Estates notwithstanding the rejection or repudiation of any Executory Contract during these Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall automatically vest in the Liquidating Trust upon Confirmation, except as otherwise expressly provided in the Plan. The Liquidating Trust, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Liquidating Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court, although the Liquidating Trustee may seek Bankruptcy Court approval of any settlement or compromise of such Causes of Action.

### e. Preservation of Privileges of Estates and Debtors

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 92 of
276

On the Effective Date, the Debtors shall be deemed to have transferred and assigned to the Liquidating Trust all of their respective rights, titles, and interests in any privilege or immunity of the Debtors' Estates with respect to the Causes of Action (other than any Causes of Action retained by the Reorganized Debtors, if the Restructuring occurs, or transferred to the Wind-Down Debtors, if the Asset Sale Distribution is elected) or Avoidance Actions, including the attorney-client privilege and the work product privilege (collectively, the "Privileges"), which Privileges shall automatically vest in the Liquidating Trust. The Liquidating Trustee shall be vested with the sole power and authority to waive or assert such Privileges for the sole benefit of the Liquidating Trust. In addition, on the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall provide the Liquidating Trust with reasonable access to the books and records of the Debtors or Reorganized Debtors concerning the Causes of Action or Avoidance Actions. The Released Parties shall use commercially reasonable efforts to cooperate with the Liquidating Trustee with respect to any litigation brought by or against the Liquidating Trust; *provided* that the Liquidating Trust will reimburse the Released Parties for reasonable and documented out-of-pocket expenses (which shall not include fees or expenses of counsel) incurred in connection with such cooperation. Without limitation, the Debtors' Professionals shall deliver any books and records of the Debtors or other materials (including any documents or materials of the Debtors that may be subject to any Privileges) that may be relevant to the Causes of Action or Avoidance Actions and that are in the respective possession, custody or control of any such Debtors' Professionals.

### f. Funding of the Liquidating Trust

If the Restructuring occurs, the Liquidating Trustee shall, with the consent of the Liquidating Trust Advisory Board, be entitled to use the $1 million initial pre-payment on the GUC Note and up to $2 million of the quarterly GUC Note payments (i.e., a total of up to $3 million of GUC Note proceeds) as a Restructuring Liquidating Trust Expense Advance. The proceeds of the Liquidating Trust Assets realized by the Liquidating Trust shall be used to repay the Restructuring Liquidating Trust Expense Advance to Holders of Allowed General Unsecured Claims on a Pro Rata basis until the Sale Proceeds Liquidating Trust Expense Advance has been repaid in full. Until the Restructuring Liquidating Trust Expense Advance has been repaid in full, no proceeds of the Liquidating Trust Assets realized by the Liquidating Trust shall be used to repay, or deemed to repay, any portion of the GUC Note (other than the Liquidating Trust Expense Advance) or the Excess General Unsecured Claim Amount.

If the Asset Sale Distribution is elected, after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, and the Allowed *De Minimis* Unsecured Claims from the Sale Proceeds, up to $3 million of the Sale Proceeds that would otherwise be paid to Holders of Allowed General Unsecured Claims may be transferred to the Liquidating Trust a Sales Proceeds Liquidating Trust Expense Advance. The Liquidating Trust Advisory Board shall determine the amount, not to exceed $3 million, of the Sale Proceeds Liquidating Trust Expense Advance. The Sale Proceeds Liquidating Trust Expense Advance shall be deemed to be a payment on account of the Claims of the Holders of Allowed General Unsecured Claims on a Pro Rata basis, which such Holders of Allowed General Unsecured Claims are then advancing to the Liquidating Trust. The proceeds of the Liquidating Trust Assets realized by the Liquidating Trust shall be used to repay the Sale Proceeds Liquidating Trust Expense Advance to Holders of Allowed General Unsecured Claims on a Pro Rata basis until the Sale Proceeds Liquidating Trust Expense Advance has been repaid in full.

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 93 of 276

### g. Order of Distribution of Liquidating Trust Assets

If the Restructuring occurs, until the GUC Note and the Excess General Unsecured Amount have been paid in full in Cash, with interest thereon at the applicable rate, the Liquidating Trust Assets shall be distributed in the following order: (i) first, to pay the Liquidating Trust Expenses; and (ii) second, of the remaining Liquidating Trust Assets, (a) fifty percent (50%) shall be used to pay the Excess General Unsecured Claim Amount, and (b) fifty percent (50%) shall be used to pay the GUC Note; provided that, if the Excess General Unsecured Claim Amount has been paid in full in Cash, but the GUC Note has not been repaid in full in Cash (or vice versa), one hundred percent (100%) shall be used to pay the Excess General Unsecured Claim Amount or the GUC Note, as applicable, until all Allowed General Unsecured Claims have been paid in full in Cash. After the GUC Note and the Excess General Unsecured Claim Amount have been repaid in full in Cash, any remaining Liquidated Trust Assets shall be distributed in the following order: (i) first, to pay the Liquidating Trust Expenses; and (ii) second, to the Holders of Allowed Tallwood Claims on a Pro Rata basis.

If the Asset Sale Distribution is elected, the Liquidating Trust Assets shall be distributed in the following order: (i) first, to pay the Liquidating Trust Expenses; (ii) second, to pay Allowed General Unsecured Claims, until all Allowed General Unsecured Claims have been repaid in full in Cash, with interest at the Federal Judgment Rate; and (iii) third, to the Plan Administrator, to make Plan Distributions in accordance with Article III.

### h. Treatment of Liquidating Trust for Federal Income Tax Purposes; No Successor-in-Interest

The Liquidating Trust shall be established for the sole purpose of distributing the assets of the Liquidating Trust, and proceeds therefrom, in accordance with Treasury Regulations section 301.7701-4(d) and Revenue Procedure 94-45, with no objective to continue or engage in the conduct of a trade or business, and is intended to qualify as a liquidating trust for U.S. federal income tax purposes. The Liquidating Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the Liquidating Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Liquidating Trustee expressly for such purpose.

### i. Termination of the Liquidating Trust

The Liquidating Trust will terminate on the earlier of: (i) final liquidation, administration and Trust Agreement and the Plan, and its full performance of all other duties and functions as set forth in the Liquidating Trust Agreement or the Plan; and (ii) the fifth (5th) anniversary of the Effective Date. Notwithstanding the foregoing, multiple fixed-term extensions can be obtained so long as Bankruptcy Court approval is obtained within six (6) months before the expiration of the term of the Liquidating Trust and each extended term; provided that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust within the meaning of section 301.7701-4(d) of the Treasury Regulations for federal income tax purposes. After (i) the final distributions pursuant to the Plan; (ii) the filing by or on behalf of the Liquidating Trust of a certification of dissolution with the Bankruptcy Court; and (iii) any other action deemed appropriate by the Liquidating Trustee, the Liquidating Trust shall be deemed dissolved for all purposes without the necessity for any other or

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 94 of 276

further actions.

**D.** **Treatment of Executory Contracts and Insurance Policies**

**1.** **Assumption and Rejection of Executory Contracts**

If the Asset Sale Distribution is elected, on the Effective Date, except as otherwise provided herein or in the Confirmation Order, each Executory Contract that is not assumed or assigned pursuant to the Purchase and Sale Agreement or Sale Order shall be deemed automatically rejected.

If the Restructuring occurs, on the Effective Date, except as otherwise provided in **Section V.H.1** of the Plan and elsewhere in the Plan, all Executory Contracts not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (i) are identified on the Rejected Executory Contracts Schedule; (ii) previously expired or terminated pursuant to their own terms; (iii) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (iv) are the subject of a motion to reject that is pending on the Effective Date; or (v) have an ordered or requested effective date of rejection that is after the Effective Date. To the extent the Debtors' license agreements and intellectual property assets are treated as though such leases and assets are Executory Contracts, such leases and assets shall be deemed assumed pursuant to the Plan and section 365 of the Bankruptcy Code.

Such automatic assumption or rejection, as applicable, shall be effective without the need for any further notice to or action, order, or approval of the Bankruptcy Court, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than any Executory Contracts that: (1) have been previously assumed, assumed and assigned, or rejected pursuant to a Bankruptcy Court order; (2) are the subject of a motion to assume, assume and assign, or reject such Executory Contracts (or of a Filed objection with respect to the proposed assumption, assumption and assignment, or rejection of such Executory Contracts) that is pending on the Effective Date; or (3) are a contract, release, or other agreement or document entered into in connection with the Plan. The assumption or rejection of Executory Contracts hereunder may include the assignment of certain of such contracts to Affiliates. Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts as set forth in the Plan or the Rejected Executory Contracts Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth in the Plan, assumptions or rejections of Executory Contracts pursuant to the Plan are effective as of the Effective Date. Each Executory Contract assumed pursuant to the Plan or by Final Order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any Final Order authorizing and providing for its assumption. Any motions to assume Executory Contracts pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contracts assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contracts (including any "change of control" provision), then such

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 95 of 276

provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contracts or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contracts Schedule at any time up to thirty (30) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is consistent with the Exit Facility.

## 2. Claims Based on Rejection of Executory Contracts

The Debtors shall file the Rejected Executory Contracts Schedule no event later than fourteen (14) days prior to the Plan Objection Deadline, or such later date as may be approved by the Bankruptcy Court, which shall set forth a list of Executory Contracts to be rejected by the Debtors pursuant to the Plan, as may be amended, modified, or supplemented from time to time; *provided* that such Rejected Executory Contracts Schedule shall be in form and substance reasonably acceptable to the Debtors, in consultation with Tallwood and the Committee.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts, pursuant to the Plan or the Confirmation Order, if any, must be Filed by such counterparty listed on the Executory Contract Rejection Schedule within thirty (30) days after the later of (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (ii) the effective date of such rejection, or (iii) the Effective Date. The Debtors, Reorganized Debtors, Wind-Down Debtors, or Liquidating Trustee, as applicable, shall have twenty-one (21) days after the date of which such Proof of Claim is filed to object to the Proof of Claim. If such objection is timely filed by the Debtors, Reorganized Debtors, Wind-Down Debtors, or Liquidating Trustee, as applicable, such Proof of Claim shall be adjudicated in accordance with the procedures set forth in **Arrticle VIII** of the Plan and **Section VII.H** herein. The Debtors or Reorganized Debtors, as applicable, shall retain the right to modify, amend, or supplement the Executory Contract Rejection Schedule for up to fourteen (14) days after the adjudication of the disputed Proof of Claim; provided, that the right to settle, litigate or otherwise seek resolution of such disputes shall vest in the Liquidating Trust on the Effective Date.

**Any Claims arising from the rejection of an Executory Contract not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contracts shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts shall be classified as *De Minimis* Unsecured Claims or General Unsecured Claims, as applicable, and shall be treated in accordance with **Section III.B.4** or **Section III.B.5** of the Plan, as applicable.

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 96 of 276

### 3.    Cure of Defaults for Assumed Executory Contracts

No later than seven (7) calendar days before the Confirmation Hearing,[16] the Debtors shall provide notices of a proposed Cure (as may be amended, modified, or supplemented from time to time) (each, a "Cure Notice") to the counterparties to the agreements proposed to be assumed pursuant to the Plan, which shall include a description of the procedures for objecting to the proposed Cure or the Reorganized Debtors' or Wind-Down Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code).   Unless otherwise agreed in writing by the parties in the applicable Executory Contract, any objection by a counterparty to an Executory Contract of a proposed assumption or related Cure must be Filed and served on counsel to the Debtor no later than fourteen (14) days after the Filing of the respective Cure Notice.

If the Asset Sale Distribution is elected, any unresolved objection to a proposed Cure shall be heard at the Sale Hearing, unless otherwise agreed by the parties.   If the Restructuring occurs, any unresolved objection disputing the proposed Cure that cannot be consensually resolved or settled within five (5) days of the Filing of such objection or request to be paid an amount that differs from the proposed Cure, may be adjudicated by the Bankruptcy Court at the Debtors' first omnibus setting following the Filing of the objection, or as such matters are brought before the Bankruptcy Court. Once such disputes are adjudicated, the Debtors or Reorganized Debtors, as applicable, shall retain the right to file subsequent Cure Notices and/or modify, amend, or supplement the Cure Notices and the Executory Contracts Rejection Schedule for up to fourteen (14) days after the adjudication of the dispute; _provided_, that the right to settle, litigate or otherwise seek resolution of such disputes shall vest in the Liquidating Trust on the Effective Date.

Any counterparty to an Executory Contract that fails to object timely to the proposed assumption and/or Cure will be deemed to have assented to such assumption and Cure, and any such untimely objection shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor or Wind-Down Debtor, as applicable, without the need for any objection by the Reorganized Debtors or Wind-Down Debtor, as applicable, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.

Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; _provided_ that nothing therein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors or the Reorganized Debtors, as applicable, shall pay undisputed Cure, if any, on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts may agree.  For the avoidance of doubt, if there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter

---

[16] Notwithstanding anything herein to the contrary, in the event that any Executory Contract is removed from the Rejected Executory Contracts Schedule and is proposed to be assumed pursuant to the Plan after such seven-day deadline, a notice of proposed Cure with respect to such Executory Contract will be sent promptly to the counterparty thereof.

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 97 of 276

pertaining to assumption, then payment of the applicable Cure shall occur at the later of (i) the Effective Date, or (ii) fourteen (14) days after entry of Final Order resolving such dispute, or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract.

Assumption of any Executory Contract pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cure, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged as of the later of (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (ii) the effective date of such assumption or (iii) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

### 4.  Preexisting Obligations to the Debtors under Executory Contracts

Rejection of any Executory Contract pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contract.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts.

### 5.  Insurance Policies

Notwithstanding anything to the contrary in the Definitive Documentation, the Plan Supplement, any other document related to any of the foregoing, or any other order of the Bankruptcy Court, each of the Debtors' Insurance Contracts shall be treated as Executory Contracts under the Plan.

In the event of an Asset Sale Distribution, unless otherwise provided in the Plan and except for the D&O Liability Insurance Policies, on the Effective Date, the Debtors shall be deemed to have rejected all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

In the event of a Restructuring, unless otherwise provided in the Plan, on the Effective Date, on and after the Effective Date (i) the Debtors and Reorganized Debtors jointly and severally shall be deemed to have assumed the Insurance Contracts pursuant to sections 105 and 365 of the Bankruptcy Code; (ii) nothing shall alter, amend or otherwise modify the terms and conditions of the Insurance Contracts except that, on and after the Effective Date, the Reorganized Debtors shall become and remain jointly and severally liable in full for all of their and the Debtors' obligations under the Insurance Contracts, regardless of whether such obligations arise before or after the Effective Date, without the requirement or need for any Insurer to file a Proof of Claim or an Administrative Expense Claim, or to object to any Cure; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunction set forth in **Section IX.F** of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit:  (a) claimants with valid workers' compensation claims or with valid direct action claims against an Insurer under applicable

non-bankruptcy law to proceed with their claims; (b) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court: (1) workers' compensation claims; (2) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunction set forth in **Section IX.F** of the Plan to proceed with its claim; and (3) all costs in relation to each of the foregoing; and (c) the Insurers to cancel any Insurance Contracts, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Contracts.

### E.      Reservation of Rights

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease that any Reorganized Debtor or Wind-Down Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, Reorganized Debtors, or Wind-Down Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

#### 1.      Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts pursuant to section 365(d)(4) of the Bankruptcy Code.

#### 2.      Employee Compensation and Benefits

##### a.      Compensation and Benefit Programs

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and, only if the Restructuring occurs, be deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for: (i) all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Program that provide for rights to acquire Interests in any of the Debtors; and (ii) all Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract.

Neither the transactions contemplated by the Plan nor any assumption of Compensation and Benefits Programs pursuant to the terms herein shall be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein.  On the Effective Date, no counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

On the Effective Date, pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, the Amended and Restated Incentive Agreement (as defined in the KEIP Order) shall be deemed assumed.

More information regarding the Debtors' Compensation and Benefits Programs can be found in the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(A), 363(B), and 507, and Fed. R. Bankr. P.*

81

*6003 and 6004 for Interim and Final Authority to (i) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation (ii) Maintain Employee Benefit Programs and Pay Related Administrative Obligations; and (iii) Authorize Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers* (the "Wages Motion") [Dkt. No. 9], and the *Final Order Pursuant to 11 U.S.C. §§ 105(A), 363(B), and 507, and Fed. R. Bankr. P. 6003 and 6004 Granting Authority to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation (II) Maintain Employee Benefit Programs and Pay Related Administrative Obligations; and (III) Authorize Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers* [Dkt. No. 191].

### b. Workers' Compensation Programs

As of the Effective Date, except as set forth in the Plan Supplement, if the Restructuring occurs, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (i) all applicable workers' compensation laws in all applicable states; and (ii) the Workers' Compensation Programs. All Proofs of Claims on account of Workers' Compensation Programs shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; and *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors or the Insurers in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

More information regarding the Debtors' Workers' Compensation Programs can be found in the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), 363(c), and 364 and Fed. R. Bankr. P. 4001, 6003, and 6004 for Interim and Final Orders (i) Authorizing the Debtors to Maintain Insurance Policies and Workers Compensation Program, and Pay All Obligations with Respect Thereto; and (ii) Granting Relief from the Automatic Stay with Respect To Workers Compensation Claims* (the "Insurance Motion") [Dkt. No. 10] and the *Final Order Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), 363(c), and 364 and Fed. R. Bankr. P. 4001, 6003, and 6004 (I) Authorizing the Debtors to Maintain Insurance Policies and Workers Compensation Program, and Pay All Obligations with Respect Thereto; and (II) Granting Relief from the Automatic Stay with Respect To Workers Compensation Claims* [Dkt. 192].

### 3. Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts assumed by such Debtor, will be performed by the applicable Debtor, Reorganized Debtor, Wind-Down Debtor, or Purchaser (to the extent assigned to the Purchaser in the event of an Asset Sale) in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts) will survive and remain unaffected by entry of the Confirmation Order.

### F. Provisions Governing Distributions

### 1. Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the initial Distribution Date (or if a Claim is not an

82

Allowed Claim or Allowed Interest on the initial Distribution Date, on the next Distribution Date after such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), or as soon as is reasonably practicable thereafter, each Holder of an Allowed Claim or Allowed Interests (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in **Article VIII** of the Plan. Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 2. Disbursing Agent

All Plan Distributions shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors or Wind-Down Debtors, as applicable.

### 3. Rights and Powers of Disbursing Agent

#### a. Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

#### b. Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, to the extent the Disbursing Agent is an Entity other than the Reorganized Debtors or Wind-Down Debtors, the amount of any reasonable fees and expenses incurred by such Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by such Disbursing Agent shall be paid in Cash by the Reorganized Debtors or Wind-Down Debtors, as applicable.

### 4. Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### a. Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim,

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 101 of 276

other than one based on a publicly traded Security, is transferred twenty (20) or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

### b. Delivery of Distributions in General

Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors or Wind-Down Debtors, as applicable.

### 5. Delivery of Distributions on DIP Claims

As soon as practicable following compliance with the requirements set forth in **Article VI** of the Plan, the DIP Agent, shall arrange to deliver or direct the delivery of such Plan Distributions to or on behalf of the Holders of Allowed DIP Claims, in accordance with the terms of the Plan. Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the DIP Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the DIP Agent or Disbursing Agent.

### 6. New Common Stock

The Reorganized Debtors shall be authorized to issue New Common Stock pursuant to its New Organizational Documents. On the Effective Date, the Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in **Article III** of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 7. Minimum Distributions

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (i) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number, and (ii) fractions of less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims and Allowed Interests (as applicable) shall be adjusted as necessary to account for the foregoing rounding.

84

### 8. Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors or the Wind-Down Debtors, as applicable, automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property or Interest in property shall be discharged and forever barred.

### a. Surrender of Canceled Instruments or Securities

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or an Interest shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest or a trustee or agent under such documents, which shall continue in effect for purposes of allowing Holders to receive Plan Distributions and maintaining priority of payment, and to preserve any applicable charging Liens and reimbursement and/or indemnification rights, in each case as set forth in the applicable certificates or instruments.  Notwithstanding anything to the contrary in the Plan, this paragraph shall not apply to certificates or instruments evidencing Claims or Interests that are Unimpaired under the Plan.

### 9. Manner of Payment

All distributions of the New Common Stock or Cash to the Holders of the applicable Allowed Claims or Interests under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable; *provided* that any distributions of Cash to the Liquidating Trust Beneficiaries shall be made by the Liquidating Trustee in accordance with the terms of the Liquidating Trust.

At the option of the Disbursing Agent, any Cash payment to be made pursuant to the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

### 10. Exemption From Registration Requirements

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Stock and (to the extent they are deemed to be a Security) the GUC Note, the Senior Secured Note, or the Secured Subordinated Note, as contemplated by **Section II.B** and **Section III.B** of the Plan, as applicable, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code, the New Common Stock (and to the extent they are deemed to be a Security) the GUC Note, the Senior

85

Secured Note, and/or the Secured Subordinated Note will be freely tradable in the U.S. by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (ii) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities; and (iii) the provisions of the New Organizational Documents and the terms of the GUC Note, the Senior Secured Note, and/or the Secured Subordinated Note (as applicable).

### 11. Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors, Reorganized Debtors, and the Wind-Down Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

### 12. Allocations

Plan Distributions with respect to Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### 13. No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order, the Final DIP Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes and Allowed Claim.

### 14. Foreign Currency Exchange Rates

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal*, National Edition, on the Effective Date.

86

### 15.    Setoffs and Recoupments

Except as expressly provided in the Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (i) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim; or (ii) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, *however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with **Section XII.G** of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

### 16.    Claims Paid or Payable by Third Parties

#### (i)    Claims Paid by Third Parties

The Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or a Wind-Down Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or a Wind-Down Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Plan Distribution to the applicable Reorganized Debtor or Wind-Down Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such Plan Distribution shall result in the Holder owing the applicable Reorganized Debtor or Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

#### (ii)    Claims Payable by Third Parties

No Plan Distributions shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Contracts until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract.  To the extent that one or more of the Debtors' Insurers agrees to pay in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

#### (iii)    Applicability of Insurance Policies

87

Except as otherwise provided in the Plan, payments to Holders of Claims covered by Insurance Contracts shall be in accordance with the provisions of the applicable Insurance Contract and the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Contract, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

### G. The Plan Administrator

#### 1. The Plan Administrator

The identity of the members of the Plan Administrator will be disclosed in the Plan Supplement or prior to Confirmation, consistent with section 1129(a)(5) of the Bankruptcy Code. The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and wind down the business and affairs of the Debtors and the Wind-Down Debtors, including: (i) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors in accordance with the Wind-Down Milestones and Wind-Down Budget; (ii) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan in accordance with the Wind-Down Budget; (iii) making distributions as contemplated under the Plan; (iv) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (v) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (vi) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind Down on and after the Effective Date; (vii) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (viii) representing the interests of the Wind-Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (ix) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan, in each case of the forgoing clauses, strictly in accordance with the Wind-Down Milestones and Wind-Down Budget.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator in accordance with the Plan Administrator Agreement. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors in the Plan Administrator Agreement shall be terminated.

##### a. Plan Administrator Rights and Powers

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in accordance with the Wind-Down Milestones and Wind-Down Budget, and as otherwise provided in the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the assets of the Wind-Down Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

88

### b. Compensation and Expenses of the Plan Administrator

The Plan Administrator's post Effective Date compensation will be set forth in the Plan Supplement and paid out of the Wind-Down Budget and Plan Administrator Assets.

### c. Wind-Down Budget

The Debtors shall include in the Plan Supplement a Wind-Down Budget.

### 2. Wind Down

On and after the Effective Date, the Plan Administrator will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court in accordance with the Wind-Down Milestones and Wind-Down Budget, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates in accordance with the Wind-Down Milestones and Wind-Down Budget.

As soon as practicable after the Effective Date, the Plan Administrator shall: (i) cause the Debtors and the Wind-Down Debtors, as applicable, to comply with, and abide by, the terms of the Purchase and Sale Agreement and any other documents contemplated thereby; (ii) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (iii) take such other actions in accordance with the Wind-Down Milestones and Wind-Down Budget as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders, board of directors or managers, or other such similar governing body of any Debtor. From and after the Effective Date, except with respect to the Wind-Down Debtors as set forth herein, the Debtors (i) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (ii) shall be deemed to have canceled pursuant to the Plan all Interests, and (iii) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

### 3. Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all required federal, state, and local tax returns for each of the Debtors reflecting all tax consequences relating to the activities of the Wind-Down Debtors as attributable to and for the account of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

89

#### 4. Dissolution of the Debtors

Except as otherwise set forth in the Plan, after the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date, including the Causes of Action retained pursuant to **Section IV.F.10** or **Section IV.G.4** of the Plan, as applicable. Except as specifically provided in the Plan or an order entered by the Bankruptcy Court in the Chapter 11 Cases, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with the Plan

### H. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims

#### 1. Allowance of Claims

Except as otherwise set forth in the Plan, after the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date, including the Causes of Action retained pursuant to **Section IV.E.10** or **Section IV.G.4** of the Plan, as applicable. Except as specifically provided in the Plan or an order entered by the Bankruptcy Court in the Chapter 11 Cases, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with the Plan.

#### 2. Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors, the Liquidating Trustee, or the Wind-Down Debtors, as applicable, may: (i) to File, withdraw, or litigate to judgment, objections to Claims; (ii) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

#### 3. Adjustment to Claims without Objection

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors or the Wind-Down Debtors, as applicable, without the Reorganized Debtors or the Wind-Down Debtors, as applicable, having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

#### 4. Time to File Objections to Claims

Except to the extent Claims are Allowed under the terms of the Plan, any objections to Claims shall be served and Filed by the Claims Objection Deadline. All Claims not objected to by the Claims Objection Deadline shall be deemed Allowed unless such deadline is extended upon approval of the Bankruptcy Court.

90

### 5. Disallowance of Claims or Interests

All Claims of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Liquidating Trustee, as applicable, allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be Disallowed pursuant to section 502(d) of the Bankruptcy Code if: (a) the Entity, on the one hand, and the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Liquidating Trustee, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

Except as provided herein or otherwise agreed to by the Reorganized Debtors or the Wind-Down Debtors, as applicable, in their sole discretion, any and all Claims evidenced by Proofs of Claims Filed after the Bar Date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely-Filed by a Final Order.

### 6. Amendments to Proofs of Claim

On or after the earlier of (i) the Effective Date, or (ii) the Bar Date, a Proof of Claim or Interest may not be Filed or amended without prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Proof of Claim Filed that is not so authorized before it is Filed shall be deemed Disallowed in full without any further action.

### 7. No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, as applicable, no payment or distribution provided to the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; provided that if only the Allowed amount of an otherwise valid Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

### 8. Distributions after Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the Plan Distribution to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

91

**I.    Settlement, Release, Injunction and Related Provisions**

**1.    Discharge of Claims and Termination of Interests in the Event of a Restructuring**

**In the event of a Restructuring, pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan (including with respect to Reinstated Claims and Postpetition Drawbridge Lease Claims), the Confirmation Order or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.  Notwithstanding anything to the contrary in the foregoing, this Section IX.A shall not apply or be construed to release, discharge or otherwise waive any Postpetition Drawbridge Lease Claims. Such Postpetition Drawbridge Lease Claims, if any, shall survive and remain unaffected by entry of the Confirmation Order, as set forth in Section V.H.**

**2.    Release of Liens**

**Except as otherwise provided in the Plan (including <u>Section IV.E</u> of the Plan), the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate with respect to which the applicable counterparty has agreed to Reinstatement in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors or the Wind-Down Debtors, as applicable, and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors or the Wind-Down Debtors, as applicable, to release any**

92

collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors or the Wind-Down Debtors, as applicable, to evidence the release of such Lien, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors, the Reorganized Debtors or the Wind-Down Debtors, as applicable, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

Notwithstanding any of the foregoing, the Debtors reserve the right to leave in place mortgages and security interests of the DIP Agent for the benefit of the Exit Lender pursuant to terms set forth in the Confirmation Order.

### 3. Releases by the Debtors

Except as provided for in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates (and any Entity seeking to exercise rights of the Estates) from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors or the Wind-Down Debtors, as applicable, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the reorganization contemplated by the Plan, the Prepetition Note, the DIP Facility, the Exit Facility, the Purchase and Sale Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the DIP Facility, the Plan, the pursuit of Confirmation, the pursuit of Consummation, the Exit Facility, the Purchase and Sale Agreement, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection thereto, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release obligations of any party or Entity under the Plan, or any document, instrument, or agreement executed to implement the Plan.

93

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release set forth in Section IX.C of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and their Estates; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors or the Wind-Down Debtors, as applicable, or the Debtors' Estates (and any Entity seeking to exercise rights of the Estates) asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**4.      Consensual Releases by the Releasing Parties**

Except as provided for in the Plan or the Confirmation Order, as of the Effective Date, for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Person or Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the reorganization contemplated by the Plan, the Prepetition Note, the DIP Facility, the Exit Facility, the Purchase and Sale Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the DIP Facility, the Plan, the pursuit of Confirmation, the pursuit of Consummation, the Exit Facility, the Purchase and Sale Agreement, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection thereto, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release obligations of any Person or Entity under the Plan, or any document, instrument, or agreement executed to implement the Plan.  Arthur Swift and Ker Zhang shall not be Released Parties; provided, however, that, if the Restructuring occurs, the Debtors, the Reorganized Debtors, and their Estates (and any Entity seeking to exercise rights of the Estates, including the Liquidating Trustee and/or Liquidating Trust) shall not execute upon their personal assets, and, instead, shall only seek any recovery from available insurance policies, if any.  Further, and notwithstanding anything to the contrary in the foregoing, the Third Party Release set forth in this Section IX.D shall not apply or be construed to release, discharge or otherwise waive any Postpetition Drawbridge Lease Claims. Such Postpetition Drawbridge Lease Claims, if any, shall survive and remain unaffected by entry of the Confirmation Order, as set forth in Section V.H.

94

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release set forth in this Section IX.D, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) consensual; (ii) essential to the confirmation of the Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.

### 5. Exculpations

Except as provided for in the Plan or the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing and execution of the DIP Facility, the Exit Facility, this Disclosure Statement, the Plan, or any restructuring transaction, contract, instrument, release or other agreement or document created or entered into in connection with this Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence or willful misconduct, but in all respects such Persons or Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth in this Section IX.E shall not apply or be construed to apply to any Postpetition Drawbridge Lease Claims. Such Postpetition Drawbridge Lease Claims, if any, shall survive and remain unaffected by entry of the Confirmation Order, as set forth in Section V.H.

The Exculpated Parties and parties covered by section 1125(e) of the Bankruptcy Code have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Each of the Exculpated Parties and parties covered by section 1125(e) of the Bankruptcy Code shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.

### 6. Injunction

Except as otherwise expressly provided in the Final DIP Order, the Plan, or the Confirmation Order or for obligations issued or required to be paid pursuant to the Final DIP Order, the Plan, or the Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, settled or are subject to

95

**exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Liquidating Trust, as applicable, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Persons or Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Persons or Entities or the property or the estates of such Persons or Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment, or other similar legal or equitable right of any kind against any obligation due from such Persons or Entities or against the property of such Persons or Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, discharged, or settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in <u>Section IX.F</u> of the Plan.**

### 7. Provision Regarding SEC

Notwithstanding the provisions of **Article IX** of the Plan, nothing in the Plan or the Confirmation Order shall (i) release any entity other than the Debtors from any claim or Cause of Action that may be asserted by the SEC, or (ii) enjoin, limit, impair, or delay the SEC from commencing or continuing any claims, Causes of Action, proceedings, or investigations against any entity other than the Debtors in any forum.

### 8. Protections Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or the Wind-Down Debtors, as applicable, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or the Wind-Down Debtors, as applicable, or another Entity with whom the Reorganized Debtors or the Wind-Down Debtors, as applicable, have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

96

### J. Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent

### K. Conditions Precedent to the Effective Date

The following shall be Conditions Precedent to the Effective Date:

1. The Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, and shall:

   a. authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

   b. decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

   c. authorize the Debtors, as applicable/necessary, to: (a) implement the restructuring transactions contemplated in the Plan; (b) distribute the New Common Stock; (c) make all distributions and issuances as required under the Plan, including Cash and the New Common Stock; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan and Plan Supplement, including the PSA;

   d. authorize the implementation of the Plan in accordance with its terms;

   e. provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

   f. authorize the payment, on or prior to the Effective Date, of all Professional Fee Claims in accordance with the terms of each Professional's engagement letter.

2. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

97

3. the final versions of the Definitive Documentation, the Plan Supplement, and all of the schedules, documents, annexes, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan in form and substance reasonably acceptable to the Debtors, in consultation with Tallwood and the Committee;

4. in the event of a Restructuring, the PSA shall remain in full force and effect;

5. in the event of the Asset Sale Distribution, the conditions to closing of the Purchase and Sale Agreement shall have been satisfied;

6. in the event of the Asset Sale Distribution, the Purchase and Sale Agreement shall have been executed and remain in full force and effect;

7. in the event of the Restructuring, the New Board and Sanjai Kohli shall have agreed in principle to the terms of an employment agreement with Sanjai Kohli, including for payment of a signing bonus from the Reorganized Debtors' general operating funds (including any proceeds of the DIP Facility and Exit Facility), that are reasonably acceptable to Sanjai Kohli and the Reorganized Debtors, in consultation with the Committee, to be entered into with the Reorganized Debtors, approved by the New Board, and become effective post-emergence;

8. in the event of the Restructuring, all conditions precedent to the Exit Facility shall have been satisfied or waived in accordance with the Exit Facility Term Sheet and Definitive Documentation to be entered in connection therewith;

9. all reasonable and documented Professional Fee Claims shall have been paid in full in Cash; and

10. the Debtors shall have implemented the applicable Plan Transaction contemplated herein in a manner consistent with the Plan and pursuant to documentation reasonably acceptable to the Debtors in consultation with Tallwood and the Committee.

**L.** **Waiver of Conditions**

The Debtors, in consultation with Tallwood and the Committee, may waive any one or more of the Conditions Precedent to the Effective Date, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

**M.** **Effect of Failure of Conditions**

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or the PSA shall: (i) constitute a waiver or release of any Claims by the Debtors, or Claims against, or Interests in, the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

98

### N. Substantial Consummation

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

### O. Modification, Revocation, or Withdrawal of Plan

#### 1. Modification and Amendments

Except as otherwise specifically provided in the Plan and PSA, the Debtors reserve the right to modify the Plan, with and in consultation with Tallwood and the Committee, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights, and in consultation with Tallwood and the Committee, to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, this Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan *provided* that each of the foregoing actions shall not violate the PSA.

#### 2. Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

#### 3. Revocation or Withdrawal of Plan

The Debtors reserve the right, in consultation with Tallwood and the Committee, to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

### P. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

99

a. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

b. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

c. resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contracts to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract that is assumed; (iii) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to **Article V** of the Plan, any Executory Contract to the list of Executory Contracts to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

d. ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

e. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

f. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

g. enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or this Disclosure Statement, including the PSA, except to the extent that the Definitive Documentation provide for exclusive jurisdiction and venue in another forum;

h. enter and enforce any order for the sale of property pursuant to sections 1123 or 1146(a) of the Bankruptcy Code;

i. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

j. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

k. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in **Article IX** of the

100

Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

l.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to **Section VI.L** of the Plan;

m.  enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

n.  determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the PSA, except to the extent that any Definitive Documentation provide for exclusive jurisdiction and venue in another forum;

o.  enter an order concluding or closing the Chapter 11 Cases;

p.  adjudicate any and all disputes arising from or relating to Plan Distributions;

q.  consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

r.  determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

s.  hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, except to the extent that any Definitive Documentation provide for exclusive jurisdiction and venue in another forum;

t.  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

u.  hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under **Article IX** of the Plan;

v.  enforce all orders previously entered by the Bankruptcy Court; and

w.  hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in **Article XII** of the Plan to the contrary, the New Organizational Documents and the Exit Facility, and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

101

### Q. Miscellaneous Provisions

#### 1. Immediate Binding Effect

Subject to **Section IX.A** of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts with the Debtors.

#### 2. Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and PSA. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving Plan Distributions and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

#### 3. Payment of Statutory Fees

All fees payable to the U.S. Trustee under 28 U.S.C. § 1930(a)(6) (including interest under 31 U.S.C. § 3717) as of confirmation will be paid on the Effective Date. Notwithstanding anything to the contrary in the Plan (including, without limitation, Sections I.A.1, I.A.2, I.A.66 and II.A of the Plan), such fees are not subject to an allowance procedure under 11 U.S.C. § 503(b), nor is the U.S. Trustee required to file a request for payment of such fees.

Following confirmation, the Debtors, the Reorganized Debtors and the Wind-Down Debtors shall pay quarterly fees to the U.S. Trustee to the extent, and in the amounts, required by 28 U.S.C. § 1930(a)(6) (including interest under 31 U.S.C. § 3717). For the avoidance of doubt, quarterly fees shall be payable for any case that is reopened. So long as the Debtors, the Reorganized Debtors and the Wind-Down Debtors are required to make these payments, the Debtors, the Reorganized Debtors and the Wind-Down Debtors shall file with the Court quarterly reports in the form specified by the U.S. Trustee for that purpose. Dissolution of Committee and Cessation of Fee and Expense Payment.

#### 4. Dissolution of Committee and Cessation of Fee and Expense Payment

On the Effective Date, the Committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; *provided, however*, that the Committee may continue to have standing for the limited purpose of Filing final fee applications with respect to Professionals retained by the Committee and defending any objections to payment of such Professional Claims. The reasonable fees and expenses incurred by the Professionals retained by the Committee in Filing any final fee applications after the Effective Date shall be paid by the Reorganized Debtors without further order of the Bankruptcy Court; *provided* that the Reorganized Debtors shall no longer be responsible for paying

102

any other fees or expenses incurred by the members of or Professionals retained by the Committee after the Effective Date.

### 5. Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, this Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### 6. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 7. Notices

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
| --- | --- |
| Wave Computing, Inc.<br>3201 Scott Blvd<br>Santa Clara, CA 95054<br>Attention: President/CEO | Sidley Austin LLP<br>555 West Fifth Street, Ste 4000<br>Los Angeles, CA 90013<br>Attention: Sam Newman, Genevieve Weiner, Julia Philips Roth<br>*and*<br>Sidley Austin LLP<br>2021 McKinney Avenue<br>Ste 2000, Dallas, TX 75201<br>Attention: Charles Persons, Juliana Hoffman, Jeri Leigh Miller |
| **Counsel to Tallwood** | **Securities and Exchange Commission** |
| Binder & Malter LLP<br>2775 Park Avenue<br>Santa Clara, CA 95050<br>Attention: Robert G Harris | US Securities and Exchange Commission<br>444 South Flower St., Ste 900<br>Los Angeles, CA 90071-9591<br>Attention: Bankruptcy Counsel<br>*and*<br>950 East Paces Rd. N.E. Ste 900<br>Atlanta GA 30326-1382<br>Attention: William M Uptegrove |
| **United States Trustee** | **Counsel to the Committee** |
| Office of The United States Trustee | Hogan Lovells US LLP |

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 121 of 276

| 280 South First St., Room 268 | 1999 Ave of the Stars, Ste 1400 |
|---|---|
| San Jose, CA 95113 | Los Angeles, CA 90067 |
| Attention: Jason B. Shorter, Jason Blumberg | Attention: Richard L Wynne, David P Simonds, Edward J McNeilly |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests

## 8.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in these Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## 9.    Entire Agreement

Except as otherwise indicated, the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## 10.    Exhibits and Annexes

All exhibits, annexes, and documents attached hereto or included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits, annexes, and documents are Filed, copies of such exhibits, annexes, and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits, annexes, and documents from the Debtors' restructuring website at: https://www.donlinrecano.com/Clients/wave/Index or the Bankruptcy Court's website at www.canb.uscourts.gov. To the extent any exhibit, annex, or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court or otherwise specifically provided for in such exhibit, annex, or document, the non-exhibit, non-annex, or non-document portion of the Plan shall control.

## 11.    Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide

104

that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (iii) nonseverable and mutually dependent.

## 12. Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

## 13. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of California, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in California shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

## 14. Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date

## 15. Closing of these Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases. One or more of the Chapter 11 Cases shall remain open until the Liquidating Trust Causes of Action have been fully adjudicated.

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 123 of 276

## VIII.  LIQUIDATION ANALYSIS, VALUATION, AND FINANCIAL PROJECTIONS

### A.  Liquidation Analysis

The Debtors believe that the Plan provides a greater recovery for Holders of Allowed Claims, and no less recovery for Holders of Interests, than would be achieved in a liquidation under chapter 7 of the Bankruptcy Code.  This belief is based on a number of considerations, including (i) the likely erosion in value of the Debtors' IP in a chapter 7 case in the context of an expeditious liquidation and the "forced sale" atmosphere; (ii) the additional Administrative Claims and Professional Claims generated by conversion to a chapter 7 case and any related costs; (iii) the absence of a robust market in which the Debtors' assets could be marketed and sold pursuant to a liquidation sale; and (iv) the additional Claims that would arise by reason of the breach or rejection in a chapter 7 case of obligations under leases and executory contracts that would otherwise be assumed under the Plan.

The Debtors, with the assistance of SCP, have prepared the Liquidation Analysis, which was updated as of the date of filing this amended Disclosure Statement and is attached hereto as **Exhibit C**, to assist Holders of Claims and Interests in evaluating the Plan.  The Liquidation Analysis compares the projected recoveries that would result for the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.  The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.  Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings.  Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis.

### B.  Financial Projections

As further discussed in **Section IX** of this Disclosure Statement, the Debtors believe the Plan meets the feasibility requirements set forth in Section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by a liquidation or the need for further financial reorganization of the Reorganized Debtors or any successor to the Debtors under the Plan.  In connection with the Solicitation and seeking Confirmation of the Plan, and for purposes of determining whether the Plan satisfies the feasibility standards, the Debtors' management has developed the Financial Projections attached hereto as **Exhibit D**.

**Creditors and other interested parties should read Section XI of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the ability of the Debtors to reorganize and the future financial performance of the Reorganized Debtors.**

## IX. FEASIBILITY AND BEST INTEREST OF THE CREDITORS

### A.  Feasibility of the Plan

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the chapter 11 plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of, the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan).

106

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan and to continue operating as a going concern. As part of this analysis, the Debtors prepared the Financial Projections, **Exhibit D**, and based on such Financial Projections, the Debtors believe that they will be able to make all payments required under the Plan and, together with the liquidity provided by the Exit Facility, Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization of the Reorganized Debtors.

### B. Best Interests of Creditors Test

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a Bankruptcy Court find, as a condition to confirmation, that a chapter 11 plan of reorganization provides, with respect to each class of claims and interests, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7.

In order to satisfy the "best interests" test, the Debtors have attached hereto as **Exhibit C** the Liquidation Analysis. The Liquidation Analysis demonstrates that the distributions to all Classes of Claims and Interests under the Plan are not less than the amount that Holders in such Classes are likely to receive if the Debtors were liquidated under chapter 7.

## X. CONFIRMATION PROCEDURES

### A. Confirmation Hearing

Section 1129(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to hold a hearing on confirmation of a chapter 11 plan. The Bankruptcy Code further provides that any party in interest may object to the confirmation of a chapter 11 plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for January 27, 2021, commencing at 10:15 a.m. (prevailing Pacific Time), before the Honorable M. Elaine Hammond, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of California. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before January 11, 2021 at 4:00 p.m. (prevailing Pacific Time). **THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO CONFIRMATION OF THE PLAN IF ANY SUCH OBJECTIONS HAVE NOT BEEN TIMELY SERVED AND FILED IN COMPLIANCE WITH THE ORDER APPROVING THE DISCLOSURE STATEMENT.**

### B. Statutory Requirements for Confirmation of the Plan

Among the requirements for the confirmation of a chapter 11 plan of reorganization are that such plan (i) is accepted by all impaired classes of claims and interests, or if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (ii) is

107

feasible; and (iii) is in the "best interests" of holders of claims and interests that are impaired under the plan.

In these Chapter 11 Cases, at the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Plan satisfies all of the necessary statutory requirements of chapter 11, (ii) they have complied or will have complied with all of the necessary requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

### 1. Acceptance by Impaired Classes

The Bankruptcy Code requires that, as a condition to confirmation, except as described in **Section X.B.2.** of this Disclosure Statement, each class of claims or interests that is impaired under a chapter 11 plan of reorganization, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.[17]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims or interests as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims or interests in that class, counting only those claims or interests that actually voted to accept or to reject the plan.

Thus, the Voting Classes described herein will have voted to accept the Plan only if two-thirds in amount and a majority in number of Holders that actually vote on the Plan vote to accept.

### 2. Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan, even if an impaired class has not accepted it, provided that the plan has been accepted by at least one impaired class. The Plan provides that Classes 7, 8, 9, 10, 11, 12, 13, 14, 15, and 16 (to the extent canceled, released, and extinguished) are deemed to reject the Plan, and the Debtors cannot guarantee that all Voting Classes will accept the Plan. The Debtors intend to seek confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) as necessary. Bankruptcy Code section 1129(b) states that, notwithstanding an impaired class's failure to accept a plan of reorganization, the plan may still be confirmed, so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the

---

[17] As described in Section 1124 of the Bankruptcy Code, a class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

108

same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of allowed Claims in that Class. The Debtors assert that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan, any Exhibit thereto and any Plan Supplement, including to amend or modify it to satisfy Bankruptcy Code section 1129(b), if necessary.

## XI. RISK FACTORS

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement.

### A. Bankruptcy-Specific Considerations

#### 1. General

While the Debtors expect that these Chapter 11 Cases will be of short duration and will not be materially disruptive to their business, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their MIPS customers and employees. The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

#### 2. Objections to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests

in such class. The Debtors assert that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that parties in interest will not object to the classification of Claims and Interests under the Plan, or that the Bankruptcy Court will approve such classification.

### 3. Challenges to the Financial Projections and Liquidation Analysis

To date, no party has raised challenges to the Debtors' Financial Projections and Liquidation Analysis. However, in the event such a challenge is raised, the Debtors' ability to obtain Confirmation of the Plan could be adversely affected.

### 4. Termination of Plan Support Agreement

The PSA may terminate if various conditions are not satisfied, which could result in protracted Chapter 11 Cases that could significantly and detrimentally impact relationships with creditors, vendors, suppliers, employees, and customers. The PSA permits the Committee to terminate the PSA if the Debtors (i) elect the Asset Sale Distribution, and the Committee reasonably determines in accordance with its fiduciary duties based on the advice of its counsel and financial advisors that the net proceeds to the Debtors of such Asset Sale Distribution are less than the implied value of the Plan, or (ii) proceed with the Restructuring, and the Committee reasonably determines in accordance with its fiduciary duties based on the advice of its counsel and financial advisors that the implied value of the Plan is less than would be the net proceeds to the Debtors of an Asset Sale Distribution.

### 5. Non-Confirmation or Delay of Confirmation of the Plan

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. The Debtors can give no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

Alternatively, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims or Interests. Here, Class 15 under the Plan – Wave Common Interests – is not receiving a distribution under the Plan and therefore deemed to reject. Nevertheless, the Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code if the Bankruptcy Court determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting class, the Bankruptcy Court also must find that at least one Impaired Class (which cannot be an "insider" class) has accepted the Plan.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the Plan as proposed. A dissenting Holder of a Claim or Interest against the Debtors could challenge the balloting procedures as not being in compliance with the solicitation procedures and the Bankruptcy Code, which could mean that the results of the balloting may be invalid. If the Bankruptcy Court determined that the balloting procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

110

For the Debtors to emerge successfully from the Chapter 11 Cases as viable entities, the Debtors, like any other chapter 11 debtor, must obtain approval from their creditors and confirmation of the Plan by the Bankruptcy Court, and then successfully implement the Plan. The foregoing process requires the Debtors to (i) meet certain statutory requirements with respect to the adequacy of this Disclosure Statement, (ii) solicit and obtain creditor acceptances of the Plan, and (iii) fulfill other statutory conditions with respect to the confirmation of the Plan.

Although the Debtors assert that the Plan satisfies all of the requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. The Debtors also understand that the Committee may object to Confirmation if the Debtors (i) elect the Asset Sale Distribution, and the Committee reasonably determines in accordance with its fiduciary duties based on the advice of its counsel and financial advisors that the net proceeds to the Debtors of such Asset Sale Distribution are less than the implied value of the Plan, or (ii) proceed with the Restructuring, and the Committee reasonably determines in accordance with its fiduciary duties based on the advice of its counsel and financial advisors that the implied value of the Plan is less than would be the net proceeds to the Debtors of an Asset Sale Distribution. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation, or that such modifications would not necessitate the re-solicitation of votes to accept the Plan, as modified. If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to reorganize their business; (b) the distributions that Holders of Claims and Interests ultimately would receive, if any, with respect to their Claims or Interests is uncertain; and (c) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims and Interests. It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate the exclusivity period during which only the Debtors may propose and seek to confirm a plan of reorganization.

## 6. Non-Consensual Confirmation

In the event that any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. These requirements must be satisfied with respect to Class 5, and any Voting Class that votes to reject the Plan (if any). The Debtors believe that the Plan satisfies these requirements. The Debtors understand that the Committee may object to Confirmation if an agreement is not reached on a consensual restructuring with the Committee.

## 7. Non-Occurrence of the Effective Date

As more fully set forth in **Article X** of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

111

### 8. Conversion to Chapter 7

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. *See* **Section VIII.A.** of this Disclosure Statement, as well as the Liquidation Analysis attached hereto as **Exhibit C**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests.

### 9. Impact of Chapter 11 Cases on the Debtors

The Plan affects both the Debtors' capital structure and the ownership, structure, and operation of its business and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including, but not limited to, the Debtors' (i) ability to obtain adequate liquidity and financing sources; (ii) ability to maintain customers' confidence in the Debtors' viability as a continuing entity and to attract and retain sufficient business from them; and (iii) ability to retain Debtors' employees, as well as the overall strength and stability of general economic conditions in light of the global COVID-19 pandemic. The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' business.

In addition, the Plan relies upon Financial Projections, including with respect to revenues, EBITDA, debt service, and Cash flow. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on the Debtors and their subsidiaries or their business or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the Plan.

Finally, the pursuit of these Chapter 11 Cases have consumed and will continue to consume a substantial portion of the time and attention of management, which may have an adverse effect on the Debtors' business and results of operations. The Debtors may also face increased levels of employee attrition.

### 10. Inability to Assume Executory Contracts

An executory contract is a contract on which performance remains due to some extent by both parties to the contract. The Plan provides for the assumption of all Executory Contracts that are not specifically rejected as set forth in the Plan. The Debtors intend to preserve as much of the benefit of their existing Executory Contracts as possible. However, with respect to some limited classes of Executory Contracts, including licenses with respect to patents or trademarks, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such

112

consent that makes assuming the contracts unattractive. The Debtors then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

### 11. Adverse Effect on Debtors' Tax Attributes

Under federal income tax law, a corporation is generally permitted to deduct from taxable income net operating losses (the "NOLs") carried forward from prior years. The Debtors estimate that they have approximately $113,873,674 of federal NOLs as of September 30, 2019. The Debtors currently expect, however, that they may realize cancellation of indebtedness income ("COD Income") as a result of the Restructuring and, thus, currently expect that a portion of their NOLs and, potentially, certain other tax attributes (including "net unrealized built-in losses") may be reduced as a result of the exclusion of the Debtors' COD Income.

The Reorganized Debtors' ability to utilize any remaining NOLs and other tax attributes to offset future taxable income is subject to certain requirements and restrictions. If the Debtors experience an "ownership change" as defined in section 382 of the IRC, the Reorganized Debtors' ability to use the NOLs may be substantially limited, which could have a negative impact on the Reorganized Debtors' financial position and results of operations. The Debtors currently expect that the Restructuring will qualify for an exception from the foregoing limitations as set forth in Section 382(l)(5) of the IRC, although no assurances can be provided in this regard. Even assuming the Restructuring does not result in an "ownership change," following the implementation of the Plan, it is possible that an "ownership change" may be deemed to occur.

Holders of Allowed Claims should carefully review **Section XIII** of this Disclosure Statement to determine how the tax implications of the Plan and these Chapter 11 Cases may further affect the Debtors and the Reorganized Debtors.

### 12. Votes and Recoveries Subject to Contingencies

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Voting Classes to accept or reject the Plan or require any sort of revote by the Voting Classes.

The estimated Claims and creditor recoveries that will be forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 13. Ability to Discharge or Satisfy Prepetition Claims

The Bar Dates for filing Proofs of Claim has been established [Dkt. No. 86]. However, the Debtors may be subject to Claims in various legal proceedings and may become subject to other legal

proceedings in the future. Although any such Claims will generally be stayed while the Chapter 11 Cases are pending, the Debtors may not be successful in ultimately discharging or satisfying such Claims. The ultimate outcome of each of these matters, including the Debtors' ability to have these matters satisfied and discharged in the bankruptcy proceeding, cannot presently be determined, nor can the liability that may potentially result from a negative outcome be reasonably estimated presently for every case. The liability the Debtors may ultimately incur with respect to any one of these matters in the event of a negative outcome may be in excess of amounts currently accrued with respect to such matters and, as a result, these matters may potentially be material to the Debtors' business, financial condition, and/or results of operations.

These matters include, without limitation, that the SEC has asserted that debts owed to the SEC may not be dischargeable in the bankruptcy proceedings pursuant to 11 U.S.C. § 1141(d)(6). The SEC has asserted that it has the right to take whatever action may be required, if any, to determine the non-dischargeability of a debt owed to the SEC at any time, including following confirmation of the Plan. The Debtors have been continuing to cooperate with the SEC. The Debtors do not believe such action will ensue; however, if the SEC successfully brings an action to determine that any debt owed to the SEC is non-dischargeable in a bankruptcy proceeding, the liability the Debtors may ultimately incur with respect to the SEC's claims may potentially be material to the Debtors' business, financial condition, and/or results of operations.

### 14. Failure to Obtain Approval of Releases, Injunctions, and Exculpation

**Article IX** of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases of claims and causes of action that may otherwise be asserted against the Debtors, Reorganized Debtors, or other Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. Any party in interest, including the UST, could object to the Plan on the grounds that the third-party release contained in **Section IX.D** of the Plan is not given consensually or in a permissible nonconsensual manner. In response to such an objection, the Bankruptcy Court could determine that the third party release is not valid under the Bankruptcy Code. If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to alter or remove the third-party release, in which case the Released Parties may withdraw their support for the Plan. This could result in substantial delay in Confirmation of the Plan or the Plan not being confirmed at all.

### 15. Plan Based on Assumptions

The Plan affects both the Debtors' capital structure and the ownership, structure, and operation of its business and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including but not limited to the Debtors' (i) ability to obtain adequate liquidity and financing sources; (ii) ability to maintain customers' confidence in the Debtors' viability as a continuing entity and to attract and retain sufficient business from them; and (iii) ability to retain Debtors' employees, as well as the overall strength and stability of general economic conditions in light of the global COVID-19 pandemic.

The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' business.

In addition, the Plan relies upon the Financial Projections, including with respect to revenues, EBITDA, debt service, and Cash flow. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on the Debtors and their subsidiaries or their business or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful implementation of the Plan.

## XII. CERTAIN SECURITIES LAW MATTERS

### A. Potential Plan Securities

The Debtors believe that the shares of New Common Stock are, and the GUC Note, the Senior Secured Note, and/or the Secured Subordinated Note may constitute, "securities" as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code and/or applicable state Blue Sky Laws. The Debtors further believe that the offer and sale of the New Common Stock and (to the extent they are deemed to be securities) the GUC Note, the Senior Secured Note, and/or the Secured Subordinated Note under the Plan are, and subsequent transfers of the such securities by the holders thereof that are not "underwriters" as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state Blue Sky Laws.

### B. Issuance and Resale of Plan Securities under the Plan

#### 1. Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws

The Debtors believe that, subject to certain exceptions described below, various provisions of the Securities Act, the Bankruptcy Code, and Blue Sky Laws exempt from federal and state securities registration requirements (a) the offer and the sale of any securities pursuant to the Plan and (b) subsequent transfers of such securities.

The Debtors have not filed a registration statement under the Securities Act or any other federal or state securities laws with respect to any new securities that may be deemed to be offered by virtue of the Solicitation. The Debtors are relying on exemptions from the registration requirements of the Securities Act, including, without limitations, Section 3(a)(9) thereof, to exempt the offer of any securities that may be deemed to be made pursuant to the solicitation of votes on the Plan. Section 3(a)(9) of the Securities Act provides that the registration requirements of the Securities Act will not apply to "any security exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange." Importantly, an exchange of debt is a separate offer from the exchange of claims for an enhanced litigation interest.

The Debtors are also relying on Section 18(b)(4)(C) of the Securities Act to exempt from Blue Sky Law requirements the offer of any securities that may be deemed to be made pursuant to the

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 133 of 276

solicitation of votes on the Plan. Section 18(b)(4)(C) provides, among other things, that state securities laws will not apply to securities that are exempt from federal registration under Section 3(a)(9) of the Securities Act. The Debtors do not have any contract, arrangement, or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent, or any other person for soliciting votes to accept or reject the Plan. The Debtors have received assurances that no person will provide any information to Holders of Allowed Claims relating to the solicitation of votes on the Plan other than to refer such Holders of Allowed Claims to the information contained in this Disclosure Statement. In addition, no broker, dealer, salesperson, agent, or any other person, is engaged or authorized to express any statement, opinion, recommendation, or judgment with respect to the relative merits and risks of the Plan.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor or such affiliate; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for Cash or property. In reliance upon these exemptions and the exemption set forth in the preceding paragraph, including the exemption provided by Sections 3(a)(9) and 18(b)(4)(C) of the Securities Act, the Debtors believe that any offer and sale of securities under the Plan (other than the Section 4(a)(2) Securities, as discussed below) will be exempt from registration under the Securities Act and Blue Sky Laws.

To the extent that the issuance of securities pursuant to the Plan is covered by Section 1145 of the Bankruptcy Code, such securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, securities governed by Section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined. Therefore, recipients of such securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under applicable Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

Recipients of any securities pursuant to the Plan are advised to consult with their own legal advisors as to the applicability of Section 1145 of the Bankruptcy Code and the availability of any exemption from registration under the Securities Act and Blue Sky Laws.

### 2. Resales of Plan Securities; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities,

116

if such offer to buy is (1) with a view to distribution of such securities and (2) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of Section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an "underwriter" within the meaning of Section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an "underwriter" under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to Section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in Section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 under the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of securities issued under the Plan by holders deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of securities who are deemed to be "underwriters" may be entitled to resell their securities pursuant to the non-exclusive safe harbor resale provisions of Rule 144 and Rule 144A of the Securities Act.

Generally, Rule 144 provides that if certain conditions are met, specified persons who resell restricted securities will not be deemed to be "underwriters" as defined in Section 2(a)(11) of the Securities Act. Rule 144 provides that:

(i) a non-affiliate who has not been an affiliate during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one year holding period regardless of whether there is current public information regarding the issuer at the time of the sale; and

(ii) an affiliate may sell restricted securities after a six month holding period if the issuer of the securities is, and has been for a period of at least ninety (90) days immediately before the sale, subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and after a one-year holding period if the issuer of the securities is or has not been subject to such requirements, provided that in each case the affiliate otherwise complies with the volume, current public information, manner of sale and notice requirements of Rule 144.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are

117

"restricted securities" within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (e.g., the availability of information required by paragraph 4(d) of Rule 144A and certain notice provisions). Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons "dealers" registered as such pursuant to Section 15 of the Exchange Act, and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary basis at least $100 million in the securities of unaffiliated issuers.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the securities contemplated herein and in the Plan would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such securities and, in turn, whether any Person may freely resell such securities. The Debtors recommend that potential recipients of securities under the Plan consult their own counsel concerning their ability to trade such securities without compliance with the registration requirements of applicable federal and state securities laws.

## XIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. Introduction

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors and to certain holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims. This summary is based on the IRC, the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local, gift or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the IRC, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, passthrough entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, persons who hold Claims or who will hold New Common Stock as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy). This

118

summary assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to holders of Claims that act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described here. This summary does not address the U.S. federal income tax consequences to holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim or Interest that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S., any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the U.S. is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) have authority to control all substantial decisions of the trust, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### B. Certain U.S. Federal Income Tax Consequences to the Debtors

The tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the Asset Sale or the Restructuring is pursued. The determination of whether the Restructuring or the Asset Sale will be pursued has not yet been made. The following discussion, however, assumes that the Debtors will pursue the Restructuring and thus only discloses the tax consequences of the Restructuring.

As of September 30, 2019, the Debtors estimate that they have approximately $113,873,674 of federal NOLs. The Debtors are currently generating additional tax losses, which will ultimately

119

increase the Debtors' NOLs and other tax attributes. As described below, however, these NOLs may be reduced as a result of the implementation of the Plan. Any NOLs remaining following implementation of the Plan may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years starting after 2017, thereby reducing the Reorganized Debtors' future aggregate tax obligations. NOLs arising before 2021 may offset 100% of future taxable income and NOLs arising after 2020 may be used to offset 80% of taxable income in a given year. The Debtors are currently unable to determine the amount of NOLs that are expected to be available following implementation of the Plan.

### 1. Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, the Debtors will realize and recognize COD Income upon satisfaction of their outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new debt issued, and (iii) the fair market value of any other consideration given in satisfaction of such satisfied indebtedness at the time of the exchange.

Under section 108 of the IRC, the Debtors will not, however, be required to include any amount of COD Income in gross income if the Debtors are under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, the Debtors must reduce their tax attributes by the amount of COD Income that they excluded from gross income pursuant to section 108 of the Code. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the Debtors will remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, the Debtors may elect first to reduce the basis of their depreciable assets pursuant to section 108(b)(5) of the IRC. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The Debtors may realize COD Income as a result of the Restructuring. The exact amount of COD Income that will be realized by the Debtors, if any, will not be determinable until the consummation of the Plan.

### 2. Limitation on NOLs and Other Tax Attributes

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs, capital loss carryovers, tax credit carryovers and certain other tax attributes allocable to periods before the Effective Date ("Pre-Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation. The Debtors anticipate that the issuance of New Common Stock to the holders of Tallwood Claims (Class 3) in exchange for their Prepetition First Lien Notes may result in an ownership change of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses may be subject to limitation unless an exception to the general rules of section 382 of the IRC applies. If an ownership change occurs and an exception is unavailable, the resulting limitation under section 382 of the IRC would be

120

independent of, and in addition to, the reduction of tax attributes described above resulting from the exclusion of COD Income.

For purposes of determining the annual limitation under section 382 of the IRC, if a corporation has a "net unrealized built-in loss" (generally, an aggregate amount of tax basis in excess of fair market value) at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization and depreciation deductions attributable to such built-in losses) recognized during the following five-years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (i) $10,000,000 or (ii) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change. Although the Debtors did not have a "net unrealized build-in loss" as recently as November 3, 2017, the Debtors may have a net unrealized built-in loss as of the Effective Date.

### (i) General Section 382 Annual Limitation

This discussion refers to the limitation determined under section 382 of the IRC in the case of an ownership change as the "Section 382 Limitation." In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (b) the "long term tax exempt rate" (which is currently 1.12%). The Section 382 Limitation may be increased during the five-year period following the ownership change to the extent that the Debtors have a "net unrealized built-in gain" rather than a net unrealized built-in loss as of the Effective Date. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if a corporation that has undergone an ownership change does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the Section 382 Limitation is generally reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to net unrealized built-in gain discussed above). As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

### (ii) Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when shareholders and/or so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims or interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOL carryforwards are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively are eliminated in their entirety.

121

A "qualified creditor" is any creditor who has held the debt of a debtor for at least eighteen months prior to the petition date or who has held "ordinary course indebtedness" that has been owned at all times by such creditor. A creditor who does not become a direct or indirect five percent shareholder of a reorganized debtor may generally be treated by the debtor as having always held any debt owned immediately before the ownership change.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOL carryforwards by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses. An election to apply the 382(l)(6) Exception rather than the 382(l)(5) Exception must be made on the tax return for the year in which the Effective Date occurred.

The Debtors currently expect that the Restructuring will qualify for the 382(l)(5) Exception, although no assurances can be provided in this regard. Even assuming the Restructuring qualifies for the 382(l)(5) Exception, the Reorganized Debtors may decide to elect out of the 382(l)(5) Exception, particularly if it appears likely that another ownership change will occur within two years after emergence. In either such case, the 382(l)(6) Exception would apply. The Reorganized Debtors will evaluate the known circumstances at the relevant time and, assuming the 382(l)(5) Exception is available, decide which exception to apply. In either case, the Debtors expect that their use of Pre-Change Losses after the Effective Date will be subject to limitation based on the rules discussed above. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an ownership change were to occur after the Effective Date.

### 3.     Applicable High Yield Discount Obligations

The Secured Subordinated Note may be issued with "significant" original issue discount.  If the yield to maturity of the Secured Subordinated Note also equals or exceeds the sum of (x) the "applicable federal rate" (as determined under Section 1274(d) of the IRC) in effect for the calendar month in which the Secured Subordinated Note is issued and (y) 5 percentage points, the Secured Subordinated Note would be considered an "applicable high yield discount obligation" ("AHYDO"). If the Secured Subordinated Note is an AHYDO, the Reorganized Debtors will generally not be allowed a deduction for interest (including original issue discount) accrued on the Secured Subordinated Note for U.S. federal income tax purposes until such time as the Reorganized Debtors actually pay such interest (including original issue discount) in cash or in other property. In addition, to the extent the yield to maturity on the Secured Subordinated Note exceeds the sum of (x) the applicable federal rate in effect for the calendar month in which the Secured Subordinated Note is issued, and (y) 6 percentage points (any such excess constituting the "disqualified yield"), the Reorganized Debtors will not be entitled to deduct the portion of the original issue discount corresponding to the disqualified yield at any time.  It is possible that the Secured Subordinated Note

122

will constitute an AHYDO subject to the foregoing rules. The deferral or disallowance of deductions for payments of interest or original issue discount on the Secured Subordinated Note described above may reduce the amount of Cash available to the Reorganized Debtors to meet their obligations under the Secured Subordinated Note.

## C. Liquidating Trust

Pursuant to the Plan, certain of the Debtors' assets will be transferred to the Liquidating Trust. For federal income tax purposes, any such assets transferred to the Liquidating Trust will be treated by the Debtors and by the Liquidating Trust Beneficiaries as (i) a transfer of such assets to the Liquidating Trust Beneficiaries, followed by (ii) a transfer of such assets by the Liquidating Trust Beneficiaries to the Liquidating Trust.

It is intended that the Liquidating Trust be treated, for U.S. federal income tax purposes, as a grantor trust, with the Liquidating Trust Beneficiaries receiving beneficial interests in the Liquidating Trust being treated as the grantors and deemed owners of the assets in the Liquidating Trust. Consistent with such tax treatment, each Liquidating Trust Beneficiary will be required to report on its U.S. federal income tax return its allocable share of the Liquidating Trust's income, losses, if any, and expenses. Accordingly, a Liquidating Trust Beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income whether or not the Liquidating Trust has made any distributions to such Liquidating Trust Beneficiary. The ability of a Liquidating Trust Beneficiary to benefit from any deduction or losses may depend on the particular situation of that Liquidating Trust Beneficiary. In addition, each Liquidating Trust Beneficiary will need to rely upon the Liquidating Trustee to file tax returns for the Liquidating Trust and to provide separate statements setting forth such Liquidating Trust Beneficiary's share of the Liquidating Trust's tax items.

## D. Certain U.S. Federal Income Tax Consequences to Certain Holders of Claims

The U.S. federal income tax consequences of the Restructuring to Holders of Claims, including the character and amount of income, gain or loss recognized as a consequence of the Plan, will depend upon, among other things, (i) the manner in which a holder acquired a Claim; (ii) the length of time the Claim has been held; (iii) whether the Claim is a capital asset in the hands of the holder; (iv) the method of tax accounting of the holder; and (v) with respect to any Claim, (a) whether such Claim was acquired at a discount, (b) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years, (c) whether the holder has previously included in income accrued but unpaid interest with respect to the Claim, and (d) whether the Claim is an installment obligation for U.S. federal income tax purposes.

EACH HOLDER OF A CLAIM AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISORS REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

### 1. General

A holder of a Claim may recognize ordinary income or loss with respect to any portion of its Claim attributable to accrued but unpaid interest. A holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any

123

consideration received is characterized for U.S. federal income tax purposes as a payment of interest, regardless of whether such holder realizes an overall gain or loss as a result of surrendering its Claim. In general, a holder that previously included in its income accrued but unpaid interest attributable to its Claim will recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim. Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtors intend to allocate for U.S. federal income tax purposes the consideration paid pursuant to the Plan with respect to a Claim first to the principal amount of such Claim as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Claim. Accordingly, in cases where a holder receives consideration in an amount that is less than the principal amount of its Claim, the Debtors intend to allocate the full amount of consideration transferred to such holder to the principal amount of such obligation and to take the position that no amount of the consideration to be received by such holder is attributable to accrued interest. There is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Subject to the foregoing rules relating to accrued interest, gain or loss recognized for U.S. federal income tax purposes as a result of the consummation of the Plan by holders of Claims that hold their Claims as capital assets generally will be treated as a gain or loss from the sale or exchange of such capital asset. Capital gain or loss will be long-term if such Claim was held by the holder for more than one year and otherwise will be short-term. Any capital losses realized generally may be used by a corporate holder only to offset capital gains, and by an individual holder only to the extent of capital gains plus $3,000 of other income.

**2.      Market Discount**

The market discount provisions of the IRC may apply to holders of certain Claims. In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its adjusted issue price) exceeds, by more than a statutory *de minimis* amount, the tax basis of the debt obligation in the holder's hands immediately after its acquisition (any such excess, "market discount"). In general, a market discount obligation is treated as having accrued market discount as of any date equal to the total market discount multiplied by a fraction, the numerator of which is the number of days the holder has owned the market discount obligation and the denominator of which is the total number of days that remained until maturity at the time the holder acquired the market discount obligation. If a holder of a Claim with accrued market discount realizes gain upon the exchange of such Claim for property pursuant to the Plan, such Holder may be required to include as ordinary income the amount of such accrued market discount to the extent of such realized gain. Holders of Claims with accrued market discount should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances..

**3.      Definition of "Security"**

The term "security" is not defined in the IRC or in the Treasury Regulations. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument. These authorities have indicated that an initial term of less than five years is evidence that the instrument is generally not a security, whereas an initial term of

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 142 of 276

ten years or more is evidence that it is a security. Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

### 4.    Consequences to U.S. Holders of Tallwood Claims (Class 3)

As part of the Restructuring, a U.S. Holder of a Tallwood Claim will receive its Pro Rata share of 62.34% of the New Common Stock, its Pro Rata share of the Secured Subordinated Note, and a beneficial interest in the Liquidating Trust in full and final satisfaction of its Claim. The Debtors currently expect, and this discussion assumes, that the Prepetition Notes are not treated as "securities" for tax purposes, and thus the exchange of Prepetition Notes for New Common Stock and the Secured Subordinated Note will be treated as a fully taxable exchange. Accordingly, a U.S. Holder of a Tallwood Claim should recognize gain or loss equal to the difference between (a) the sum of (i) the fair market value of the New Common Stock, (ii) the "issue price" of the Secured Subordinated Note, and (iii) the fair market value of the beneficial interest in the Liquidating Trust, and (b) the U.S. Holder's adjusted tax basis in its Prepetition Notes, in each case, as of the Effective Date. The character of such gain or loss will depend on certain factors discussed above that are specific to the U.S. Holder of a Tallwood Claim. A U.S. Holder's tax basis in the New Common Stock should equal its fair market value on the Effective Date, and a U.S. Holder's tax basis in the Secured Subordinated Note should equal the "issue price" of the Secured Subordinated Note. In addition, a U.S. Holder's holding period in the New Common Stock and the Secured Subordinated Note received should begin on the day following the Effective Date.

If interests in the Secured Subordinated Note are "publicly traded," then the "issue price" is generally expected to equal the fair market value of the Secured Subordinated Note on the Effective Date. If interests in the Senior Secured Subordinated Note are not publicly traded, then the issue price will depend on whether the Prepetition Note is publicly traded, in which case the issue price of interests in the Secured Subordinated Note is generally expected to be determined by reference to the fair market value of the Prepetition Note. Otherwise, the issue price of an interest in the Secured Subordinated Note is generally expected to equal its stated redemption price at maturity. For these purposes, a debt instrument generally is treated as publicly traded if, at any time during the 31-day period ending 15 days after the issue date, (i) a sales price exists for the debt that is considered reasonably available (e.g., the sales price appears in a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments (including a price provided only to certain customers or to subscribers) or persons that broker purchases or sales of debt instruments) within a reasonable period of time after the exchange, (ii) a firm quote is considered to exist for the debt instrument (e.g., a price quote is available from at least one broker, dealer or pricing service (including a price provided only to certain customers or to subscribers) for the debt instrument and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the debt) or (iii) one or more indicative quotes for the debt instrument are considered to exist (e.g., a price quote is available from at least one broker, dealer or pricing service (including a price provided only to certain customers or to subscribers) for the debt instrument and the price quote is not a firm quote).

125

A U.S. Holder who receives an interest in the Secured Subordinated Note will generally be required to include stated interest on the Secured Subordinated Note in income in accordance with such U.S. Holder's regular method of tax accounting. In addition, if the Secured Subordinated Note is treated as issued with original issue discount for U.S. federal income tax purposes, a U.S. Holder of an interest in the Senior Secured Subordinated Note will also be required to include in income as interest the amount of such original issue discount over the term of the Secured Subordinated Note based on the constant yield method. In such a case, a U.S. Holder will also be required to include amounts in income before they are received. A U.S. Holder's tax basis in its interest in the Secured Subordinated Note will be increased by the amount of original issue discount included in income and reduced by the amount of cash (other than payments of stated interest) received with respect to its interest in the Secured Subordinated Note.

Corporate U.S. Holders of a Tallwood claim should consult their tax advisors about the potential for a dividends received deduction if the Secured Subordinated Note is classified as an AHYDO (as discussed above in section XIII(B)(3)).

### 5. Consequences to U.S. Holders of *De Minimis* Unsecured Claims (Class 4)

As part of the Restructuring, a U.S. Holder of a *De Minimis* Unsecured Claim will receive payment in full in Cash. A U.S. Holder that receives Cash in satisfaction of its *De Minimis* Unsecured Claim should recognize income equal to the amount of Cash received. The character of such income will depend on certain factors discussed above that are specific to the U.S. Holder of a *De Minimis* Unsecured Claim.

### 6. Consequences to U.S. Holders of General Unsecured Claims (Class 5)

As part of the Restructuring, a U.S. Holder of a General Unsecured Claim will receive its Pro Rata Share of the GUC Note and a beneficial interest in the Liquidating Trust.

The precise U.S. federal income tax consequences for a Holder of a General Unsecured Claim will depend, in part, upon the Holder's method of accounting (cash or accrual) and whether its Claim is a capital asset or item of inventory property in the hands of the holder.

To the extent that a U.S. Holder does not have any basis in its General Unsecured Claim for U.S. federal income tax purposes (e.g., such U.S. Holder does not hold its General Unsecured Claim as a capital asset or as an item of inventory property), then such U.S. Holder is generally expected to recognize income equal to the sum of (i) the "issue price" of the Holder's interest in the GUC Note and (ii) the fair market value of the beneficial interest in the Liquidating Trust received. Such income is further expected to be classified as ordinary in nature. In the event that a U.S. Holder is a cash-method taxpayer, such U.S. Holder may not recognize income with respect to the GUC Note until there is a payment of principal or interest with respect to the GUC Note. Such U.S. Holder may recognize income, however, with respect to the receipt of a beneficial interest in the Liquidating Trust. A U.S. Holder's tax basis in the GUC Note should equal the issue price for such GUC Note, and a U.S. Holder's tax basis in the Liquidating Trust should equal the fair market value of the assets, if any, that it is treated as receiving for U.S. federal income tax purposes. In addition, a U.S. Holder's holding period for its interest in the GUC Note and beneficial interest in the Liquidating Trust received on the Effective Date should begin on the day following the Effective Date.

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 144 of 276

On the other hand, for a U.S. Holder that holds its General Unsecured Claim as a capital asset or as an item of property, such U.S. Holder would generally be expected to realize gain or loss in an amount equal to the difference between (a) the sum of (i) the issue price of the Holder's interest in the GUC Note and (ii) the fair market value of the beneficial interest in the Liquidating Trust received and (b) the adjusted tax basis in its General Unsecured Claim, determined immediately prior to the Effective Date. The character of such gain or loss will depend on certain factors discussed above that are specific to the U.S. Holder of a General Unsecured Claim. A U.S. Holder's tax basis in the GUC Note should equal the issue price for such GUC Note, and a U.S. Holder's tax basis in its beneficial interest in the Liquidating Trust should equal the fair market value of the assets, if any, that it is treated as receiving for U.S. federal income tax purposes. In addition, a U.S. Holder's holding period for its interest in the GUC Note and beneficial interest in the Liquidating Trust received on the Effective Date should begin on the day following the Effective Date.

If interests in the GUC Note are "publicly traded," then the issue price is generally expected to equal the fair market value of the GUC Note on the Effective Date. If interests in the GUC Note are not publicly traded, then the issue price will depend on whether the Unsecured Claims are publicly traded, in which case the issue price of interests in the GUC Note is generally expected to be determined by reference to the fair market value of the Unsecured Claims. Otherwise, the issue price of an interest in the GUC Note is generally expected to equal its stated redemption price at maturity. For these purposes, a debt instrument generally is treated as publicly traded if, at any time during the 31-day period ending 15 days after the issue date, (i) a sales price exists for the debt that is considered reasonably available (e.g., the sales price appears in a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments (including a price provided only to certain customers or to subscribers) or persons that broker purchases or sales of debt instruments) within a reasonable period of time after the exchange, (ii) a firm quote is considered to exist for the debt instrument (e.g., a price quote is available from at least one broker, dealer or pricing service (including a price provided only to certain customers or to subscribers) for the debt instrument and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the debt) or (iii) one or more indicative quotes for the debt instrument are considered to exist (e.g., a price quote is available from at least one broker, dealer or pricing service (including a price provided only to certain customers or to subscribers) for the debt instrument and the price quote is not a firm quote).

A U.S. Holder who receives an interest in the GUC Note will generally be required to include stated interest on the GUC Note in income in accordance with such U.S. Holder's regular method of tax accounting. In addition, if the GUC Note is treated as issued with original issue discount for U.S. federal income tax purposes, a U.S. Holder of an interest in the GUC Note will also be required to include in income as interest the amount of such original issue discount over the term of the GUC Note based on the constant yield method. In such a case, a U.S. Holder will also be required to include amounts in income before they are received. A U.S. Holder's tax basis in its interest in the GUC Note will be increased by the amount of original issue discount included in income and reduced by the amount of Cash (other than payments of stated interest) received with respect to its interest in the GUC Note.

Holders of General Unsecured Claims should consult their tax advisors with respect to the U.S. federal income tax consequences to them of the Restructuring.

127

### 7. Non-U.S. Holders

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to property (including Cash) received in exchange for Claims, unless (i) such Non-U.S. Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) if such Non-U.S. Holder is an individual, such Non-U.S. Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

### 8. FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including interest on the Secured Subordinated Note and the GUC Note). FATCA withholding may apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

**Non-U.S. Holders should consult their tax advisors regarding the impact, if any, of FATCA on such Non-U.S. Holders' exchange of any of their Claims pursuant to the Plan.**

### 9. Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan. Additionally, under the backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). The current backup withholding rate is 24 percent. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND**

INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XIV. RESERVATION OF RIGHTS

The foregoing discussion is subject to change (possibly substantially) based on, among other things, subsequent changes to the Plan and events that may subsequently occur that may impact the timeline for the transactions contemplated by the Plan. The Debtors and the Debtors' advisors reserve the right to modify, revise, or supplement this discussion and other tax related sections of the Plan and Disclosure Statement in accordance with the terms of the Plan and the Bankruptcy Code.

## XV. CONCLUSION

In the opinion of each of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. In addition, any alternative to confirmation of the Plan could result in extensive delays and increased administrative expense.

Accordingly, the Debtors recommend all Holders of Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than 4:00 p.m. (prevailing Pacific Time) on January 11, 2021.

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 147 of 276

Dated: December 1, 2020

Respectfully submitted,

SIDLEY AUSTIN LLP
*/s/ Samuel A. Newman*
Samuel A. Newman
Charles M. Persons

Attorneys for Debtors and
Debtors in Possession

## EXHIBIT A

**Fourth Amended Plan**

SIDLEY AUSTIN LLP
Samuel A. Newman (SBN 217042)
(sam.newman@sidley.com)
Genevieve G. Weiner (SBN 254272)
(gweiner@sidley.com)
Julia Philips Roth (SBN 324987)
(julia.roth@sidley.com)
555 West Fifth Street
Los Angeles, CA 90013
Telephone: 213.896.6000
Facsimile: 213.896.6600

SIDLEY AUSTIN LLP
Charles M. Persons (admitted *pro hac vice*)
(cpersons@sidley.com)
Juliana Hoffman (admitted *pro hac vice*)
(jhoffman@sidley.com)
Jeri Leigh Miller (admitted *pro hac vice*)
(jeri.miller@sidley.com)
2021 McKinney Avenue
Suite 2000
Dallas, TX 75201
Telephone: 214.981.3300
Facsimile: 214.981.3400

*Attorneys for Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>WAVE COMPUTING, INC., *et al.*,<br><br>    Debtors.[1] | ) Case No. 20-50682 (MEH)<br>)<br>) Chapter 11 (Jointly Administered)<br>)<br>) **FOURTH AMENDED JOINT CHAPTER**<br>) **11 PLAN OF REORGANIZATION FOR**<br>) **WAVE COMPUTING, INC. AND ITS**<br>) **DEBTOR AFFILIATES**<br>)<br>) Dated:      December 1, 2020<br>)<br>) |

---

[1] The Debtors in these Chapter 11 Cases are Wave Computing, Inc., MIPS Tech, Inc., Hellosoft, Inc., Wave Computing (UK) Limited, Imagination Technologies, Inc., Caustic Graphics, Inc., and MIPS Tech, LLC. The Debtors' mailing address is 3201 Scott Blvd, Santa Clara, CA 95054.

# **TABLE OF CONTENTS**

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION ........................................ 1

    A.    Defined Terms ............................................................................................... 1

    B.    Rules of Interpretation ................................................................................. 20

    C.    Computation of Time ................................................................................... 20

    D.    Reference to Monetary Figures.................................................................... 20

    E.    Reference to the Debtors, the Reorganized Debtors, or the Wind-Down Debtors ......................................................................................................... 21

    F.    Controlling Document .................................................................................. 21

ARTICLE II ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS ..................... 21

    A.    General Administrative Expense Claims ..................................................... 21

    B.    DIP Claims................................................................................................... 22

    C.    Professional Claims ..................................................................................... 23

    D.    Priority Tax Claims ...................................................................................... 24

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............ 24

    A.    Classification of Claims and Interests......................................................... 24

    B.    Treatment of Claims and Interests .............................................................. 25

    C.    Treatment of Tallwood Claims if the Asset Sale Distribution is Elected .................. 34

    D.    Special Provision Governing Unimpaired Claims ....................................... 35

    E.    Elimination of Vacant Classes .................................................................... 35

    F.    Acceptance or Rejection of this Plan .......................................................... 35

    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ........................................................................................ 36

ARTICLE IV MEANS FOR IMPLEMENTATION OF THIS PLAN ......................................... 36

    A.    General Settlement of Claims and Interests................................................. 36

    B.    Plan Transactions ........................................................................................ 37

    C.    Cancellation of Existing Securities and Agreements.................................... 37

    D.    Section 1146 Exemption .............................................................................. 37

    E.    The Restructuring......................................................................................... 38

i

| | F. | Asset Sale Distribution | 43 |
| | G. | Liquidating Trust | 48 |
| ARTICLE V | | TREATMENT OF EXECUTORY CONTRACTS | 53 |
| | A. | Assumption of Executory Contracts | 53 |
| | B. | Claims Based on Rejection of Executory Contracts | 54 |
| | C. | Cure of Defaults for Assumed Executory Contracts | 54 |
| | D. | Preexisting Obligations to the Debtors under Executory Contracts | 56 |
| | E. | Insurance Policies | 56 |
| | F. | Reservation of Rights | 57 |
| | G. | Employee Compensation and Benefits | 57 |
| | H. | Contracts and Leases Entered Into After the Petition Date | 57 |
| ARTICLE VI | | PROVISIONS GOVERNING DISTRIBUTIONS | 58 |
| | A. | Timing and Calculation of Amounts to Be Distributed | 58 |
| | B. | Disbursing Agent | 58 |
| | C. | Rights and Powers of Disbursing Agent | 58 |
| | D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 59 |
| | E. | Manner of Payment | 60 |
| | F. | Exemption From Registration Requirements | 60 |
| | G. | Compliance with Tax Requirements | 61 |
| | H. | Allocations | 61 |
| | I. | No Postpetition Interest on Claims | 61 |
| | J. | Foreign Currency Exchange Rates | 61 |
| | K. | Setoffs and Recoupments | 61 |
| | L. | Claims Paid or Payable by Third Parties | 62 |
| ARTICLE VII | | THE PLAN ADMINISTRATOR | 63 |
| | A. | The Plan Administrator | 63 |
| | B. | Wind Down | 64 |

| | | | |
|---|---|---|---|
| C. | Tax Returns | | 64 |
| D. | Dissolution of the Wind-Down Debtors | | 65 |

ARTICLE VIII PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND DISPUTED CLAIMS ........................................................................................ 65

| A. | Allowance of Claims | 65 |
| B. | Claims Administration Responsibilities | 65 |
| C. | Adjustment to Claims without Objection | 65 |
| D. | Time to File Objections to Claims | 66 |
| E. | Disallowance of Claims or Interests | 66 |
| F. | Amendments to Proofs of Claim | 66 |
| G. | No Distributions Pending Allowance | 66 |
| H. | Distributions after Allowance | 66 |

ARTICLE IX SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ........ 67

| A. | Discharge of Claims and Termination of Interests | 67 |
| B. | Release of Liens | 67 |
| C. | Releases by the Debtors | 68 |
| D. | Consensual Releases by the Releasing Parties | 69 |
| E. | Exculpation | 70 |
| F. | Injunction | 70 |
| G. | Provision Regarding SEC | 71 |
| H. | Protections Against Discriminatory Treatment | 71 |
| I. | Reimbursement or Contribution | 72 |

ARTICLE X CONDITIONS PRECEDENT TO CONFIRMATION  AND CONSUMMATION OF THIS PLAN ...................................................................... 72

| A. | Conditions Precedent to the Effective Date | 72 |
| B. | Waiver of Conditions | 73 |
| C. | Effect of Failure of Conditions | 73 |
| D. | Substantial Consummation | 73 |

iii

| | | | |
|---|---|---|---|
| 1 | ARTICLE XI MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN | ............ 74 |
| 2 | A. | Modifications and Amendments | ........................................................... 74 |
| 3 | B. | Effect of Confirmation on Modifications | ............................................ 74 |
| 4 | C. | Revocation or Withdrawal of Plan | ..................................................... 74 |
| 5 | ARTICLE XII RETENTION OF JURISDICTION | ................................................ 74 |
| 6 | ARTICLE XIII MISCELLANEOUS PROVISIONS | ............................................. 77 |
| 7 | A. | Immediate Binding Effect | .................................................................. 77 |
| 8 | B. | Additional Documents | ......................................................................... 77 |
| 9 | C. | Payment of Statutory Fees | .................................................................. 77 |
| 10 | D. | Dissolution of the Committee and Cessation of Fee and Expense Payment | ............. 77 |
| 11 | E. | Reservation of Rights | .......................................................................... 78 |
| 12 | F. | Successors and Assigns | ....................................................................... 78 |
| 13 | G. | Notices | ............................................................................................... 78 |
| 14 | H. | Term of Injunctions or Stays | .............................................................. 79 |
| 15 | I. | Entire Agreement | ................................................................................ 79 |
| 16 | J. | Exhibits and Annexes | .......................................................................... 79 |
| 17 | K. | Nonseverability of Plan Provisions | ..................................................... 79 |
| 18 | L. | Votes Solicited in Good Faith | .............................................................. 80 |
| 19 | M. | Governing Law | ................................................................................... 80 |
| 20 | N. | Waiver or Estoppel | ............................................................................. 80 |
| 21 | O. | Closing of These Chapter 11 Cases | ..................................................... 80 |

iv

Wave Computing, Inc., a Delaware corporation ("Wave"); MIPS Tech, Inc., a Delaware corporation; Hellosoft, Inc., a Delaware corporation; Wave Computing (UK) Limited, a United Kingdom limited corporation; Imagination Technologies, a Delaware corporation; Caustic Graphics, Inc., a Delaware corporation; and MIPS Tech, LLC, a Delaware limited liability company (each a "Debtor" and collectively, the "Debtors"), along with Tallwood Technology Partners LLC, a California limited liability company, and the Committee (as defined below) propose this joint chapter 11 plan of reorganization (this "Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtors. Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor. Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, business, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, and certain related matters. The Debtors, Tallwood (as defined below), and the Committee (as defined below) are co-proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code (collectively, the "Plan Co-Proponents").

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

### A. Defined Terms

As used in this Plan, capitalized terms have the meanings set forth below.

1. "Administrative Expense Claim(s)" means a Claim for costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and until and including the Effective Date that is allowable under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code that has not already been paid, including: (i) the actual and necessary costs and expenses of preserving the Estates and operating the Debtors' businesses; (ii) the DIP Claims; (iii) the Professional Claims; and (iv) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

2. "Administrative Expense Claims Bar Date" means the deadline for Filing requests for payment of Administrative Expense Claims, which: (i) with respect to General Administrative Expense Claims other than those that were accrued in the ordinary course of business, shall be 30 days after the Effective Date; and (ii) with respect to Professional Claims, shall be 45 days after the Effective Date.

3. "Affiliate(s)" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person or Entity that is not a Debtor, the term "Affiliate" shall apply to such persons as if the Person or Entity were a Debtor.

4. "Allowed" means, as to a Claim or an Interest, or any portion of such Claim or Interest, a Claim or Interest that either (i) is listed in the Schedules as neither disputed, contingent, nor unliquidated and with respect to which no contrary or superseding Proof of Claim has been Filed, and

that has not been paid pursuant to an order of this Bankruptcy Court or otherwise satisfied prior to the Effective Date; (ii) is evidenced by a Proof of Claim Filed on or before the applicable Bar Date for which no objection has been Filed on or before the Claims Objection Deadline; (iii) is not the subject of an objection to allowance that was Filed on or before the Claims Objection Deadline; (iv) has not been settled, waived, withdrawn, or denied pursuant to a Final Order; or (v) is expressly allowed (a) pursuant to a Final Order; (b) pursuant to an agreement between the Holder of such Claim or Interest and the Debtors or the Reorganized Debtors, as applicable; or (c) pursuant to the terms of this Plan; provided, however, that proofs of interest need not be Filed with respect to any Interest. For the avoidance of doubt, a Claim evidenced by a Proof of Claim Filed after the applicable Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.

5.      "Applicable Benchmark Rate" means (i) on or before December 31, 2021, LIBOR and (ii) on and after January 1, 2022, SOFR.

6.      "Asset Sale" means the sale or sales of substantially all of the Debtors' assets in accordance with the terms of this Plan, pursuant to a purchase price and such other terms as are reasonably acceptable to the Debtors, in consultation with the Committee.

7.      "Asset Sale Election Notice" means a notice Filed with the Plan Supplement indicating that the Debtors have elected to pursue the Asset Sale.

8.      "Asset Sale Distribution" means a liquidation in accordance with Section IV.F hereof pursuant to which the Sale Proceeds are distributed, which shall occur only if (i) the Debtors, in consultation with the Committee, elect to pursue the Asset Sale, (ii) the Debtors File an Asset Sale Election Notice, (iii) the Sale Order is entered authorizing the Asset Sale, and (iv) the Purchase and Sale Agreement, in form and substance acceptable to the Debtors, in consultation with the Committee, and the Purchaser, is entered into prior to the filing of the Plan Supplement and consummated on or prior to the Effective Date.

9.      "Assumed Purchaser Obligations" has the meaning set forth in the Purchase and Sale Agreement (or such other similar term as may be used in the Purchase and Sale Agreement).

10.      "Avoidance Action(s)" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors, their Estates, the Committee, any other interested party authorized by the Bankruptcy Court, or other successor to the rights of the Debtors' Estates, including Claims, Causes of Action, or remedies under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent and voidable transfer laws.

11.      "Bankruptcy Code" means title 11 of the United States Code 11 U.S.C. §§ 101-1532, as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing that are made retroactive to the Petition Date, as the same may exist on any relevant date to the extent applicable to the Chapter 11 Cases.

12.      "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of California, San Jose Division.

2

13. "Bankruptcy Rule(s)" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

14. "Bar Date" means August 31, 2020, the date listed in the *Notice of 341(a) Meeting of Creditors via Telephone Conference and Notice of Bar Date* at Docket Number 86 as the date by which Proofs of Claim must be Filed with respect to Claims other than Administrative Expense Claims or other Claims for which the Bankruptcy Court enters an order excluding the holders of such Claims from the requirement of Filing Proofs of Claim by such date.

15. "Business Day" means any day other than a Saturday, Sunday, or other day on which the New York Stock Exchange or NASDAQ is closed for trading.

16. "Cash" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

17. "Cause(s) of Action" means any Claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (i) all rights of setoff, counterclaim, or recoupment; (ii) claims under contracts or for breaches of duties imposed by law; (iii) the right to object to or otherwise contest Claims or Interests; (iv) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (v) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (vi) any claim under any state or foreign law, including, without limitation, any fraudulent transfer or similar claim. For the avoidance of doubt, "Causes of Action" includes any rights of the Estates to seek recovery, under any legal theory whatsoever, against Windtree, Oakmont Corporation and any of their direct or indirect members, shareholders, stockholders, partners, affiliates, or transferees (whether initial, immediate or mediate) with respect to the Windtree Redemption.

18. "Chapter 11 Cases" means the cases filed by the Debtors under chapter 11 of the Bankruptcy Code and jointly administered as case number 20-50682.

19. "Claim(s)" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

20. "Claims and Balloting Agent" means Donlin Recano & Company, Inc., the notice, claims, and solicitation agent retained by the Debtors in these Chapter 11 Cases.

21. "Claims Objection Deadline" means the deadline for Filing an objection to any Claim, including any Claim for damages arising from the Debtors' rejection of any Executory Contract, which deadline shall be one hundred eighty (180) days after the Effective Date, subject to any extensions approved by an order of the Bankruptcy Court; provided, however, that the Claims Objection Deadline shall not apply to any Claim Filed after the applicable Bar Date.

3

22. "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

23. "Class" means a category of Holders of Claims or Interests pursuant to sections 1122(a) and 1123(a) of the Bankruptcy Code.

24. "CM/ECF" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

25. "Collateral" means (i) substantially all current and future assets of each of the Debtors of any nature or type whatsoever, including, without limitation, Cash, accounts, accounts receivable, goods, instruments, investment property (including ownership interests in corporations, partnerships, and limited liability companies), inventory, vehicles, customer lists, trademarks, copyrights, brands, know-how and other intellectual property, plant and equipment, patents, trade secrets, tax assets, real property and/or leasehold rights, personal property, commercial tort claims, any tangible or intangible assets, and any and all proceeds of the foregoing; provided, however that "Collateral" shall exclude any other Cause of Action or Avoidance Action under the Bankruptcy Code or applicable non-bankruptcy law (or recovery thereunder); and (ii) substantially all of the capital stock and/or equity interests held by any of the Debtors in another Entity.

26. "Committee" means the official statutory committee of unsecured creditors appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code for these Chapter 11 Cases on May 18, 2020.

27. "Compensation and Benefits Programs" means all employment and severance agreements and policies, and all employment, compensation, and benefit plans, policies, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and the employees, former employees and retirees of their subsidiaries.

28. "Conditions Precedent" has the meaning set forth in Section X.

29. "Confirmation" means entry of the Confirmation Order on the docket of these Chapter 11 Cases.

30. "Consummation" means the occurrence of the Effective Date.

31. "Confirmation Hearing" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

32. "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code, which order shall be in form and substance reasonably acceptable to the Plan Co-Proponents.

33. "Cure" means payment of all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract (or such lesser amount as may be agreed upon

4

by the parties to the Executory Contract) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

34.     "Cure Notice(s)" means any Filed notice of a proposed Cure, as may be amended, modified, or supplemented from time to time.

35.     "D&O Liability Insurance Policies" means all insurance policies issued at any time to any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy" or run-off coverage) and all agreements, documents, or instruments relating thereto.

36.     "*De Minimis* Unsecured Claim(s)" means any unsecured Claims, other than an Administrative Expense Claim, a Priority Claim, a Series E Section 510(b) Claim, a Series D Section 510(b) Claim, or an Intercompany Claim, in an amount of $2,000 or less.

37.     "Debtor(s)" has the meaning ascribed to it in the recitals.

38.     "Debtor Release Parties" means, collectively, (i) the Debtors; (ii) the Reorganized Debtors or the Wind-Down Debtors, as applicable; (iii) Sanjai Kohli; (iv) Thomas FitzGerald; (v) Lawrence Perkins; (vi) SierraConstellation Partners; and (vii) all current officers and directors of the Debtors.

39.     "Debtor Release" means the releases of the Released Parties provided for in Section IX.C.

40.     "Definitive Documentation" means the definitive documents and agreements governing the Plan Transactions contemplated by the Plan, consisting of: (i) the Plan (and all exhibits, supplements, and annexes thereto); (ii) the Confirmation Order and pleadings in support of entry of the Confirmation Order; (iii) the Disclosure Statement and the other solicitation materials Filed with respect to the Plan; (iv) the order of the Bankruptcy Court approving the Disclosure Statement and such other solicitation materials; (v) the documentation with respect to the DIP Facility (including the DIP Note, the Interim DIP Order, the Final DIP Order, the DIP Motion, and all other motions, notices, declarations, orders, stipulations, or other documents related to the DIP Note); (vi) the documentation with respect to the Senior Secured Note, GUC Note, and the Secured Subordinated Note; (vii) the Exit Facility Documents; (viii) amended employment agreements for each executive officer of the Reorganized Debtors; (ix) the certificates of incorporation, limited liability agreements, bylaws, and other New Organizational Documents (as applicable) of the Reorganized Debtors; and (x) all other documents that will comprise the Plan Supplement or that are otherwise related to the Plan.

41.     "DIP Agent" means Tallwood Management Company, LLC in its capacity as administrative and collateral agent under the DIP Facility.

42.     "DIP Claim(s)" means, only to the extent actually advanced to the Debtors by the DIP Lender, those debtor-in-possession, post-petition loans approved on a final basis in the Final DIP Order in the total amount of up to $10,286,511 consisting of (i) a new money facility in the aggregate principal amount of up to $7,500,000 subject to the Debtors' operational needs on or before the Effective Date; and (ii) a refinancing facility in the aggregate principal amount of up to $2,786,511, rolled up on a dollar-for-dollar basis as new money is advanced, which equals that portion of Prepetition Tallwood Debt constituting Post-UCC-1 Draws plus interest of $36,511 thereon.

5

43. "DIP Facility" means the secured, superpriority postpetition financing in the aggregate principal amount of up to $10,286,511 approved on a final basis in the Final DIP Order.

44. "DIP Lender" means Tallwood in its capacity as lender under the DIP Note.

45. "DIP Motion" means the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, and 364 for Orders Authorizing (I) Postpetition Financing; (II) Cash Collateral Use; (III) Adequate Protection to Existing Secured Parties; (IV) Liens and Superpriority Claims; and (V) Modifying the Automatic Stay* Filed on the Petition Date at Docket Number 14.

46. "DIP Note" means that certain *Amended and Restated Senior Secured Super-Priority Debtor-in-Possession Promissory Note* (as the same may be amended, restated, supplemented, or otherwise modified from time to time) by and between Wave, as borrower, each of the other Debtor parties, as note parties and guarantors, Tallwood, as lender, and the DIP Agent, as administrative and collateral agent under the DIP Facility.

47. "DIP Orders" means the Interim DIP Order and the Final DIP Order.

48. "Disallowed" means, as to a Claim or an Interest, a Claim or an Interest (or portion thereof) that has been disallowed, denied, dismissed, or overruled pursuant to this Plan or a Final Order of the Bankruptcy Court, or any other court of competent jurisdiction.

49. "Disbursing Agent" means (i) in the case of a Restructuring, the Reorganized Debtors and in the case of an Asset Sale Distribution, the Plan Administrator; or (ii) such other Entity designated by the Debtors, Reorganized Debtors, Wind-Down Debtors or Plan Administrator to hold and disburse the Plan Distributions to Holders of Allowed Claims, Allowed Interests, or other eligible Entities pursuant to the terms of this Plan.

50. "Disclosure Statement" means the disclosure statement for this Plan, Filed contemporaneously herewith and incorporated by reference herein, including all exhibits and schedules thereto.

51. "Disputed" means, as to a Claim or Interest, a Claim or an Interest (or portion thereof) (i) that is neither an Allowed Claim nor a Disallowed Claim; (ii) that is listed on the Schedules as "disputed"; or (iii) for which a timely objection to such Claim has been Filed, which objection has not been withdrawn or determined pursuant to a Final Order.

52. "Distribution Date" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Disbursing Agent shall make Plan Distributions in accordance with the terms of this Plan.

53. "Distribution Record Date" means the record date for purposes of making Plan Distributions under this Plan, which date shall be the Effective Date.

54. "Effective Date" means the date that is the first Business Day after Confirmation on which all Conditions Precedent have been satisfied or waived in accordance with this Plan and the Confirmation Order.

6

55. "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

56. "Escrowed Amount" has the meaning ascribed to it in Section III.C.

57. "Estate(s)" means the estate(s) of any of the Debtors created under section 301 and 541 of the Bankruptcy Code upon the commencement of each of the Debtors' Chapter 11 Cases.

58. "Excess General Unsecured Claim Amount" means the amount of the Allowed General Unsecured Claims that, on the Effective Date, exceeds the balance of the GUC Note, which amount shall accrue interest at the Federal Judgment Rate.

59. "Exculpated Parties" means collectively, and in each case, solely in its capacity as such: (i) the Debtor Release Parties; (ii) the Tallwood Release Parties; (iii) each of the respective current professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents and other representatives of each of the Debtor Release Parties and each of the Tallwood Release Parties; (iv) the Committee and its current and former members; (v) the Professionals; and (vi) each of the professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents and other representatives of each of the current and former members of the Committee; provided, however, that, if the Asset Sale Distribution is elected, the Tallwood Release Parties shall not be Exculpated Parties (including under categories (i) and (iii) above) unless an exculpation is separately negotiated and agreed to between the Plan Co-Proponents.

60. "Executory Contract" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

61. "Exit Facility" means the first Lien senior secured revolving credit facility provided for under the Exit Facility Documents in a maximum amount of the Exit Facility Commitment Amount. The Exit Facility shall be secured by first-priority Liens and pledges on the Collateral, *pari passu* with the Liens and pledges of the Senior Secured Note, and the proceeds shall be used to provide liquidity to the Reorganized Debtors for general corporate purposes. Should Tallwood, in its sole discretion, increase the amount of its commitment under the Exit Facility, management of the Reorganized Debtors shall have absolute discretion to direct and control the use of all amounts funded in excess of the Exit Facility Commitment Amount. No payments of principal or interest shall be required during the first year of the Exit Facility term.

62. "Exit Facility Agreement" means that certain credit, loan or other agreement, dated as of the Effective Date, by and among the Reorganized Debtors and the Exit Lender, the terms of which shall be acceptable to the Debtors and the Exit Lender and consistent with the Exit Facility Term Sheet attached as an exhibit to the Plan Supplement.

63. "Exit Facility Commitment Amount" means $5,110,000.

64. "Exit Facility Documents" means, collectively, the Exit Facility Agreement, and any and all other agreements, documents, certificates and instruments delivered or to be entered into in connection therewith, the terms of which shall be reasonably acceptable to the Debtors and the Exit Lender and consistent with the Exit Facility Term Sheet attached as an exhibit to the Plan Supplement.

65. "Exit Facility Term Sheet" means that certain term sheet describing the terms of the Exit Facility attached as an exhibit to the Plan Supplement.

7

66.     "Exit Lender" shall mean Tallwood in its capacity as lender under the Exit Facility.

67.     "Federal Judgment Rate" means the federal judgment rate in effect as of the Petition Date.

68.     "File," "Filed," or "Filing" means file, filed, or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases.

69.     "Final DIP Order" means the *Final Order Granting Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, and 364 for Orders Authorizing (I) Postpetition Financing; (II) Cash Collateral Use; (III) Adequate Protection to Existing Secured Parties; (IV) Liens and Superpriority Claims; and (V) Modifying the Automatic Stay* entered by the Bankruptcy Court on September 24, 2020 at Docket Number 537.

70.     "Final Order" means as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

71.     "General Administrative Expense Claim(s)" means an Administrative Expense Claim other than a DIP Claim or Professional Claim.

72.     "General Unsecured Claim(s)" means any Claim other than an Administrative Expense Claim, a *De Minimis* Unsecured Claim, a Priority Claim, a Tallwood Claim, a Secured Tax Claim, an Other Secured Claim, a Series E Section 510(b) Claim, a Series D Section 510(b) Claim, or an Intercompany Claim.

73.     "Governing Body" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of any of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable.

74.     "Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

75.     "GUC Board Representative" means the one (1) member of the New Board appointed by the Liquidating Trustee.

76.     "GUC Note" means a new secured promissory note to be issued by Reorganized Wave and guaranteed by each of the other Reorganized Debtors in an aggregate amount of $36,000,000.00. The GUC Note will be secured by perfected, second-priority Liens and pledges, *pari passu* with the Liens and pledges of the Secured Subordinated Note, on the Collateral and subject to the terms and conditions described herein.

8

(i)     The GUC Note shall accrue interest at the GUC Note Interest Rate, which shall be due and payable in Cash on a quarterly basis.

(ii)    Upon the occurrence of an event of default and during the continuation thereof, additional interest shall accrue on any outstanding amounts owed under the GUC Note at a default rate equal to the GUC Note Interest Rate plus two percent (2%) per annum.

(iii)   The GUC Note shall provide for prepayment of the first $1,000,000.00 of the principal amount of the GUC Note on the Effective Date, which funds may be retained by the Liquidating Trustee to pay operating expenses of the Liquidating Trust. Thereafter, the GUC Note shall provide for payment of the remaining principal amount of the GUC Note, with interest as set forth above, via nineteen (19) equal quarterly installments commencing on the first day of the second month after the Effective Date. The Plan Supplement shall include a 5-year amortization schedule of such quarterly payments.

(iv)   The GUC Note shall become due and payable in full in Cash upon the earlier of (a) five (5) years after the Effective Date, (b) the consummation of a sale of all or substantially all of the Debtors' assets, or (c) a change of control.

(v)    Prepayments of principal under the GUC Note shall be permitted at any time at par, without penalty or premium.

(vi)   The GUC Note shall be held by and administered by the Liquidating Trustee for the benefit of the holders of Allowed General Unsecured Claims, subject to the terms of an intercreditor agreement with Tallwood and the Reorganized Debtors (a) stating that upon any sale or change in control, the GUC Note shall be paid in full in cash and (b) regulating enforcement of remedies as between Tallwood and the holder of the GUC Note.

(vii)  The GUC Note shall contain representations and warranties, affirmative and negative covenants and events of default customary for financings of this type, subject to reasonably agreed exceptions, carve outs and qualifications. Without limitation, the GUC Note shall (a) prohibit the Reorganized Debtors from incurring financial indebtedness (other than the Exit Facility in an additional amount not to exceed $5,000,000) without the prior written consent of the holder of the GUC Note and (b) require the Reorganized Debtors to maintain a minimum Cash balance of $2,000,000, tested on a rolling 60-day basis and subject to a 30-day cure period.

77.    "GUC Note Interest Rate" means, with respect to the GUC Note, an interest rate equal to the Applicable Benchmark Rate plus five percent (5%) per annum.

78.    "Holder(s)" means an Entity holding a Claim or Interest, as applicable.

79.    "Impaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

80.    "Insurance Contracts" means all insurance policies, including the D&O Liability Insurance Policies and the Workers' Compensation Program, that have been issued (or provide

9

coverage) at any time to any of the Debtors (or any of their predecessors) and all agreements, documents, or instruments relating thereto.

81.     "Insurer" means any company or Entity that issued an Insurance Contract and includes any third-party administrator of or for any Insurance Contract, along with any predecessors, successors, and/or Affiliates thereto.

82.     "Intercompany Claim" means a Claim held by a Debtor or an Affiliate against another Debtor or Affiliate.

83.     "Intercompany Interest(s)" means any Interest(s) held by a Debtor or an Affiliate.

84.     "Intercreditor Agreement" means an intercreditor agreement among the holders of the Senior Secured Note, the GUC Note, and the Secured Subordinated Note.

85.     "Interest" means (i) any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor that existed immediately prior to the Petition Date, including all units, shares, common stock, preferred stock, partnership interests, and other instruments evidencing any fixed or contingent ownership in any Debtor or any rights to purchase or demand the issuance of any of the foregoing (including options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities); or (ii) any other agreement, arrangement, or commitment of any character relating to, or whose value is related to, any of the foregoing.

86.     "Interim DIP Order" means the *Interim Order Granting Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, and 364 for Orders Authorizing (I) Postpetition Financing; (II) Cash Collateral Use; (III) Adequate Protection to Existing Secured Parties; (IV) Liens and Superpriority Claims; and (V) Modifying the Automatic Stay* entered by the Bankruptcy Court on May 4, 2020 at Docket Number 72.

87.     "KEIP Order" means the *Order Approving Debtors' Motion for the Entry of an Order (I) Authorizing the Debtors to Implement Key Employee Incentive Plan and (II) Granting Related Relief* entered by the Bankruptcy Court on September 23, 2020 at Docket Number 532 and/or any all amendments and modifications thereto, as applicable.

88.     "LIBOR" means the greater of (i) the three (3) month USD London Interbank Offered Rate for the applicable interest period at 11 a.m. New York time two (2) Business Days prior to the start of such interest period and (ii) one percent (1%).

89.     "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

90.     "Liquidating Trust" means the liquidation trust established pursuant to Section IV.E.2 under which all potential Avoidance Actions and other Causes of Action, as well as all rights to their related recoveries, shall be automatically transferred upon Confirmation of this Plan.

91.     "Liquidating Trust Advisory Board" means an advisory board to the Liquidating Trustee appointed in accordance with Section IV.G.3.

10

92. "Liquidating Trust Agreement" the agreement governing the terms and conditions of the Liquidating Trust, which shall be in form and substance reasonably acceptable to the Debtors and the Committee.

93. "Liquidating Trust Assets" means all of the Estates' Assets transferred to the Liquidating Trust pursuant to Section IV.G.2.

94. "Liquidating Trust Beneficiaries" means the Holders of Allowed General Unsecured Claims and the Holders of Allowed Tallwood Claims, whether or not such Claims are Allowed as of the Effective Date.

95. "Liquidating Trust Expenses" means all actual and necessary costs and expenses incurred by the Liquidating Trust in connection with carrying out the obligations of the Liquidating Trust pursuant to the terms of this Plan and the Liquidating Trust Agreement.

96. "Liquidating Trustee" means the trustee of the Liquidating Trust.

97. "New Board" means the board of directors of Reorganized Wave, which shall be reasonably acceptable to the Debtors, in consultation with Tallwood and the Committee.

98. "New Common Stock" means the common stock of Reorganized Wave to be issued and outstanding on the Effective Date if a Restructuring is consummated.

99. "New Organizational Documents" means, in the event of a Restructuring, the documents providing for corporate governance of the Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents, as applicable, which shall be consistent with this Plan and section 1123(a)(6) of the Bankruptcy Code (as applicable), which New Organizational Documents shall be included in the Plan Supplement and shall be in form and substance reasonably acceptable to the Debtors, in consultation with Tallwood and the Committee.

100. "Other Priority Claim" means any Claim other than an Administrative Expense Claim or Priority Tax Claim that is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

101. "Other Secured Claim" means any Secured Claim, including any Secured Tax Claim, other than a Tallwood Claim. For the avoidance of doubt, Other Secured Claims includes any Claim arising under, derived from, or based upon any letter of credit issued in favor of one or more Debtors, the reimbursement obligation for which is either secured by a Lien on collateral or is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

102. "Patent Asset Sale" means one or more sales of all or a significant portion of the Debtors' patent portfolio.

103. "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

104. "Petition Date" means April 27, 2020.

105. "Plan" has the meaning ascribed to it in the recitals.

11

106.    "Plan Administrator" means the person selected by the Debtors, in consultation with Tallwood and the Committee, to administer the Plan Administrator Assets if the Asset Sale Distribution is elected.    All costs, liabilities, and expenses reasonably incurred by the Plan Administrator, and any personnel employed by the Plan Administrator in the performance of the Plan Administrator's duties, shall be paid from the Plan Administrator Assets, subject to and in accordance with the Wind-Down Budget.

107.    "Plan Administrator Assets" means, if the Asset Sale Distribution is elected, on the Effective Date, all assets of the Estates vested in the Wind-Down Debtors to be administered by the Plan Administrator, and, thereafter, all assets held from time to time by the Wind-Down Debtors to be administered by the Plan Administrator

108.    "Plan Co-Proponents" has the meaning ascribed to it in the recitals.

109.    "Plan Distribution(s)" means payment(s) or distribution(s) to Holders of Allowed Claims, Allowed Interests, or other eligible Entities under this Plan.

110.    "Plan Objection Deadline" means the date set by the Bankruptcy Court as the deadline to File an objection to Confirmation of this Plan.

111.    "Plan Supplement" means those documents and forms of documents, agreements, schedules, and exhibits to this Plan, which shall be Filed by the Debtors no later than fourteen (14) days before the Plan Objection Deadline, or such later date as may be approved by the Bankruptcy Court, including, as applicable: (i) the Exit Facility Term Sheet; (ii) the New Organizational Documents; (iii) the Rejected Executory Contracts Schedule; (iv) the Cure Notice(s); (v) the Liquidating Trust Agreement; (vi) the identity of the Liquidating Trustee and the compensation of the Liquidating Trustee; (vii) the Senior Secured Note; (viii) the GUC Note; (ix) the Secured Subordinated Note; (x) the Schedule of Retained Causes of Action; (xi) the Purchase and Sale Agreement, if any; (xii) the identity of the Plan Administrator, if any and the compensation of any such Plan Administrator; (xiii) the Plan Administrator Agreement; (xiv) the Asset Sale Election Notice; (xv) the Wind-Down Budget and Wind-Down Milestones; and (xvi) any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

112.    "Plan Transactions" means the transactions described in Section IV.E and Section IV.F.

113.    "Postpetition Drawbridge Lease" means that certain Lease, dated April 28, 2020 by and between MIPS Tech, LLC and Drawbridge 3201 Scott, LLC pursuant to which the Debtors are leasing a portion of the premises located at 3201 Scott Boulevard, Santa Clara, California 95054 (as the same may be amended, restated, supplemented, or otherwise modified from time to time).

114.    "Postpetition Drawbridge Lease Claim(s)" means, whether known or unknown, any claims and Causes of Action against and liabilities and obligations of any of (i) the Debtors; (ii) the Reorganized Debtors, (iii) the Wind-Down Debtors, (iv) the Purchaser, and/or (v) with respect to each of the foregoing Entities in clauses (i) through (iv), their respective assets or properties, as applicable, arising under or related to the Postpetition Drawbridge Lease.

115.    "Post-UCC-1 Draws" means the $2,750,000 of prepetition draws under the Prepetition Note made after January 3, 2020, which is the date upon which the Prepetition Note Lender filed a UCC-1 financing statement with respect to Wave.

12

116.    "<u>Prepetition Note</u>" means that certain Secured Promissory Note, dated July 5, 2019 (as further amended, restated, or otherwise modified from time to time) by and among Wave, as borrower, each subsidiary thereto, as a note party, and Tallwood, as lender, in the maximum aggregate principal amount of $19,400,000.00.

117.    "<u>Prepetition Note Lender</u>" means Tallwood in its capacity as lender under the Prepetition Note.

118.    "<u>Prepetition Tallwood Debt</u>" means any and all principal, accrued and unpaid interest, costs, expenses, and other amounts or obligations due under and evidenced by the Prepetition Note, which as of April 27, 2020, totaled $13,408,137.50, including interest.

119.    "<u>Priority Claim(s)</u>" means a Priority Tax Claim, Priority Wage Claim, or Other Priority Claim.

120.    "<u>Priority Tax Claim</u>" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

121.    "<u>Privileges</u>" has the meaning ascribed to it in Section IV.G.5.

122.    "<u>Pro Rata</u>" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

123.    "<u>Professional</u>" means an Entity: (i) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on Confirmation, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

124.    "<u>Professional Claim(s)</u>" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including Confirmation under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

125.    "<u>Professional Claim Escrow Account</u>" means an interest-bearing escrow account in an amount equal to the Professional Claim Reserve Amount funded and maintained by the Reorganized Debtors after the Effective Date solely for purposes of paying Allowed but unpaid Professional Claims.

126.    "<u>Professional Claim Reserve Account</u>" means the aggregate amount of Allowed and estimated Professional Claims and other Administrative Expense Claims on account of Professionals (including, for the avoidance of doubt, any transaction or success fees of financial advisors and/or investment bankers) incurred upon, and after giving effect to the occurrence of, the Effective Date to be paid by the Debtors' estates *less* the total of any retainers held by the Professionals.

127.    "<u>Proof of Claim</u>" means a proof of claim Filed against any of the Debtors in these Chapter 11 Cases on or before the applicable Bar Date.

13

128. "Purchase and Sale Agreement" means one or more asset purchase agreements pursuant to which the Asset Sale is consummated.

129. "Purchaser" means the purchaser or purchasers under the Purchase and Sale Agreement, together with their successors and permitted assigns.

130. "Reinstate," "Reinstated," or "Reinstatement" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

131. "Rejected Executory Contracts Schedule" means the schedule of Executory Contracts to be rejected by the Debtors pursuant to this Plan, as may be amended, modified, or supplemented from time to time, which schedule (including any amendments, modifications, or supplements thereto) shall be in form and substance reasonably acceptable to the Debtors, in consultation with Tallwood and the Committee, and shall be Filed no later than fourteen (14) days before the Plan Objection Deadline, or such later date as may be approved by the Bankruptcy Court.

132. "Released Parties" means collectively, and in each case, in its capacity as such: (i) the Debtor Release Parties; (ii) the Tallwood Release Parties; (iii) the Committee and its current and former members; (iv) the Professionals; and (v) with respect to each of the foregoing Entities in clauses (i) through (iv), such entity's current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, principals, members, employees, agents, advisors, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals and other representatives, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, and successors and assigns, each in its capacity as such; provided, however, that former officers and directors of the Debtors as well as current and former shareholders of the Debtors are expressly excluded, except for those shareholders specifically enumerated herein; and provided further that, if the Asset Sale Distribution is elected, the Tallwood Release Parties shall not be Released Parties (including under categories (i) and (v) above) unless a release is separately negotiated and agreed to between the Plan Co-Proponents.

133. "Releasing Parties" means collectively, and in each case, in its capacity as such: (i) the Debtor Release Parties; (ii) the Tallwood Release Parties; (iii) the Committee; (iv) the Professionals; (v) each Holder of a Claim and/or Interest that (a) votes to accept the Plan or (b) makes the opt-in election on the applicable ballot or form and timely returns such ballot or form pursuant to the instructions set forth therein; and (vi) with respect to each of the foregoing Entities in clauses (i) through (v), such Entity's current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, principals, members, employees, agents, advisors, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals and other representatives, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, and successors and assigns, each in its capacity as such; provided, however, that former officers and directors of the Debtors as well as current and former shareholders of the Debtors are expressly excluded, except for those shareholders specifically enumerated herein; and provided further that, if the Asset Sale Distribution is elected, the Tallwood Release Parties shall not be Releasing Parties unless a release is separately negotiated and agreed to between the Plan Co-Proponents.

14

134. "Reorganized Debtors" means, if an Asset Sale Distribution is not elected, a Debtor or any successor or assign thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

135. "Reorganized Wave" means, in the event of a Restructuring, at the discretion of the Plan Co-Proponents, either (i) Wave, as reorganized pursuant to and under the Plan, or (ii) a newly-created holding company, which shall own each of the other Reorganized Debtors.

136. "Restructuring" means the transactions and reorganization contemplated by, and pursuant to, this Plan in accordance with Section IV.E, under which, among other things, the New Common Stock shall be distributed, and which shall occur on the Effective Date if the Asset Sale Distribution does not occur.

137. "Restructuring Liquidating Trust Expense Advance" has the meaning ascribed to it in Section IV.G.6.

138. "Sale Hearing" means the hearing at which the Bankruptcy Court considers the approval of the Asset Sale.

139. "Sale Order" means one or more orders of the Bankruptcy Court, including the Confirmation Order, in form satisfactory to the Debtors approving the consummation of the applicable Asset Sale.

140. "Sale Proceeds" means the Cash and non-Cash consideration provided by an Entity in connection with any Asset Sale, net of expenses (including transaction costs, Compensation and Benefits Programs reserves, hedge breakage, and other costs and expenses arising from the Asset Sale, if any).

141. "Sale Proceeds Liquidating Trust Expense Advance" has the meaning ascribed to it in Section IV.G.6.

142. "Schedule of Retained Causes of Action" means that certain schedule filed with the Plan Supplement of certain Causes of Action of the Debtors that are not released or waived pursuant to the Plan, as such schedule may be amended, modified, or supplemented from time to time by the Debtors, with the consent of the Committee.

143. "Schedules" means, with respect to each Debtor, the schedules of assets and liabilities and statement of financial affairs Filed by such Debtor with the Bankruptcy Court on June 3, 2020 pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statements have been or may be amended or supplemented by such Debtor at any point prior to the Effective Date.

144. "Securities Act" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, or any similar federal, state, or local law.

145. "Security" means any security, as defined in section 2(a)(1) of the Securities Act.

146. "Series D Section 510(b) Claim(s)" means any Claim against any of the Debtors arising from or related to the purchase or ownership of Wave Series D Preferred Interests that is subject to subordination under section 510(b) of the Bankruptcy Code.

15

147.    "Series E Section 510(b) Claim(s)" means any Claim against any of the Debtors arising from or related to the purchase or ownership of Wave Series E Preferred Interests that is subject to subordination under section 510(b) of the Bankruptcy Code.

148.    "Secured" means, when referring to a Claim, (i) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; or (ii) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

149.    "Secured Claim(s)" means a Claim: (i) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; or (ii) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

150.    "Secured Subordinated Note" means a new secured, subordinated promissory note to be issued by Reorganized Wave and guaranteed by each of the other Reorganized Debtors in an aggregate principal amount equal to $4,000,000. The Secured Subordinated Note will be secured by perfected, second-priority Liens and pledges, *pari passu* with the Liens and pledges of the GUC Note, on the Collateral and subject to the terms and conditions described herein.

(i)     The Secured Subordinated Note will accrue interest at the Secured Subordinated Note Interest Rate, which shall be due and payable in kind on a quarterly basis; provided however that once seventy-five percent (75%) of the Allowed General Unsecured Claims has been paid, interest shall be due and payable in Cash or in kind, at the option of the Debtors, on a quarterly basis.

(ii)    Until such time as seventy-five percent (75%) of the Allowed General Unsecured Claims has been indefeasibly paid in Cash, (a) the Secured Subordinated Note shall not receive any principal payments; and (b) no rights or remedies may be exercised under the Secured Subordinated Note.

(iii)   After such time as both (a) seventy-five percent (75%) of the Allowed General Unsecured Claims has been indefeasibly paid in Cash and (b) the GUC Note has been indefeasibly paid in full in Cash, the Secured Subordinated Note may be prepaid at par, without penalty or premium.

(iv)    Upon the occurrence of an event of default and during the continuation thereof, additional interest shall accrue on any outstanding amounts owed under the Secured Subordinated Note at a default rate equal to the Secured Subordinated Note Interest Rate plus two percent (2%) per annum.

(v)     The Secured Subordinated Note shall become due and payable in full in Cash upon the earlier of (a) seven (7) years after the Effective Date; or (b) the consummation of a sale of all or substantially all of the Debtors' assets to an unaffiliated third party if all Allowed General Unsecured Claims have been indefeasibly paid (or will be paid pursuant to the proposed transaction) in full in Cash.

(vi)    The Secured Subordinated Note shall contain representations and warranties, affirmative and negative covenants and events of default customary for financings of

16

this type, subject to reasonably agreed exceptions, carve outs and qualifications. The representations, warranties, covenants and events of default contained in the Secured Subordinated Note shall be no more restrictive, from the perspective of the Debtors, than the representations, warranties, covenants and events of default contained in the GUC Note. The Secured Subordinated Note shall be subject to the Intercreditor Agreement.

151. "Secured Subordinated Note Interest Rate" means, with respect to the Secured Subordinated Note, an interest rate equal to the Applicable Benchmark Rate plus five percent (5%) per annum.

152. "Secured Tax Claim(s)" means any Secured Claim that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

153. "Senior Secured Note" means a new senior secured promissory note to be issued by Reorganized Wave and guaranteed by each of the other Reorganized Debtors in an aggregate principal amount equal to the amount of DIP Claims outstanding as of the Effective Date (up to an aggregate total principal of $10,286,511) *less* $4,000,000. If the aggregate amount of the Allowed DIP Claims outstanding as of the Effective Date do not exceed $4,000,000, the Senior Secured Note shall not be issued. The Senior Secured Note will be secured by perfected, first-priority Liens and pledges, *pari passu* with the Liens and pledges of the Exit Facility, on the Collateral and subject to the terms and conditions described herein.

(i) The Senior Secured Note will accrue interest at the Senior Secured Note Interest Rate, which shall be due and payable quarterly in Cash.

(ii) No payments of principal or interest shall be required during the first year of the Senior Secured Note term.

(iii) The Senior Secured Notes shall not be entitled to any payment of principal until such time as (a) the *De Minimis* Unsecured Claims and (b) the GUC Note have been paid in full. After such time, it shall be subject to prepayment at par, without penalty or premium. Interest shall nevertheless be payable as and when due.

(iv) Upon the occurrence of an event of default and during the continuation thereof, additional interest shall accrue on any outstanding amounts owed under the Senior Secured Note at a default rate equal to the Senior Secured Note Interest Rate plus two percent (2%) per annum.

(v) The Senior Secured Note shall become due and payable in full in Cash upon the earlier of (a) five (5) years after the Effective Date; or (b) the consummation of a sale of all or substantially all of the Debtors' assets to an unaffiliated third party.

(vi) The Senior Secured Note shall contain representations and warranties, affirmative and negative covenants and events of default customary for financings of this type, subject to reasonably agreed exceptions, carve outs and qualifications. The representations, warranties, covenants and events of default contained in the Senior Secured Note shall be no more restrictive, from the perspective of the Debtors, than the representations,

17

warranties, covenants and events of default contained in the GUC Note. The Senior Secured Note shall be subject to the Intercreditor Agreement.

154. "Senior Secured Note Interest Rate" means, with respect to the Senior Secured Note, an interest rate equal to the Applicable Benchmark Rate plus five percent (5%) per annum.

155. "SOFR" means the greater of (i) the three (3) month USD Secured Overnight Financing Rate for the applicable interest period at 11 a.m. New York time two (2) Business Days prior to the start of such interest period and (ii) one percent (1%).

156. "Tallwood" means Tallwood Technology Partners LLC, a California limited liability company who is the Debtors' Prepetition Note Lender, DIP Lender, and Holder of Wave Interests.

157. "Tallwood Claim(s)" means those Claims relating to the Prepetition Tallwood Debt that are not refinanced pursuant to the terms of the DIP Facility.

158. "Tallwood Equityholders" means, collectively, and in each case, in its capacity as a Holder of Wave Interest: Tallwood, Tallwood III, L.P., Tallwood III Associates, L.P., Tallwood III Partners, L.P., Tallwood Investment Partners, L.P., and Entropy Research Labs LLC.

159. "Tallwood Release Parties" means, collectively: (i) the Prepetition Note Lender, (ii) the DIP Lender; (iii) the DIP Agent; (iv) the Exit Lender; (v) the Tallwood Equityholders; (vi) Desi Banatao; (vii) Dado Banatao; and (viii) Rey Banatao.

160. "Third Party Release" means the consensual releases of the Released Parties by the Releasing Parties provided for in Section IX.D.

161. "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

162. "Unimpaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

163. "U.S. Trustee" means the Office of the United States Trustee.

164. "Wave" has the meaning ascribed to it in the recitals.

165. "Wave Common Interest(s)" means any Wave Interest that results or arises from the existing common stock of Wave.

166. "Wave Interest(s)" means (i) the Interest(s) in Wave, including any shares of Wave's common or preferred stock issued and outstanding as of the Petition Date, whether or not transferable, or any options, warrants, or rights, contractual or otherwise, obligating Wave to issue, transfer, purchase, redeem, or sell any shares of its common or preferred stock, any rights under any stock option plans, stockholder rights agreements, voting agreements, or registration rights agreements regarding Wave's common or preferred stock; (ii) any Claim arising from the rescission of a purchase, sale, or other acquisition of Wave's common or preferred stock (or any right, claim, or interest in and to any common or preferred stock); (iii) any Claims for the payment of dividends on any shares of

18

Wave's common or preferred stock; and (iv) any Claims for damages or other relief arising from the purchase, sale, disposition, holding, or other acquisition of Wave's common or preferred stock.

167.    "Wave Preferred Interest(s)" means any Wave Series A-1 Preferred Interest(s), Wave Series A-2 Preferred Interest(s), Wave Series B Preferred Interest(s), Wave Series C Preferred Interest(s), Wave Series D Preferred Interest(s), or Wave Series E Preferred Interest(s).

168.    "Wave Series A-1 Preferred Interest(s)" means any Wave Interest that results or arises from the existing series A-1 preferred stock of Wave.

169.    "Wave Series A-2 Preferred Interest(s)" means any Wave Interest that results or arises from the existing series A-2 preferred stock of Wave.

170.    "Wave Series B Preferred Interests" means any Wave Interest that results or arises from the existing series B preferred stock of Wave.

171.    "Wave Series C Preferred Interests" means any Wave Interest that results or arises from the existing series C preferred stock of Wave.

172.    "Wave Series D Preferred Interests" means any Wave Interest that results or arises from the existing series D preferred stock of Wave.

173.    "Wave Series E Preferred Interests" means any Wave Interest that results or arises from the existing series E preferred stock of Wave.

174.    "Wind Down" means, if the Asset Sale Distribution is elected, the wind down and dissolution of the Debtors' Estates following the Effective Date as set forth in Section VII.B.

175.    "Wind-Down Budget" means a budget in form and substance reasonably acceptable to the Debtors and the DIP Agent and as set forth in the Plan Supplement.

176.    "Wind-Down Debtors" means, on or after the Effective Date and if an Asset Sale Distribution is elected, any Debtor or any successor or assign thereto, by merger, consolidation, or otherwise.

177.    "Wind-Down Milestones" means the deadlines, set forth in the Plan Supplement by which the Plan Administrator must complete certain aspects of the Wind Down.

178.    "Windtree" means Windtree Drive LLC.

179.    "Windtree Redemption" means the redemption by Wave of Windtree's Wave Series E Preferred Interests in exchange for a payment of $40 million, which effectuated settlement agreement, dated July 1, 2019, between, among others, Wave and Windtree.

180.    "Workers' Compensation Program" means the written contracts, agreements, agreements of indemnity, self-insured bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance issued to or entered into at any time by any of the Debtors.

19

## B. Rules of Interpretation

For purposes of this Plan and unless otherwise provided herein: (i) each term, whether stated in the singular or the plural, will include both the singular and the plural; (ii) any reference to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (iii) any reference herein to an existing document, schedule, exhibit, or annex, shall mean that document, schedule, exhibit, or annex, as it may thereafter be amended, modified, or supplemented; (iv) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (v) all references in this Plan to Section(s) are references to Articles of this Plan, as the same may be amended, waived or modified from time to time in accordance with the terms hereof; (vi) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Section, paragraph, or clause contained in this Plan; (vii) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation"; (viii) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (ix) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (x) all references to docket numbers of documents Filed in these Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (xi) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors or the Wind-Down Debtors, as applicable, in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (xii) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; and (xiii) any reference to an Entity's "subsidiaries" means its direct and indirect subsidiaries.

## C. Computation of Time

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. In the event that any payment, distribution, act, or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then such payment, distribution, act, or deadline shall be deemed to occur on the next succeeding Business Day, but if so made, performed or completed by such next succeeding Business Day, shall be deemed to have been completed or to have occurred as of the required date. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

## D. Reference to Monetary Figures

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

20

### E. Reference to the Debtors, the Reorganized Debtors, or the Wind-Down Debtors

Except as otherwise specifically provided to the contrary in this Plan, references to the Debtors, the Reorganized Debtors, or the Wind-Down Debtors shall mean the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, to the extent the context requires.

### F. Controlling Document

Except as set forth in this Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order referenced in this Plan (other than the Confirmation Order) conflicts with or is in any way inconsistent with any provision of this Plan, this Plan shall govern and control. In the event of an inconsistency between the Confirmation Order and this Plan, the Confirmation Order shall control.

### ARTICLE II
### ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, General Administrative Expense Claims, DIP Claims, Professional Claims, and Priority Tax Claims have not been classified and thus, are excluded from the Classes of Claims and Interests set forth in Section III hereof.

### A. General Administrative Expense Claims

Unless otherwise agreed to by the Holder of an Allowed General Administrative Expense Claim and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and with the consent of the Committee and Tallwood (which consent shall not be unreasonably withheld, conditioned or delayed), each Holder of an Allowed General Administrative Expense Claim that is unpaid as of the Effective Date shall receive, on account and in full satisfaction of such Allowed General Administrative Expense Claim, Cash in an amount equal to the Allowed amount of such General Administrative Expense Claim, to be paid in accordance with the following: (i) if a General Administrative Expense Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed General Administrative Expense Claim is due or as soon as reasonably practicable thereafter); (ii) if such General Administrative Expense Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such General Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) at such time and upon such terms as may be agreed upon by such Holder and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable; or (iv) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Each Holder of a General Administrative Expense Claim that was not accrued in the ordinary course of business must File and serve a request for payment of such General Administrative Expense Claim on the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date. Holders of General Administrative Expense Claims that are required to File and serve a request for payment of such General Administrative Expense Claims by the Administrative Expense Claims Bar Date that do not File and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and

21

enjoined from asserting such General Administrative Expense Claims against the Debtors or Reorganized Debtors, as applicable, or their respective property, and such General Administrative Expense Claims shall be deemed forever discharged and released as of the Effective Date. Any requests for payment of General Administrative Expense Claims that are not properly Filed and served by the Administrative Expense Claims Bar Date shall not appear on the Claims Register and shall be Disallowed automatically without the need for further action by the Debtors or the Reorganized Debtors, as applicable, or further order of the Bankruptcy Court.

The Debtors or the Reorganized Debtors, with the consent of the Committee and Tallwood, which consent shall not be unreasonably withheld, conditioned or delayed, may settle General Administrative Expense Claims without further Bankruptcy Court approval. The Reorganized Debtors may also choose to object to any General Administrative Expense Claim no later than sixty (60) days from the Administrative Expense Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors, Reorganized Debtors, the Wind-Down Debtors, or other party with standing, as applicable, object to a timely Filed and properly served General Administrative Expense Claim, such General Administrative Expense Claim will be deemed Allowed in the amount requested. In the event that the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, object to a General Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such General Administrative Expense Claim should be Allowed and, if so, in what amount.

### B. DIP Claims

If a Restructuring occurs, on the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, each Holder of an Allowed DIP Claim shall receive, on account of and in full and final satisfaction of such Holder's Allowed DIP Claim, (i) if the aggregate amount of all such Holders' Allowed DIP Claims is equal to or less than $4,000,000, its Pro Rata share of 37.66% of the New Common Stock and (ii) if the aggregate amount of all such Holders' Allowed DIP Claims exceeds $4,000,000, (a) its Pro Rata share of 37.66% of the New Common Stock and (b) solely with respect to the portion of such Holders' aggregate Allowed DIP Claims that exceeds $4,000,000, their Pro Rata share of the Senior Secured Note.

If an Asset Sale Distribution is elected, on the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, each Holder of an Allowed DIP Claim shall receive payment in full in Cash on account of and in full and final satisfaction of such Holder's Allowed DIP Claim.

The DIP Lender shall have the right to credit bid, dollar-for-dollar, the full amount of the Allowed DIP Claim, plus all interest and fees accrued thereunder, pursuant to section 363(k) of the Bankruptcy Code. In no event shall Tallwood have the right to credit bid any amount of the Tallwood Claims, whether pursuant to section 363(k) of the Bankruptcy Code or otherwise.

### C. Professional Claims

#### 1. Final Fee Applications and Payment of Professional Claims

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than the Administrative Expense Claims Bar Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Claim Escrow Account, which the Reorganized Debtors or the Wind-Down Debtors, as applicable, will establish in trust for the Professionals and fund with Cash equal to the Professional Claim Reserve Amount on the Effective Date.

#### 2. Professional Claim Escrow Account

On the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall fund the Professional Claim Escrow Account with Cash equal to the aggregate Professional Claim Reserve Amount for all Professionals. The Professional Claim Escrow Account shall be maintained in trust for the Professionals. Such funds in the Professional Claim Escrow Account shall not constitute property of the Debtors' Estates or property of the Reorganized Debtors or the Wind-Down Debtors, except as otherwise expressly set forth in the last sentence of this paragraph. The amount of Professional Claims owing to the Professionals on and after the Effective Date shall be paid in Cash to such Professionals from funds held in the Professional Claim Escrow Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order. When all Allowed Professional Claims have been paid in full, amounts remaining in the Professional Claim Escrow Account, if any, shall revert to the Reorganized Debtors or the Wind-Down Debtors, as applicable, without any further action or order of the Bankruptcy Court.

#### 3. Professional Claim Reserve Account

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five (5) days before the Effective Date; provided, however, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in these Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors, Reorganized Debtors, or the Wind-Down Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional.

#### 4. Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in this Plan, from and after the Effective Date, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and Consummation of this Plan incurred by the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may

23

employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## D. Priority Tax Claims

Except as otherwise agreed by a Holder of an Allowed Priority Tax Claim and the Debtors or Reorganized Debtors, as applicable, with the consent of Tallwood (which consent shall not be unreasonably withheld, conditioned or delayed), each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Claim, regular installment payments in Cash over a period ending not later than five (5) years after the Petition Date equal in total value, as of the Effective Date, to the Allowed amount of such Claim, plus interest as permitted under applicable law.  For the avoidance of doubt, at no point shall the Holders of Allowed Priority Tax Claims be paid in a manner or on terms less favorable than Allowed Claims paid under the GUC Note, except that the Holders of Allowed Priority Tax Claims shall not receive any security interest for such Claims.  If the aggregate amount of Allowed Priority Tax Claims is less than $12,949,150, then the difference between such aggregate amount and $12,949,150 shall be used to pay, in Cash, outstanding amounts of the GUC Note and the Excess General Unsecured Claim Amount as follows: (i) fifty percent (50%) shall be used to pay the Excess General Unsecured Claim Amount, and (ii) fifty percent (50%) shall be used to pay the GUC Note; provided that, if the Excess General Unsecured Claim Amount has been paid in full in Cash, but the GUC Note has not been repaid in full in Cash (or vice versa), one hundred percent (100%) shall be used to pay the Excess General Unsecured Claim Amount or the GUC Note, as applicable.  Tax Claims not entitled to priority, and to the extent such Claims are Allowed Claims, shall be obligations of the applicable Reorganized Debtors and paid *pari passu* with the Allowed General Unsecured Claims included under the GUC Note, but without receiving security for such Claims.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

## A. Classification of Claims and Interests

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and Plan Distribution pursuant to sections 1122 and 1123(a) of the Bankruptcy Code.  This Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class for purposes of distribution only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code and as described in Article II, the Debtors have not classified General Administrative Expense Claims, DIP Claims, Professional Claims, and Priority Tax Claims.

The classification of Claims and Interests against the Debtors pursuant to this Plan is as follows:

24

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Tallwood Claims | Impaired | Entitled to Vote |
| Class 4 | *De Minimis* Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 7 | Wave Series E Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Series E Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Wave Series D Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Series D Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Wave Series C Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 12 | Wave Series B Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 13 | Wave Series A-2 Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 14 | Wave Series A-1 Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 15 | Wave Common Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 16 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |

**B. Treatment of Claims and Interests**

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors or the Wind-Down Debtors, as applicable, in consultation with Tallwood and the Committee, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

25

1.    Class 1 – Other Secured Claims

    (a)    *Classification*.  Class 1 consists of all Other Secured Claims.

    (b)    *Treatment*.  Each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors and in consultation with Tallwood and the Committee:

        (i)    payment in full in Cash;

        (ii)    the return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim; or

        (iii)    such other treatment sufficient to render such Allowed Other Secured Claim as Unimpaired.

    (c)    *Voting*.  Class 1 is Unimpaired under this Plan.  Holders of Claims in Class 1 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

2.    Class 2 – Other Priority Claims

    (a)    *Classification*.  Class 2 consists of all Other Priority Claims.

    (b)    *Treatment*.  On the Effective Date, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash.

    (c)    *Voting*.  Class 2 is Unimpaired under this Plan.  Holders of Claims in Class 2 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

3.    Class 3 – Tallwood Claims

    (a)    *Classification*.  Class 3 consists of the Tallwood Claims.

    (b)    *Allowance.*  On the Effective Date, the Tallwood Claims shall (subject to Section III.C) be Allowed in the amount of $10,621,628.

    (c)    *Treatment*.  On the Effective Date or as soon thereafter as is reasonably practicable:

        (i)    if the Restructuring occurs, each Holder of an Allowed Tallwood Claim shall receive its Pro Rata share of 62.34% of the New Common Stock, its Pro Rata share of the Secured Subordinated Note, and its right to recovery under the Liquidating Trust as set forth in Section IV.G.7 below; or

        (ii)    if the Asset Sale Distribution is elected, each Holder of an Allowed Tallwood Claim shall (subject to Section III.C) receive its Pro Rata

26

share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, and the *De Minimis* Unsecured Claims up to the Allowed amount of such Tallwood Claim.[1]

(d)     *Voting*.  Class 3 is Impaired under this Plan.  Holders of Claims in Class 3 are entitled to vote to accept or reject this Plan.

4.     Class 4 – *De Minimis* Unsecured Claims

(a)     *Classification*.  Class 4 consists of all *De Minimis* Unsecured Claims.

(b)     *Treatment*.  On the Effective Date, or within thirty (30) days thereafter, each Holder of an Allowed *De Minimis* Unsecured Claim shall receive payment in full in Cash.

(c)     *Voting*.  Class 4 is Unimpaired under this Plan.  Holders of Claims in Class 4 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

5.     Class 5 – General Unsecured Claims

(a)     *Classification*.  Class 5 consists of all General Unsecured Claims.[2]

(b)     *Treatment*.   On the Effective Date, or as soon thereafter as is reasonably practicable:

(i)     if the Restructuring occurs, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the GUC Note and its right to recovery under the Liquidating Trust as set forth in Section IV.G.7 below; or

(ii)     if the Asset Sale Distribution is elected, each Holder of an Allowed General Unsecured Claim shall (subject to Section III.C) receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed

---

[1] If the Liens securing the Tallwood Claims are avoided, as set forth in Section III.C, and the Tallwood Claims are not subordinated to the General Unsecured Claims, the Tallwood Claims will rank *pari passu* with the General Unsecured Claims with respect to the distribution of Sale Proceeds.  If the Liens securing the Tallwood Claims are avoided and the Tallwood Claims are subordinated to the General Unsecured Claims, as set forth in Section III.C, the Tallwood Claims will rank below the General Unsecured Claims with respect to the distribution of Sale Proceeds.

[2] To the extent that Class 5 includes General Unsecured Claims against multiple Debtors, the treatment of Class 5 described herein potentially constitutes a partial substantive consolidation of the applicable Debtors.

27

Tallwood Claims, and the Allowed *De Minimis* Unsecured Claims, up to the Allowed amount of such General Unsecured Claim.[3]

For the avoidance of doubt, tax Claims not entitled to priority, and to the extent such Claims are Allowed Claims, shall be obligations of the applicable Reorganized Debtors and paid *pari passu* with the Allowed General Unsecured Claims included under the GUC Note, but without receiving security for such Claims.

(c)     *Voting*.  Class 5 is Impaired under this Plan.  Holders of Claims in Class 5 are entitled to vote to accept or reject this Plan.

6.     Class 6 – Intercompany Claims

(a)     *Classification*.  Class 6 consists of all Intercompany Claims.

(b)     *Treatment*.  On the Effective Date, or as soon thereafter as is reasonably practicable:

(i)     if the Restructuring occurs, at the option of the applicable Debtor and with the consent of Tallwood (which consent shall not be unreasonably withheld, conditioned or delayed), all Intercompany Claims shall be either Reinstated or canceled, released, and extinguished and shall be of no further force and effect without any Plan Distribution; if the Debtors elect to Reinstate the Intercompany Claims, no payments may be made with respect to the Intercompany Claims until all Allowed General Unsecured Claims have been repaid in full in Cash; or

(ii)     if the Asset Sale Distribution is elected, all Intercompany Claims shall be canceled, released, and extinguished and shall be of no further force and effect without any Plan Distribution.

(c)     *Voting*.  Pursuant to sections 1126(f) and 1126(g) of the Bankruptcy Code, Holders of Intercompany Claims are not entitled to vote to accept or reject this Plan.

7.     Class 7 – Wave Series E Preferred Interests

(a)     *Classification*.  Class 7 consists of all Wave Series E Preferred Interests.

(b)     *Treatment*.  On the Effective Date, or as soon thereafter as is reasonably practicable:

---

[3] If the Liens securing the Tallwood Claims are avoided, as set forth in Section III.C, and the Tallwood Claims are not subordinated to the General Unsecured Claims, the Allowed Tallwood Claims will rank *pari passu* with the Allowed General Unsecured Claims with respect to the distribution of Sale Proceeds.  If the Liens securing the Tallwood Claims are avoided and the Tallwood Claims are subordinated to the General Unsecured Claims, as set forth in Section III.C, the Allowed Tallwood Claims will rank below the Allowed General Unsecured Claims with respect to the distribution of Sale Proceeds.

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 182 of 276

(i) if the Restructuring occurs, all Wave Series E Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or

(ii) if the Asset Sale Distribution is elected, each Holder of an Allowed Wave Series E Preferred Interest shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, and the Allowed General Unsecured Claims, up to the Allowed amount of such Wave Series E Preferred Interest.

(c) *Voting*. Class 7 is Impaired under this Plan. Holders of Interests in Class 7 are conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

8. Class 8 – Series E Section 510(b) Claims

(a) *Classification*. Class 8 consists of all Series E Section 510(b) Claims.

(b) *Treatment*. On the Effective Date, or as soon thereafter as is reasonably practicable, all Series E Section 510(b) Claims shall be canceled, released, and extinguished, and will be of no further force or effect; and

(i) if the Restructuring occurs, all Series E Section 510(b) Claims shall be canceled, released, and extinguished, and will be of no further force, and Holders of such Claims shall not receive any Plan Distribution; or

(ii) if the Asset Sale Distribution is elected, each Holder of a Series E Section 510(b) Claim shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, and the Allowed Wave Series E Preferred Interests, up to the Allowed amount of such Series E Section 510(b) Claim.

(c) *Voting*. Class 8 is Impaired under this Plan. Holders of Claims in Class 8 are conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

29

9. <u>Class 9 – Wave Series D Preferred Interests</u>

    (a)    *Classification*.  Class 9 consists of all Wave Series D Preferred Interests.

    (b)    *Treatment*.  On the Effective Date, or as soon thereafter as is reasonably practicable,

        (i)    if the Restructuring occurs, all Wave Series D Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or

        (ii)    if the Asset Sale Distribution is elected, each Holder of an Allowed Wave Series D Preferred Interest shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, and the Allowed Series E Section 510(b) Claims, up to the Allowed amount of such Wave Series D Preferred Interest.

    (c)    *Voting*.  Class 9 is Impaired under this Plan. Holders of Interests in Class 9 are conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

10. <u>Class 10 – Series D Section 510(b) Claims</u>

    (a)    *Classification*.  Class 10 consists of all Series D Section 510(b) Claims.

    (b)    *Treatment*.  On the Effective Date, or as soon thereafter as is reasonably practicable:

        (i)    if the Restructuring occurs, all Series D Section 510(b) Claims shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Claims shall not receive any Plan Distribution; or

        (ii)    if the Asset Sale Distribution is elected, each Holder of a Series D Section 510(b) Claim shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims, and the Allowed

30

Wave Series D Preferred Interests, up to the Allowed amount of such Series D Section 510(b) Claim.

(c)    *Voting*. Class 10 is Impaired under this Plan. Holders of Claims in Class 10 are conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

11.    <u>Class 11 – Wave Series C Preferred Interests</u>

(a)    *Classification*. Class 11 consists of all Wave Series C Preferred Interests.

(b)    *Treatment*. On the Effective Date, or as soon thereafter as is reasonably practicable:

   (i)    if the Restructuring occurs, all Wave Series C Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or

   (ii)    if the Asset Sale Distribution is elected, each Holder of an Allowed Wave Series C Preferred Interest shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims, the Allowed Wave Series D Preferred Interests, and the Allowed Series D Section 510(b) Claims, up to the Allowed amount of such Wave Series C Preferred Interest.

(c)    *Voting*. Class 11 is Impaired under this Plan. Holders of Interests in Class 11 are conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

12.    <u>Class 12 – Wave Series B Preferred Interests</u>

(a)    *Classification*. Class 12 consists of all Wave Series B Preferred Interests.

(b)    *Treatment*. On the Effective Date, or as soon thereafter as is reasonably practicable:

   (i)    if the Restructuring occurs, all Wave Series B Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or

31

(ii)     if the Asset Sale Distribution is elected, each Holder of an Allowed Wave Series B Preferred Interest shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims, the Allowed Wave Series D Preferred Interests, the Allowed Series D Section 510(b) Claims, and the Allowed Wave Series C Preferred Interests, up to the Allowed amount of such Wave Series B Preferred Interest.

(c)     *Voting*. Class 12 is Impaired under this Plan. Holders of Interests in Class 12 are conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

13.     Class 13 – Wave Series A-2 Preferred Interests

(a)     *Classification*. Class 13 consists of all Wave Series A-2 Preferred Interests.

(b)     *Treatment*. On the Effective Date, or as soon thereafter as is reasonably practicable:

(i)     if the Restructuring occurs, all Wave Series A-2 Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or

(ii)     if the Asset Sale Distribution is elected, each Holder of an Allowed Wave Series A-2 Preferred Interest shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims, the Allowed Wave Series D Preferred Interests, the Allowed Series D Section 510(b) Claims, the Allowed Wave Series C Preferred Interests, and the Allowed Wave Series B Preferred Interests, up to the Allowed amount of such Wave Series A-2 Preferred Interest.

(c)     *Voting*. Class 13 is Impaired under this Plan. Holders of Interests in Class 13 are conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

32

14. <u>Class 14 – Wave Series A-1 Preferred Interests</u>

    (a) *Classification*. Class 14 consists of all Wave Series A-1 Preferred Interests.

    (b) *Treatment*. On the Effective Date, or as soon thereafter as is reasonably practicable:

        (i) if the Restructuring occurs, all Wave Series A-1 Preferred Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or

        (ii) if the Asset Sale Distribution is elected, each Holder of an Allowed Wave Series A-1 Preferred Interest shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims, the Allowed Wave Series D Preferred Interests, the Allowed Series D Section 510(b) Claims, the Allowed Wave Series C Preferred Interests, the Allowed Wave Series B Preferred Interests, and the Allowed Wave Series A-2 Preferred Interests, up to the Allowed amount of such Wave Series A-1 Preferred Interest.

    (c) *Voting*. Class 14 is Impaired under this Plan. Holders of Interests in Class 14 are conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

15. <u>Class 15 – Wave Common Interests</u>

    (a) *Classification*. Class 15 consists of all Wave Common Interests.

    (b) *Treatment*. On the Effective Date, or as soon thereafter as is reasonably practicable:

        (i) if the Restructuring occurs, all Holders of Wave Common Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Interests shall not receive any Plan Distribution; or

        (ii) if the Asset Sale Distribution is elected, each Holder of a Wave Common Interest shall receive its Pro Rata share of the Sale Proceeds after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the

33

Allowed Other Secured Claims, the Allowed Tallwood Claims, the Allowed *De Minimis* Unsecured Claims, the Allowed General Unsecured Claims, the Allowed Wave Series E Preferred Interests, the Allowed Series E Section 510(b) Claims, the Allowed Wave Series D Preferred Interests, the Allowed Series D Section 510(b) Claims, the Allowed Wave Series C Preferred Interests, the Allowed Wave Series B Preferred Interests, the Allowed Wave Series A-2 Preferred Interests, and the Allowed Wave Series A-1 Preferred Interests.

(c)　*Voting*.  Pursuant to sections 1126(f) and 1126(g) of the Bankruptcy Code, Holders of Interests in Class 15 are not entitled to vote to accept or reject this Plan.

16.　<u>Class 16 – Intercompany Interests</u>

(a)　*Classification*.  Class 16 consists of all Intercompany Interests.

(b)　*Treatment*.  On the Effective Date, or as soon thereafter as is reasonably practicable:

(i)　if the Restructuring occurs, at the option of the applicable Debtor, in consultation with Tallwood and the Committee, all Intercompany Interests shall be either Reinstated or canceled, released, and extinguished and shall be of no further force and effect without any Plan Distribution; or

(ii)　if the Asset Sale Distribution is elected, all Intercompany Interest shall be canceled, released, and extinguished and shall be of no further force and effect without any Plan Distribution.

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests, but for the purposes of administrative convenience and maintaining the prepetition corporate structure,[4] and in exchange for the Debtors', the Reorganized Debtors', or the Wind-Down Debtors', as applicable, agreement under this Plan to make certain distributions to the Holders of Allowed Claims.

(c)　*Voting*.  Pursuant to sections 1126(f) and 1126(g) of the Bankruptcy Code, Holders of Intercompany Interests are not entitled to vote to accept or reject this Plan.

**C.  Treatment of Tallwood Claims if the Asset Sale Distribution is Elected**

If the Asset Sale Distribution is elected, the Debtors shall establish an escrow account into which the Debtors shall deposit Sale Proceeds in an amount equal to the lesser of (i) the amount of the

---

[4] An organizational chart of the Debtors and certain non-debtor affiliates is attached to this Plan as Exhibit A.

34

Tallwood Claims and (ii) the amount of the Sale Proceeds less the aggregate amount of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims and the Allowed *De Minimis* Unsecured Claims (the "Escrowed Amount"). In such event, the Plan Co-Proponents shall negotiate in good faith the application of the Escrowed Amount as between the Tallwood Claims and the General Unsecured Claims.

If the application of the Escrowed Amount as between the Tallwood Claims and the General Unsecured Claims has not been resolved or compromised before the Effective Date, upon the Effective Date, the Estates' right to (i) Dispute the Tallwood Claims; (ii) challenge the amount, validity, perfection, enforceability, priority or extent of the Prepetition Tallwood Debt; and (iii) assert Causes of Action to avoid, subordinate, or disallow any of the Prepetition Tallwood Debt, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise, shall automatically transfer to the Liquidating Trust. If the Committee obtains standing from the Bankruptcy Court to assert such Causes of Action and such Causes of Action have not been finally resolved or compromised before the Effective Date, upon the Effective Date, the Committee's right to assert such Causes of Action shall automatically transfer to and vest in the Liquidating Trust.

### D. Special Provision Governing Unimpaired Claims

Except as otherwise provided in this Plan, nothing under this Plan shall affect the Debtors', the Reorganized Debtors', or the Wind-Down Debtors' rights regarding any Unimpaired or Reinstated Claim, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired or Reinstated Claim.

### E. Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### F. Acceptance or Rejection of this Plan

#### 1. Presumed Acceptance of this Plan

Claims in Classes 1, 2, 4, and 6 (to the extent Unimpaired) and Interests in Class 16 (to the extent Reinstated) are Unimpaired under this Plan. The Holders of such Claims and Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.

#### 2. Voting Classes

Claims in Classes 3 and 5 are Impaired under this Plan and the Holders of such Claims are entitled to vote to accept or reject this Plan. If such a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject this Plan, such Class shall be deemed to have accepted this Plan.

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 189 of 276

### 3. Deemed Rejection of this Plan

Claims in Classes 6 (to the extent Impaired), 8, and 10 and Interests in Classes 7, 9, 11, 12, 13, 14, 15, and 16 (to the extent canceled, released, and extinguished) are Impaired under this Plan and are anticipated to receive no Plan Distribution on account of their Claims and Interests. The Holders of such Claims and Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.

### G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by Class 5. The Debtors reserve the right to modify this Plan in accordance with Section XI.A hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules. If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before Confirmation.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THIS PLAN

### A. General Settlement of Claims and Interests

As discussed in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to this Plan, including (i) any challenge to the amount, validity, perfection, enforceability, priority or extent of the Prepetition Tallwood Debt (if the Restructuring occurs) or DIP Claims; and (ii) any claim to avoid, subordinate, or disallow any of the Prepetition Tallwood Debt (if the Restructuring occurs) or DIP Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise. This Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Section VI.A hereof, all Plan Distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

If the Asset Sale Distribution is elected, this Section IV.A shall not apply to the Tallwood Prepetition Debt. Instead, Section III.C shall apply to (i) any challenge to the amount, validity, perfection, enforceability, priority or extent of the Prepetition Tallwood Debt; and (ii) any claim to avoid, subordinate, or disallow any of the Prepetition Tallwood Debt, whether under any provision of

36

chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.

## B. Plan Transactions

On or before the Effective Date, the applicable Debtors, Reorganized Debtors, or Wind-Down Debtors shall enter into and shall take any actions as may be necessary or appropriate to effectuate the Asset Sale Distribution or the Restructuring, as applicable. The actions to implement the Plan Transaction may include: (i) the execution and delivery of appropriate agreements or other documents that are consistent with the terms of this Plan and that satisfy the applicable requirements of law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan; (iii) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (iv) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with this Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate this Plan.

## C. Cancellation of Existing Securities and Agreements

On the Effective Date, except to the extent otherwise provided in this Plan or the Confirmation Order, all notes, instruments, certificates, credit agreements, indentures, and other similar documents evidencing Claims or Interests, shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such canceled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan. Notwithstanding the occurrence of the Confirmation Date, Effective Date, or anything to the contrary herein, the Prepetition Note and DIP Note shall continue in effect solely to the extent necessary to: (i) permit Holders of Claims under the Prepetition Note and DIP Note to receive their respective Plan Distributions, as applicable; and (ii) permit the Reorganized Debtors to make or assist in making, as applicable, Plan Distributions on account of the Prepetition Note and DIP Note. Except as provided in this Plan, on the Effective Date, the DIP Agent and its agents, successors, and assigns shall be automatically and fully discharged of all of its duties and obligations associated with the DIP Note. The commitments and obligations (if any) of the Prepetition Note Lender or DIP Lender to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the Prepetition Note or DIP Note, shall fully terminate and be of no further force or effect on the Effective Date.

## D. Section 1146 Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor, a Wind-Down Debtor, the Liquidating Trust, the Liquidating Trustee, or to any other Person) of property under this Plan, including the Asset Sale, if applicable, or pursuant to: (i) the issuance, distribution, transfer, or exchange of any debt, equity

37

security, or other interest in the Debtors or the Reorganized Debtors; (ii) the Plan Transactions; (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iv) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facility; or (v) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### E. The Restructuring

If the Restructuring occurs, the following provisions shall govern.

#### 1. Reorganized Debtors

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under this Plan as necessary to consummate this Plan. Cash payments to be made pursuant to this Plan will be made by the Debtors or Reorganized Debtors. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under this Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of this Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in the Definitive Documentation, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors or members of the applicable Reorganized Debtors deem appropriate.

#### 2. Sources for Plan Distributions

The Debtors and the Reorganized Debtors, as applicable, shall fund Plan Distribution under this Plan with: (i) Cash on hand, including Cash from operations and borrowed from the DIP Facility;

38

(ii) proceeds from the Exit Facility; (iii) proceeds from the Liquidating Trust; and (iv) the newly-issued Senior Secured Note, Secured Subordinated Note, and GUC Note.

(a)     Exit Facility

Upon the Effective Date, Tallwood shall provide a commitment of the Exit Facility Commitment Amount under the Exit Facility pursuant to the Exit Facility Documents.  In exchange for providing such commitment under the Exit Facility, Tallwood shall receive a first priority Lien on the Collateral pursuant to the Exit Facility Documents.

Confirmation shall be deemed approval of the Exit Facility, including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees to be paid by the Debtors or the Reorganized Debtors in connection therewith. Confirmation also shall be deemed to give effect to the Liens securing the Exit Facility and such Liens shall be deemed automatically perfected on a first priority basis, to extent provided for in the Exit Facility Documents, without any further filing or action by any party.

(b)     New Common Stock

The issuance of the New Common Stock shall be authorized without any further action by the Holders of Claims or Interests.  Reorganized Wave shall be authorized to issue shares of New Common Stock under this Plan and pursuant to their New Organizational Documents.  On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to this Plan.

All of the shares of New Common Stock issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to herein shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

(c)     Liquidating Trust

Upon the Effective Date, the Liquidating Trust shall be established and administered in accordance with Section IV.G.

(d)     Senior Secured Note

The Senior Secured Note will be on the terms set forth herein, as will be more fully set forth in the Plan Supplement.

Confirmation shall be deemed to give effect to the Liens securing the Senior Secured Note and such Liens shall be deemed automatically perfected on a second priority basis, to extent provided for in the Senior Secured Note, without any further filing or action by any party.

(e)     Secured Subordinated Note

The Secured Subordinated Note will be on the terms set forth herein, as will be more fully set forth in the Plan Supplement.

Confirmation shall be deemed to give effect to the Liens securing the Secured Subordinated Note and such Liens shall be deemed automatically perfected on a second priority basis, to extent provided for in the Secured Subordinated Note, without any further filing or action by any party.

(f)　　Underline GUC Note

The GUC Note will be on the terms set forth herein, as will be more fully set forth in the Plan Supplement.

Confirmation shall be deemed to give effect to the Liens securing the GUC Note and such Liens shall be deemed automatically perfected on a second priority basis, to extent provided for in the GUC Note, without any further filing or action by any party.

(g)　　Underline Patent Asset Sale

If the Restructuring occurs, The Reorganized Debtors may, on and after the Effective Date and during the term of the Plan, enter into one or more Patent Asset Sales. Until seventy-five percent (75%) of the aggregate principal amount of the GUC Note outstanding as of the Effective Date has been indefeasibly paid in Cash, the net proceeds from any Patent Asset Sale shall, unless the Liquidating Trustee otherwise consents, be distributed as follows: (i) forty percent (40%) shall be retained by the Reorganized Debtors for general corporate purposes and (ii) sixty percent (60%) shall be used to pay the GUC Note. After seventy-five percent (75%) of the aggregate principal amount of the GUC Note outstanding as of the Effective Date has been indefeasibly paid in Cash, all net proceeds of any Patent Asset Sale may be retained by the Reorganized Debtors for general corporate purposes.

### 3. Corporate Existence

Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated in this Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other New Organizational Documents) are amended under this Plan or otherwise. To the extent such documents are amended, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). After the Effective Date, the respective certificate of incorporation and bylaws (or other New Organizational Documents) of one or more of the Reorganized Debtors may be amended or modified without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 4. Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, this Plan or Plan Supplement, on the

40

Effective Date, all property in each Estate and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in this Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 5. Corporate Action

Upon the Effective Date, all actions contemplated under this Plan shall be deemed authorized and approved in all respects, including: (i) adoption or assumption, as applicable, of the Compensation and Benefit Programs; (ii) selection of the directors and officers for the New Board; (iii) implementation of this Plan; (iv) entry into the Exit Facility; (v) entry into the Senior Secured Note, the GUC Note and the Secured Subordinated Note, (vi) adoption of the New Organizational Documents; (vii) the issuance and distribution of the New Common Stock; (viii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts; and (ix) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the restructuring contemplated by this Plan (whether to occur before, on, or after the Effective Date). All matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the holders of securities, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the Reorganized Debtors, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under this Plan in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the Exit Facility, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Section IV.E.5 shall be effective notwithstanding any requirements under non-bankruptcy law, in each case in accordance with applicable law.

### 6. New Organizational Documents

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors. To the extent required under this Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required by the laws of the respective state or country of organization. The New Organizational Documents will prohibit the issuance of non-voting equity securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents, in each case in accordance with applicable law.

41

## 7. Indemnification Provisions in New Organizational Documents

As of the Effective Date, the New Organizational Documents of each Reorganized Debtor shall, to the fullest extent permitted by applicable law, provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, current and former managers, directors, officers, employees, or agents at least to the same extent as the certificate of incorporation, bylaws, or similar organizational document of each of the respective Debtors on the Petition Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted.

## 8. Directors and Officers of the Reorganized Debtors

As of the Effective Date, the term of the current members of the board of directors of Wave shall expire, and all of the directors for the initial term of the New Board shall be appointed in accordance with the terms herein and the terms to be provided in the Plan Supplement. The GUC Board Representative shall remain on the New Board until fifty-one percent (51%) of the principal amount outstanding under the GUC Note as of the Effective Date has been paid. For the avoidance of doubt, the New Board shall be appointed in compliance with section 1129(a)(5) of the Bankruptcy Code. The identity of the members of the New Board will be disclosed in the Plan Supplement or prior to Confirmation, consistent with section 1129(a)(5) of the Bankruptcy Code. If the GUC Board Representative is not the same person as the Liquidating Trustee, the GUC Board Representative may share with the Liquidating Trustee all documents and information received in his or her capacity as the GUC Board Representative.

## 9. Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, File, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

## 10. Director and Officer Liability Insurance

The Reorganized Debtors shall obtain new director and officer liability insurance policies to cover the New Board effective as of the Effective Date.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any "tail" D&O Liability Insurance Policies covering the Debtors' current boards of directors in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and, subject to the terms of the applicable D&O Liability Insurance Policies, all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

42

### 11. Employee and Retiree Benefits

Unless otherwise provided herein, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### 12. Closing the Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases, provided, as of the Effective Date, the Reorganized Debtors may submit separate orders to the Bankruptcy Court under certification of counsel previously provided to the U.S. Trustee closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly, provided further that matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed. Nothing in this Plan shall authorize the closing of any case effective as of a date that precedes the date any such order is entered. Any request for such relief shall be made on motion served on the U.S. Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing. Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

### F. Asset Sale Distribution

If the Asset Sale Distribution is elected, the following provisions shall govern.

### 1. Asset Sale

In the event of an Asset Sale, and upon entry of the Sale Order, the Debtors shall be authorized to consummate the applicable Asset Sale to the applicable Purchaser pursuant to the terms of the applicable Purchase and Sale Agreement, the Sale Order, the Plan, and the Confirmation Order. The Sale Proceeds and any reserves required pursuant to the Purchase and Sale Agreement (including any documents contemplated to be executed or delivered by the Debtors or the Purchaser under the Purchase and Sale Agreement), the Debtors' rights under the Purchase and Sale Agreement, payments made directly by the Purchaser on account of any Assumed Purchaser Obligations under the Purchase and Sale Agreement, and payments of Cures made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided herein. Unless otherwise agreed in writing by the Debtors and the Purchaser, distributions required by this Plan on account of Allowed Claims that are Assumed Purchaser Obligations shall be paid by the Purchaser to the extent such Claim is Allowed against the Debtors.

43

## 2. Vesting of Assets in the Wind-Down Debtors

Except as otherwise provided in this Plan, the Confirmation Order, the Purchase and Sale Agreement, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in this Plan or the Plan Supplement, on the Effective Date, the assets of the Debtors remaining after effectuating the Asset Sales shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided for in this Plan, the DIP Orders, the Purchase and Sale Agreement, or the Sale Order, each Wind-Down Debtor may operate its business and use, acquire, or dispose of property in accordance with the Wind-Down Budget, and compromise or settle any Claims, Interests, or Causes of Action (other than the Causes of Action transferred to the Liquidating Trust).

## 3. Sources of Plan Distributions

The Wind-Down Debtors will fund distributions under this Plan with (i) Cash on hand on the Effective Date, (ii) the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not transferred to the Liquidating Trust and not settled, released, discharged, enjoined, or exculpated under this Plan or otherwise on or prior to the Effective Date and (iii) proceeds, if any, distributed to the Wind-Down Debtors by the Liquidating Trustee.

Notwithstanding anything to the contrary in this Plan or in the Purchase and Sale Agreement, on the Effective Date, any Cause of Action (i) not settled, released, discharged, enjoined, or exculpated under this Plan on or prior to the Effective Date or (ii) not transferred to the Liquidating Trust shall vest in the Wind-Down Debtors and shall be subject to administration by the Plan Administrator.

## 4. Wind-Down Debtors

On and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of (i) winding down the Debtors' business and affairs as expeditiously as reasonably possible in accordance with the Wind-Down Budget and Wind-Down Milestones, (ii) resolving Disputed Claims (other than, if Disputed and not previously resolved, the Tallwood Claims) (iii) making distributions on account of Allowed Claims as provided hereunder, (iv) funding distributions in accordance with the Wind-Down Budget, (v) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action (other than the Causes of Action transferred to the Liquidating Trust) on the Schedule of Retained Causes of Action in an efficacious manner, (vi) filing appropriate tax returns, (vii) complying with their continuing obligations under the Purchase and Sale Agreement, if any, and the DIP Orders (as applicable), and (viii) administering this Plan in an efficacious manner. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, (ii) DIP Orders (as applicable), and (iii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

## 5. Plan Administrator

On and after the Effective Date, the Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, officers, or other such

44

similar governing body, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by this Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers, officers, directors, sale director, or other such similar governing body of the Wind-Down Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors, and shall succeed to the powers of the Wind-Down Debtors' managers, directors, officers, and other Governing Bodies. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors. The foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchaser. The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget.

**6.      Dissolution and Governing Bodies of the Debtors**

As of the Effective Date, the current board shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, members, or Governing Bodies, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, managers, or other such similar governing body, as applicable, of the Debtors, or the members of any Debtor. Subject in all respects to the terms of this Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, and other such similar governing body, as applicable, of the Debtors with respect to their affairs. Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (i) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of its state of formation; and (ii) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule.

**7.      Release of Liens**

Except as otherwise expressly provided herein or in the Confirmation Order, on the Effective Date, all Liens on any property of any Debtors or the Wind-Down Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors or the Wind-Down Debtors shall be automatically discharged and released; <u>provided</u> that notwithstanding anything to the contrary set forth in this Plan, subject to the funding of the

45

Professional Fee Escrow Account, (i) all Liens of the DIP Agent, DIP Lenders, and (subject to Section III.C) Tallwood on any property of any Debtors or the Wind-Down Debtors shall remain valid, binding, and in full effect on and after the Effective Date, (ii) all property of the Debtors and Wind-Down Debtors shall remain subject to the Liens and claims of the DIP Agent, DIP Lenders, and (subject to Section III.C) Tallwood and shall continue to secure all Obligations (as defined in the DIP Note and Prepetition Note, as applicable) owing to the DIP Agent, DIP Lenders, and (subject to Section III.C) Tallwood, (iii) all guarantees of any Debtors or the Wind-Down Debtors in favor of the DIP Agent, DIP Lenders, and (subject to the immediately following paragraph) Tallwood shall be reaffirmed and remain in full force and effect, and (iv) the proceeds of sales of any collateral of the Wind-Down Debtors securing the DIP Claims and (subject to Section III.C) Tallwood Claims shall remain subject to the Liens and claims of the DIP Agent, DIP Lenders, and (subject to Section III.C) Tallwood, as applicable, to the same extent as such Liens and claims were enforceable against the Debtors and the Debtors' assets, in each case of clauses (i)-(iv) of this Section IV.F.7 until the DIP Agent, DIP Lenders, and (subject to Section III.C) Tallwood receive their distributions or other treatment in accordance with Section II.B and Section III.B.

### 8. Corporate Action

Upon the Effective Date, all actions contemplated under this Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including: (i) consummation of the Asset Sale; and (ii) all other actions contemplated under this Plan (whether to occur before, on, or after the Effective Date). All matters provided for in this Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with this Plan or the corporate structure of the Debtors or Wind-Down Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the equity holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Wind-Down Debtors. The authorizations and approvals contemplated by this Section IV.F.8 shall be effective notwithstanding any requirements under non-bankruptcy law.

### 9. Effectuating Documents; Further Transactions

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Wind-Down Debtors, the Plan Administrator, and the officers and members thereof are, authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of this Plan such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to this Plan.

### 10. Preservation of Causes of Action

Unless any Cause of Action against a Person or Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Final Order, in accordance with section

46

1123(b) of the Bankruptcy Code, the Debtors shall convey to the Plan Administrator all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action not transferred to the Liquidating Trust, whether arising before or after the Petition Date, which shall vest in the Plan Administrator pursuant to the terms of this Plan. The Plan Administrator may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action not transferred to the Liquidating Trust, whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Plan Administrator may, in its reasonable business judgment, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Plan Administrator deems appropriate, including on a contingency fee basis. **No Person or Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against it. The Debtors and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action not transferred to the Liquidating Trust against any Person or Entity, except as otherwise expressly provided in this Plan; provided that the Wind-Down Debtors, in consultation with the Plan Administrator after the Effective Date, may prosecute any such Cause of Action against any party only in connection with their objection to and resolution of any Claim asserted by such party.** Unless any Cause of Action against a Person or Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Final Order, the Plan Administrator expressly reserves all Causes of Action not transferred to the Liquidating Trust for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court.

## 11.    Closing the Chapter 11 Cases

The Wind-Down Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; provided that, as of the Effective Date, the Wind-Down Debtors may submit separate orders to the Bankruptcy Court under certification of counsel previously provided to the U.S. Trustee closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly, provided further that matters concerning Claims may be heard and adjudicated in one of the Debtors' chapter 11 cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed. Nothing in this Plan shall authorize the closing of any case effective as of a date that precedes the date any such order is entered. Any request for such relief shall be made on motion served on the U.S. Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing. Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Wind-Down Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with this Plan, the Plan Administrator shall seek authority from the

47

Bankruptcy Court to close the Chapter 11 Case of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### G. Liquidating Trust

#### 1. Appointment of Liquidating Trustee

Upon the Effective Date, the Liquidating Trust, which shall be a Delaware liquidating trust, shall be established pursuant to the Liquidating Trust Agreement. The initial Liquidating Trustee shall be appointed by the Committee, in consultation with the Debtors and Tallwood. The appointment of the Liquidating Trustee shall be approved in the Confirmation Order, and the Liquidating Trustee's duties shall commence as of the Effective Date. The Liquidating Trustee shall administer the Liquidating Trust and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of (i) enforcing Causes of Action belonging to the Estates and (ii) if the Restructuring occurs, holding the GUC Note.

In accordance with the Liquidating Trust Agreement, the Liquidating Trustee shall serve in such capacity through the earlier of (i) the date that the Liquidating Trust is dissolved in accordance with Section IV.G.9; and (ii) the date such Liquidating Trustee resigns, is terminated, or is otherwise unable to serve; provided, however, that, if the Liquidating Trustee resigns, is terminated, or is otherwise unable to serve, the Liquidating Trust Advisory Board shall appoint a successor to serve as the Liquidating Trustee in accordance with the Liquidating Trust Agreement. If the Liquidating Trust Advisory Board does not appoint a successor within the time periods specified in the Liquidating Trust Agreement, then the Court, upon the motion of any party-in-interest, including counsel to the Liquidating Trust, shall approve a successor to serve as the Liquidating Trustee. Any such successor Liquidating Trustee shall serve in such capacity until the Liquidating Trust is dissolved.

#### 2. Establishment of the Liquidating Trust

Upon the Effective Date, if the Restructuring occurs, (i) the GUC Note; and (ii) subject to the releases and exculpations set forth herein (including the Debtor Release and the Third Party Release), each of the Causes of Action (other than the right to object to or otherwise contest Claims or Interests as described below) and Avoidance Actions that are not released or waived pursuant to this Plan shall automatically vest in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries. On the Effective Date, standing to commence, prosecute and compromise all Causes of Actions (other than the right to object to or otherwise contest Claims or Interests as described below) and Avoidance Actions vesting in the Estates shall transfer to the Liquidating Trustee and/or the Liquidating Trust free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in this Plan or the Confirmation Order. If the Restructuring occurs, the primary right to object to or otherwise contest Claims or Interests shall be retained by the Reorganized Debtors, except as otherwise agreed between the Reorganized Debtors and the Liquidating Trustee in writing in accordance with Section XIII.G. If the Reorganized Debtors do not object to or otherwise contest a Claim, the Liquidating Trust shall have standing and the right to file and prosecute such a Claim objection, and in all circumstances, the Liquidating Trust shall have the right to join in any claim objection filed by or pursued by the Reorganized Debtors.

Upon the Effective Date, if the Asset Sale Distribution is elected, each of the Causes of Action (including, if not previously compromised, the right to object to or contest the Tallwood Claims, but

48

excluding the right to object to or otherwise contest Claims or Interests as described below) and Avoidance Actions that are not released or waived pursuant to this Plan shall automatically vest in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries. On the Effective Date, standing to commence, prosecute and compromise all Causes of Actions (including, if not previously compromised, the right to object to or contest the Tallwood Claims, but excluding the right to object to or otherwise contest Claims or Interests as described below) and Avoidance Actions vesting in the Estates shall transfer to the Liquidating Trustee and/or the Liquidating Trust free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in this Plan or the Confirmation Order. If the Asset Sale Distribution is elected, all rights to object to or otherwise contest Claims or Interests (other than, if not previously compromised, the right to object to or contest the Tallwood Claims) shall be transferred to, and shall vest in, the Wind-Down Debtors, except as otherwise agreed between the Wind-Down Debtors and the Liquidating Trustee in writing in accordance with Section XIII.G. If the Wind-Down Debtors do not object to or otherwise contest a Claim, the Liquidating Trust shall have standing and the right to file and prosecute such a Claim objection, and in all circumstances, the Liquidating Trust shall have the right to join in any claim objection filed by or pursued by the Wind-Down Debtors.

### 3. Liquidating Trust Advisory Board

The Liquidating Trust Advisory Board shall consist of three (3) members.

If the Restructuring occurs, until the GUC Note has been indefeasibly paid in full in Cash, all members of the Liquidating Trust Advisory Board shall be Holders of Allowed General Unsecured Claims, with the initial members selected by the Committee. After the GUC Note has been indefeasibly paid in full in Cash, if the Liquidating Trust retains any assets, the Liquidating Trust Advisory Board shall consist of: (i) a representative appointed by a majority in value of Holders of Allowed General Unsecured Claims; (ii) a representative appointed by Tallwood; and (iii) a representative appointed by a majority of the Holders of Interests in Reorganized Wave. After all of the Allowed General Unsecured Claims have been indefeasibly paid in full in Cash, the representative appointed by the Holders of Allowed General Unsecured Claims shall resign and be replaced by a representative appointed by Tallwood.

If the Asset Sale Distribution is elected, until all Allowed General Unsecured Claims have been indefeasibly paid in full in Cash, all members of the Liquidating Trust Advisory Board shall be Holders of Allowed General Unsecured Claims, with the initial members selected by the Committee. After all Allowed General Unsecured Claims have been indefeasibly paid in full in Cash, the members of the Liquidating Trust Advisory Board shall be selected by the Plan Administrator.

### 4. Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX hereof, the Liquidating Trust shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, other than those (i) released pursuant to this Plan, (ii) if the Restructuring occurs, retained by the Reorganized Debtors and (iii) if the Asset Sale Distribution is elected, transferred to the Wind-Down Debtors, whether arising before or after the Petition Date, and the Liquidating Trust's right to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in this Plan.

49

The Liquidating Trust may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Liquidating Trust Beneficiaries. **No Person or Entity (other than the Released Parties) may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Liquidating Trust will not pursue any and all available Causes of Action of the Debtors against it. The Liquidating Trust expressly reserves all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in this Plan. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against the Liquidating Trust, without the need for any objection or responsive pleading by the Liquidating Trust or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Liquidating Trust may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Liquidating Trust and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against a Person or Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan (including in Article IX hereof) or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation.

The Liquidating Trust reserves and retains such Causes of Action of the Estates notwithstanding the rejection or repudiation of any Executory Contract during these Chapter 11 Cases or pursuant to this Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall automatically vest in the Liquidating Trust upon Confirmation, except as otherwise expressly provided in this Plan. The Liquidating Trust, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Liquidating Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court, although the Liquidating Trustee may seek Bankruptcy Court approval of any settlement or compromise of such Causes of Action.

### 5. Preservation of Privileges of the Estates and Debtors

On the Effective Date, the Debtors shall be deemed to have transferred and assigned to the Liquidating Trust all of their respective rights, titles, and interests in any privilege or immunity of the Debtors' Estates with respect to the Causes of Action (other than any Causes of Action retained by the Reorganized Debtors, if the Restructuring occurs, or transferred to the Wind-Down Debtors, if the Asset Sale Distribution is elected) or Avoidance Actions, including the attorney-client privilege and the work product privilege (collectively, the "Privileges"), which Privileges shall automatically vest in the Liquidating Trust. The Liquidating Trustee shall be vested with the sole power and authority to waive or assert such Privileges for the sole benefit of the Liquidating Trust. In addition, on the

50

Effective Date, the Debtors or Reorganized Debtors, as applicable, shall provide the Liquidating Trust with reasonable access to the books and records of the Debtors or Reorganized Debtors concerning the Causes of Action or Avoidance Actions. The Released Parties shall use commercially reasonable efforts to cooperate with the Liquidating Trustee with respect to any litigation brought by or against the Liquidating Trust; provided that the Liquidating Trust will reimburse the Released Parties for reasonable and documented out-of-pocket expenses (which shall not include fees or expenses of counsel) incurred in connection with such cooperation. Without limitation, the Debtors' Professionals shall deliver any books and records of the Debtors or other materials (including any documents or materials of the Debtors that may be subject to any Privileges) that may be relevant to the Causes of Action or Avoidance Actions and that are in the respective possession, custody or control of any such Debtors' Professionals.

### 6. Funding of the Liquidating Trust

If the Restructuring occurs, the Liquidating Trustee shall, with the consent of the Liquidating Trust Advisory Board, be entitled to use the $1 million initial pre-payment on the GUC Note and up to $2 million of the quarterly GUC Note payments (i.e., a total of up to $3 million of GUC Note proceeds) as an advance against Liquidating Trust Expenses (the "Restructuring Liquidating Trust Expense Advance"). The proceeds of the Liquidating Trust Assets realized by the Liquidating Trust shall be used to repay the Restructuring Liquidating Trust Expense Advance to Holders of Allowed General Unsecured Claims on a Pro Rata basis until the Sale Proceeds Liquidating Trust Expense Advance has been repaid in full. Until the Restructuring Liquidating Trust Expense Advance has been repaid in full, no proceeds of the Liquidating Trust Assets realized by the Liquidating Trust shall not be used to repay, or deemed to repay, any portion of the GUC Note (other than the Liquidating Trust Expense Advance) or the Excess General Unsecured Claim Amount.

If the Asset Sale Distribution is elected, after satisfaction of the Allowed General Administrative Expense Claims, the Allowed DIP Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, the Allowed Other Priority Claims, the Allowed Other Secured Claims, and the Allowed *De Minimis* Unsecured Claims from the Sale Proceeds, up to $3 million of the Sale Proceeds that would otherwise be paid to Holders of Allowed General Unsecured Claims may be transferred to the Liquidating Trust as an advance against Liquidating Trust Expenses (the "Sale Proceeds Liquidating Trust Expense Advance"). The Liquidating Trust Advisory Board shall determine the amount, not to exceed $3 million, of the Sale Proceeds Liquidating Trust Expense Advance. The Sale Proceeds Liquidating Trust Expense Advance shall be deemed to be a payment on account of the Claims of the Holders of Allowed General Unsecured Claims on a Pro Rata basis, which such Holders of Allowed General Unsecured Claims are then advancing to the Liquidating Trust. The proceeds of the Liquidating Trust Assets realized by the Liquidating Trust shall be used to repay the Sale Proceeds Liquidating Trust Expense Advance to Holders of Allowed General Unsecured Claims on a Pro Rata basis until the Sale Proceeds Liquidating Trust Expense Advance has been repaid in full.

### 7. Order of Distribution of Liquidating Trust Assets

If the Restructuring occurs, until the GUC Note and the Excess General Unsecured Amount have been paid in full in Cash, with interest thereon at the applicable rate, the Liquidating Trust Assets shall be distributed in the following order: (i) first, to pay the Liquidating Trust Expenses; and (ii) second, of the remaining Liquidating Trust Assets, (a) fifty percent (50%) shall be used to pay the

51

Excess General Unsecured Claim Amount, and (b) fifty percent (50%) shall be used to pay the GUC Note; provided that, if the Excess General Unsecured Claim Amount has been paid in full in Cash, but the GUC Note has not been repaid in full in Cash (or vice versa), one hundred percent (100%) shall be used to pay the Excess General Unsecured Claim Amount or the GUC Note, as applicable, until all Allowed General Unsecured Claims have been paid in full in Cash. After the GUC Note and the Excess General Unsecured Claim Amount have been repaid in full in Cash, any remaining Liquidated Trust Assets shall be distributed in the following order: (i) first, to pay the Liquidating Trust Expenses; and (ii) second, to the Holders of Allowed Tallwood Claims on a Pro Rata basis.

If the Asset Sale Distribution is elected, the Liquidating Trust Assets shall be distributed in the following order: (i) first, to pay the Liquidating Trust Expenses; (ii) second, to pay Allowed General Unsecured Claims, until all Allowed General Unsecured Claims have been repaid in full in Cash, with interest at the Federal Judgment Rate; and (iii) third, to the Plan Administrator, to make Plan Distributions in accordance with Article III.

### 8. Treatment of Liquidating Trust for Federal Income Tax Purposes; No Successor-in-Interest

The Liquidating Trust shall be established for the sole purpose of distributing the assets of the Liquidating Trust, and proceeds therefrom, in accordance with Treasury Regulation section 301.7701-4(d) and Revenue Procedure 94-45, with no objective to continue or engage in the conduct of a trade or business, and are intended to qualify as a liquidating trust for U.S. federal income tax purposes. The Liquidating Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the Liquidating Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Liquidating Trustee expressly for such purpose.

### 9. Termination of the Liquidating Trust

The Liquidating Trust will terminate as soon as practicable after full performance of all duties and functions as set forth in the Liquidating Trust Agreement and the Plan, but in no event later than the fifth (5th) anniversary of the Effective Date. Notwithstanding the foregoing, multiple fixed-term extensions can be obtained so long as Bankruptcy Court approval is obtained within six (6) months before the expiration of the term of the Liquidating Trust and each extended term; provided that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust within the meaning of Section 301.7701-4(d) of the Treasury Regulations for federal income tax purposes. After (i) the final distributions pursuant to this Plan; (ii) the filing by or on behalf of the Liquidating Trust of a certification of dissolution with the Bankruptcy Court; and (iii) any other action

52

deemed appropriate by the Liquidating Trustee, the Liquidating Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

# ARTICLE V
# TREATMENT OF EXECUTORY CONTRACTS

## A. Assumption of Executory Contracts[5]

If the Asset Sale Distribution is elected, on the Effective Date, except as otherwise provided herein or in the Confirmation Order, each Executory Contract that is not assumed or assigned pursuant to the Purchase and Sale Agreement or Sale Order shall be deemed automatically rejected.

If the Restructuring occurs, on the Effective Date, except as otherwise provided in Section V.H.1 and elsewhere herein, all Executory Contracts not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (i) are identified on the Rejected Executory Contracts Schedule; (ii) previously expired or terminated pursuant to their own terms; (iii) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (iv) are the subject of a motion to reject that is pending on the Effective Date; or (v) have an ordered or requested effective date of rejection that is after the Effective Date.

Such automatic assumption or rejection, as applicable, shall be effective without the need for any further notice to or action, order, or approval of the Bankruptcy Court, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than any Executory Contracts that: (i) have been previously assumed, assumed and assigned, or rejected pursuant to a Bankruptcy Court order; (ii) are the subject of a motion to assume, assume and assign, or reject such Executory Contract (or of a Filed objection with respect to the proposed assumption, assumption and assignment, or rejection of such Executory Contract) that is pending on the Effective Date; or (iii) are a contract, release, or other agreement or document entered into in connection with the Plan. The assumption or rejection of Executory Contracts hereunder may include the assignment of certain of such contracts to Affiliates. Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts as set forth in this Plan or the Rejected Executory Contracts Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts pursuant to this Plan are effective as of the Effective Date. Each Executory Contract assumed pursuant to this Plan or by Final Order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any Final Order authorizing and providing for its assumption. Any motions to assume Executory Contracts pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract assumed or assumed and assigned pursuant to this Plan restricts or prevents, or purports to

---

[5] The Debtors were not counterparties to any Unexpired Leases as of the Petition Date; therefore, provisions regarding the treatment of Executory Contracts contemplated herein do not account for treatment of any Unexpired Leases.

53

restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in this Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contracts Schedule at any time up to thirty (30) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is consistent with this Plan.

## B. Claims Based on Rejection of Executory Contracts

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts, pursuant to this Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court by the applicable counterparty listed on the Executory Contract Rejection Schedule within thirty (30) days after the later of (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (ii) the effective date of such rejection, or (iii) the Effective Date. The Debtors, Reorganized Debtors, Wind-Down Debtors, or Liquidating Trustee, as applicable, shall have twenty-one (21) days after the date of which such Proof of Claim is filed to object to the Proof of Claim. If such objection is timely filed by the Debtors, Reorganized Debtors, Wind-Down Debtors, or Liquidating Trustee, as applicable, such Proof of Claim shall be adjudicated in accordance with the procedures set forth in Article VIII. The Debtors or Reorganized Debtors, as applicable, shall retain the right to modify, amend, or supplement the Executory Contract Rejection Schedule for up to fourteen (14) days after the adjudication of the disputed Proof of Claim; provided that the right to settle, litigate, or otherwise seek resolution of such disputes shall vest in the Liquidating Trust on the Effective Date.

**Any Claims arising from the rejection of an Executory Contract not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts shall be classified as *De Minimis* Unsecured Claims or General Unsecured Claims, as applicable, and shall be treated in accordance with Section III.B.4 or Section III.B.5, as applicable.

## C. Cure of Defaults for Assumed Executory Contracts

No later than seven (7) calendar days before the Confirmation Hearing,[6] the Debtors shall provide Cure Notices to the counterparties to the agreements proposed to be assumed pursuant to this Plan, which shall include a description of the procedures for objecting to the proposed Cure amounts or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder"

---

[6] Notwithstanding anything herein to the contrary, in the event that any Executory Contract is removed from the Rejected Executory Contracts Schedule and thereby assumed after the expiration of such seven-day deadline, a Cure Notice with respect to such Executory Contracts will be sent promptly to the counterparty thereof.

54

(within the meaning of section 365 of the Bankruptcy Code). Unless otherwise agreed in writing by the parties in the applicable Executory Contract, any objection by a counterparty to an Executory Contract to a proposed assumption or related Cure must be Filed and served on counsel to the Debtor no later than fourteen (14) days after the Filing of the respective Cure Notice.

If the Asset Sale Distribution is elected, any unresolved objection shall be heard at the Sale Hearing, unless otherwise agreed by the parties. If the Restructuring occurs, any unresolved objection to a proposed Cure that cannot be consensually resolved or settled within five (5) days of the Filing of such objection may be adjudicated by the Bankruptcy Court at the Debtors' first omnibus setting following the Filing of the objection, or at such other time as such matters are brought before the Bankruptcy Court. Once any such dispute is adjudicated, the Debtors or Reorganized Debtors, as applicable, shall retain the right to file subsequent Cure Notices and/or modify, amend, or supplement the Cure Notices and the Executory Contract Rejection Schedule for up to fourteen (14) days after the adjudication of such dispute; provided, that the right to settle, litigate, or otherwise seek resolution of all such disputes shall vest in the Liquidating Trust on the Effective Date.

Any counterparty to an Executory Contract that fails to object timely to the proposed assumption or Cure will be deemed to have assented to such assumption and Cure, and any untimely objection shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor or the Wind-Down Debtor, as applicable, without the need for any objection by the Reorganized Debtors or Wind-Down Debtor, as applicable, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.

Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; provided that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure amount. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors or the Reorganized Debtors, as applicable, shall pay undisputed Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts may agree. For the avoidance of doubt, if there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the applicable Cure amount shall occur at the later of (i) the Effective Date or (ii) fourteen (14) days after entry of a Final Order resolving such dispute, or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract.

Assumption of any Executory Contract pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged as of the later of (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption; (ii) the effective date of such**

55

**assumption; or (iii) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

### D. Preexisting Obligations to the Debtors under Executory Contracts

Rejection of any Executory Contract pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts.

### E. Insurance Policies

Notwithstanding anything to the contrary in the Definitive Documentation, the Plan Supplement, any other document related to any of the foregoing, or any other order of the Bankruptcy Court, each of the Debtors' Insurance Contracts shall be treated as Executory Contracts under this Plan.

In the event of an Asset Sale Distribution, unless otherwise provided in this Plan and except for the D&O Liability Insurance Policies, on the Effective Date, the Debtors shall be deemed to have rejected all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

In the event of a Restructuring, unless otherwise provided in this Plan, on the Effective Date, on and after the Effective Date (i) the Debtors and Reorganized Debtors jointly and severally shall be deemed to have assumed the Insurance Contracts pursuant to sections 105 and 365 of the Bankruptcy Code; (ii) nothing shall alter, amend or otherwise modify the terms and conditions of the Insurance Contracts except that, on and after the Effective Date, the Reorganized Debtors shall become and remain jointly and severally liable in full for all of their and the Debtors' obligations under the Insurance Contracts, regardless of whether such obligations arise before or after the Effective Date, without the requirement or need for any Insurer to file a Proof of Claim or an Administrative Expense Claim, or to object to any Cure; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunction set forth in Section IX.F hereof, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (a) claimants with valid workers' compensation claims or with valid direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (b) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court: (1) workers' compensation claims; (2) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunction set forth in Section IX.F hereof to proceed with its claim; and (3) all costs in relation to each of the foregoing; and (c) the Insurers to cancel any Insurance Contracts, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Contracts.

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 210 of 276

### F. Reservation of Rights

Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract is in fact an Executory Contract or that any Reorganized Debtors or Wind-Down Debtor has any liability thereunder. If there is a dispute regarding whether a contract is or was executory at the time of assumption or rejection, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

### G. Employee Compensation and Benefits

#### 1. Compensation and Benefit Programs

Subject to the provisions of this Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under this Plan and, only if the Restructuring occurs, be deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for: (i) all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Program that provide for rights to acquire Interests in any of the Debtors; and (ii) all Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract.

Neither the transactions contemplated by this Plan nor any assumption of Compensation and Benefits Programs pursuant to the terms herein shall be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein. On the Effective Date, no counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to this Plan other than those applicable immediately prior to such assumption.

On the Effective Date, pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, the Amended and Restated Incentive Agreement (as defined in the KEIP Order) shall be deemed assumed.

#### 2. Workers' Compensation Programs

As of the Effective Date, except as set forth in the Plan Supplement, if the Restructuring occurs, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (i) all applicable workers' compensation laws in all applicable states; and (ii) the Workers' Compensation Programs. All Proofs of Claims on account of Workers' Compensation Programs shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided that nothing in this Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; and provided further that nothing herein shall be deemed to impose any obligations on the Debtors or the Insurers in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

### H. Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the

57

applicable Debtor, Reorganized Debtor, Wind-Down Debtor, or Purchaser (to the extent assigned to the Purchaser in the event of an Asset Sale) in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

# ARTICLE VI
# PROVISIONS GOVERNING DISTRIBUTIONS

### A. Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the initial Distribution Date (or if a Claim is not an Allowed Claim or Allowed Interest on the initial Distribution Date, on the next Distribution Date after such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), or as soon as is reasonably practicable thereafter, each Holder of an Allowed Claim or Allowed Interests (as applicable) shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VIII. Except as otherwise provided in this Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### B. Disbursing Agent

All Plan Distributions shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors or the Wind-Down Debtors, as applicable.

### C. Rights and Powers of Disbursing Agent

#### 1. Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all Plan Distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

#### 2. Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, to the extent the Disbursing Agent is an Entity other than the Reorganized Debtors or the Wind-Down Debtors, the amount of any reasonable fees and expenses incurred by such Disbursing Agent on or after the Effective Date (including taxes),

58

and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by such Disbursing Agent shall be paid in Cash by the Reorganized Debtors or the Wind-Down Debtors, as applicable.

### D. Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### 1. Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making Plan Distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim, other than one based on a publicly traded security, is transferred twenty (20) or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

#### 2. Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such Plan Distribution; provided however, that the manner of such Plan Distribution shall be determined at the discretion of the Reorganized Debtors or the Wind-Down Debtors, as applicable.

#### 3. Delivery of Distributions on DIP Claims

As soon as practicable following compliance with the requirements set forth in Article VI hereof, the DIP Agent, shall arrange to deliver or direct the delivery of such Plan Distributions to or on behalf of the Holders of Allowed DIP Claims, in accordance with the terms of this Plan. Notwithstanding anything in this Plan to the contrary, and without limiting the exculpation and release provisions of this Plan, the DIP Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the DIP Agent or Disbursing Agent.

#### 4. Minimum Distributions

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to this Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (i) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number; and (ii) fractions of less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

#### 5. Undeliverable Distributions and Unclaimed Property

In the event that any Plan Distribution to any Holder of Allowed Claims is returned as undeliverable, no Plan Distribution to such Holder shall be made unless and until the Disbursing Agent

59

has determined the then-current address of such Holder, at which time such Plan Distribution shall be made to such Holder without interest; provided however, that such Plan Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors or the Wind-Down Debtors, as applicable, automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property or Interest in property shall be discharged and forever barred.

### 6. Surrender of Canceled Instruments or Securities

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or an Interest shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any agreement that governs the rights of the Holder of a Claim or Interest or a trustee or agent under such documents, which shall continue in effect for purposes of allowing Holders to receive Plan Distribution under this Plan and maintaining priority of payment, and to preserve any applicable charging Liens and reimbursement and/or indemnification rights, in each case as set forth in the applicable certificates or instruments. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims or Interests that are Unimpaired under this Plan.

### E. Manner of Payment

All distributions of the New Common Stock or Cash to the Holders of the applicable Allowed Claims or Interests under this Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable; provided that any distributions of Cash to the Liquidating Trust Beneficiaries shall be made by the Liquidating Trustee in accordance with the terms of the Liquidating Trust.

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

### F. Exemption From Registration Requirements

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Stock and (to the extent they are deemed to be a Security) the GUC Note, the Secured Subordinated Note, and/or the Senior Secured Note, as contemplated by Section II.B and Section III.B hereof and applicable, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities. In addition, under section 1145 of the Bankruptcy Code, the New Common Stock (and to the extent they are deemed to be a Security) the GUC Note, the Secured Subordinated Note, and/or the Senior Secured Note will be freely tradable in the U.S. by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (ii) compliance with applicable securities laws and any rules and regulations of the Securities and

60

Exchange Commission, if any, applicable at the time of any future transfer of such Securities; and (iii) the provisions of the New Organizational Documents and the terms of the GUC Note, the Secured Subordinated Note, and/or the Senior Secured Note (as applicable).

### G. Compliance with Tax Requirements

In connection with this Plan, to the extent applicable, the Debtors, Reorganized Debtors or the Wind-Down Debtors, as applicable, the Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Plan Distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

### H. Allocations

Plan Distributions with respect to Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### I. No Postpetition Interest on Claims

Unless otherwise specifically provided for in this Plan, the Confirmation Order, the Final DIP Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Plan Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes and Allowed Claim.

### J. Foreign Currency Exchange Rates

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal*, National Edition, on the Effective Date.

### K. Setoffs and Recoupments

Except as expressly provided in this Plan, each Reorganized Debtor or each Wind-Down Debtor, as applicable, may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights,

61

and Causes of Action that such Reorganized Debtor or Wind-Down Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (i) agreed in amount among the relevant Reorganized Debtor(s) or Wind-Down Debtor(s) and the Holder of the Allowed Claim; or (ii) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; provided, however, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or Wind-Down Debtor, as applicable, or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or Wind-Down Debtor, as applicable, or its successor may possess against the applicable Holder. In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing in accordance with Section XIII.G on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

### L. Claims Paid or Payable by Third Parties

#### 1. Claims Paid by Third Parties

The Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or a Wind-Down Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or a Wind-Down Debtors on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Plan Distribution to the applicable Reorganized Debtor or Wind-Down Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan. The failure of such Holder to timely repay or return such Plan Distribution shall result in the Holder owing the applicable Reorganized Debtor or Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

#### 2. Claims Payable by Third Parties

No Plan Distributions shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Contracts until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract. To the extent that one or more of the Debtors' Insurers agrees to pay in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

62

### 3. Applicability of Insurance Policies

Except as otherwise provided in this Plan, payments to Holders of Claims covered by Insurance Contracts shall be in accordance with the provisions of the applicable Insurance Contract and this Plan. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Contract, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

## ARTICLE VII
## THE PLAN ADMINISTRATOR

For the avoidance of doubt, a Plan Administrator will only be appointed if an Asset Sale Distribution is elected. Therefore, the provisions of this Article VII only apply if an Asset Sale Distribution is elected.

### A. The Plan Administrator

The powers of the Plan Administrator shall include any and all powers and authority to implement this Plan and wind down the business and affairs of the Debtors and the Wind-Down Debtors, including: (i) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors in accordance with the Wind-Down Milestones and Wind-Down Budget; (ii) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under this Plan in accordance with the Wind-Down Budget; (iii) making distributions as contemplated under this Plan; (iv) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (v) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating this Plan to the extent necessary; (vi) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind Down on and after the Effective Date; (vii) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (viii) representing the interests of the Wind-Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (ix) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to this Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of this Plan, in each case of the forgoing clauses, strictly in accordance with the Wind-Down Milestones and Wind-Down Budget.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court; provided that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator in accordance with the Plan Administrator Agreement. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors in the Plan Administrator Agreement shall be terminated.

### 1. Plan Administrator Rights and Powers

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down Milestones and

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 217 of 276

Wind-Down Budget, and as otherwise provided in the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the assets of the Wind-Down Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

### 2. Compensation and Expenses of the Plan Administrator

The Plan Administrator's post Effective Date compensation will be set forth in the Plan Supplement and paid out of the Wind-Down Budget and Plan Administrator Assets.

### 3. Wind-Down Budget

The Debtors shall include in the Plan Supplement a Wind-Down Budget.

### B. Wind Down

On and after the Effective Date, the Plan Administrator will be authorized and directed to implement this Plan and any applicable orders of the Bankruptcy Court in accordance with the Wind-Down Milestones and Wind-Down Budget, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates in accordance with the Wind-Down Milestones and Wind-Down Budget.

As soon as practicable after the Effective Date, the Plan Administrator shall: (i) cause the Debtors and the Wind-Down Debtors, as applicable, to comply with, and abide by, the terms of the Purchase and Sale Agreement and any other documents contemplated thereby; (ii) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (iii) take such other actions in accordance with the Wind-Down Milestones and Wind-Down Budget as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of this Plan. Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders, board of directors or managers, or other such similar governing body of any Debtor. From and after the Effective Date, except with respect to the Wind-Down Debtors as set forth herein, the Debtors (i) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (ii) shall be deemed to have canceled pursuant to this Plan all Interests, and (iii) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

### C. Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors reflecting all tax consequences

64

relating to the activities of the Wind-Down Debtors as attributable to and for the account of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### D. Dissolution of the Wind-Down Debtors

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under this Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the filing of any documents with the secretary of state for the state in which the Wind-Down Debtor is formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable state(s).

### ARTICLE VIII
### PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

### A. Allowance of Claims

Except as otherwise set forth in this Plan, after the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date, including the Causes of Action retained pursuant to Section IV.F.10 or Section IV.G.4, as applicable. Except as specifically provided in this Plan or an order entered by the Bankruptcy Court in the Chapter 11 Cases, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with this Plan.

### B. Claims Administration Responsibilities

Except as otherwise specifically provided in this Plan, after the Effective Date, the Reorganized Debtors, the Liquidating Trustee, or the Wind-Down Debtors, as applicable, may: (i) File, withdraw, or litigate to judgment, objections to Claims; (ii) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### C. Adjustment to Claims without Objection

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors or the Wind-Down Debtors, as applicable, without such Reorganized Debtors or Wind-Down Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

65

### D. Time to File Objections to Claims

Except to the extent Claims are Allowed under the terms of this Plan, any objections to Claims shall be served and Filed by the Claims Objection Deadline. All Claims not objected to by the Claims Objection Deadline shall be deemed Allowed unless such deadline is extended upon approval of the Bankruptcy Court.

### E. Disallowance of Claims or Interests

All Claims of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Liquidating Trustee, as applicable, allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be Disallowed pursuant to section 502(d) of the Bankruptcy Code if: (i) the Entity, on the one hand, and the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Liquidating Trustee, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (ii) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

Except as provided herein or otherwise agreed to by the Reorganized Debtors or the Wind-Down Debtors, as applicable, in their sole discretion, any and all Claims evidenced by Proofs of Claims Filed after the Bar Date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely-Filed by a Final Order.

### F. Amendments to Proofs of Claim

On or after the earlier of (i) the Effective Date or (ii) the Bar Date, a Proof of Claim or Interest may not be Filed or amended without prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Proof of Claim Filed that is not so authorized before it is Filed shall be deemed Disallowed in full without any further action.

### G. No Distributions Pending Allowance

Notwithstanding any other provision of this Plan, if any portion of a Claim is a Disputed Claim, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; provided that if only the Allowed amount of an otherwise valid Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

### H. Distributions after Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such

66

Claim the Plan Distribution to which such Holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim.

## ARTICLE IX
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A.  Discharge of Claims and Termination of Interests

In the event of a Restructuring, pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan (including with respect to Reinstated Claims and Postpetition Drawbridge Lease Claims), the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted this Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date. Notwithstanding anything to the contrary in the foregoing, this Section IX.A shall not apply or be construed to release, discharge or otherwise waive any Postpetition Drawbridge Lease Claims.  Such Postpetition Drawbridge Lease Claims, if any, shall survive and remain unaffected by entry of the Confirmation Order, as set forth in Section V.H.

### B.  Release of Liens

**Except as otherwise provided in this Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate with respect to which the applicable counterparty has agreed to Reinstatement in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors or the Wind-Down Debtors, as applicable, and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized**

67

Debtors or the Wind-Down Debtors, as applicable, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors or the Wind-Down Debtors, as applicable, to evidence the release of such Lien, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Reorganized Debtors, as applicable, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

Notwithstanding any of the foregoing, the Debtors reserve the right to leave in place mortgages and security interests of the DIP Agent for the benefit of the Exit Lender pursuant to terms set forth in the Confirmation Order.

### C. Releases by the Debtors

Except as provided for in this Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates (and any Entity seeking to exercise rights of the Estates) from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors or the Wind-Down Debtors, as applicable, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the reorganization contemplated by this Plan, the Prepetition Note, the DIP Facility, the Exit Facility, the Purchase and Sale Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the DIP Facility, this Plan, the pursuit of Confirmation, the pursuit of Consummation, the Exit Facility, the Purchase and Sale Agreement, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection thereto, including the issuance or distribution of securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release obligations of any party or Entity under this Plan, or any document, instrument, or agreement executed to implement this Plan.

68

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release set forth in this Section IX.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the restructuring and implementing this Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and their Estates; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors or the Wind-Down Debtors, as applicable, or the Debtors' Estates (and any Entity seeking to exercise rights of the Estates) asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

### D. Consensual Releases by the Releasing Parties

**Except as provided for in this Plan or the Confirmation Order, as of the Effective Date, for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Person or Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the reorganization contemplated by this Plan, the Prepetition Note, the DIP Facility, the Exit Facility, the Purchase and Sale Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the DIP Facility, this Plan, the pursuit of Confirmation, the pursuit of Consummation, the Exit Facility, the Purchase and Sale Agreement, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection thereto, including the issuance or distribution of securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release obligations of any Person or Entity under this Plan, or any document, instrument, or agreement executed to implement this Plan. Ker Zhang and Arthur Swift shall not be Released Parties; provided, however, that, if the Restructuring occurs, the Debtors, the Reorganized Debtors, and their Estates (and any Entity seeking to exercise rights of the Estates, including the Liquidating Trustee and/or Liquidating Trust) shall not execute upon their personal assets, and, instead, shall only seek any recovery from available insurance policies, if any. Further, and notwithstanding anything to the contrary in the foregoing, the Third Party Release set forth in this Section IX.D shall not apply or be construed to release, discharge or otherwise waive any Postpetition Drawbridge Lease Claims. Such Postpetition Drawbridge Lease Claims, if any, shall survive and remain unaffected by entry of the Confirmation Order, as set forth in Section V.H.**

69

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release set forth in this Section IX.D, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) consensual; (ii) essential to the confirmation of this Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Third Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.

**E. Exculpation**

Except as provided for in this Plan or the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the DIP Facility, the Exit Facility, the Disclosure Statement, this Plan, or any restructuring transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, the Filing of these Chapter 11 Cases, the pursuit of Confirmation, or the administration and implementation of this Plan, including the issuance of securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence or willful misconduct, but in all respects such Persons or Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth in this Section IX.E shall not apply or be construed to apply to any Postpetition Drawbridge Lease Claims. Such Postpetition Drawbridge Lease Claims, if any, shall survive and remain unaffected by entry of the Confirmation Order, as set forth in Section V.H.

The Exculpated Parties and parties covered by section 1125(e) of the Bankruptcy Code have, and upon Consummation of this Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan. Each of the Exculpated Parties and parties covered by section 1125(e) of the Bankruptcy Code shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.

**F. Injunction**

Except as otherwise expressly provided in the Final DIP Order, this Plan, or the Confirmation Order or for obligations issued or required to be paid pursuant to the Final DIP Order, this Plan, or the Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, settled or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the

70

**following actions against, as applicable, the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Liquidating Trust, as applicable, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Persons or Entities or the property or the estates of such Persons or Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment, or other similar legal or equitable right of any kind against any obligation due from such Persons or Entities or against the property of such Persons or Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, discharged, or settled pursuant to this Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this Section IX.F.**

### G. Provision Regarding SEC

Notwithstanding the provisions of this Article IX, nothing in this Plan or the Confirmation Order shall (i) release any entity other than the Debtors from any claim or Cause of Action that may be asserted by the SEC or (ii) enjoin, limit, impair, or delay the SEC from commencing or continuing any claims, Causes of Action, proceedings, or investigations against any entity other than the Debtors in any forum.

### H. Protections Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or the Wind-Down Debtors, as applicable, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or the Wind-Down Debtors, as applicable, or another Entity with whom the Reorganized Debtors or the Wind-Down Debtors, as applicable, have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

71

## I. Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (i) such Claim has been adjudicated as non-contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE X
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THIS PLAN

### A. Conditions Precedent to the Effective Date

The following shall be Conditions Precedent to the Effective Date:

1. The Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, and shall:

    (i) authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the this Plan;

    (ii) decree that the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent;

    (iii) authorize the Debtors, as applicable/necessary, to: (a) implement the restructuring transactions contemplated in this Plan; (b) make all distributions and issuances as required under this Plan, including Cash and the New Common Stock; and (c) enter into any agreements, transactions, and sales of property as set forth in this Plan and Plan Supplement, including the Exit Facility;

    (iv) authorize the implementation of this Plan in accordance with its terms;

    (v) provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under this Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

    (vi) authorize the payment, on or prior to the Effective Date, of all Professional Fee Claims in accordance with the terms of each Professional's engagement letter.

2. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate this Plan;

3. the final versions of the Definitive Documentation, the Plan Supplement, and all of the schedules, documents, annexes, and exhibits contained therein shall have been Filed in a manner

72

consistent in all material respects with this Plan in form and substance reasonably acceptable to the Debtors, in consultation with Tallwood and the Committee;

4. in the event of the Asset Sale Distribution, the conditions to closing of the Purchase and Sale Agreement shall have been satisfied;

5. in the event of the Asset Sale Distribution, the Purchase and Sale Agreement shall have been executed and remain in full force and effect;

6. in the event of the Restructuring, all conditions precedent to the Exit Facility shall have been satisfied or waived in accordance with the Exit Facility Term Sheet and Definitive Documentation to be entered in connection therewith;

7. in the event of the Restructuring, the New Board and Sanjai Kohli shall have agreed in principle to the terms of an employment agreement with Sanjai Kohli, including for payment of a signing bonus from the Reorganized Debtors' general operating funds (including any proceeds of the DIP Facility and Exit Facility), that are reasonably acceptable to Sanjai Kohli and the Reorganized Debtors, in consultation with the Committee, to be entered into with the Reorganized Debtors, approved by the New Board, and become effective post-emergence;

8. all reasonable and documented Professional Fee Claims shall have been paid in full in Cash; and

9. the Debtors shall have implemented the applicable Plan Transaction contemplated herein in a manner consistent with this Plan and pursuant to documentation reasonably acceptable to the Debtors, in consultation with Tallwood and the Committee.

### B. Waiver of Conditions

The Debtors, in consultation with Tallwood and the Committee, may waive any one or more of the Conditions Precedent to the Effective Date, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

### C. Effect of Failure of Conditions

If Consummation does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims by the Debtors, or Claims against, or Interests in, the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

### D. Substantial Consummation

"Substantial Consummation" of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

73

# ARTICLE XI
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

### A. Modifications and Amendments

Except as otherwise specifically provided in this Plan, the Debtors reserve the right to modify this Plan, in consultation with Tallwood and the Committee, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in this Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors, in consultation with Tallwood and the Committee, expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify this Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, or remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan.

### B. Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### C. Revocation or Withdrawal of Plan

The Debtors reserve the right, in consultation with Tallwood and the Committee, to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then: (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

# ARTICLE XII
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(A)      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any

74

request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(B)     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

(C)     resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract that is assumed; (iii) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract is or was executory or expired;

(D)     ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of this Plan;

(E)     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

(F)     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(G)     enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with this Plan or the Disclosure Statement, except to the extent that the Definitive Documentation provide for exclusive jurisdiction and venue in another forum;

(H)     enter and enforce any order for the sale of property pursuant to sections 1123, or 1146(a) of the Bankruptcy Code;

(I)     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

(J)     issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan;

(K)     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article IX hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

75

(L)     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Section VI.L hereof;

(M)     enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(N)     determine any other matters that may arise in connection with or relate to this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan or the Disclosure Statement, except to the extent that any Definitive Documentation provide for exclusive jurisdiction and venue in another forum;

(O)     enter an order concluding or closing the Chapter 11 Cases;

(P)     adjudicate any and all disputes arising from or relating to distributions under this Plan;

(Q)     consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(R)     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

(S)     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan, except to the extent that any Definitive Documentation provide for exclusive jurisdiction and venue in another forum;

(T)     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(U)     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under Article IX hereof;

(V)     enforce all orders previously entered by the Bankruptcy Court; and

(W)     hear any other matter not inconsistent with the Bankruptcy Code.

**As of the Effective Date, notwithstanding anything in this Article XII to the contrary, the New Organizational Documents and the Exit Facility and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.**

76

# ARTICLE XIII
## MISCELLANEOUS PROVISIONS

### A. Immediate Binding Effect

Subject to Section X.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts with the Debtors.

### B. Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving Plan Distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

### C. Payment of Statutory Fees

All fees payable to the U.S. Trustee under 28 U.S.C. § 1930(a)(6) (including interest under 31 U.S.C. § 3717) as of the Confirmation Date will be paid on the Effective Date. Notwithstanding anything to the contrary in the Plan (including, without limitation, Sections I.A.1, I.A.2, I.A.66 and II.A), such fees are not subject to an allowance procedure under 11 U.S.C. § 503(b), nor is the U.S. Trustee required to file a request for payment of such fees.

Following confirmation, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors (as applicable) shall pay quarterly fees to the U.S. Trustee to the extent, and in the amounts, required by 28 U.S.C. § 1930(a)(6) (including interest under 31 U.S.C. § 3717). For the avoidance of doubt, quarterly fees shall be payable for any case that is reopened. So long as the Debtors, the Reorganized Debtors and the Wind-Down Debtors are required to make these payments, the Debtors, the Reorganized Debtors and the Wind-Down Debtors shall file with the Court quarterly reports in the form specified by the U.S. Trustee for that purpose.

### D. Dissolution of the Committee and Cessation of Fee and Expense Payment

On the Effective Date, the Committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; provided, however, that the Committee may continue to have standing for the limited purpose of Filing final fee applications with respect to Professionals retained by the Committee and defending any objections to payment of such Professional Claims. The reasonable fees and expenses incurred by the Professionals retained by the Committee in Filing any final fee applications after the Effective Date shall be paid by the Reorganized Debtors without further order of the Bankruptcy Court; provided that the Reorganized Debtors shall no longer be responsible for paying

77

any other fees or expenses incurred by the members of or Professionals retained by the Committee after the Effective Date.

### E. Reservation of Rights

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### F. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### G. Notices

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Wave Computing, Inc.<br>3201 Scott Blvd<br>Santa Clara, CA 95054<br>Attention: President/CEO | Sidley Austin LLP<br>555 West Fifth Street<br>Los Angeles, CA 90013<br>Attention: Sam Newman, Julia Philips Roth<br><br>Sidley Austin LLP<br>2021 McKinney Avenue<br>Ste 2000, Dallas, TX 75201<br>Attention: Charles Persons, Juliana Hoffman, Jeri Leigh Miller |
| **Counsel to Tallwood** | **Securities and Exchange Commission** |
| Binder & Malter LLP<br>2775 Park Avenue<br>Santa Clara, CA 95050<br>Attention: Robert G Harris | US Securities and Exchange Commission<br>444 South Flower St., Ste 900<br>Los Angeles, CA 90071-9591<br>Attention: Bankruptcy Counsel<br><br>950 East Paces Rd. N.E. Ste 900<br>Atlanta GA 30326-1382<br>Attention: William M Uptegrove |

| United States Trustee | Counsel to the Committee |
|---|---|
| Office of The United States Trustee<br>280 South First St., Room 268<br>San Jose, CA 95113<br>Attention: Jason B. Shorter, Jason Blumberg | Hogan Lovells US LLP<br>1999 Ave of the Stars, Ste 1400<br>Los Angeles, CA 90067<br>Attention: Richard L Wynne, David P Simonds, Edward J McNeilly |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

## H. Term of Injunctions or Stays

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in these Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## I. Entire Agreement

Except as otherwise indicated, this Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

## J. Exhibits and Annexes

All exhibits, annexes, and documents attached hereto or included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits, annexes, and documents are Filed, copies of such exhibits, annexes, and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits, annexes, and documents from the Debtors' restructuring website at https://www.donlinrecano.com/Clients/wave/Index or the Bankruptcy Court's website at www.canb.uscourts.gov. To the extent any exhibit, annex, or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court or otherwise specifically provided for in such exhibit, annex, or document, the non-exhibit, non-annex, or non-document portion of this Plan shall control.

## K. Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding,

79

alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to this Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (iii) nonseverable and mutually dependent.

### L. Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under this Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the securities offered and sold under this Plan and any previous plan.

### M. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of California, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in California shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

### N. Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

### O. Closing of These Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of these Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases. One or more of the Chapter 11 Cases shall remain open until the Liquidating Trust Causes of Action have been fully adjudicated.

[*Remainder of Page Intentionally Left Blank*]

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 234 of 276

Dated: December 1, 2020

Respectfully submitted,
SIDLEY AUSTIN LLP

*/s/ Samuel A. Newman*
Samuel A. Newman
Charles M. Persons

*Attorneys for Debtors and*
*Debtors in Possession*

**EXHIBIT A**

**ORGANIZATIONAL CHART**



# Wave Corporate Entity Structure

**Wave Computing, Inc.**
Delaware, USA

Wave Computing (Private) Limited
Sri Lanka (wind-down process)

AI-Wave Computing, Inc.
Philippines (wind-down process)

**MIPS Tech, Inc.***
*FKA: Tallwood MIPS, Inc*
Delaware, USA

**Hellosoft, Inc.***
Delaware, USA

**Wave Computing (UK) Limited***
*FKA: MIPS Tech Limited*
*FKA: Hellosoft Limited*
UK

**Imagination Technologies, Inc.***
*FKA: Videologic, Inc.*
Delaware, USA

**Caustic Graphics, Inc.***
Delaware, USA

**MIPS Tech, LLC**
*FKA: Imagination Technologies, LLC*
*FKA: MIPS Technologies, Inc.*
Delaware, USA

Sales services

Israel Registration

Taiwan Branch

MIPS Technologies International Ltd.
Cayman Islands

Wave Computing (Shanghai) Co., Ltd.
(WFOE)
(wind-down process)

= Entities under bankruptcy

Entity
Branch
No Activity
*

**EXHIBIT B**

**Amended and Restated**
**Plan Support Agreement**

DocuSign Envelope ID: 6605F019-22E5-4827-92D9-8B1072103FE8

**THIS PLAN SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS PLAN SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE EXECUTION OF THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

*FIRST AMENDED AND RESTATED PLAN SUPPORT AGREEMENT*

This FIRST AMENDED AND RESTATED PLAN SUPPORT AGREEMENT (including all exhibits and schedules attached hereto and incorporated herein, this "**Agreement**") is made and entered into as of November 16, 2020 by and among the following parties:[1]

 i. Wave Computing, Inc., a Delaware corporation ("**Wave**"), and its direct and indirect subsidiaries (MIPS Tech LLC, a Delaware limited liability company ("**MIPS**"); MIPS Tech, Inc., a Delaware corporation; Hellosoft, Inc., a Delaware corporation; Wave Computing (UK) Limited, a United Kingdom limited corporation; Imagination Technologies, Inc., a Delaware corporation; and Caustic Graphics, Inc., a Delaware corporation) (collectively, the "**Debtors**");

 ii. The official statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code in the chapter 11 cases of the Debtors on May 18, 2020 (the "**Committee**");

 iii. Tallwood Technology Partners LLC, a California limited liability company ("**Tallwood**"), and, together with the Committee, in their respective capacities as co-proponents of the Plan (the "**Plan Co-Proponents**");

 iv. Tallwood, in its capacity as the lender (the "**DIP Lender**") under that certain Senior Secured Super-Priority Debtor-In-Possession Promissory Note, dated as of April 27, 2020 (the "**DIP Note**"), pursuant to which the Debtors obtained a debtor-in-possession financing facility (the "**DIP Facility**") from the DIP Lender;

 v. Tallwood, in its capacity as a prepetition lender (the "**Prepetition Note Lender**") pursuant to that certain Secured Promissory Note, dated as of July 5, 2019 (as further amended, restated, or otherwise modified from time to time) (the "**Prepetition Note**");

 vi. those certain holders of preferred stock of Wave that are signatories hereto (the "**Prepetition Ad Hoc Preferred Equityholder Group**" and, collectively with

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the chapter 11 plan of reorganization attached hereto as **Exhibit A-1** (as the same may be amended, supplemented, or otherwise modified from time to time in accordance with this Agreement, the "**Plan**").

DocuSign Envelope ID: 6605F019-22E5-4827-92D9-8B1072103FE8

Tallwood, the DIP Lender, and the Prepetition Note Lender, the "**Specified Supporting Creditors**"); and

vii.    any other creditors that are signatories hereto (together with the Committee, the "**Other Supporting Creditors**" and, together with the Specified Supporting Creditors, the "**Supporting Creditors**" and, collectively, with (i) the Debtors and (ii) any transferee that becomes a Supporting Creditor pursuant to section 4.03, the "**Parties**").

This Agreement amends and restates in its entirety that certain Plan Support Agreement dated as of October 15, 2020, by and among the Debtors and the Specified Supporting Creditors.

## *RECITALS*

**WHEREAS**, on April 27, 2020, the Debtors commenced voluntary reorganization cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**");

**WHEREAS**, the Supporting Creditors and the Debtors have engaged in good faith, arm's-length negotiations regarding a transaction (the "**Restructuring**") in the form of the Plan, to be filed on or around the date hereof; and

**WHEREAS**, the Supporting Creditors and the Debtors have agreed to take certain actions in support of the Restructuring on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## *AGREEMENT*

**Section 1.  *Agreement Effective Date.*** This Agreement is effective and binding as of the date hereof (such date, the "**Agreement Effective Date**").

**Section 2.  *Exhibits Incorporated by Reference.*** Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits.  In the event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, this Agreement (without reference to the exhibits) shall govern.

**Section 3.  *Definitive Documentation.*** The definitive documents and agreements governing the Restructuring (collectively, the "**Definitive Documentation**") shall consist of: (a) the Plan (and all exhibits thereto); (b) the order confirming the Plan (the "**Confirmation Order**") and pleadings in support of entry of the Confirmation Order; (c) the disclosure statement (the "**Disclosure Statement**") and the other solicitation materials in respect of the Plan (such materials, collectively, the "**Solicitation Materials**"); (d) the documentation with respect to the DIP Facility, including the DIP Note, the Interim DIP Order, the Final DIP Order, the DIP Motion, and all other motions,

notices, declarations, orders, stipulations, or other documents related to the DIP Note (collectively, the "**DIP Documentation**"); (f) the documentation with respect to the Senior Secured Note, the Secured Subordinated Note, and the General Unsecured Note; (g) the documentation with respect to the Exit Facility, including the Exit Facility Agreement and any and all other agreements, documents, certificates and instruments delivered or to be entered into in connection therewith (collectively, the "**Exit Facility Documents**"); (g) the certificates of incorporation, limited liability company agreements, bylaws, and other organizational and stockholders agreements and documents (as applicable) of the Reorganized Debtors; and (h) all other documents that will comprise the Plan Supplement(s) or are otherwise related to the Plan. The Definitive Documentation remains subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, and shall be subject to any consent rights set forth in this Agreement and otherwise be in form and substance reasonably acceptable to the Debtors; provided, that, the Exit Facility Documents shall be in form and substance reasonably acceptable to the Debtors and the Plan Co-Proponents and consistent with the Exit Facility Term Sheet attached as an exhibit to the Plan Supplement.

**Section 4.**  *Commitments Regarding the Restructuring*

4.01.  <u>Commitment of the Supporting Creditors</u>.  During the period beginning on the Agreement Effective Date and ending on a Termination Date (as defined in Section 7.06) (such period, the "**Effective Period**"), each Supporting Creditor shall (severally and not jointly), in each of its capacities as a holder of claims against the Debtors, including, without limitation, claims in connection with the DIP Facility ("**Claims**") or interests in the Debtors ("**Interests**" and together with Claims, the "**Debtor Claims/Interests**"):

(i)  negotiate, execute and implement the Definitive Documentation on terms consistent with this Agreement and to implement the Restructuring;

(ii)  to the extent a class is permitted to vote to accept or reject the Plan and upon receipt of the Disclosure Statement that has been approved by the Bankruptcy Court, vote each of its Debtor Claims/Interests reflected on the signature pages hereto to (A) accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis and (B) not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its vote with respect to the Plan;

(iii)  not (A) object to, delay, interfere, impede, or take any other action to delay, interfere or impede, directly or indirectly, with the Restructuring, confirmation of the Plan, or approval of the Disclosure Statement or the Solicitation Materials (including joining in or supporting any efforts to object to or oppose any of the foregoing) or (B) propose, file, support, or vote for, directly or indirectly, any restructuring, workout, plan of arrangement, alternative transaction, including a sale pursuant to section 363 of the Bankruptcy Code, or chapter 11 plan for the Debtors other than the Restructuring and the Plan;

(iv)  not object to any pleadings consistent with this Agreement filed by the Debtors in furtherance of the Restructuring, including any motion seeking approval of the DIP Facility on the terms set forth in the DIP Note;

<div align="center">3</div>

(v)     not, nor encourage any other person or entity to, take any action, including initiating or joining in any legal proceeding that is inconsistent with this Agreement, or delay, impede, appeal, or take any other negative action, directly or indirectly, that could reasonably be expected to interfere with the approval, acceptance, confirmation, consummation, or implementation of the Restructuring or the Plan, as applicable;

(vi)     not exercise any right or remedy for the enforcement, collection, or recovery of any obligation arising under any obligation of any Debtor (including the Prepetition Note and this Agreement subject to further approval and order from the Bankruptcy Court);

(vii)     not instruct (or join in any direction requesting that) any agent under related loan documents to take any action, or refrain from taking any action, that would be inconsistent with this Agreement, the Plan, or the Restructuring;

(viii)     not object to or opt out of any release included in the Solicitation Materials or the Plan;

(ix)     support the Restructuring and all transactions set forth in this Agreement, including confirmation of the Plan and entry of the Confirmation Order; and

(x)     execute and deliver any other required agreements to effectuate and consummate the Restructuring.

4.02.   Commitment of the Debtors.

(a)     During the Effective Period, the Debtors agree to:

(i)     use commercially reasonable efforts to pursue the Restructuring on the terms set forth in this Agreement and the Plan; and

(ii)     use commercially reasonable efforts to (A) support and complete the Restructuring and all transactions set forth in this Agreement, including confirmation of the Plan and entry of the Confirmation Order; (B) negotiate in good faith all Definitive Documentation that is subject to negotiation as of the Agreement Effective Date; (C) execute and deliver any other required agreements to effectuate and consummate the Restructuring; (D) obtain required regulatory and/or third-party approvals for the Restructuring; (E) complete the Restructuring in a timely and expeditious manner, and as otherwise required by this Agreement and the Definitive Documentation; (F) operate their business, subject to the Bankruptcy Court order approving the DIP Facility and the Final DIP Order, in the ordinary course, taking into account the Restructuring and the commencement of the Chapter 11 Cases; and (G) not undertake any actions materially inconsistent with the Restructuring or the adoption and implementation of the Plan and confirmation thereof.

(b)     During the Effective Period, the Debtors also agree to, upon the reasonable request of either of the Plan Co-Proponents, inform the advisors to such requesting Party as to:  (i) the material business and financial (including liquidity) performance of the Debtors; and (ii) the status and progress of the Restructuring, including progress in relation to the negotiations of the Definitive Documentation.

(c)     To the extent of any conflict between this Agreement and any DIP Documentation, this Section 4.02 and each other section in this Agreement shall not be deemed to supersede or modify such DIP Documentation.

4.03.   Transfer of Interests and Securities.

(a)     During the Effective Period, (i) no Supporting Creditor shall directly or indirectly sell, pledge, assign, encumber, or transfer (each, a "**Transfer**") any of the Debtor Claims/Interests without the prior written consent of the Debtors.  Each Supporting Creditor agrees and acknowledges that any Transfer of Debtor Claims/Interests without the prior written consent of the Debtors shall be deemed null and void *ab initio*.

(b)     This Agreement shall in no way be construed to preclude the Supporting Creditors from acquiring additional Debtor Claims/Interests; provided, however, such acquired Debtor Claims/Interests shall automatically and immediately upon acquisition by a Supporting Creditor be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the Debtors).

4.04.   Representations and Warranties of Supporting Creditors. Each Supporting Creditor, severally, and not jointly, represents and warrants to all Parties that:

(a)     it is the exclusive beneficial owner of the face amount or unit amount, as applicable, of the Debtor Claims/Interests, or is the nominee, investment manager, or advisor for beneficial holders of the Debtor Claims/Interests, as reflected in such Supporting Creditor's signature block to this Agreement (each such signature block, a "**Supporting Creditor Signature Block**", and each such amount of Debtor Claims/Interests, the "**Owned Debtor Claims/Interests**");

(b)     it has the exclusive authority to act on behalf of, vote and consent to matters concerning the Owned Debtor Claims/Interests (or direct such action, vote, or consent);

(c)     the Owned Debtor Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Supporting Creditor's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)     (i) it an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act of 1933, as amended (the "**Securities Act**")), and (ii) any securities of the Debtors acquired by the applicable Supporting Creditor in connection with the Restructuring will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

(e)     there is no action, suit or proceeding pending or threatened against such Supporting Creditor or any of such Supporting Creditor's properties or assets (including any of such Supporting Creditor's Owned Debtor Claims/Interests) that would reasonably be expected to prevent, impair or delay the consummation by such Supporting Creditor of the transactions contemplated by this Agreement or otherwise prevent, impair or delay such Supporting Creditor's ability to perform its obligations hereunder;

(f)    it understands and acknowledges that the Debtors may enter into Definitive Documentation in reliance upon such Supporting Creditor's execution, delivery and performance of this Agreement;

(g)    it has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of the Restructuring, has had the opportunity to review the Debtors' books and records and other information requested by it in connection with its evaluation of this Agreement and the Restructuring, and has adequate information concerning the matters that are the subject of this Agreement;

(h)    it understands and agrees that no Debtor is making any representation or warranty to such Supporting Creditor in connection with this Agreement or the Restructuring except as expressly set forth in Section 5, the Debtors disclaim any forward looking statements and/or projections related to this Agreement and the Restructuring, and such Supporting Creditor understands and agrees that the Restructuring may not occur and is subject to material risks and/or changes;

(i)    it has independently and without reliance upon the Debtors, or any officer, employee, agent or representative thereof, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Agreement; and

(j)    it has had the opportunity to be represented and advised by legal counsel in connection with this Agreement and acknowledges and agrees that it voluntarily and of its own choice and not under coercion or duress enters into the Agreement.

**Section 5.**  ***Mutual Representations, Warranties, and Covenants.*** Each of the Parties, severally and not jointly represents, warrants, and covenants to each other Party:

5.01.    Enforceability. It is validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

5.02.    No Consent or Approval. Except as expressly provided in this Agreement, the Plan, or the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring contemplated by, and perform the respective obligations under, this Agreement.

5.03.    Compliance with Laws; No Conflict.  The execution, delivery, and performance of this Agreement does not and shall not: (i) violate any provision of law, rules, or regulations applicable to it or any of its subsidiaries in any material respect; (ii) violate its certificate of incorporation, bylaws, or other organizational documents or those of any of its subsidiaries; or (iii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual obligation to which it is a party, which conflict, breach, or default, would have a material adverse effect on the Restructuring.

DocuSign Envelope ID: 6605F019-22E5-4827-92D9-8B1072103FE8

5.04. <u>Power and Authority</u>. Except as expressly provided in this Agreement, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement.

5.05. <u>Governmental Consents</u>. Except as expressly set forth herein and with respect to the Debtors' performance of this Agreement (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Restructuring), the execution, delivery and performance by it of this Agreement does not, and shall not, require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body.

**Section 6.** *Acknowledgement*. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.

**Section 7.** *Termination Events*.

7.01. <u>Supporting Creditor Termination Events</u>.

(a) *Specified Supporting Creditors Termination Events*. This Agreement may be terminated as between the Specified Supporting Creditors and the other Parties by the delivery to the Debtors, and counsel to the Other Supporting Creditors, of a unanimous written notice in accordance with Section 9.09 hereof by the Specified Supporting Creditors, upon the occurrence and continuation of any of the following events:

(i) any Debtor, as applicable, materially breaches its obligations under this Agreement and such breach has not been cured (if susceptible to cure) within twenty (20) business days after the receipt by the Debtors of written notice of such breach;

(ii) the issuance by any court of competent jurisdiction of any final, non-appealable injunction or order enjoining the consummation of the Restructuring; <u>provided</u>, <u>however</u>, that the Debtors shall have twenty (20) business days after issuance of such injunction, judgment, decree, charge, ruling, or order to obtain relief that would allow consummation of the Restructuring;

(iii) entry of an order by the Bankruptcy Court appointing a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in the Chapter 11 Cases;

(iv) the conversion or dismissal of the Chapter 11 Cases;

(v) the order approving the Disclosure Statement (the "**Disclosure Statement Order**") has not been entered by the Bankruptcy Court within sixty (60) calendar days after the date hereof;

(vi)     the Confirmation Order has not been entered by the Bankruptcy Court within ninety (90) calendar days after the entry of the Disclosure Statement Order; or

(vii)     the effective date of the Plan (the "**Plan Effective Date**") has not occurred within thirty (30) calendar days following the date of entry of the Confirmation Order (together with the milestones set forth in the foregoing clauses (v) to (vi), collectively, the "**Milestones**").

The Supporting Creditor Termination Events and the Milestones may be waived with the written consent of (A) Tallwood; (B) the DIP Lender, (C) the Prepetition Note Lender, and (D) the Required Prepetition Ad Hoc Preferred Equityholders (as defined below).

7.02.    Committee's Termination Events.

(a)     *Committee's Termination Events*. This Agreement may be terminated as between the Committee and the other Parties by the delivery to the Debtors, and to the Specified Supporting Creditors, of a notice in accordance with Section 9.09 hereof by the Committee, upon the occurrence of any of the following events:

(i)     any Debtor, as applicable, materially breaches its obligations under this Agreement and such breach has not been cured (if susceptible to cure) within twenty (20) business days after the receipt by the Debtors of written notice of such breach;

(ii)     the issuance by any court of competent jurisdiction of any final, non-appealable injunction or order enjoining the consummation of the Restructuring; provided, however, that the Debtors shall have twenty (20) business days after issuance of such injunction, judgment, decree, charge, ruling, or order to obtain relief that would allow consummation of the Restructuring;

(iii)     entry of an order by the Bankruptcy Court appointing a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in the Chapter 11 Cases;

(iv)     the conversion or dismissal of the Chapter 11 Cases;

(v)     the Disclosure Statement Order has not been entered by the Bankruptcy Court within sixty (60) calendar days after the date hereof;

(vi)     the Confirmation Order has not been entered by the Bankruptcy Court within ninety (90) calendar days after the entry of the Disclosure Statement Order;

(vii)     the Plan Effective Date has not occurred within thirty (30) calendar days following the date of entry of the Confirmation Order; or

(viii)     the Debtors (a) elect the Asset Sale Distribution, and the Committee reasonably determines in accordance with its fiduciary duties based on the advice of its counsel and financial advisors that the net proceeds to the Debtors of such Asset Sale Distribution are less than the implied value of the Plan or (b) proceed with the Restructuring, and the Committee reasonably determines in accordance with its fiduciary duties based on the advice of its counsel

8

and financial advisors that the implied value of the Plan is less than would be the net proceeds to the Debtors of an Asset Sale Distribution.

7.03. <u>Debtors' Termination Events</u>. The Debtors may terminate this Agreement as to all Parties, delivered in accordance with Section 9.09 hereof, upon the occurrence of any of the following events: (a) the breach by any of the Supporting Creditors of any material provision set forth in this Agreement that remains uncured for a period of twenty (20) business days after the receipt by the Supporting Creditors of notice of such breach; (b) the board of directors, board of managers, or such similar governing body of any Debtor determines based on advice of counsel that proceeding with any of the Restructuring would be inconsistent with the exercise of its fiduciary duties; or (c) the issuance by any court of competent jurisdiction of any final, non-appealable injunction or order enjoining the consummation of the Restructuring; <u>provided</u>, <u>however</u>, that the Debtors shall have twenty (20) business days after issuance of such injunction, judgment, decree, charge, ruling, or order to obtain relief that would allow consummation of the Restructuring.

7.04. <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement among all of the following: (a) each of the Plan Co-Proponents; (b) the DIP Lender, (c) the Prepetition Note Lender, (d) the Required Prepetition Ad Hoc Preferred Equityholders (as defined below), and (e) each of the Debtors.

7.05. <u>Termination Upon Completion of the Restructuring</u>. This Agreement shall terminate automatically without any further required action or notice on the Plan Effective Date.

7.06. <u>Effect of Termination</u>.

(a) No Party may terminate this Agreement if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of one or more termination events specified herein. The date on which termination of this Agreement as to a Party is effective in accordance with Sections 7.01, 7.02, 7.03, 7.04, or 7.05 shall be referred to as a "**Termination Date**."

(b) In no event shall the termination of this Agreement relieve a Party of any breach of this Agreement made by such Party prior to the Termination Date.

**Section 8.** *Amendments*. This Agreement, including, without limitation, the Plan, may not be modified, amended, or supplemented without prior written consent of the (a) Debtors, (b) the Plan Co-Proponents, (c) the DIP Lender, (d) the Prepetition Note Lender, and (e) the members of the Prepetition Ad Hoc Preferred Equityholder Group who, in the aggregate, hold a majority of the interests of the Prepetition Ad Hoc Preferred Equityholder Group as a whole (the "**Required Prepetition Ad Hoc Preferred Equityholders**"); provided that any modification, amendment or supplement that materially, adversely and disproportionately effects the Other Supporting Creditors shall require the prior written consent of those Other Supporting Creditors who, in the aggregate, hold a majority of the Owned Debtors Claims/Interests of the Other Supporting Creditors as a whole; <u>provided further</u> that, such written consent of each such Supporting Creditor shall not be unreasonably withheld, conditioned or delayed.

9

DocuSign Envelope ID: 6605F019-22E5-4827-92D9-8B1072103FE8

**Section 9.** *Miscellaneous*.

9.01. <u>Further Assurances</u>. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring, as applicable.

9.02. <u>Complete Agreement</u>. This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral, or written, among the Parties with respect thereto.

9.03. <u>Headings</u>. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

9.04. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF CALIFORNIA APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or do not have jurisdiction over any Party hereto.

9.05. <u>Trial by Jury Waiver</u>. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

9.06. <u>Execution of Agreement</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

9.07. <u>Interpretation and Rules of Construction</u>. This Agreement is the product of negotiations among the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel. In addition, this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.

9.08. <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third-party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity other than as permitted herein.

9.09. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to a Debtors, to:

Wave Computing, Inc.
3201 Scott Blvd.
Santa Clara, CA 95054Attention: Sanjai Kohli, President
E-mail address: skohli@wavecomp.com

with copies (which alone shall not constitute notice) to:

Sidley Austin LLP
555 West Fifth Street
Los Angeles, CA 90013
Attention: Sam Newman and Vijay Sekhon
E-mail addresses: sam.newman@sidley.com and
vsekhon@sidley.com

and

Sidley Austin LLP
2021 McKinney Ave #2000
Dallas, TX 75201
Attention: Charles Persons
E-mail addresses: cpersons@sidley.com

(b)    if to the Committee, to:

Hogan Lovells US LLP – Los Angeles office
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067
Attention: Rick Wynne and Edward McNeilly
E-mail addresses: richard.wynne@hoganlovells.com and
edward.mcneilly@hoganlovells.com

(c)    if to Tallwood, DIP Lender, Prepetition Note Lender or Prepetition Ad Hoc Preferred Equityholder Group, to:

Tallwood Technology Partners LLC
3, 3000 Sand Hill Rd. #240

11

Menlo Park, CA 94025
Attention: Desi Banatao
E-mail address: desi@tallwoodvc.com

with a copy (which alone shall not constitute notice) to:

Binder & Malter LLP
2775 Park Avenue
Santa Clara, CA 95050
Attention: Rob Harris
E-mail address: rob@bindermalter.com

(d)      if to the Other Supporting Creditors, to the address furnished by such Other Supporting Creditors to each of the Parties by notice given in accordance with the requirements set forth above;

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

Any notice given by delivery, mail, or courier shall be effective when received.

9.10.    Independent Due Diligence and Decision Making. Each Supporting Creditor hereby confirms that it is (a) a sophisticated party with respect to the matters that are the subject of this Agreement, (b) has had the opportunity to be represented and advised by legal counsel in connection with this Agreement and acknowledges and agrees that it voluntarily and of its own choice and not under coercion or duress enters into the Agreement, (c) has adequate information concerning the matters that are the subject of this Agreement, and (d) has independently and without reliance upon any other Party hereto, or any of their affiliates, or any officer, employee, agent or representative thereof, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that it has relied upon each other Party's express representations, warranties, and covenants in this Agreement.

9.11.    Waiver. If the Restructuring is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.

9.12.    Settlement Discussions; No Admission. This Agreement and the Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement. This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.

9.13.    Several, Not Joint, Claims. The agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

DocuSign Envelope ID: 6605F019-22E5-4827-92D9-8B1072103FE8

9.14.  <u>Relationship Among Parties</u>.  None of the Supporting Creditors shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Supporting Creditor, any Debtor, or any of the Debtor's respective creditors or other stakeholders, and there are no commitments among or between the Supporting Creditors, in each case except as expressly set forth in this Agreement.  No prior history, pattern or practice of sharing confidence among or between any of the Supporting Creditors, and/or the Debtors shall in any way affect or negate this understanding and agreement.  The Parties have no agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any securities of any of the Debtors and do not constitute a "group" within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934 or Rule 13d-5 promulgated thereunder.  For the avoidance of doubt: (1) each Supporting Creditor is entering into this Agreement directly with the Debtors and not with any other Supporting Creditor, (2) no Supporting Creditor shall have any right to bring any action against any other Supporting Creditor with respect this Agreement (or any breach thereof) and (3) no Supporting Creditor shall, nor shall any action taken by a Supporting Creditor pursuant to this Agreement, be deemed to be acting in concert or as any group with any other Supporting Creditor with respect to the obligations under this Agreement nor shall this Agreement create a presumption that the Supporting Creditors are in any way acting as a group.  All rights under this Agreement are separately granted to each Supporting Creditor by the Debtors and vice versa, and the use of a single document is for the convenience of the Debtors. The decision to commit to enter into the transactions contemplated by this Agreement has been made independently.

9.15.  <u>Severability</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

9.16.  <u>Specific Performance/Remedies</u>. It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (including attorney's fees and costs) as a remedy for any such breach, in addition to any other remedy to which such non-breaching Party may be entitled, at law or equity, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder. Each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

9.17.  <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

[*Remainder of page intentionally left blank.*]

13

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

**DEBTORS:**

**WAVE COMPUTING, INC.**, as Debtor and Debtor in Possession

By: *Lawrence R. Perkins*
Name: Lawrence R. Perkins
Title: Authorized Person

**MIPS TECH, INC.**, as Debtor and Debtor in Possession

By: *Lawrence R. Perkins*
Name: Lawrence R. Perkins
Title: Authorized Person

**MIPS TECH, LLC**, as Debtor and Debtor in Possession

By: *Lawrence R. Perkins*
Name: Lawrence R. Perkins
Title: Authorized Person

**HELLOSOFT, INC.**, as Debtor and Debtor in Possession

By: *Lawrence R. Perkins*
Name: Lawrence R. Perkins
Title: Authorized Person

[Signature Page to Plan Support Agreement]

**IMAGINATION TECHNOLOGIES, INC.**, as Debtor and Debtor in Possession

By: _Lawrence R. Perkins_ _____

Name: Lawrence R. Perkins

Title: Authorized Person

**CAUSTIC GRAPHICS, INC.**, as Debtor and Debtor in Possession

By: _Lawrence R. Perkins_ _____

Name: Lawrence R. Perkins

Title: Authorized Person

**WAVE COMPUTING (UK) LIMITED**, as Debtor and Debtor in Possession

By: _Lawrence R. Perkins_ _____

Name: Lawrence R. Perkins

Title: Authorized Person

**COMMITTEE:**                    **The Official Statutory Committee of Unsecured Creditors**, in its capacity as Plan Co-Proponent

By: Synopsys Inc.
Its: Committee Chair

By: _Ean Sewell_
                    77976390B0D34DC...

Name: Ean Sewell
Title:  Senior Corporate Counsel

[Signature Page to Plan Support Agreement]

**TALLWOOD:**           **Tallwood Technology Partners, LLC**, in its capacity as DIP Lender, Prepetition Note Lender, and a member of the Prepetition Ad Hoc Preferred Equityholder Group

By: _Desi Banatao_ _____

6FA88D02E635409...

Name: Desi Banatao

Title: President

**PREPETITION AD HOC**
**PREFERRED EQUITYHOLDER**
**GROUP:**

**Tallwood III, L.P.**, in its capacity as a member of the Prepetition Ad Hoc Preferred Equityholder Group

By: Tallwood III Management, LLC
Its: General Partner

By: _Diosdado Banatao_
  9548E0F888DA41B...  _____
Name: Diosdado Banatao
Title: Managing Member

**Tallwood III Associates, L.P.**, in its capacity as a member of the Prepetition Ad Hoc Preferred Equityholder Group

By: Tallwood III Management, LLC
Its: General Partner

By: _Diosdado Banatao_
  9548E0F888DA41B...  _____
Name: Diosdado Banatao
Title: Managing Member

**Tallwood III Partners, L.P.**, in its capacity as a member of the Prepetition Ad Hoc Preferred Equityholder Group

By: Tallwood III Management, LLC
Its: General Partner

By: _Diosdado Banatao_
  9548E0F888DA41B...  _____
Name: Diosdado Banatao
Title: Managing Member

**Tallwood Investment Partners, L.P.**, in its capacity as a member of the Prepetition Ad Hoc Preferred Equityholder Group

By: Tallwood Management Company, LLC
Its: General Partner

By: *Diosdado Banatao*
9548E0F883DA41B... _____
Name: Diosdado Banatao
Title:  Manager

**Tallwood Technology Partners, LLC**
**Its assignee of Entropy Research Labs LLC**, in its capacity as a member of the Prepetition Ad Hoc Preferred Equityholder Group

By: *Desi Banatao*
6FA88D02E635409... _____
Name: Desi Banatao
Title:  President

DocuSign Envelope ID: 6605F019-22E5-4827-92D9-8B1072103FE8

**[●]**

By: _____
Name:
Title:

| Claim of Interest Type | Number and Series of Shares or Principal Amount (as applicable) |
|---|---|
| Preferred Equity Interests | [●] |
| Prepetition Note | $[●] |
| DIP Note | $[●] |
| Other Claims | $[●] |

Address for Notice:

[_____]
[_____]
Attention: [_____]
Facsimile: [_____]

DocuSign Envelope ID: 6605F019-22E5-4827-92D9-8B1072103FE8

**EXHIBIT A-1**

**Plan**

[See Attached]

**EXHIBIT C**

**Liquidation Analysis**

WAVE COMPUTING, INC. AND ITS SUBSIDIARIES

LIQUIDATION ANALYSIS

## Overview

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE
ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN, OR A
TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IF THE CHAPTER 11
CASES ARE CONVERTED TO A CHAPTER 7 LIQUIDATION, ACTUAL RESULTS COULD
VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS
LIQUIDATION ANALYSIS.

### I.    Introduction

Wave Computing, Inc. and its subsidiaries that are Debtors in these proceedings (collectively,
"Wave" or the "Debtors") with the assistance of their restructuring, legal, and financial advisors,
have prepared this hypothetical liquidation analysis (this "Liquidation Analysis") in connection
with the Plan and Disclosure Statement.[1] This analysis permits parties in interest to evaluate
whether the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code, also
referred to as the "best interests of creditors" test.

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code,
the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each
holder of a claim or interest who does not otherwise vote in favor of the plan with property of a
value, as of the effective date of the plan, that is not less than the amount that such holder would
receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  This
Liquidation Analysis sets forth the estimated aggregate amount of liquidation proceeds available
to holders of Claims against and Interests in the Debtors in a chapter 7 liquidation and is based
upon certain assumptions discussed in the Disclosure Statement and the global notes provided
herein.  Capitalized terms not defined in the Global Notes shall have the meanings ascribed to
them in the Disclosure Statement. Based on the Liquidation Analysis, the Debtors submit that the
Plan provides holders of Impaired Claims with more value than they would receive in a liquidation
scenario, thereby satisfying the "best interests" test.

The Liquidation Analysis estimates potential cash distributions to Holders of Allowed Claims and
Interests in a hypothetical chapter 7 liquidation of the Debtors' assets.  Asset values discussed in
the Liquidation Analysis may differ materially from reorganization or going concern values
referred to in the Disclosure Statement.

THE LIQUIDATION ANALYSIS WAS PREPARED BY THE DEBTORS WITH THE
ASSISTANCE OF THEIR ADVISORS.

---

[1] Unless otherwise defined in this Liquidation Analysis, all capitalized terms used in this
Liquidation Analysis will have the meanings ascribed to them in the Disclosure Statement or the
Plan, as applicable.

262114836v.10

## II. Scope, Intent, and Purpose of Liquidation Analysis

The determination of the costs of, and hypothetical proceeds from, the liquidation of the Debtors' assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of Claims listed on the Debtors' schedules, Proofs of Claim filed to date, and a review of Claims satisfied to date. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Cases, but which could be asserted and Allowed in a chapter 7 liquidation, including unpaid Chapter 11 administrative expense Claims, and chapter 7 administrative Claims such as trustee fees, wind-down costs, and professional fees. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

### Global Notes to Liquidation Analysis

### 1. Conversion Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis assumes conversion of the Debtors' Chapter 11 Cases to chapter 7 liquidation cases on November 30, 2020 (the "Conversion Date") and presents a high and low recovery scenario on a consolidated basis. On the Conversion Date, it is assumed that the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") to oversee the liquidation of the Estates. In addition, it is assumed that all non-Debtor subsidiaries of Wave Computing, Inc., including any foreign subsidiaries would commence liquidation under chapter 7 on the Conversion Date. The liquidation is estimated to take approximately 90-days, being completed on or around February 28, 2021.

Except as noted herein, the Liquidation Analysis is based upon the unaudited financial statements of Wave as of August 31, 2020, projected to February 28, 2021 to account for incremental

262114836v.10

depreciation and amortization over that time frame, and those values, in total, are assumed to be representative of Wave's assets and liabilities.

**2.      Consolidated Liquidation**

The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered and substantively consolidated proceeding.  Therefore, the Liquidation Analysis considers a consolidated liquidation.

**3.      Liquidation Methodology**

Wave is assumed to significantly reduce operations on the Conversion Date and be liquidated through a liquidation of the underlying assets.  Most of the employees would be terminated while Wave's assets would be liquidated over an assumed 90-day period.  The gross liquidation proceeds assumed to be received as a result of the sale and liquidation of the assets and operations of Wave, as outlined above, less the costs associated with the liquidation, is then used to satisfy the various Claims, including chapter 7 Claims, chapter 11 administrative expenses, priority non-tax Claims, and pre-petition Claims.  The Liquidation Analysis assumes that the Trustee would resolve Claims and other matters involving the Debtors' Estates and make distributions to creditors.  No assumption is made regarding any potential claims of the Debtors against their equity holders, current/former directors or officers, or lenders.

The Liquidation Analysis assumes that, given the complexity of the Debtors' operations, the conversion from chapter 11 to chapter 7 would trigger disruptions in the Debtor's operations that would make it nearly impossible for the Trustee to maintain operations and fulfill customer's engineering support needs.  It is further assumed that if such an attempt were made, maintaining operations would be both risky and costly.  Accordingly, the Liquidation Analysis assumes that there would be little or no benefit to the Trustee in attempting to maintain the Debtors' ongoing operations for any meaningful period of time.

**4.      Other Potential Claims**

Liquidation may result in additional Claims against the Estate that have not been quantified, unless specifically noted.  These additional Claims would dilute any potential recoveries to holders of other pre-petition unsecured Claims.  No attempt has been made to estimate these additional unsecured and/or administrative Claims (unless specifically noted) that may occur in a chapter 7 liquidation.

<u>Conclusion</u>

The determination of hypothetical proceeds from this Liquidation Analysis is a highly uncertain process involving the extensive use of estimates and assumptions, which, while considered reasonable by the Debtors and the Debtors' advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors.

This Analysis was prepared during the Debtors' ongoing review and evaluation of potential Claims against the Debtors' Estates, and the Debtors continue to assess whether they will adjudicate such Claims before the Bankruptcy Court.  Accordingly, the amount of Allowed Claims against the

262114836v.10

Debtors' Estates may differ from the Claim amounts used in this Liquidation Analysis. Additionally, asset values discussed herein may be different than amounts referred to in the Plan, which presumes the reorganization of the Debtors' assets and liabilities under chapter 11 of the Bankruptcy Code. The estimated liquidation recoveries and proceeds waterfall are presented herein as a collective summary of the Debtors' estimated recoveries.

As summarized in the table below, the Debtors have determined pursuant to this Liquidation Analysis that upon the Effective Date the Plan will provide all creditors and equity holders with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code, and thus believe the Plan satisfies the requirement of 1129(a)(7) of the Bankruptcy Code.

262114836v.10

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 264 of 276

# Estimated Liquidation Recoveries

($ in 000s)

| | Estimated Book Value at 2/28/2021 | % Low Recovery | % High Recovery | $ Low Recovery | $ High Recovery |
|---|---|---|---|---|---|
| **ASSET RECOVERIES** | | | | | |
| **Current Assets** | | | | | |
| Cash | $2,975.7 | 100.0% | 100.0% | $2,975.7 | $2,975.7 |
| Restricted Cash/Letter of Credit | 1,346.3 | 100.0% | 100.0% | 1,346.3 | 1,346.3 |
| Accounts Receivable | 1,360.0 | 70.0% | 85.0% | 952.0 | 1,156.0 |
| Current Portion of Customer Contracts | 19,219.0 | 20.0% | 30.0% | 3,843.8 | 5,765.7 |
| Prepaids | 837.0 | 10.0% | 45.0% | 83.7 | 376.7 |
| **Total Current Assets** | **$25,738.0** | | | **$9,201.5** | **$11,620.3** |
| **Non-Current Assets** | | | | | |
| **Intangibles** | | | | | |
| Developed Technology | $9,148.8 | 0.0% | 10.0% | $0.0 | $914.9 |
| Trade Name | 3,411.7 | 0.0% | 10.0% | 0.0 | 341.2 |
| In-Process Technology | 3,634.2 | 0.0% | 10.0% | 0.0 | 363.4 |
| Customer Relations | 2,305.6 | 0.0% | 10.0% | 0.0 | 230.6 |
| Patents/Trademarks | 15,000.0 | 20.0% | 35.0% | 3,000.0 | 5,250.0 |
| **Tangibles** | | | | | |
| Computers & Equipment | $680.1 | 0.0% | 5.0% | $0.0 | $34.0 |
| Furniture and Fixtures | 1.8 | 0.0% | 5.0% | 0.0 | 0.1 |
| Software | 19.3 | 0.0% | 5.0% | 0.0 | 1.0 |
| Tools & Test Equipment | 1.0 | 0.0% | 5.0% | 0.0 | 0.0 |
| **Total Non-Current Assets** | **$34,202.4** | | | **$3,000.0** | **$7,135.1** |
| **Total Proceeds from Assets** | **$59,940.4** | | | **$12,201.5** | **$18,755.5** |
| **LIQUIDATION FEES AND COSTS** | | | | | |
| Employees During Wind-Down | | | | $336.0 | $336.0 |
| Utilities / Expenses During Wind-Down | | | | 551.0 | 551.0 |
| Professional, Legal and Liquidator Fees | | | | 666.0 | 880.0 |
| **Total Liquidation Costs** | | | | **$1,553.0** | **$1,767.0** |
| **Net Proceeds Before Secured Claims** | | | | **$10,648.4** | **$16,988.5** |
| **CLAIMS RECOVERIES** | | | | | |
| **Secured Claims** | | | | | |
| Prepetition Tallwood Debt (Rolled-Up Portion) | | | | $2,839.9 | $2,839.9 |
| Other Secured Claims | | | | 1,376.3 | 1,376.3 |
| **Total Secured Claims** | | | | **$4,216.2** | **$4,216.2** |
| **Net Proceeds After Secured Claims** | | | | **$6,432.3** | **$12,772.3** |
| **Chapter 11 Administrative & Priority Claims** | | | | | |
| Tax Claims | | | | $9,736.1 | $9,736.1 |
| Employee Termination Costs | | | | 149.3 | 149.3 |
| Post Petition AP | | | | 250.0 | 250.0 |
| Accrued Professional Fees | | | | 5,182.0 | 5,182.0 |
| Accrued UST Fees | | | | 63.0 | 63.0 |
| Other Priority Claims | | | | 13.7 | 13.7 |
| **Total Admin & Priority Claims** | | | | **$15,394.1** | **$15,394.1** |
| **% Recovery to Admin & Priority Claims** | | | | **41.8%** | **83.0%** |
| **Remaining Funds for Unsecured Claims** | | | | **$0.0** | **$0.0** |
| **Unsecured Claims** | | | | | |
| Estimated General Unsecured Claims | | | | $49,036.8 | $49,036.8 |
| Prepetition Tallwood Debt (*Pari Passu* Portion) | | | | 10,622.9 | 10,622.9 |
| **Total Unsecured Claims** | | | | **$59,659.7** | **$59,659.7** |
| **% Recovery to Unsecured Claims** | | | | **0.0%** | **0.0%** |
| **Remaining Funds for Equity Holders** | | | | **$0.0** | **$0.0** |
| **Equity Interests** | | | | | |
| Series E Preferred Interests | | | | $28,366.2 | $28,366.2 |
| **% Recovery to Series E** | | | | **0%** | **0%** |
| Series E Section 510(b) Claims | | | | 17,030.2 | 17,030.2 |
| **% Recovery to Series E** | | | | **0%** | **0%** |
| Series D Preferred Interests | | | | 51,680.7 | 51,680.7 |
| **% Recovery to Series D** | | | | **0%** | **0%** |
| Series D Section 510(b) Claims | | | | 5,058.0 | 5,058.0 |
| **% Recovery to Series D** | | | | **0%** | **0%** |
| Series C Preferred Interests | | | | 43,931.9 | 43,931.9 |
| **% Recovery to Series C** | | | | **0%** | **0%** |
| Series B Preferred Interests | | | | 8,336.7 | 8,336.7 |
| **% Recovery to Series B** | | | | **0%** | **0%** |
| Series A-1 Preferred Interests | | | | 7,390.1 | 7,390.1 |
| **% Recovery to Series A-2** | | | | **0%** | **0%** |
| Series A-2 Preferred Interests | | | | 968.7 | 968.7 |
| **% Recovery to Series A-1** | | | | **0%** | **0%** |
| Common Interests | | | | 674.9 | 674.9 |
| **% Recovery to Common** | | | | **0%** | **0%** |

262114836v.10

## Notes to Specified Line Items of Liquidation Analysis

### Asset Recoveries

**1.**     **Cash** – Assumes 100% recovery of projected 02/28/21 cash balances of Debtors and Debtors' subsidiaries' and affiliates' bank accounts. Cash excludes Restricted Cash.

**2.**     **Restricted Cash/Letter of Credit** – Represents a letter of credit held in cash at Silicon Valley Bank for the benefit of Water Tower Fee Owner, LLC.

**3.**     **Accounts Receivable** – Represents expected amounts due from third party customers as of the Conversion Date. The accounts receivable liquidation value is based on the Debtors' projected book value as of 02/28/21 and a recovery of 70% - 85%.

**4.**     **Current Portion of Customer Contracts** – Includes Debtors' 12 month forecast for current MIPS royalty customer contracts. Assumes a buyer would pay between 20% - 30% of a projected year of collections.

**5.**     **Prepaids** – Represents prepaid software costs and deposits or retainers paid to vendors or professionals. With the exception of professional fee retainers, the recovery on prepaid assets is presumed to be minimal. Estimated recovery ranges from 10% - 45%.

**6.**     **Intangibles** – Consists of developed technology, trade name, in-process technology, customer relations, and patents/trademarks. With the exception of patents/trademarks, the estimated liquidation value varies by category but is assumed to be 0% - 10% of book value based on management's estimate. Patents/trademarks initial estimated value at 2/28/2021 is based on an indication of interest from late 2019, with recovery ranging from 20% - 35% in a liquidation.

**7.**     **Tangibles** – Consists of computers and equipment, furniture and fixtures, software, and tools and test equipment, net of accumulated depreciation. Estimated liquidation value is assumed to be 0% - 5% of book value based on management's estimate.

### Liquidation Fees and Costs

**8.**     **Employees During Wind-Down** – Assumes minimal personnel would be needed to assist in the wind-down of operations and sale of assets throughout the duration of the liquidation which is assumed to be 90 days upon conversion to chapter 7. These personnel would be needed to assist with collection of receivables, engineering support, accounting and other administrative activities. Projected reduced payroll and benefit run rates were utilized to derive costs.

**9.** **Utilities and Expenses During Wind-Down** – Assumes utilities and expenses at headquarters for ninety (90) days, as well as wind-down costs for foreign entities. Current run rates were used to derive costs.

**10.** **Professional, Legal and Liquidator Fees** – Assumes Trustee fees of 3.0% on gross liquidation proceeds. Estimates chapter 7 professional fees of $100,000 per month ($75,000 for legal and $25,000 for accounting) during the assumed 90-day liquidation period.

<u>Secured Claims</u>

**11.** **Prepetition Tallwood Debt (Rolled-Up Portion)**[2] – Consists of the portion of the Prepetition Note that was rolled-up into the DIP Facility, constituting Post-UCC-1 Draws totaling $2.78 million plus interest of $53,408. The Liquidation Analysis assumes this secured portion of the Prepetition Note to be paid off by the Debtors with available proceeds as part of the recovery process.

**12.** **Other Secured Claims** – Includes (a) $1.35 million Letter of Credit held in Restricted Cash/Letter of Credit for the benefit of Debtors' Campbell, CA facility landlord, and (b) any secured Claim other than a Tallwood Claim.

<u>Chapter 11 Administrative & Priority Claims</u>

After the deduction of the secured Claims, the remaining proceeds are allocated *pro rata* to the Chapter 11 administrative Claims and priority Claims.

**13.** **Tax Claims**[3] – Includes the Claim filed by the California Franchise Tax Board in the amount of approximately $9.6 million (priority portion) in connection with the 2013 taxes (including penalties and interest), as well as other smaller priority tax Claims.

**14.** **Employee Termination Costs** – Approximately $149,000 of severance is estimated for employee terminations stemming from a conversion to liquidation. Estimates based on accrued but unused vacation balances.

---

[2] Notwithstanding certain allegations raised by the Official Committee of Unsecured Creditors about whether certain of the Prepetition Note Lender's Claims were properly and timely perfected, the Debtors take no position at this time about the nature of such Claims. Instead, for purposes of this Liquidation Analysis, the rolled-up portion of the Prepetition Tallwood Debt is treated as secured, while the portion that was not rolled up will recover *pari passu* with the General Unsecured Claims in accordance with paragraph 20, below.

[3] The Debtors reserve all rights to object to and prosecute all Claims, including the Claims filed by the California Franchise Tax Board and Internal Revenue Service.

262114836v.10

Case: 20-50682    Doc# 859    Filed: 12/03/20    Entered: 12/03/20 12:09:00    Page 267 of 276

15. **Post-Petition AP** – Represents accounts-payable arising from operations post-petition and prior to the Conversion Date. Accounts-payable is estimated to be commensurate with balances on the Conversion Date.

16. **Accrued and Unpaid Chapter 11 Professional Fees** – Represents projected accrued and unpaid professional fees as part of the Chapter 11 Cases as of February 28, 2021 and excludes success fees which would not be due in the event of a liquidation.

17. **Accrued and Unpaid UST Fees** – Represents projected accrued and unpaid United States Trustee fees as part of the Chapter 11 Cases as of February 28, 2021.

18. **Other Priority Claims** – Consists of a *De Minimis* contractor priority Claim.

There may be additional administrative Claims arising from other contract assumptions and potential new contracts arising from the liquidation process. Such Claims would further reduce recoveries to Unsecured Claims.

## Unsecured Claims

After the deduction of the Secured Claims' payoff and distribution to Chapter 11 administrative Claims and priority Claims, the remaining liquidation proceeds are allocated *pro rata* to the unsecured Claims.

19. **General Unsecured Claims** – For purposes of the Liquidation Analysis, General Unsecured Claims includes any other unsecured Claims against the Debtors that are not entitled to priority of payment under section 507(a) of the Bankruptcy Code and not subject to subordination under section 726(a) of the Bankruptcy Code. General Unsecured Claims are estimated to be approximately $49 million. This estimate is based on certain assumptions regarding claim objections and may change significantly due to further claim objections and offsets, all as subject to court approval.

20. **Prepetition Tallwood Debt (*Pari Passu* Portion)** – Consists of the portion of the Prepetition Note in the amount of $10.62 million that was not rolled-up set forth in this paragraph 11. The Liquidation Analysis assumes this unsecured portion to be paid *pari pasu* with the General Unsecured Claims.

## Equity Interests

21. **Interests** – Consists of any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor that existed immediately prior to the Petition Date, including all units, shares, common stock, preferred stock, partnership interests, and other instruments evidencing any fixed or contingent ownership in any Debtor or any rights to purchase or demand the issuance of any of the foregoing (including options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities); or (b) any other agreement, arrangement, or commitment of any

262114836v.10

character relating to, or whose value is related to, any of the foregoing. Note that there are no recoveries to any equity holder.

# EXHIBIT D

**Financial Projections**

-DRAFT-

## Sources & Uses of Capital

| Source: | | Use: | |
|---|---|---|---|
| Senior Secured Revolver | 5,110,000 | Opening Cash, Minimum Required Liquidity (Exit Financing and Equity) | 2,600,209 |
| New Senior Secured Notes | 6,286,510 | Pay Off DIP Facility and roll-up (DIP Claims) | 6,286,510 |
| New Subordinated Secured Notes | 4,000,000 | Pay Tallwood's Prepetition Unsecured Note | 4,000,000 |
| GUC - Secured Notes | 36,000,000 | Consideration for Unsecured Creditors and Other Claims | 36,000,000 |
| Tax Payment Plan & Priority | 12,646,825 | Tax Payment Plan & Priority | 12,646,825 |
| Letter of Credit for Water Tower | 1,346,000 | Pay Water Tower (for Secured Amount) | 1,346,000 |
| Debt for Equity (Common Shares) Exchange | 10,621,628 | Debt for Equity (Common Shares) Exchange | 10,621,628 |
| Cash for Equity (Common Shares) | 0 | GUC Note Initial Funding | 1,000,000 |
| | | Admin and Transaction Costs not Paid by DIP | 1,589,792 |
| Total Sources: | $76,010,963 | Total Uses: | $76,010,963 |

## Balance Sheet

| Assets | Beginning Balance |
|---|---|
| Cash from Revolver | 2,600,209 |
| Cash from DIP | 1,609,158 |
| Accounts Receivable | 4,217,000 |
| Prepaid Expenses | 550,000 |
| Other | - |
| Intangible Assets | 47,560,927 |
| Intangible Assets – New Technology | 7,000,000 |
| Office Equip and Computers | 1,126,063 |
| **Total Assets** | **64,663,356** |

| Liabilities & Shareholders' Equity | Beginning Balance |
|---|---|
| Accounts Payable | 277,000 |
| Wages Payable | 255,000 |
| Other Payables | - |
| Senior Secured Revolver | 5,110,000 |
| **Total Current Liabilities** | **5,642,000** |
| Sr. Secured Notes | 6,286,510 |
| Sub. Secured Notes | 4,000,000 |
| Tax Payment Plan | 12,646,825 |
| GUC - Secured Notes | 36,000,000 |
| **Total Liabilities** | **64,575,335** |
| Opening Equity | 88,021 |
| **Total Liabilities & Equity** | **64,663,356** |

## Capital Schedules

| | Beginning Balance | Interest Rate | Term | Pmts/Year | 3 M LIBOR | Floor | Spread |
|---|---|---|---|---|---|---|---|
| Sr. Secured Notes (DIP Claims) | 6,286,510 | 6.0% | 5 | 4 | 0.2% | 1.0% | 5.0% |
| Sub. Secured Notes | 4,000,000 | 6.0% | 7 | 4 | 0.2% | 1.0% | 5.0% |
| Tax Payment & Priority | 12,646,825 | 6.0% | 5 | 4 | | | |
| GUC - Secured Notes | 36,000,000 | 6.0% | 5 | 4 | 0.2% | 1.0% | 5.0% |
| Senior Secured Revolver | 5,110,000 | 4.5% | 5 | 4 | 0.2% | 1.0% | 3.5% |
| Common shares from Debt exchange | 0 | | | | | | |
| Common Shares from Cash | | | | | | | |
| GUC Note Initial Funding | 1,000,000 | | | | | | |

Equity on B/S

| | Opening | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| | $ 88,021 | $ 4,444,993 | $ 20,359,099 | $ 40,417,169 |

Cash (Shortfall) / Surplus

| Opening | |
|---|---|
| | 2,544,871 |

## Depreciation Schedules

| | Beginning Balance | Term | |
|---|---|---|---|
| Intangible Assets | 54,560,927 | 7 | From the August 31, 2020 Balance Sheet and assumptions on New Technology |
| New Tech Development (from 2022) | 0 | 9 | Based on average royalty life of 9 years |
| Office Equip and Computers | 1,126,063 | 5 | From the August 31, 2020 Balance Sheet |

**Wave Computing, Inc.**
Projected Financial Statements

-DRAFT-

Projected Income Statement

| ($ in 000s) | 2021F | 2022F | 2023F | 2024F | 2025F | 2026F | 2027F |
|---|---|---|---|---|---|---|---|
| Net Sales | $ 32,619 | $ 38,408 | $ 48,554 | $ 63,280 | $ 80,826 | $ 99,366 | $ 120,089 |
| *% Growth* | - | *17.7%* | *26.4%* | *30.3%* | *27.7%* | *22.9%* | *20.9%* |
| Cost of Goods Sold | | | | | | | |
| Gross Profit | 32,619 | 38,408 | 48,554 | 63,280 | 80,826 | 99,366 | 120,089 |
| Operating Expenses | | | | | | | |
| Payroll | 7,875 | 7,350 | 8,820 | 10,419 | 13,371 | 16,592 | 21,442 |
| Payroll (Benefits) | 945 | 882 | 1,058 | 1,250 | 1,604 | 1,991 | 2,573 |
| Sr. Executive Comp | 500 | 525 | 567 | 612 | 661 | 714 | 771 |
| Sales & Marketing | - | 3,000 | 3,500 | 4,000 | 4,500 | 5,000 | 5,500 |
| Outsourcing | 2,180 | 2,255 | 2,628 | 2,592 | 3,095 | 3,698 | 4,422 |
| Property Costs (Includes Utilities) | 660 | 683 | 731 | 782 | 837 | 895 | 958 |
| Insurance | 550 | 583 | 641 | 705 | 776 | 854 | 939 |
| Legal Patent Maintenance | 120 | 130 | 143 | 157 | 172 | 190 | 209 |
| IT | 240 | 247 | 297 | 356 | 427 | 513 | 615 |
| IT - Design Tools/Computers | 1,575 | 1,400 | 1,600 | 1,800 | 2,200 | 2,600 | 3,200 |
| Bank Fees | 24 | 25 | 25 | 26 | 27 | 28 | 29 |
| Vendor Payments | 600 | 618 | 742 | 890 | 1,068 | 1,281 | 1,538 |
| Total Operating Expenses | 15,269 | 17,698 | 20,752 | 23,589 | 28,739 | 34,356 | 42,195 |
| EBITDA | 17,350 | 20,710 | 27,803 | 39,691 | 52,087 | 65,010 | 77,894 |
| *% Margin* | *53.2%* | *53.9%* | *57.3%* | *62.7%* | *64.4%* | *65.4%* | *64.9%* |
| Depreciation & Amortization Expense | 8,020 | 9,181 | 10,492 | 11,803 | 13,114 | 14,200 | 15,461 |
| Interest Expense | 2,627 | 2,430 | 1,837 | 1,392 | 837 | 130 | 46 |
| Tax Accrual | 2,346 | 3,184 | 5,416 | 9,274 | 13,348 | 17,738 | 21,836 |
| Net Income | 4,357 | 5,914 | 10,058 | 17,223 | 24,789 | 32,942 | 40,552 |
| *% Margin* | *13.4%* | *15.4%* | *20.7%* | *27.2%* | *30.7%* | *33.2%* | *33.8%* |

(1) 2021 projections are based of 2020 pro-forma

Case: 20-50682   Doc# 859   Filed: 12/03/20   Entered: 12/03/20 12:09:00   Page 272 of 276

**Projected Balance Sheet**

*($ in 000s)*

| | Opening | 12/31/21 | 12/31/22 | 12/31/23 | 12/31/24 | 12/31/25 | 12/31/26 | 12/31/27 |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Cash | 4,209 | 6,471 | 6,490 | 16,434 | 34,899 | 55,057 | 100,360 | 154,623 |
| Accounts Receivable | 4,217 | 5,083 | 5,288 | 5,515 | 4,830 | 4,316 | 3,930 | 3,641 |
| Prepaid Expenses | 550 | 580 | 636 | 700 | 770 | 847 | 932 | 939 |
| Other Current | - | - | - | - | - | - | - | - |
| Total Current Assets | 8,976 | 12,134 | 12,414 | 22,649 | 40,499 | 60,220 | 105,221 | 159,202 |
| Machinery & Equipment | 1,126 | 901 | 876 | 1,400 | 1,725 | 1,850 | 2,000 | 2,000 |
| Intangible Assets | 54,561 | 46,767 | 47,861 | 47,844 | 46,717 | 44,478 | 41,128 | 36,667 |
| Other Non-Current | - | - | - | - | - | - | - | - |
| Total Non-Current Assets | 55,687 | 47,667 | 48,737 | 49,245 | 48,442 | 46,328 | 43,128 | 38,667 |
| **Total Assets** | **64,663** | **59,802** | **61,151** | **71,894** | **88,941** | **106,548** | **148,349** | **197,869** |
| **Liabilities & Equity** | | | | | | | | |
| Accounts Payable | 277 | 450 | 447 | 514 | 550 | 652 | 767 | 914 |
| Wages Payable | 255 | 348 | 365 | 435 | 512 | 652 | 804 | 1,033 |
| Other Payables | - | - | - | - | - | - | - | - |
| Senior Secured Revolver | 5,110 | 5,110 | - | - | - | - | - | - |
| Total Current Liabilities | 5,642 | 5,907 | 811 | 949 | 1,062 | 1,304 | $1,571 | $1,947 |
| Long-Term Portion of First Priority Secured Notes | 6,287 | 6,287 | 6,287 | 6,287 | 6,287 | - | - | - |
| Long-Term Portion of Tax Payment Plan | 12,647 | 10,117 | 7,588 | 5,059 | 2,529 | - | - | - |
| Long-Term Portion of GUC Secured Notes | 36,000 | 28,800 | 21,600 | 14,400 | 7,200 | - | - | - |
| Long-Term Portion of Subordinated Secured Notes | 4,000 | 4,245 | 4,506 | 4,782 | 4,223 | 2,815 | 1,408 | - |
| Total Non-Current Liabilities | 58,933 | 49,449 | 39,981 | 30,528 | 20,239 | 2,815 | 1,408 | - |
| **Total Liabilities** | **64,575** | **55,357** | **40,792** | **31,477** | **21,301** | **4,119** | **2,979** | **1,947** |
| Equity | | | | | | | | |
| Capital Stock | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 |
| Additional Paid-In Capital | - | - | - | - | - | - | - | - |
| Developed Technology | - | - | 10,000 | 20,000 | 30,000 | 40,000 | 50,000 | 60,000 |
| Retained Earnings | - | 4,357 | 10,271 | 20,329 | 37,552 | 62,341 | 95,282 | 135,834 |
| Total Equity | 88 | 4,445 | 20,359 | 40,417 | 67,640 | 102,429 | 145,370 | 195,922 |
| **Total Liabilities and Equity** | **64,663** | **59,802** | **61,151** | **71,894** | **88,941** | **106,548** | **148,349** | **197,869** |

**Projected Statement of Cash Flows**

*($ in 000s)*

| | 12/31/21 | 12/31/22 | 12/31/23 | 12/31/24 | 12/31/25 | 12/31/26 | 12/31/27 |
|---|---|---|---|---|---|---|---|
| **Cash Flow from Operations** | | | | | | | |
| Net Income | 4,357 | 5,914 | 10,058 | 17,223 | 24,789 | 32,942 | 40,552 |
| Depreciation & Amortization | 8,020 | 9,181 | 10,492 | 11,803 | 13,114 | 14,200 | 15,461 |
| Change in Accounts Receivable | (866) | (204) | (228) | 686 | 514 | 386 | 289 |
| Change in Prepaid Expenses | (30) | (56) | (64) | (70) | (77) | (85) | (7) |
| Change in Other | - | - | - | - | - | - | - |
| Change in Accounts Payable | 173 | (3) | 67 | 36 | 102 | 115 | 147 |
| Change in Wages Payable | 92 | 17 | 70 | 76 | 140 | 153 | 229 |
| Change in Other Payables | - | - | - | - | - | - | - |
| Total Cash Flow from Operations | 11,746 | 14,848 | 20,396 | 29,754 | 38,582 | 47,710 | 56,671 |
| **Cash Flow from Investing** | | | | | | | |
| Capital Expenditures | - | (250) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) |
| Proceeds from Sale of Assets | - | - | - | - | - | - | - |
| Total Cash Flow from Investing | - | - | - | - | - | - | - |
| **Cash Flow from Financing** | | | | | | | |
| Net Borrowings from Secured Note | - | - | - | (704) | (7,694) | (1,408) | (1,408) |
| Net Borrowings from Unsecured Notes | (9,729) | (9,729) | (9,729) | (9,729) | (9,729) | - | - |
| Capital Contributions | - | - | - | - | - | - | - |
| Total Cash Flow from Financing | (9,729) | (9,729) | (9,729) | (10,433) | (17,424) | (1,408) | (1,408) |
| Cash, Beginning Balance | 4,209 | 6,471 | 6,490 | 16,434 | 34,899 | 55,057 | 100,360 |
| Net Change in Cash | 2,262 | 19 | 9,943 | 18,465 | 20,158 | 45,302 | 54,263 |
| **Cash, Ending Balance** | **6,471** | **6,490** | **16,434** | **34,899** | **55,057** | **100,360** | **154,623** |

- CONFIDENTIAL -

1    **#END OF ORDER#**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   <u>**COURT SERVICE LIST**</u>

2   ECF Parties by ECF